1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          22 Cr. 352 (JSR)

5  JATIEK SMITH,
        a/k/a "Tiek,"
6  SEQUAN JACKSON,
        a/k/a "Supa,"
7  ANTHONY MCGEE,
        a/k/a "Touch,"
8  KAHEEN SMALL,
        a/k/a "Biz,"
9  DAMON DORE,
        a/k/a "Demo,"
10 HASIM SMITH,
        a/k/a "Hoodie,"
11 RAHMIEK LACEWELL,
        a/k/a "Ready,"
12 MANUEL PEREIRA,
        a/k/a "Manny," and
13 OCTAVIO PERALTA,

14            Defendants.
                                        Conference
15 ------------------------------x

16                                      New York, N.Y.
                                        July 5, 2022
17                                      3:15 p.m.

18 Before:

19

20              HON. JED S. RAKOFF,

21                                      District Judge

22

23

24

25

1                        APPEARANCES

2

3

DAMIAN WILLIAMS
4        United States Attorney for the
         Southern District of New York
5   BY:  ADAM S. HOBSON
         RUSHMI BHASKARAN
6        Assistant United States Attorneys

7   ANTHONY CECUTTI
         Attorney for Defendant Jackson
8   BY:  LISA SCOLARI

9   RUHNKE & BARRETT
         Attorneys for Defendant McGee
10  BY:  JEAN D. BARRETT

11  LISA SCOLARI
         Attorney for Defendant Small
12
    MICHAEL D. BRADLEY
13       Attorney for Defendant Dore

14  DAVID K. BERTAN
         Attorney for Defendant H. Smith
15
    STEPHEN TURANO
16       Attorney for Defendant Lacewell

17  THOMAS AMBROSIO
         Attorney for Defendant Pereira
18
    GARY A. FARRELL
19       Attorney for Defendant Peralta

20

21

22

23
    Also Present:
24  Shannon Finneran, U.S. Pretrial Services

25

1        (Case called)

2        MR. HOBSON:  Good afternoon, your Honor.  Adam Hobson

3    and Rushmi Bhaskaran for the government.  We're also joined at

4    counsel table by Shannon Finneran from pretrial services

5    office.

6        THE COURT:  Good afternoon.

7        MS. SCOLARI:  Good afternoon, your Honor.  Lisa

8    Scolari.  With the Court's permission, I'm standing in for

9    Anthony Cecutti, who is on trial out of the district.  He

10   represents Sequan Jackson, who has consented to me appearing

11   for him.

12        I also represent my client, Mr. Small.  He's aware

13   that I'm covering.  He also consents to my doing so.

14        THE COURT:  Thank you.

15        MS. BARRETT:  Good afternoon, your Honor.  Jean

16   Barrett on behalf of Anthony McGee.

17        MR. AMBROSIO:  Good afternoon, your Honor.  Thomas

18   Ambrosio on behalf of Manuel Pereira.

19        THE COURT:  Good afternoon.

20        MR. BRADLEY:  Good afternoon, your Honor.  Michael

21   Bradley, representing Damon Dore, who is seated here.

22        THE COURT:  Good afternoon.

23        MR. TURANO:  Good afternoon, your Honor.  Stephen

24   Turano on behalf of Rahmiek Lacewell, who is present in the

25   jury box.

1          THE COURT:  Good afternoon.

2          MR. BERTAN:  Good afternoon, your Honor.  David

3    Bertan, on behalf of Hasim Smith, who is seated second from the

4    end in the jury box.

5          THE COURT:  Good afternoon.

6          MR. BERTAN:  From the left.

7          THE COURT:  From the left.  OK.  Thank you.

8          MR. FARRELL:  Good afternoon, your Honor.  Gary

9    Farrell.  My client, Mr. Peralta, is directly behind me.

10          THE COURT:  Good afternoon.

11          All right.  As I understand it, all of the defendants

12    have been previously arraigned, so this is, first, a scheduling

13    conference, and then there were also some bail issues that we

14    need to take up.

15          How long does the government want for the completion

16    of discovery?

17          MR. HOBSON:  Your Honor, we understand that defense

18    counsel is in the process of arranging for a discovery

19    coordinator in this case, which they believe will be helpful.

20    We agree.  The discovery is somewhat voluminous here.  It

21    includes a lot of electronic records, multiple months of wire

22    calls, several seized phones that we are still in the process

23    of unlocking, some of which will require a privilege review.

24    So we are asking for one month from the date of the appointment

25    of the discovery coordinator to complete discovery.

1    THE COURT:  No, I don't want it to turn on that.  I

2  almost always approve the appointment of the discovery

3  coordinator.  There's no reason that that can't be expedited by

4  the defense, and then as soon as they get me the person's name

5  and credentials, I'll undoubtedly approve it.

6    MR. HOBSON:  That's fine, your Honor.

7    THE COURT:  Why don't we say six weeks for the

8  completion of discovery, and that would be -- let's see; today

9  is the 5th.  So that would be August 16.

10    All right.  How long do defense counsel want for the

11  making of any motions?

12    MS. SCOLARI:  Your Honor, what I would suggest, since

13  we really don't have a handle on the volume of discovery,

14  except that it's extensive --

15    THE COURT:  Well, I'm perfectly happy to have the

16  government describe it in as much detail as you wish right now,

17  but we're going to set a date for motions.

18    MS. SCOLARI:  I'm not suggesting you won't.  I

19  appreciate that.  All I'm saying is when we ask for a date,

20  it's going to be far out.

21    THE COURT:  All right.  Let's hear from the

22  government.

23    What does the discovery specifically consist of?

24    MR. HOBSON:  Your Honor, it's going to consist of,

25  it's going to be wire calls.  It's going to be the results of

1   various search warrants.  It's going to be the electronic, the

2   results of electronic search warrants on -- I believe each of

3   these defendants have electronic devices that were seized and

4   are in the process of being searched.  It's going to also

5   consist of tax returns and financial records.

6           THE COURT:  OK.

7           MS. SCOLARI:  Your Honor, my understanding is there

8   were wiretaps on at least two phones and there were two months

9   of wires.  That alone is going to present a lot of materials

10  for defendants, particularly those who are incarcerated, to

11  review.  So I think the earliest we could even contemplate

12  motions would be potentially January.

13          I know you're not going to like that, but let me tell

14  you why.  Because right now, every other week they are locking

15  down MDC, which means these men are locked in their cells and

16  can't get out at all.  We can't see them.  So it's not even

17  like I can go see my client and go through the discovery with

18  him.  When they're out, if they're lucky, they're out half a

19  day.  Some of these units have two computers.  Some have one.

20  If they can get on a computer an hour a day, they're fortunate.

21  It's going to present a real problem for these clients who are

22  incarcerated to review the material and get ready and help

23  their lawyers decide how to proceed.

24          So with that in mind, I'm asking for a ridiculously

25  long date.  I understand from your facial expression --

1          THE COURT:  I agree with your adjective, ridiculous,

2    but let's think it through.

3          First of all, with respect to access to your clients,

4    which is, of course, very important, my practice is that if

5    you're not getting adequate access, then you call -- and this

6    is on an individual defendant basis.  So the attorney for that

7    defendant, along with government counsel, calls me.  I then

8    call the warden and make special arrangements, and although I'm

9    sure the wardens are never happy about it, I've never had one

10   refuse me.  So I will undertake to do that in this case if that

11   continues to be a problem.

12         Now, of course, you're not going to be getting the

13   discovery and reviewing it for a while, so the present

14   situation may ease or it may not.  But I will make sure to do

15   that so that you get adequate access.

16         I agree with you that my normal practice of asking for

17   motions two weeks after the completion of discovery would be a

18   little tight in this case, but I can't imagine why you need six

19   months, which is what you're asking for.

20         MS. SCOLARI:  Judge, in abundance of caution, because

21   as I said, there's constant lockdowns.  There are things that

22   we can't control.  And from what I'm hearing, this is happening

23   at MDC.  We're getting emails every other week.  Lawyers cannot

24   visit.  The defendants are on lockdown.

25         THE COURT:  I understand.  That's why I'm offering my

1   intervention, which, as I say, has always worked in the past,

2   although as they say, past experience is no guarantee of future

3   results.

4            MS. SCOLARI:  Right.

5            THE COURT:  But nevertheless, if that were to fail,

6   then, of course, I would reconsider the date we're about to

7   set.  But let's assume that my poor efforts to reason with the

8   warden are successful so that you get adequate access, then how

9   much time do you need?

10           MS. SCOLARI:  Your Honor, it's hard for me to speak

11  for those that are in Westchester County jail.  I'm very

12  familiar with the difficulties in MDC.  I'm not familiar with

13  the difficulty in Westchester County.  I've heard potentially

14  an hour a day to review discovery if there's no untoward,

15  unexpected consequences.  So I don't know.  There may be

16  somebody that can speak to Westchester County better than I.

17           MR. BERTAN:  Westchester County has a problem in that

18  they usually require the discovery to be provided on CDs, not

19  hard drives.  And I don't know how that's going to work out on

20  this particular case, because the discovery is voluminous,

21  according to the government.

22           There's also another issue, your Honor.  Once we get

23  the discovery, it's not really coming to us.  It's coming to a

24  discovery coordinator, who will need time to process and put it

25  in a format that makes it easier for us to review.  So that

1    kind of has to be added in as well.

2            THE COURT:  Well, my experience is that it actually

3    decreases the overall time, because what you then get from the

4    discovery coordinator is something that you can make prompt use

5    of and don't have to spin your wheels in the way you would were

6    it not for the excellent efforts of the discovery coordinator.

7            MR. BERTAN:  Yes, your Honor.  Just reminding the

8    Court that we'll need that extra processing time.

9            THE COURT:  I agree that has to be factored in.

10           MR. AMBROSIO:  Your Honor, the only other issue that

11   I've experienced at Westchester County jail is, depending on

12   the level of lockdown there, many times legal visits have to be

13   through a glass, and you're in an open area where there's no

14   door and there's essentially no privacy, because the guards are

15   right next to you.  So that is a potential there.

16           MR. TURANO:  Your Honor, also, one other issue.  I

17   don't think we've gotten to the issue of a protective order

18   yet, but there will be a protective order in place, and I think

19   that could slow down the process as well because some of the

20   discovery, although I think the government has indicated that

21   they're going to do their best to keep documents -- produce as

22   much, as many documents as they can and without designating

23   them as attorney's eyes only or -- (indiscernible).

24           THE COURT:  Of course, that doesn't rest in the hands

25   ultimately of the government.  It rests in the hands of the

M75WsmiC

1   Court, and if I am not persuaded that a particular group of

2   documents should be for, say, attorney's eyes only, they're not

3   going to get that protective order even if you sign it.  So

4   there is a third party here known as the judge.

5          MR. TURANO:  OK.  Then, your Honor, that's something

6   that we can obviously, whatever date you set, if we find that

7   there's a large number and we're having problems

8   (indiscernible) time that we'd have to spend with our clients

9   to view it and certainly we'd come back to the Court.

10          MS. SCOLARI:  Your Honor, would you consider, as I now

11  have heard the Court's admonition, would you consider a date in

12  November versus January?

13          THE COURT:  I would.

14          MS. SCOLARI:  Thank you.

15          THE COURT:  And in fact, all the many points you're

16  making makes me think that we should pick a date fairly late in

17  November.  So let's say Monday, November 21, for the making of

18  any motions.  Then we'll hold a further conference on Tuesday,

19  November 22.

20          Linda, what time do we have available?

21          THE DEPUTY CLERK:  Any time you like, Judge.

22          THE COURT:  11 a.m.

23          At that time if there are motions that can be made and

24  can be dealt with orally, they will be.  If they require

25  written responses, we'll set a time then for the written

1    response from the government and any reply papers from the

2    defense.  And if there's a need for any evidentiary hearing on

3    the basis of the motions, we'll set the date for that at that

4    time as well.

5          Now, it occurs to me that maybe we also ought to set a

6    trial date, because we've got all of you here, and the sooner

7    we set the trial date, the more you can factor it into your own

8    schedules, so that when some other judge naïvely says, Let's go

9    to trial on January 3, you can say:  Oh, no.  I'm trying a case

10   before Judge Rakoff.

11         But I'm not suggesting January 3 is the date.  I'm

12   just giving you the point.  It sounds to me that a realistic

13   date would be February.

14         Is that a problem for anyone?

15         MS. SCOLARI:  I believe it is, Judge.  I have Mr.

16   Cecutti's schedule, and between his trial schedule and mine,

17   the earliest that we could suggest is June.

18         THE COURT:  June?

19         MS. SCOLARI:  Yes, your Honor.

20         I knew you would make that same face.

21         THE COURT:  No, it's not the same face.  It's, I hope,

22   a much worse face.  You know there's a thing called the Speedy

23   Trial Act.  Not only that, there's something called the Sixth

24   Amendment, which says that the defendants and the public are

25   entitled to a speedy trial.

1    Now, I don't know if you saw an opinion that I had the

2    privilege of authoring that came down from the Second Circuit

3    last week, entitled *United States v. Pikus*, where I reversed a

4    conviction for violation of the Speedy Trial Act.  It would be

5    hypocritical for me then to not pay a great deal of attention

6    to the need for a speedy trial.

7    Now, I recognize, of course, that there's going to

8    have to be time for discovery.  That's why I've given the

9    government more time than I usually do.  I've just given you

10   what I consider to be a huge amount of time to prepare any

11   motions, and of course, in preparing motions, you'll also be,

12   in effect, partly preparing for trial.  But I can't imagine --

13   let us say all motions are resolved by, as I think is likely,

14   the middle, worst case, end of December, then what else is

15   there to do other than, of course, accommodate your schedule if

16   you have actual trial requirements?  That, of course --

17   Well, let's hear what they are.  Let's start with

18   February.  Who's got an actual trial date in February?

19   OK.  What is your trial?

20   MS. BARRETT:  In January, I'm starting an at least

21   ten-week trial in the Southern District of Illinois, on a

22   murder case, multidefendant, and obviously lots of lawyers.

23   The trial is before Judge Dugan.

24   THE COURT:  All right.

25   Is there anyone else who's got a February problem?

M75WsmiC

1          MS. SCOLARI:  Yes.  Mr. Cecutti has a January 23 trial

2     that's to last four weeks, so that's well into February.

3          THE COURT:  Is there anyone else who's got a February

4     trial?

5          Maybe what we should do is sever and just try everyone

6     else in February and then try your two clients thereafter.  The

7     government's going to oppose that in a minute, but --

8          MS. BARRETT:  No objection, your Honor.

9          THE COURT:  Yes, I would think you'd be delighted.

10          MS. BARRETT:  Yes.

11          THE COURT:  So what about that?

12          MR. HOBSON:  We do oppose, your Honor.  Could we

13     inquire about maybe March or April before we have a severance?

14          THE COURT:  Yes.  That's fair enough.

15          Who's got a problem in March?

16          Oh, three.

17          Who's got a problem in April?

18          Well, this is now your problem as opposed to --

19          MS. SCOLARI:  It's a dual problem.  Mr. Cecutti and I

20     both have, different cases, but trial obligations in April.

21          THE COURT:  You're making the case for severance.

22          Let me hear who's got a problem -- I'm really

23     reluctant to go into May or June, but just for the sake of the

24     record, who's got a problem in May?

25          All right.  Well, no one has a problem in May, so at

M75WsmiC

1      least one month earlier on that basis.  But why shouldn't we

2      try everyone else in February?

3               MR. HOBSON:  Your Honor, one thing I'd note about this

4      case that I think is unique from a number of cases we bring, we

5      have a very large number of victims here.  We've interviewed

6      over 25 victims in the course of investigating this case, and

7      we have more that we are approaching.  I think that this case

8      is going to turn on a lot of victim testimony, and to make

9      victims testimony once is difficult enough.  I think to make

10     them testify multiple times is asking a lot of these victims.

11               THE COURT:  Why?

12               MR. HOBSON:  Because I think it's very --

13               THE COURT:  Are they victims of violence, or are they

14     just victims of a scheme?

15               MR. HOBSON:  They're victims of violence.  A number of

16     these were older individuals, who were physically assaulted,

17     punched.  They've been threatened.  Their families have been

18     threatened.  They are terrified of testifying.

19               THE COURT:  Of course, that would be true the first

20     time they testify.  And then when they see that the world does

21     not end, they might be less stressed out for a second time.

22               MR. HOBSON:  Respectfully, I don't think that's going

23     to be true of the victims here, especially since some of them

24     might be facing their actual assaulters in one trial but not in

25     another trial.

1           I'd also note that witness tampering is one of the --

2     sorry.  Obstruction of justice is one of the racketeering

3     predicates here.  This gang has been threatening witnesses and

4     has been trying to intimidate witnesses from cooperating with

5     the federal investigation.

6           THE COURT:  All right.  I think on balance we will set

7     this down for a May trial for everyone.

8           How long a trial are we talking about?

9           MR. HOBSON:  We estimate three weeks, your Honor.

10          THE COURT:  All right.  Let's put it down for Monday,

11    May 2, at 9 a.m.  And I'll put aside three weeks for the trial.

12          Pursuant to Section 3161 of Title 18, I will exclude

13    from calculations under the Speedy Trial Act all time between

14    now and May 2, 2023 -- I was looking at 2022.  Let me make sure

15    that was a Monday.

16          THE DEPUTY CLERK:  Monday, May 1, 2023.

17          THE COURT:  OK.  That's even better.  We can celebrate

18    May Day together.

19          Pursuant to Section 3161 of Title 18, I will exclude

20    from calculations all time between now and May 1, 2023, finding

21    that such time is necessary for the completion of the

22    voluminous discovery, the evaluation of the discovery, the

23    meeting with the defendants under these difficult

24    circumstances, and the drafting of any motions as well as

25    subsequent trial preparation, and the accommodating of

M75WsmiC

1    counsels' various schedules.  For those and other reasons, the

2    best interests of justice in excluding such time substantially

3    outweigh the interests of the public and the defendants in a

4    speedy trial, although let me assure you that, in my mind, May

5    1 is now fixed, firm, and definite.

6          Before we get to the individual bail issues of a

7    couple of the defendants, is there anything else anyone needs

8    to take up?

9          MS. SCOLARI:  Your Honor, just briefly?

10          I know the Court does not permit filing papers without

11    permission.  I will be asking for a bond modification as to my

12    client.  He is out, and so with permission, can I file that

13    request on ECF?

14          THE COURT:  Yes.  Whenever you're ready, I'm ready to

15    hear you.

16          MS. SCOLARI:  Very good.  Thank you.

17          THE COURT:  OK.

18          I think, unless the marshals disagree, that maybe the

19    best idea is now to let all the lawyers and the defendants who

20    don't have bail applications go back, unless they want to stay,

21    but otherwise go back to their respective places.  And then we

22    can proceed with the remaining people on the bail applications.

23          MS. BARRETT:  Your Honor, on behalf of Anthony McGee,

24    who I didn't identify, he's the first person in the box over

25    there.

1      Your Honor, would the Court entertain -- I have not

2  filed a further bail application, because I'm working on

3  gathering and putting together a proposal.

4      THE COURT:  Well, here's my position on bail, just so

5  everyone knows.

6      MS. BARRETT:  OK.

7      THE COURT:  I will entertain a bail application and a

8  bail reapplication at any time between now and the trial of

9  this case, because I take very seriously the constitutional

10 right to bail.  But of course, I need some notice.  For

11 example, one of the reasons I thought we would take up the bail

12 applications that I was informed of today is because the rest

13 of this week I'll be sitting in the Ninth Circuit by

14 designation, and I didn't want to ask you to have to come to

15 Portland, Oregon, to make your bail application.  So I do need

16 a little advance warning.

17     But why don't we do this.  Let's leave everyone here

18 in the courtroom.  Let's do the bail applications right now.

19 We'll get them done, those who are ready.  And those who are

20 not ready I can hear next week, when I'm back.

21     MS. BARRETT:  Thank you, your Honor.

22     THE COURT:  OK.  So who has a bail application?

23     MR. BERTAN:  On behalf of Mr. Smith, your Honor, I

24 filed earlier today a letter with the Court explaining

25 circumstances which I believe support granting bail.

M75WsmiC

1          I have in my hand his passport.  His girlfriend

2     brought it today, as I said she would.  I've also received a

3     letter from Regal Cinemas in Staten Island, where Mr. Smith has

4     worked previously, and they've offered him a job once he's

5     released.

6          I'm happy to hand that up to the Court, and I've

7     confirmed with counsel on his state court case regarding the

8     plea offer that's outstanding on that charge.  I'm happy to

9     turn those up to the Court for review.

10          THE COURT:  OK.

11          MR. BERTAN:  I apologize to the government.  I only

12     have the one copy.  They were given to me this afternoon.

13          THE COURT:  We'll get them a copy.

14          MR. BERTAN:  His girlfriend has also had installed a

15     landline phone to ensure location monitoring in his home.

16          Simply put, your Honor, under the bail statute, in

17     looking at the characteristics and factors that the Court

18     should consider, you have steady employment since at least

19     2009, a lifetime residency on Staten Island, strong family

20     ties.  His girlfriend of ten years and his 11-month-old

21     daughter live on Staten Island.  He lives with them.  There is

22     no history of drug or alcohol abuse.  He has made court

23     appearances in the past, and as I've noted, his record, which,

24     at first blush, looks more serious, is really a collection of

25     mostly driving offenses.  The one most serious charge,

1    manslaughter, is a reckless manslaughter, where he was involved

2    in an automobile accident.  He pleaded guilty on that count,

3    was sentenced, completed his state sentence, and then was

4    discharged early on parole.

5         THE COURT:  What about the government, a few minutes

6    ago, was suggesting -- and I don't know if they're suggesting

7    this with respect to your client or not; we'll hear from them

8    in a minute -- but was suggesting that there was a real danger

9    here of intimidation of witnesses?  And if your client was part

10   of that, assuming the government is able to establish that

11   that's more likely than not, then he would be a danger to the

12   community.  So what about that?

13        MR. BERTAN:  One moment, your Honor.  I just want to

14   look something up.

15        The sole allegation against him, according to the

16   government's letter of June 28, is that he may have been

17   present at another assault.  There has been no factual

18   allegation thus far that he was involved in any witness

19   intimidation.  And what I would note for the Court is taking a

20   step back from my particular bail application, if you look at

21   the industry of, this EMS industry in general, it is an

22   extremely competitive business.  The participants, the

23   companies all listen to scanners.  They rush to fire scenes,

24   accident scenes, and they compete with each other, sometimes

25   physically, in order to get the business.

M75WsmiC

1    The incident in which Mr. Smith was arrested at a fire

2    scene, he's charged with assaulting a police officer, that's

3    the basis for the plea offer of a violation of disorderly

4    conduct.  He got into an argument with a police officer, and

5    the police officer took offense and charged him.  The Queens

6    District Attorney's Office has offered him a plea to disorderly

7    conduct.  That does not rise to the level of assaulting a

8    police officer.  So in that regard, I don't believe that he

9    shows a propensity to violence.

10    Also, if he is under home detention with an ankle

11    bracelet, he's not going to be going out anywhere.  He's

12    perfectly content posting a bond, staying at home, taking care

13    of his daughter, and helping me prepare for trial.

14    THE COURT:  All right.  Let me hear from the

15    government.

16    MR. HOBSON:  Your Honor, first of all, can I confirm

17    that the Court has had an opportunity to review our June 28

18    bail letter?  That should be on the docket.  It was submitted

19    to Judge Aaron.

20    THE COURT:  The answer is that I don't think I have.

21    I did review Mr. Bertan's letter of earlier today.  And I also

22    got the pretrial services report that was sent initially to

23    Judge Aaron, in which the pretrial services officer believes

24    that detention is necessary, both because the defendant poses a

25    risk of nonappearance and because the defendant poses a risk of

1    danger.  And with respect to the latter, that report says,

2    among other things, that the defendant, in addition to the

3    pending charge that we just heard about, has a history

4    involving violence and weapon use, constituting really a

5    pattern, in the pretrial services officer's view, and is an

6    alleged gang member.

7          With respect to nonappearance, the pretrial services

8    officer said there was a risk of nonappearance because of

9    possession of a passport, questionable employment status, and

10   prior arrests and convictions.  That was, subject to hearing

11   from you, I thought perhaps not as overwhelming as the issue of

12   danger, but the issue of danger is one that is, of course, very

13   important to the Court.

14          MR. HOBSON:  Yes, your Honor.

15          We view this primarily as detention based on danger,

16   although we do think there are some risks of flight in addition

17   to those factors that pretrial set forth that are not

18   insignificant here, and I'll outline those.

19          The reason I asked about our June 28 letter is this is

20   a somewhat unusual gang case, and I wanted to -- our letter set

21   forth some of the details of how this racketeering and

22   extortion scheme operated.

23          THE COURT:  Tell me now.

24          MR. HOBSON:  So I'll go over it.

25          THE COURT:  Yes.

M75WsmiC

1          MR. HOBSON:  I didn't want to belabor it if the Court

2     had that.

3          THE COURT:  Yes.

4          MR. HOBSON:  Essentially, this case involves a group

5     of Bloods gang members who brought mob tactics to control

6     what's called the fire emergency mitigation services industry

7     in the Queens and Brooklyn and Staten Island areas.

8          What happens when a property loss, when a property has

9     a fire is a number of actors come on the scene.  One of those

10    is referred to as an EMS company, an emergency mitigation

11    services company.  First Response was an emergency mitigation

12    company based in Brooklyn.  And these companies would go to a

13    scene, jockey with other companies to encourage a property

14    owner to sign their company up and have them manage the cleanup

15    of the property, help with the submission of basic information

16    that's then passed on to insurers.

17         Another member of this industry, which is a little

18    less relevant for Mr. Smith's bail argument but which I'll

19    discuss is what's called a public adjustor.

20         When an insurance loss happens, often a property owner

21    will hire a public adjustor, which is someone who advocates

22    with the insurance company on their behalf, helping with

23    submitting and negotiating the claim.

24         The public adjustors and the EMS companies work hand

25    in hand.  They often refer each other, and they often are

1    involved in the submissions of claims.

2         What happened with First Response is an individual

3    named Jatiek Smith, who is a Blood, and who is Hasim Smith's

4    brother, joined this, what had at the time been a legitimate

5    company, First Response, in 2020 -- he joined in 2019, and over

6    the course of 2020 and 2021, they used violence and threats of

7    violence to take over that company and to take over the EMS

8    industry as a whole and also eventually to take over, to exert

9    control over the public adjustor industry as well.

10        They used violence and threats of violence to enforce

11   a rotation system, in which they would decide who got which

12   job.  They would also, they also enforced an extortion system

13   in which EMS companies were required to pay them $1,000 and

14   then ultimately $2,000 a week in order to continue operating

15   and to avoid getting violence, to avoid being attacked.

16        There were multiple assaults in this industry, and one

17   thing that's notable is a lot of these assaults were carried

18   out against, for lack of a better word, "civilians."  People

19   who were engaged in this legitimate industry, had been engaged

20   in it for years, often were in their 60s, and then were

21   suddenly met with sucker punches and assaults and being thrown

22   to the ground at the scenes of these fires, often in front of

23   homeowners, who were there suffering a fire loss and trying to

24   figure out what to do.

25        It really created a level of chaos that was unheard of

1    in this industry.

2          There were also lots of threats of violence to

3    members' families, suggesting that the members of First

4    Response knew where people's families were and would attack

5    their families.  There was discussion of guns.  There was

6    discussion of shootings.  I'll note that in our search during

7    the takedowns, we recovered at least three guns in the office

8    building that this crew was using as their headquarters and

9    also guns in some of the defendants' homes.

10          This particular defendant, Hasim Smith, as I said, is

11   the brother of the leader, Jatiek Smith, and Hasim Smith's

12   primary job was to run the night shift.  So he was in charge of

13   who got what fires at nights and in enforcing First Response's

14   dominance during the nighttime.  As the Court can imagine, a

15   lot of fires happen at night.  There's a lot of activity in

16   this industry at night, and we know that a lot of the assaults

17   here happened at night.

18          I know the Court asked about his particular

19   involvement in threats to witnesses.  While I don't know of

20   this defendant's particular involvement in making threats, I do

21   know that he was present at some occasions in which Jatiek

22   Smith was threatening members of the industry not to cooperate

23   with law enforcement and with the federal investigation.

24          With respect to this defendant's history, I think it

25   is more troubling than what Mr. Bertan has described and is a

M75WsmiC

little more along the lines of what pretrial has described.

Mr. Bertan omitted a lot of the youthful offender conduct,

which involved some weapons charges, I believe, reckless

endangerment, resisting arrest.  But even of the charges that

were not youthful offenders, I think that when the Court looks

at sort of the pattern of them, it shows a consistent disregard

for the law, and it's very troubling that a lot of these

happened while he was on pretrial release for other cases.

Just my quick analysis of it is that in June 2013, he

was arrested for a burglary and for reckless endangerment, for

fleeing from the police.  He was convicted for that in late

2013 and sentenced in early 2014 for about 90 days.  But as

soon as he got out, he's arrested again in April of 2014 for

reckless endangerment based on reckless driving.

In June 2014, he's arrested for selling drugs.  A few

weeks later, also in June 2014, he's arrested for vehicular

assault after leaving the scene of personal injury accident.

That is not the crime for which he was convicted of

manslaughter.  It was while he was on pretrial release for

that, that on July 25, 2015, while those prior cases were still

pending, this particular manslaughter incident happened.

And I believe, my understanding from the police

reports is what happened there is he was recklessly driving,

trying to get around a car, ran a red light, ran into a pole,

and the 19-year-old female passenger in his car died as a

1    result.

2         He got out from parole for these various offenses in

3    January 2020, and immediately he joined his brother's company

4    at First Response and began his involvement in this enterprise,

5    so committing these crimes while he was on parole, as soon as

6    he got out from jail for those other crimes.

7         In March 2022, so just a few months ago, he was

8    arrested for attacking a police officer at the scene of a fire.

9    I recognize that that was, or I'm told that that's pleading

10   down to a disorderly conduct, but according to the arrest

11   report, he was flailing his arms, attacking a police officer at

12   the scene, and the police officer was hit and injured in the

13   course of that attack.

14        As for his gang membership, NYPD records indicate that

15   he previously identified himself as a member of the Tombstone

16   Gangsta branch of the Bloods.  That's the same branch of the

17   Bloods that his brother is in.

18        Finally, I think that all of this, this pattern of

19   lawlessness and the nature of this particular enterprise, makes

20   us very concerned about the risk of violence and the risk to

21   the community should he be released.

22        I don't think the risk of flight plays as strong a

23   role, but I don't think it's insignificant here, partly given

24   his history of resisting arrest, his record of bench warrants,

25   his consistent violation of the terms of his release, the fact

1   that he has more money in the bank than a lot of defendants

2   have, and the fact that he, with these serious federal charges

3   pending, does have a real incentive to flee.  So I don't think

4   that's a risk to be ignored, but I do agree with the Court that

5   danger to the community is a primary risk here.

6            THE COURT:  All right.

7            Let me hear from defense counsel.

8            MR. BERTAN:  Your Honor, just briefly, it's my

9   understanding there were no weapons found when Mr. Smith was

10  arrested.  So that's the first thing.

11           Secondly, he has no violent convictions on his

12  criminal history.

13           THE COURT:  Yes, but when we talk about danger to the

14  community, though -- of course, I'm most concerned with the

15  possibility of violence, but we're also talking about the

16  likelihood that he will go out and commit new crimes, and

17  according to the government, he has not only a long history of

18  committing crimes, but he does so either the minute he's

19  released or while he's on supervised release or probation, and

20  that is a pattern that seems to have existed from early in his

21  criminal career, so to speak.

22           Why doesn't that make him a danger to the community?

23           MR. BERTAN:  Your Honor, given his most recent arrest

24  and release from jail on the manslaughter charge, he was

25  discharged early on parole, and that, according to Mr. Smith

M75WsmiC

1   and Ms. Dixon, was primarily because he was doing well on

2   parole.  He was working, and he wasn't getting into any other

3   trouble or any other arrests.

4           The incident in which he was arrested in Queens for

5   assaulting the police officer, police can write whatever they

6   like in their initial arrest report.  The bottom line is when

7   the district attorney decides what can be proven and not

8   proven, that case was reduced to disorderly conduct.  It seems

9   more likely than not that that charge was drastically elevated

10  by the police to support the arrest.  He may have been

11  disorderly.

12          THE COURT:  I agree with you that what is most

13  critical is what the district attorney offered by way of a

14  plea, but that can be for a hundred reasons.  It can be because

15  they're overloaded with cases.  The reasons why plea bargains

16  are made, particularly in the overloaded state system, are not

17  the basis for inferring that the police exaggerated their

18  report, and I decline to make that finding.  But I do agree

19  with you that what's ultimately relevant is the fact that the

20  district attorney was apparently prepared to accept a plea of

21  disorderly conduct.  So I'll take it at that.

22          MR. BERTAN:  Your Honor, with regard to danger to the

23  community, I can only reiterate that Mr. Smith is willing to

24  abide by whatever conditions this Court would set -- home

25  detention with monitoring -- and that would act to protect the

1  community.  He would be at home.  Any breach of that condition

2  would have him back here in front of your Honor.

3          THE COURT:  Thank you for your excellent arguments.

4          I'm going to detain him.  I do agree with defense

5  counsel that there are conditions that would prevent against

6  the likelihood of flight, but what we have here and what

7  animates my decision is a long history -- as well as an

8  involvement in a well-known, vicious gang, but a long history

9  of personal involvement in criminal activity coming even when

10  ordered by the court not to do it, because he was on probation

11  or supervised release or something similar to that.  And that

12  suggests strongly that regardless of what conditions were

13  imposed, he would find a way to continue posing a threat to the

14  community.  So on that basis, the Court will detain him.

15          Now, there was another bail application.

16          MR. TURANO:  Your Honor, I just have an application

17  with respect to Mr. Lacewell.

18          Now, I did appear and made an argument with respect to

19  this in magistrate court.

20          THE COURT:  Right.  So this is, in effect, an appeal

21  from Judge Aaron.

22          MR. TURANO:  It is, your Honor.  At the time I

23  mentioned and referenced that I believe --

24          THE COURT:  Although I should note for the record that

25  it is *de novo* appeal, and while I have the greatest respect for

1  Judge Aaron, I have to, on my own, reconsider all the relevant

2  elements.

3           MR. TURANO:  And your Honor, that's, quite frankly,

4  why I proceeded before Judge Aaron, because at the time I

5  pledged or I thought that I would have a significant package to

6  offer, and in fact, over the last few days, I do have a

7  significant package.

8           I have spoken to personally -- I think it was

9  approximately 14 people, who, by the way, first time ever I

10 called them and not a single person didn't answer their phone,

11 and not a single person didn't articulate that they were more

12 than willing and able to sign, if permitted by the Court, on

13 behalf of Mr. Lacewell.  And that runs the gamut.  I have

14 cousins.  I have siblings.  His mother's in the courtroom.  His

15 child's mother's in the courtroom.  Mr. Lacewell has a

16 one-year-old, Zion, who is -- his ties to the New York

17 community are significant.

18          I suspect what concerned -- I know what concerned

19 Judge Aaron.  I suspect what will concern the Court here is a

20 danger to the community.  Now, my client does have a criminal

21 history, no doubt.  I'm not going to sit here and say that he

22 does not have a criminal history with multiple serious

23 convictions.  I will note that his last conviction -- sorry,

24 not his last conviction, but he was released in 2017.

25          THE COURT:  I'm just looking now at the presentence

M75WsmiC

 1    report that was given to Judge Aaron.

 2            At age 18, he pled guilty to second degree rape and

 3    was sentenced to one to three years.  At age 25, he pled guilty

 4    to false impersonation.

 5            I'm sorry.  I missed one.

 6            At age 24, he pled guilty to criminal possession of a

 7    controlled substance.  At age 25, as mentioned -- also, at age

 8    25, he pled guilty to attempted reckless endangerment,

 9    involving a gang assault that caused serious physical injury.

10    There was a consolidated charge there, which I don't have the

11    results of in front of me, but of attempted murder.

12            In 2014, he pled guilty to a felony offense involving

13    criminal possession of a controlled substance.  And in 2021, he

14    was convicted on a plea to disorderly conduct.

15            Now, those are just the pleas.  Many of the charges

16    went well beyond that, but I only look at the pleas.  I don't

17    feel I can draw any inference from charges that were not pled

18    to and were not tried.  But even just looking at the pleas,

19    that's a pretty continuous pattern of misconduct.

20            MR. TURANO:  Judge, as I indicated, it is a

21    significant history, but he is now -- my client is now 37 years

22    of age.  As I indicated, his, he was released in 2017, so we

23    have a period of five years where he has been offense free.

24            Now, with respect to this case, your Honor, with

25    respect to these allegations --

M75WsmiC

1          THE COURT:  I'm sorry.  There was --

2          MR. TURANO:  Just to continue, your Honor.

3          THE COURT:  -- disorderly conduct.

4          MR. TURANO:  You're right.  Disorderly conduct, your

5    Honor, for which he received, I believe he pled guilty.

6          THE COURT:  A conditional discharge.

7          MR. TURANO:  Right, right, which, essentially, after a

8    period of time, would have been removed from his record.

9          THE COURT:  Yes, and this apparently involved the

10   operation of an unlicensed vehicle, or something to that

11   effect.

12         MR. TURANO:  Correct.

13         Now, your Honor, so, again, I know your Honor

14   indicated a pattern.  Now, I think what's important, and I

15   agree, most of these charges -- in fact, all of these charges

16   were state charges.  I'm not suggesting that Mr. Lacewell be

17   released today, RORed, and come back sometime -- I think the

18   next appearance is November, whenever it is.

19         Your Honor, pretrial services is obviously very good

20   at what they do.  This is a federal charge.  I'm suggesting

21   that there be some very strict conditions.  We have a bunch of

22   people that are prepared to come and sign, essentially, confess

23   their livelihood.

24         THE COURT:  Once again, although I'll hear from the

25   government on flight, I am generally of the view that people in

1    this situation, if they're held in home confinement, with

2    monitoring and all like that, become a low risk of flight.  I

3    have had people flee in that situation, but they've been the

4    great exception.  It's the danger to the community that I'm

5    concerned with.

6             MR. TURANO:  Judge, for the same reason why he's not a

7    flight risk he's not a danger to the community.  He is not

8    alleged to be someone who is a kingpin that can operate out of

9    his home and conduct business.  In fact, he came to this

10   alleged conspiracy very late.  He came to it, was hired by this

11   company in, I believe, December, December 23 of 2020.

12            He was laid off, as the government will indicate, by

13   the nominal owner, who some of his conspirators are alleged to

14   have kind of bullied and forced out of the business.  That guy

15   that was bullied laid him off in March of 2021 prior to his

16   arrest.  So he was in a truncated position in the conspiracy.

17   There's no allegation that he had any leadership position or

18   any authority.  He was essentially one of 50 employees in a

19   very competitive and, from what I understand, before these guys

20   ever were born, a very rough-and-tumble business.

21            My client, but I will go back -- again, we are talking

22   about danger to the community, allegations of being a danger to

23   the community.  In the government's June 28 letter to Judge

24   Aaron, where they were outlining what they suspect was, for

25   purposes of detention and bail, they talk about some pretty

sensational and salacious acts of violence.  The problem is that my client wasn't even part of the company at this time.

So when you flip to pages and get to, finally, page 5 of my client's reference, they say he may have been involved or may have been present -- not involved.  I'm sorry.  He may have been present at, where there was an alleged act of violence.

Was it a slap?  Was it a push?  Was it a shove?  I don't know.  But the fact of the matter is, your Honor, there's no allegations that he had any positions of leadership, that he had any acts, specifically involved in any acts of violence. The government had an opportunity to present that, and that wasn't in their paperwork.

Certainly, your Honor, he was not found in possession of any guns.  I don't see -- and we're also kind of faced with, your Honor, I know it's difficult argument, because based on our schedules, we all raised our hand and said we want a November date to turn over motions and we want a May or June, or whatever, trial date.  And I understand that, but all the while, Mr. Lacewell is going to sit in jail, you know, in a crowded facility, where there clearly is an inability to defend this case, I believe, effectively or as effectively if he's home.

And I think, your Honor, while his criminal history is troubling -- it's troubling to the Court, and no doubt, it's troubling to me, certainly.  I understand that.  I don't think

1  we'd be here if he didn't have any criminal history.  Clearly,

2  clearly there's a package that I have that I think can

3  satisfy -- assuming I can satisfy the government, assuming I

4  could satisfy pretrial, there is a package in place with the

5  conditions that would not only protect or alleviate any

6  concerns the Court would have about a flight risk but also

7  would alleviate the Court's concerns about him coming out and

8  continuing to commit offenses.

9            THE COURT:  All right.

10           Let me hear from the government.

11           MS. BHASKARAN:  Thank you, your Honor.

12           The government's primary concern with respect to this

13  defendant is the danger that he presents, and that's based on

14  his conduct in the charged indictment as well as his criminal

15  history, which your Honor's already gone through.

16           So let me start with the defendant's role in this

17  conspiracy.

18           Mr. Hobson's remarks about the nature of the

19  conspiracy and the acts committed by members of the conspiracy

20  is all applicable to this defendant.  So I adopt those remarks

21  by reference.

22           But this particular defendant was very involved in

23  this conspiracy, and we know that because he was intercepted on

24  Title III wiretaps that the government did in connection with

25  this investigation.  We know that he's been involved in some of

1   the acts of extortion in this case, and we also know that he

2   was present at at least one of the assaults that we

3   investigated.

4         The government has a letter that describes some of the

5   assaults that we're aware of.  We did not describe each and

6   every one of the assaults that we investigated.  But one such

7   assault occurred in October of 2021.  We believe that the

8   defendant, Mr. Lacewell, was present at that assault because

9   cell-site evidence puts him at the scene of that particular

10  assault at the time that it occurred.

11        During that assault, a victim, who was present at the

12  assault, was punched twice in the face.  And again, these

13  assaults are completely unprovoked.  This was a worker at a

14  construction site.

15        THE COURT:  This is a point your colleague made with

16  respect to the other defendant that also factored into my

17  ruling there, and I want to hear from defense counsel here.

18        MS. BHASKARAN:  Yes, your Honor.

19        THE COURT:  It's one thing to say that a defendant was

20  not personally involved in assaulting someone, but if, as part

21  of an extortionate gang scheme, he is personally present when

22  one or more assaults occur, the inference is reasonable that he

23  is fully supportive of that tactic being used, which, according

24  to your colleague, was the favored tactic of this particular

25  conspiracy.

1          MS. BHASKARAN:  I agree, your Honor.

2          And if I could also add with respect to this assault,

3     one of the things that the assailants did after assaulting this

4     particular victim was that they took the victim's

5     identification card and took a photograph of it.  And the

6     inference there, of course, is that they were intimidating the

7     victim to know where that victim lived.

8          We also have evidence that Mr. Lacewell was present at

9     that same event that my colleague described, where, I believe,

10    defendant Hasim Smith is encouraging victims, witnesses not to

11    assist with law enforcement's investigation.  And so we have

12    serious concerns about Mr. Lacewell's involvement in the

13    obstructive conduct that this indictment charged.

14         Mr. Turano makes some remarks about how Mr. Lacewell

15    had a tertiary role in the conspiracy, and that is not what we

16    believe the evidence will show.  Mr. Lacewell was actually

17    arrested at the lead defendant's home on the day of the

18    takedown.  The lead defendant had flown to Puerto Rico the day

19    before, and Mr. Lacewell was found there.  He actually

20    attempted to run away as law enforcement attempted to arrest

21    him, which I think is a factor that the Court should consider

22    when determining whether there are any conditions that would be

23    appropriate for him to be released.

24         So we do think the conduct here that's been charged in

25    this case is very serious.  It's very violent.

1      This defendant, too, is a member of a dangerous street

2  gang, the Bloods.  And as your Honor has already noted, he has

3  a very significant criminal history, beginning from when he was

4  18 years old and continuing to this day, with his most recent

5  conviction at the age of 35.  And that presents a tremendous

6  concern.  And to the extent that there is any thought that a

7  very significant bail package might mitigate the danger that he

8  presents, I think that criminal history answers that question

9  quite clearly.

10      THE COURT:  Let me hear from defense counsel.

11      MR. TURANO:  Thank you.

12      As far as -- work backwards.  Mr. Lacewell denies,

13  certainly in the last however many years, denies having any

14  gang affiliation.  Like I said, he's 37 years old.  That's an

15  allegation that's easily made, but certainly he would deny that

16  he was, in fact, a Blood gang member.

17      In terms of attempting to run away, now, the Court

18  should consider that, although the Court indicated your Honor's

19  not as concerned about my client being a flight risk, the fact

20  of the matter is he was at this home when a search, I guess, of

21  Mr. Smith was executed for his arrest.  He opens the door.  He

22  sees law enforcement.  There is no altercation.  There was no

23  flight.  He went without incident.  So I don't think that

24  that's something that your Honor can or should be able to

25  really consider when someone is kind of disturbed at whatever,

1    6:00 in the morning.

2           As far as witness tampering goes, that is something

3    that kind of concerns me, because I have not heard anything

4    about -- certainly Mr. Lacewell has been in jail for the last

5    few days, since his bail application, and I have not heard

6    anything from the government with respect to witness

7    intimidation until it came up at this argument about severance.

8           So I don't believe witness intimidation and my

9    client's role in this intimidation was ever a basis for his

10   detention with Judge Aaron.  So I would submit, your Honor, we

11   are going to sit, and maybe, what, April 15 -- depending upon

12   your Honor's practice in terms of *Jencks* material, when we

13   actually get *Jencks* material, I will be sitting and sitting and

14   sitting, looking at discovery, and there's not going to be any

15   evidence of witness tampering or any evidence of actual

16   violence on those wiretaps.

17          THE COURT:  Just to interrupt for a second, because

18   it's a side issue, but with respect to Jencks Act material, of

19   course, I can't force the government to give it in advance.

20   But my practice in a case like this is to require it to be

21   given a month in advance, not two weeks in advance, the only

22   exception being if there's someone who is subject to potential

23   physical threats that are not just theoretical but have been

24   shown.  But barring that, I'm hopeful the government will agree

25   with me -- but we don't need to reach that today -- and you can

1    get, you and all the defendants can get the Jencks Act material

2    a month before trial.

3         MR. TURANO:  And your Honor, believe me, I appreciate

4    the extra two weeks.

5         My point is, though, I think that we can make a lot of

6    allegations about the strength of the case, and sitting here

7    during a bail hearing or standing here during a bail

8    application, I really can't respond to that, and I shouldn't be

9    responding to that.  I can tell you what I see in the

10   government's detention papers.  When they were arguing to Judge

11   Aaron why he should be detained, and what they simply said is

12   there's nothing about the witness intimidation.  There's

13   nothing about guns.  There's nothing about acts of violence.

14   All they say after a number of very salacious, horrible

15   assaults, that my client was not a member of the conspiracy,

16   that Mr. Lacewell is an employee and a self-professed Bloods

17   member -- again, I've spoken to that already -- and in addition

18   to being present at at least one assault is involved in the

19   extortion of victims.

20        I understand that he is charged in an indictment.  I

21   understand that, and that's what essentially that says, but

22   that's not enough.  And your Honor, I do believe, I do believe

23   with the package that I'm able to present, with the strict

24   conditions, including home confinement, electronic

25   monitoring -- all the things that protect and satisfy the

1    Court's concerns about flight risk -- should be put in place

2    that would, I can satisfy significantly the Court's concerns

3    about him continuing a pattern of criminal conduct, which

4    again, I would submit, your Honor, although it is extensive, we

5    have a man who's now 37 years of age and had served his time on

6    those, pled guilty to all of the offenses for which he was

7    charged and was released in 2017.

8           I think, you know, we can vet through the 14, and by

9    the way, here is all the financial information of, all the pay

10   stubs and all the things that I have of all these people who

11   know Mr. Lacewell well, notwithstanding the charges set, you

12   know, we vouch that he will abide by all these conditions,

13   including, including some strong third-party candidates,

14   custodians who can sit here and say (indiscernible) committing

15   any acts of certainly not extortion or violence, because I

16   don't think the government can even argue that his arms were

17   long enough to do that.  He was laid off in March of 2022 by

18   this kind of nominal victim owner.

19          So, your Honor, for those reasons, and I don't want to

20   belabor it, but for those reasons, I believe that a package can

21   be in place that will absolutely alleviate any concerns which

22   the Court would have with respect to the violence.

23          THE COURT:  Thank you very much.

24          And I want to thank both counsel for the defense, both

25   in the previous application and this one, for their excellent

1 arguments.

2      Once again, I am, on the one hand, persuaded that

3 there are a set of conditions that could reasonably assure

4 against flight, but that there are not a set of conditions that

5 would reasonably assure against danger to the community.

6      Yes, it's true that in this, as in every other bail

7 hearing, the Court relies on what the government says it will

8 be able to prove.  And of course, that sometimes doesn't come

9 to pass, but here, the government says that it will show that

10 this defendant was present when a vicious attack in furtherance

11 of the overall conspiracy did occur, and that by itself speaks

12 volumes about his state of mind.  When it's coupled to the

13 prior history of repeated criminal activity, the Court thinks

14 that the likelihood of danger is very real and that no set of

15 conditions can assure against it.  So the defendant will be

16 detained on that basis.

17      I appreciate the fact that there are family members

18 and other supporters here, and I am very grateful that they

19 came.  And that was part of the reason I agreed with the

20 defense on the flight risk part, but of course, the danger to

21 the community is a different kind of evaluation.

22      Is there anything else any counsel needs to raise with

23 the Court at this time?

24      All right.  That concludes this proceeding.

25      MR. HOBSON:  Your Honor, I'm sorry.  I have one

M75WsmiC

1    procedural question, which is, as we discussed, we're getting a

2    protective order together.  Once we have agreement, should we

3    just email that to chambers?

4          THE COURT:  Yes, but just keep in mind that this

5    Court's practice is to maximize disclosure and only restrict

6    disclosure, such as for attorney's eyes only, in the most

7    substantial situation.  So bear that in mind whenever you're

8    working on it.

9          MR. HOBSON:  Yes, your Honor.  We are.

10         THE COURT:  Very good.  Thanks a lot.

11         (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25