UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

    UNITED STATES OF AMERICA,         :

                                                          :

        vs.                                             :
                                                           No. 22-cr-352 (JSR)

ANTHONY MCGEE, KAHEEN SMALL,    :
DAMON DORE, RAHMIEK LACEWELL,
ET AL.                                         :

               Defendants.

------------------------------------------------------------ X

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS ANTHONY MCGEE, KAHEEN SMALL, DAMON DORE, AND RAHMIEK LACEWELL'S MOTION TO SEVER

## TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.    BACKGROUND ...................................................................................................... 2

    A.    The Indictment ............................................................................................. 2

    B.    The Investigation ......................................................................................... 3

    C.    Mr. Smith's Interview with Law Enforcement on November 11, 2021 ................ 3

    D.    Mr. Smith's Arrest and Troubling In-Court Behavior ............................................ 4

ARGUMENT ........................................................................................................................ 5

    A.    This Court has Wide Discretion to Sever the Trial ................................................ 5

    B.    The Moving Defendants will Suffer Substantial Prejudice from Evidence Admissible Only Against Mr. Smith ....................................................................... 6

    C.    Mr. Smith's Alleged Culpability is Significantly Greater than that of the Moving Defendants and Will Cause Them Substantial Prejudice ........................ 9

    D.    Mr. Smith's Likely In-Court Behavior Supports Severance ................................ 11

CONCLUSION .................................................................................................................... 13

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aratari v. Cardwell*,
    357 F. Supp. 681 (S.D. Ohio 1973) ...................................................................................11

*United States v. Cardascia*,
    951 F.2d 474 (2d Cir. 1991) ................................................................................................5

*United States v. Diaz*,
    176 F.3d 52 (2d Cir. 1999) ...............................................................................................7, 8

*United States v. Gallo*,
    863 F.2d 185 (2d Cir. 1988) ................................................................................................5

*United States v. Gilbert*,
    504 F. Supp. 565 (S.D.N.Y. 1980) ....................................................................................10

*United States v. Kelly*,
    349 F.2d 720 (2d Cir. 1965) .............................................................................................5, 9

*United States v. Kozak*,
    2014 WL 1281914 (D. Neb. Mar. 27, 2014) ...............................................................6, 7, 11

*United States v. Salameh*,
    152 F.3d 88 (2d Cir. 1998) ..................................................................................................6

*United States v. Vargas*,
    279 F. App'x 56 (2d Cir. 2008) (unpublished) ....................................................................8

*United States v. Veteto*,
    701 F.2d 136 (11th Cir. 1983) ...........................................................................................12

*United States v. Werner*,
    620 F.2d 922 (2d Cir. 1980) ................................................................................................5

*Zafiro v. United States*,
    506 U.S. 534 (1993) ....................................................................................................5, 6, 9

**Other Authorities**

Federal Rule of Criminal Procedure 14 ........................................................................1, 2, 3, 5

Federal Rule of Evidence 801 ..............................................................................................7

I. **PRELIMINARY STATEMENT**

Defendants Anthony McGee, Kaheen Small, Damon Dore, and Rahmiek Lacewell (the "Moving Defendants") respectfully submit this memorandum in support of their motion, pursuant to Rule 14(a) of the Federal Rules of Criminal Procedure, to sever their upcoming trial from co-defendant Jatiek Smith.

The Court should exercise its wide discretion and sever the trial so that the Moving Defendants can be tried separately from Mr. Smith for three reasons. First, evidence that is admissible against Mr. Smith would not be admissible against the Moving Defendants in a separate trial. In particular, Mr. Smith's hour-long voluntary and highly inculpatory interview with law enforcement will likely be played for the jury. Second, by the Government's own admission, Mr. Smith is significantly more culpable than the Moving Defendants. Mr. Smith allegedly ran the charged enterprise and is alleged to have engaged in the most egregious conduct such as threatening to shoot and kill victims and their families. The Government's investigation centered around Mr. Smith, including a Title III wiretap and multiple search warrants of Mr. Smith's communications devices and communications applications. As a result, a large portion of the Government's evidence will come straight from Mr. Smith's mouth (orally and in written form). Third, Mr. Smith's outbursts during a pre-trial proceeding last fall are likely to recur during trial and unfairly prejudice the Moving Defendants, all of whom have followed courtroom decorum throughout the pretrial proceedings. Mr. Smith also has repeatedly sought to discharge his counsel and proceed *pro se* to trial, which will increase the likelihood that he disrupts the trial and prejudices the Moving Defendants. These three factors weigh heavily in favor of severing the Moving Defendants from Mr. Smith in order to ensure that the Moving Defendants receive a fair trial.

## II. BACKGROUND

### A. The Indictment

On June 28, 2022, the Court unsealed a two-count Indictment charging Mr. Smith, the Moving Defendants, as well as Hasim Smith, Sequan Jackson, Manuel Pereira, and Octavio Peralta with one count of racketeering conspiracy and one count of extortion conspiracy. It charges an alleged scheme to assert control over the emergency mitigation services ("EMS") companies and other participants in the fire restoration industry using violence and threats of violence that Mr. Smith allegedly spearheaded through his work for First Response Cleaning Corp. ("First Response"). Indictment ¶ 1. First Response and other EMS companies assist property owners after their property has been damaged in a fire by cleaning up and removing the debris and ventilating the property. *Id*. ¶ 2. Property owners typically work with adjusters to "investigate, process, and submit the insurance claims to their insurer." *Id*. ¶ 3. There are generally two types of adjusters: (i) public adjusters who act on behalf of the property owner to negotiate a settlement of a claim for loss or damage with the insurance company and who are paid a percentage of the settlement that the insurer pays out, and (ii) independent adjusters who work for and are paid by the insurer to investigate and adjust claims arising under the insurance contract the insurer issues. *Id.*

According to the Indictment, EMS companies compete for work by arriving on the scene of a fire after it has occurred and signing up directly with the property owner. Indictment ¶ 4. Once the EMS company is hired, it can make a referral for a public adjuster to work with the property owner to process the insurance claim. *Id*. In the alternative, public adjusters can obtain the work directly from the property owner and make the referral for an EMS company to work for the property owner. *Id*. ¶ 5.

The Indictment alleges that the Defendants, through First Response, extorted other EMS companies and participants in the fire restoration industry and threatened and used force to exert control over the fire restoration industry.  Indictment ¶ 1.

**B.     The Investigation**

According to the affidavit supporting the Title III wiretap application to intercept communications over a cellular telephone that Mr. Smith was allegedly using, law enforcement began investigating First Response in March 2021.  Ex. A, Affidavit in Support of Application for Order Authorizing the Interception of Wire and Electronic Communications over Cellular Telephones, at USAO_000136.  That month, law enforcement seized Mr. Smith's telephone upon his return from international travel, extracted a forensic copy, and returned the phone to him.  *Id.* at USAO_000195-96.  Law enforcement obtained a search warrant and reviewed the contents of his phone—including text messages, WhatsApp communications, video and audio recordings, and social media posts—and concluded that Mr. Smith was "in charge" of the alleged scheme.  *Id.* at USAO_000196, USAO_000213; Ex. B, Agent Affidavit in Support of Application for Search and Seizure Warrant, at USAO_000327-28.  In October and November 2021, law enforcement sought and received court authorization to intercept communications over Mr. Smith's cellular telephone.  Ex. C, October 14, 2021 Order of Interception, at USAO_000115-16, Ex. D, November 12, 2021 Order of Interception, at USAO_000273-74.

**C.     Mr. Smith's Interview with Law Enforcement on November 11, 2021**

In November 2021, one month after law enforcement began intercepting his cellular telephone, Mr. Smith presented himself to law enforcement and sat for a recorded interview.  Ex.

E.[1] Over the course of one hour, Mr. Smith gave an extensive summary of his perception of the fire restoration industry and how he became involved in it. The highlights of the interview include:

- Mr. Smith acknowledged that there "used to be problems" between different fire restoration companies, but he said "I stopped every single problem." *Id.* at 24:40-24:55.

- Mr. Smith said he was able to take control of the industry because he was "a criminal," whereas his competitors "were regular [] civilians trying to be criminals." *Id.* at 35:15-35:27.

- Mr. Smith distinguished the "problems" that used to exist in the industry from the "real problems" he was willing to create for his competitors. *Id.* at 35:42-35:50.

- Mr. Smith described how the fire restoration industry was now "a big cohesive group," *id.* at 38:05-38:10, "through me," *id.* at 38:32-38:36.

- Mr. Smith described a rotation system in place such that EMS companies would get business even if they were not first on the scene. *Id.* at 38:40-38:53.

- Mr. Smith admitted he was a Blood gang member and that his reputation as a gang member was what helped him resolve these "problems." *Id.* at 43:20-44:10, 44:50-45:20.

D.   **Mr. Smith's Arrest and Troubling In-Court Behavior**

After the unsealing of the Indictment, law enforcement arrested all of the Defendants, other than Mr. Smith, in the New York area. Mr. Smith was in Puerto Rico at the time. Letter from United States to Judge Rakoff, ECF 91 at 4 (Oct. 31, 2022). He told the federal agents that he was not going to let them arrest him, swatted them away, and warned one agent that "he would go

---

[1] The Moving Defendants are delivering the Exhibit E to Chambers under separate cover.

4

down the deep end with all of us that were in the room" and that he was "going to take some of us down." *Id*. Mr. Smith refused to submit to the agents for almost two hours. *Id.*

Mr. Smith has remained in custody since his arrest. During and after a November 17, 2022 court conference, Mr. Smith became agitated and disruptive after the Court moved his November 28, 2022 trial to May 1, 2023. Tr. of Proceedings (Nov. 17, 2022), ECF 115 at 6-7. Mr. Smith also expressed frustration over the Court's hesitance to allow him to proceed *pro se*. *Id.* at 5-6. And after the conference, we understand that Mr. Smith refused to leave the cell block.

## ARGUMENT

### A. This Court has Wide Discretion to Sever the Trial

Federal Rule of Criminal Procedure 14 allows the Court to "sever the defendants' trials, or provide any other relief that justice requires" if "consolidation for trial appears to prejudice a defendant." Fed. R. Crim. P. 14(a). "A trial court has wide discretion in considering a motion to sever" under Federal Rule of Criminal Procedure 14. *United States v. Gallo*, 863 F.2d 185, 194 (2d Cir. 1988); *Zafiro v. United States*, 506 U.S. 534, 539 (1993) (leaving the relief under Rule 14 "to the district court's sound discretion"). Indeed, the Second Circuit has described the district court's decision to sever as "virtually unreviewable." *United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991).

The Court should grant a motion for severance "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. To succeed on a motion to sever, the defendant must demonstrate "substantial prejudice." *United States v. Werner*, 620 F.2d 922, 928 (2d Cir. 1980). Substantial prejudice may exist "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Zafiro*, 506 U.S at 539. The risk of substantial prejudice also

5

increases "[w]hen many defendants are tried together in a complex case and they have markedly different degrees of culpability." *Id.*; *see also United States v. Kelly*, 349 F.2d 720, 759 (2d Cir. 1965) (concluding that severance should have been granted where defendant had a significantly smaller role in the conspiracy than co-defendants). And though not independently sufficient to warrant severance, a defendant may also suffer substantial prejudice when a co-defendant is extremely disruptive in the courtroom. *E.g.*, *United States v. Kozak*, 2014 WL 1281914, at *1 (D. Neb. Mar. 27, 2014).

**B.      The Moving Defendants will Suffer Substantial Prejudice from Evidence Admissible Only Against Mr. Smith**

The Court should sever the trial because the Government has key evidence that is admissible only against Mr. Smith and not his co-defendants. "'Prejudice' occurs in joint trials when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998). As the Supreme Court has recognized, a party may suffer substantial prejudice when the Government has "[e]vidence that is probative of a defendant's guilt but technically admissible only against a codefendant." *Zafiro*, 506 U.S. at 539.

Here, evidence that is only admissible against Mr. Smith will substantially prejudice his co-defendants. Prior to the unsealing of the Indictment, on November 11, 2021, Mr. Smith voluntarily sat for an interview with law enforcement. The interview lasted almost an hour. In the interview, Mr. Smith made numerous incriminating statements. Mr. Smith admitted that he was a "Blood" gang member and acknowledged that everybody in the industry knew his reputation. Ex. E at 43:20-44:10. He said that prior to his employment, there used to be "problems" in the industry, before stating that "I stopped every single problem." *Id.* at 24:40-24:55. Mr. Smith distinguished the "problems" that used to exist in the industry from the "real

6

problems" he was willing to create for his competitors. *Id.* at 35:42-35:50. He said he was able to take control of the industry because he was "a criminal," whereas his competitors "were regular [] civilians trying to be criminals." *Id.* at 35:15-35:27.

Mr. Smith further described the changes that occurred to the fire restoration industry under his watch. He stated that the entire industry was all working together now "through me." Ex. E at 38:05-38:36. Mr. Smith explained that the industry was now "a big cohesive group." *Id.* at 38:10. According to Mr. Smith, the different emergency mitigation services companies would now rotate their work. *Id.* at 38:40-38:53. He stated that about 20 companies were now coordinating with each other. *Id.* at 46:27-46:55. And because these companies now coordinated, Mr. Smith explained that their competitors, who were not part of this agreement, were left in the lurch. *Id.*

Mr. Smith's statements during his interview with law enforcement are likely admissible against Mr. Smith, but they are inadmissible against his co-defendants. Under Federal Rule of Evidence 801(d)(2)(A), the government would likely be able to introduce these statements against Mr. Smith because they are statements "made by a party." Fed. R. Evid. 801(d)(2)(A). On the other hand, the video-taped statements are not admissible against Mr. Smith's co-defendants. While the Government will likely argue that these statements are admissible under Federal Rule of Evidence 801(d)(2)(E), that it is incorrect. Federal Rule of Evidence 801(d)(2)(E) permits the introduction of statements by a co-conspirator only when the statement was made "during and in furtherance of the conspiracy." To be in furtherance of the conspiracy, "the statements must in some way have been designed to promote or facilitate achievement of the goals of the ongoing conspiracy." *United States v. Diaz*, 176 F.3d 52, 85 (2d Cir. 1999).

Although Mr. Smith's statements were undoubtedly made during the time period of the conspiracy, they were not made "in furtherance of the conspiracy." Mr. Smith came to law enforcement and offered his statements on his own volition. He proceeded to explain how the fire restoration industry previously operated and how it had changed since he became involved. Mr. Smith repeatedly described how he personally changed the industry. He spoke about how his reputation and background as a Blood and as a criminal allowed him to reshape the industry and center it around him. Mr. Smith explained that about 20 emergency mitigation services companies were now working together as "a big cohesive group," "through me." Ex. E at 38:05-38:36. According to Mr. Smith, this group now applied a rotation system, where companies would get jobs even if they were not soliciting the businesses themselves.

These statements did not further the conspiracy in any way. They did not "promote or facilitate" the alleged enterprise's goals. *Diaz*, 176 F.3d at 85; *see also United States v. Vargas*, 279 F. App'x 56, 61 (2d Cir. 2008) (unpublished) ("Because the statements of the witnesses were made to law enforcement agents, they were not 'in furtherance of the conspiracy' and, thus, were inadmissible hearsay."). Mr. Smith's statements cannot even be characterized as an effort to conceal any purported scheme. In fact, they did the exact opposite. Mr. Smith described in extensive detail how he had used his reputation and experience as a Blood to take control of the fire restoration industry. As per the Indictment, Mr. Smith explained how he had "[i]mpos[ed] a system of rules upon" other members of the industry by establishing a rotation system that operated "through me." Indictment ¶ 10(a), Ex. E at 38:05-38:36. He repeatedly stated that he was able to do so because he was a "criminal" and a Blood. These statements gave law enforcement significant information on the purported scheme from the sole leader of the enterprise. Therefore, because

8

Mr. Smith's statements to law enforcement were not made in furtherance of the conspiracy, they are not admissible against his co-defendants.

If the Court does not sever Mr. Smith's trial from the Moving Defendants, the evidence of his video-taped statement will be substantially prejudicial because no limiting instruction could diminish the taint. As discussed above, Mr. Smith acknowledged to law enforcement that he was a Blood and a criminal. If exposed to these statements, the jury will unfairly conclude that Mr. Smith's co-defendants are similarly criminals. Moreover, as discussed in the Moving Defendants' motion *in limine*, Mr. Smith's admission that he is a Blood is highly prejudicial to the Moving Defendants. Despite lacking relevance to the alleged scheme, jurors likely will attribute Mr. Smith's stated membership in the Bloods to the Moving Defendants.

Separately, Mr. Smith described his actions in taking control of the fire restoration industry in detail. Jurors are likely to assume that Mr. Smith's admissions mean his alleged subordinates were similarly culpable. Mr. Smith's statements, which would ordinarily be inadmissible against his co-defendants, will thus substantially prejudice the Moving Defendants. The Court should therefore sever Mr. Smith's trial.

**C.    Mr. Smith's Alleged Culpability is Significantly Greater than that of the Moving Defendants and Will Cause Them Substantial Prejudice**

Severance is also particularly appropriate here because of Mr. Smith's markedly higher degree of culpability. Courts will find substantial prejudice exists in instances where the defendants "have markedly different degrees of culpability." *Zafiro*, 506 U.S. at 539. Indeed, the Second Circuit has previously stated that severance was necessary where co-defendants' culpability "rubbed off" on the defendant. *Kelly*, 349 F.2d at 759.

Per the Government's investigation and filings, it views Mr. Smith as significantly more culpable than the Moving Defendants. The brunt of the Government's investigation focused on

9

Mr. Smith.  The Government seized his cellular telephone and intercepted his communications.  It made no similar request for any of the Moving Defendants.  Consistent with the Investigation, the Indictment specifies that the alleged enterprise centers around "the power of its leader, Jatiek Smith."  Indictment ¶ 9(b); *see also* Letter from United States, ECF 91 at 1 (noting that Mr. Smith "was the leader of th[e] violent extortion crew").  And in opposing Mr. Smith's motion for release pending trial, the Government stressed that it viewed Mr. Smith as significantly more culpable than his co-defendants.  It stated that "the danger posed by Jatiek Smith surpasses" that of any of his co-defendants.  *Id.* at 1.  And Mr. Smith was the primary—if not sole—beneficiary of the alleged enterprise.  *Id.* at 3 ("EMS companies had to pay Smith in order to receive any jobs.").

The Government's filings also make clear that Mr. Smith was the primary enforcer of the alleged enterprise.  In opposing Mr. Smith's motion for bail, the Government stated that Mr. Smith "direct[ed]" his subordinates to use force, personally "threatened to kill victims or their family members," "threaten[ed] victims not to speak to the authorities about his violence," personally "assaulted an employee of a rival EMS company" and "recorded his threats."  *Id.* at 1-3.  In contrast, none of the Moving Defendants have allegations of violence at the level of those levied against Mr. Smith.  Thus, by the Government's own admissions, even in his role as leader of the enterprise, Mr. Smith was far more culpable than his co-defendants for the alleged threats and acts of violence.

The markedly different degrees of culpability between Mr. Smith and the Moving Defendants render this case similar to *United States v. Gilbert*, 504 F. Supp. 565 (S.D.N.Y. 1980). There, the court severed two defendants charged with conspiracy from the primary defendant after the two less-culpable defendants showed that "much of the Government's evidence" would "implicate only" the leader of the alleged conspiracy."  *Id.* at 566.  Because the defendants "made

10

a sufficient showing of disproportionate involvement in the overall scheme . . . that [they] would be prejudiced by the gradually accumulating effect of evidence of [the leader's] wrongdoing," the court concluded that the trials must be severed. *Id.* at 571.

So too here there is a great imbalance in relative culpability. The brunt of the Government's evidence centers around Mr. Smith. Mr. Smith was the leader of the alleged scheme, and he personally was involved in many of the incidents of violence the Government alleges furthered the conspiracy. The Government also has produced numerous recordings Mr. Smith took of himself threatening his victims. These recordings show that Mr. Smith was not just the leader of the alleged scheme, but in many ways was the entire scheme. The Moving Defendants are likely to suffer substantial prejudice if they go to trial with Mr. Smith. Jurors will be subjected to disproportionate amounts of evidence implicating only Mr. Smith. As the trial goes on, the Moving Defendants will be unfairly prejudiced by this evidence, as jurors will be increasingly likely to assume their guilt simply because they are on trial with Mr. Smith. The Court should sever Mr. Smith from the Moving Defendants to avoid this result.

**D.     Mr. Smith's Likely In-Court Behavior Supports Severance**

Finally, the Court should sever Mr. Smith from the Moving Defendants to avoid the significant risk that his in-court behavior will substantially prejudice them.

In certain circumstances, a court will grant severance when a defendant's behavior is so disruptive in court that it will substantially prejudice his co-defendants. For instance, in *United States v. Kozak*, the court severed one defendant because of his "disruptiveness[] and refusal to follow court instructions," concluding that if the two defendants were tried together, the moving defendant would "suffer undue prejudice." 2014 WL 1281914, at *1, *4. Similarly in *Aratari v. Cardwell*, the court found that a defendant's right to a fair trial was violated due to "the prolonged

11

and disruptive nature of" his co-defendants actions in the courtroom. 357 F. Supp. 681, 684 (S.D. Ohio 1973).

Mr. Smith's courtroom behavior during pre-trial proceedings demonstrates that he likely will be very disruptive during trial, and in so doing, will substantially prejudice the Moving Defendants. As this Court knows, during a November 17, 2022 conference, Mr. Smith became agitated at his counsel's motion to delay the trial and the Court's decision to grant that motion. Tr Tr. of Proceedings (Nov. 17, 2022), ECF 115 at 6-7. Mr. Smith was also frustrated at the Court's hesitance at allowing him to proceed *pro se*. *Id.* After the conference, Mr. Smith refused to leave the cell block. This was not an isolated incident. As the Government described in its opposition to Mr. Smith's motion for bail, Mr. Smith not only resisted arrest, but told the arresting officers that "he would go down the deep end with all of us that were in the room" and spent almost two hours making other hostile comments. Letter from United States, ECF 91 at 4. He has also repeatedly sought to discharge his counsel and proceed *pro se* to trial, *see* Tr. of Proceedings (Nov. 17, 2022), ECF 115 at 5-6; Letter from Jatiek Smith to Judge Rakoff (Jan. 12, 2023), ECF 129 at 1, which significantly increases the likelihood of prejudice to the Moving Defendants, *see United States v. Veteto*, 701 F.2d 136, 139 (11th Cir. 1983) ("A trial involving a *pro se* defendant and co-defendants who are assisted by counsel is pregnant with the possibility of prejudice.").

Based on his in-court behavior and his history of disruptiveness, Mr. Smith will likely repeatedly disrupt the trial, especially if he represents himself. And given that much of the Government's allegations center on Mr. Smith's alleged efforts to threaten and intimidate, jurors may conclude that his outbursts not only show that he is guilty, but will also assume that the Moving Defendants are guilty, too. This risk of unfair prejudice is significant, and the Court should address it by exercising its wide discretion to sever the Moving Defendants from Mr. Smith.

**CONCLUSION**

For all of the reasons described above, the Moving Defendants respectfully request that the Court order a severance, pursuant to Fed. R. Evid. 14(a), and that they be tried separately from Mr. Mr. Smith.

Dated: February 13, 2023                                   Respectfully submitted,

*/s/ Glen A. Kopp*                                                */s/ Jean D. Barrett*
Glen A. Kopp                                                         Jean D. Barrett
MAYER BROWN, LLP                                         RUHNKE & BARRETT
1221 Avenue of the Americas                              47 Park Street
New York, NY 10020                                           Montclair, NJ 07042
Tel: (212) 506-2648                                              Tel: (973)744-1000

*/s/ Daniel L. Stein*                                             *Attorney for Anthony McGee*
Daniel L. Stein
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue                                                  */s/ Lisa Scolari*
New York, NY10153                                            Lisa Scolari
Tel: (212) 310-8140                                              LAW OFFICE OF LISA SCOLARI
                                                                             20 Vesey Street
*Attorneys for Rahmiek Lacewell*                      Suite 400
                                                                             New York, N.Y. 10007
                                                                             Tel: (212) 227-8899

                                                                             *Attorney for Kaheen Small*


                                                                             */s/ Michael D. Bradley*
                                                                             Michael D. Bradley
                                                                             BRADLEY LAW FIRM PC
                                                                             2 Park Avenue, 20th Floor
                                                                             New York, NY 10016
                                                                             Tel: (212) 235-2089

                                                                             *Attorney for Damon Dore*