# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of the United States of America for Authorization to Continue to Intercept Wire and Electronic Communications Occurring over the Cellular Telephones Initially Identified as 929-320-8554 and 347-662-1334; USAO Reference No. 2021R00338. | **Affidavit in Support of Application for Order Authorizing the Interception of Wire and Electronic Communications over Cellular Telephones**<br><br>**Sealed** |

## Contents

I. Specifications ............................................................................................................ 3

   A. Affiant .............................................................................................................. 3

   B. Purpose of Affidavit ......................................................................................... 3

   C. Target Subjects. ................................................................................................ 4

   D. Target Offenses ................................................................................................ 4

   E. Objectives of the Interception.......................................................................... 5

   F. Target Cellphones and Service Providers ........................................................ 5

     1. Target Cellphone and Successor Target Cellphone Identifiers...................... 5

     2. Successor Service Provider............................................................................ 7

     3. Application to Successor Target Cellphones and Successor Service Provider. ............ 7

   G. Communications Features of Target Cellphone............................................... 7

     1. Wire Communications Capabilities ............................................................... 7

     2. Electronic Communications Capabilities....................................................... 7

   H. Background Conversations ............................................................................... 7

   I. Territorial Scope and Jurisdiction..................................................................... 8

   J. Period of Interception ....................................................................................... 8

   K. Monitoring Agents and Personnel.................................................................... 8

   L. Minimization of Wire Communications........................................................... 9

     1. Special Considerations Regarding Packet Data Copies of Voice Calls.......... 9

     2. Minimization of Electronic Communications............................................... 10

   M. Prior Applications............................................................................................ 11

II. The Investigation and Probable Cause ..................................................................... 12

   A. Probable Cause................................................................................................. 12

USAO_000123

B. Basis and Scope of Declarations ................................................................................ 12

C. Details of the Investigation ...................................................................................... 14

    1. Background to the Investigation ............................................................................ 14

    2. The October 2021 Wiretap ................................................................................... 15

        a. Calls Relating to an October 18, 2021 Assault ................................................. 16

        b. Calls on Smith Phone-1 .................................................................................... 20

        c. Jackson Phone-1 ............................................................................................... 34

III. Normal Investigative Techniques ............................................................................ 39

A. Interceptions To-Date Have Not Yet Accomplished All the Goals of the Investigation. 39

B. Insufficiency of Alternative Investigative Techniques ............................................ 40

    1. Undercover Officers ............................................................................................. 40

    2. Confidential Informants and Cooperating Witnesses .......................................... 42

    3. Physical Surveillance ........................................................................................... 43

    4. Pole Camera ......................................................................................................... 44

    5. Geolocation Information ....................................................................................... 45

    6. Telephone Records and Pen Registers ................................................................. 46

    7. Search Warrants ................................................................................................... 46

    8. Witness Interviews ............................................................................................... 48

    9. Cooperating Witnesses ........................................................................................ 50

    10. Trash Searches ................................................................................................... 50

    11. Grand Jury Process and Financial Investigation ................................................ 50

IV. Ancillary Investigative Orders ................................................................................ 52

A. Order to Service Provider ....................................................................................... 52

    1. Technical Assistance to Accomplish the Interception ......................................... 52

    2. Pen Register and Trap and Trace Information ..................................................... 53

    3. Geolocation Information and Delayed Notice and Return ................................... 53

    4. Non-Disclosure ................................................................................................... 55

    5. Successor Service Provider .................................................................................. 55

B. Order for Expedited Provision of Information Concerning Communications Devices Related to the Interception ........................................................................................... 55

V. Sealing ...................................................................................................................... 56

2019.06.27

USAO_000124

State of New York          )
County of New York         ) ss.:
Southern District of New York   )

WILLIAM CLARK, a Special Agent with Department of Homeland Security, Homeland

Security Investigations ("HSI"), being duly sworn, deposes and states:

## I. Specifications
### A. Affiant

I am an investigative or law enforcement officer of the United States within the meaning

of 18 U.S.C. § 2510(7)—that is, an officer of the United States who is empowered by law to

conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I have

been a special agent with HSI for approximately five years.  Prior to that, I was a special agent

with Internal Revenue Service's Criminal Investigation for approximately five years.  During that

time, I have participated in investigations of offenses involving extortion, racketeering, and gang-

related violence, similar in nature to the suspected offenses outlined below, and, among other

things, have conducted or participated in surveillance, the execution of search warrants,

debriefings of informants, reviews of electronic evidence, and have participated in investigations

that included the interception of wire and electronic communications.  Through my training,

education and experience, I have become familiar with the manner in which extortion schemes are

operated.

### B. Purpose of Affidavit

I respectfully submit this Affidavit in support of the Application of Assistant United States

Attorney Adam S. Hobson pursuant to the provisions of Chapter 119 of Title 18, United States

Code ("Title III"), for an Order of Interception authorizing the interception and recording of wire

2019.06.27

and electronic communications by the Target Subjects specified below over the Target Cellphones

specified below. I further submit this Affidavit in support of the Government's Application for

ancillary orders and warrants (a) to the Service Provider, and any Successor Service Provider, for

(i) necessary technical support to accomplish the interception, pursuant to 18 U.S.C. § 2518(4);

(ii) pen register and trap and trace information for the Target Cellphones pursuant to 18 U.S.C. §§

3121 *et seq.*; and (iii) geolocation information for the Target Cellphones, pursuant to Fed. R. Crim.

P. 41, with delayed notification to the person affected pursuant to Rule 41(f)(3) & 18 U.S.C. §

3103a(b); and (b) to any wire and electronic communications service provider, pursuant to 18

U.S.C. § 2703(d) for expedited provision of subscriber, toll and service records for telephones and

communications devices in communication with the Target Cellphones.

### C.   Target Subjects.

As also set forth in the Application, the Target Subjects whose communications are sought

to be intercepted are: JATIEK SMITH, a/k/a "Tiek," SEQUAN JACKSON, a/k/a "Supa,"

ANTHONY MCGEE, a/k/a "Touch," KAHEEN SMALL, a/k/a "Bizz," a/k/a "Biz," CARL

WALSH, CHARLOTTE WALSH, OCTAVIO PERALTA, MANUEL PEREIRA, DAMON

DORE, JORDAN BORYK, and others unknown.

### D.   Target Offenses

As also set forth in the Application, the Target Offenses that are the subject of this

Application, each of which is predicate offense under 18 U.S.C. § 2516, are: extortion and

extortion conspiracy, in violation of 18 U.S.C. § 1951; possession and use of firearms, in violation

of 18 U.S.C. § 924(c); racketeering and racketeering conspiracy (specifically, conducting the

affairs of an "enterprise"—that is, a group of individuals associated in fact, although not a legal

USAO_000126

entity, the activities of which affect interstate and foreign commerce—through a pattern of racketeering activity consisting of multiple acts of extortion and extortion conspiracy in violation of New York Penal Law §§ 155.40(2), 155.05(2)(e)(i), 155.05(2)(e)(ii), 105.10 and 20.00, and violations of federal law, namely 18 U.S.C. § 1951) in violation of 18 U.S.C. §§ 1962(c) and (d) and punishable under 18 U.S.C. § 1963.

### E.  Objectives of the Interception

As also set forth in the Application, the objectives of the interception sought herein are to reveal to the greatest extent possible: (i) the nature, extent and methods of the Target Subjects' commission of the Target Offenses; (ii) the identities of the Target Subjects, to the extent currently unknown, as well as their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iii) the source, receipt, and distribution of money involved in those activities; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records; (vi) the locations and sources of resources used to finance their illegal activities; (vii) the locations and disposition of the proceeds from and relating to those activities; and (viii) the location and other information necessary to seize and or forfeit money and items of value, and other evidence of or proceeds of the commission of the Target Offenses. In addition, these interceptions are expected to constitute admissible evidence of the commission of the Target Offenses.

### F.  Target Cellphones and Service Providers

#### 1.  Target Cellphone and Successor Target Cellphone Identifiers

The current telephone number of Target Cellphones, as well as their Subscriber, Service Provider, IMEI and/or IMSI, are listed below. The IMEI, variously referred to as International Mobile Equipment Identifier or International Mobile Station Equipment Identity, is like a serial

2019.06.27

USAO_000127

number for the particular cellphone device. The Target Cellphones also have a serial number, somewhat the equivalent of a customer account number, called, variously, the International Mobile Subscriber Identity (or Identification or Identifier)—the IMSI. The IMSI is stored on a small chip, referred to as a SIM card. At this time, the key identifier for the Target Cellphones, and the means by which it will be identified to the Service Provider for installation of the intercept, is the telephone number:

| Target Cellphone & User | Phone Number | Service Provider | Subscriber & Service Address | IMEI: | IMSI |
|---|---|---|---|---|---|
| Smith Phone-1<br><br>JATIEK SMITH | 929-320-8554 | T-Mobile | SOLIDSMITHCORP<br><br>70 Van Pelt Ave<br>Staten Island, NY | 353897100042680 | 310260240063546 |
| Jackson Phone-1<br><br>SEQUAN JACKSON | 347-662-1334 | T-Mobile | JUNIORSBOARDUPINC<br><br>191 Rensselaer Ave<br>Apt 2<br>Staten Island, NY | 354703754852340 | 310260297118054 |

A user of a cellphone like the Target Cellphone may switch the SIM card from one cellphone to another; may obtain a new SIM card (for example, a pre-paid card) for use with the same telephone number; or may request the service provider to port a new telephone number to the SIM card. It is to capture communications after certain such switches in customer service that authorization to intercept "Successor Target Cellphones" is also sought. By "Successor Target Cellphones" is meant (a) a cellphone with the same telephone number as the Target Cellphone, but where the SIM card's IMSI has changed; or (b) a cellphone with a new telephone number, but where the SIM card's IMSI remain the same.

6

USAO_000128

### 2. Successor Service Provider

I know from the foregoing that the user of such a cellphone can switch the provider of service to that cellphone from one service provider to another service provider ("Successor Service Provider").

### 3. Application to Successor Target Cellphones and Successor Service Provider.

To avoid interruption in the execution of the Order of Interception, it is requested that the Order of Interception apply without further order of this Court to any Successor Target Cellphones, as well as to any Successor Service Provider for any of the Target Cellphones. Further, unless otherwise indicated, references herein to the "Target Cellphones" or "Service Provider" include any successors thereto.

### G. Communications Features of Target Cellphone

#### 1. Wire Communications Capabilities

In addition to normal voice communications capabilities, the Service Provider for the Target Cellphones have confirmed that the Target Cellphones have voicemail capabilities. It is requested that the Order of Interception also apply to messages left to, and retrieved from, voicemail, that are otherwise subject to interception under Title III.

#### 2. Electronic Communications Capabilities

The Target Cellphone also has certain electronic communications capabilities. It is requested that the Order of Interception also apply to electronic communications transmitted over the Target Cellphone, including but not limited to, text messages and Internet traffic.

### H. Background Conversations

It is common practice that individuals using cellphones frequently speak in the presence of and while personally communicating with other individuals on the subjects related to the cellphone communication. It is accordingly requested that the Order of Interception also apply to background

7

2019.06.27

conversations overheard over the Target Cellphones while the Target Cellphones are active or otherwise in use, that are otherwise subject to interception under Title III.

### I.  Territorial Scope and Jurisdiction
Pursuant to 18 U.S.C. § 2518(3), interception of wire and electronic communications that are subject to interception under Title III occurring within the Southern District of New York is hereby authorized; and in the event that the Target Cellphones are used outside the territorial jurisdiction of this Court, interceptions may continue in the Southern District of New York, the location where communications over the Target Cellphones will first be heard and/or read and minimized. Interception of messages that are subject to interception under Title III left to or retrieved from voicemail for the Target Cellphones; and interception of background conversations that are subject to interception under Title III occurring in the vicinity of the Target Cellphones while the telephones are active or otherwise in use, are also hereby authorized.

### J.  Period of Interception
As set forth in the Application, HSI will execute the Order of Interception as soon as practicable after it is signed. Inasmuch as the illegal operation described herein is a continuing conspiracy involving numerous persons as yet unidentified and unknown, it is requested that authorization to intercept not automatically terminate when the first communication described herein has been obtained, but rather continue until the Objectives of the Interception are fully achieved, or for a period of thirty (30) days, whichever is earlier. The thirty days are measured from the date of the Court's Order.

### K.  Monitoring Agents and Personnel
Consistent with 18 U.S.C. § 2518(5), the interceptions for which authorization is sought will be conducted only by Government personnel, and by individuals operating under a contract

8

2019.06.27

USAO_000130

with the Government under the supervision of an investigative or law enforcement officer authorized to conduct the interception.

### L. Minimization of Wire Communications

Consistent with 18 U.S.C. § 2518(5), monitoring agents and personnel will conduct the interception in such a way as to minimize the interception of wire communications not otherwise subject to interception under Title III. Monitoring of conversations will terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Title III. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the Target Subjects or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If a conversation has been minimized, the monitoring agents will spot check to ensure that the conversation has not turned to criminal matters. In the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization will be accomplished as soon as practicable after such interception. Monitoring agents and personnel will also operate under specific Minimization Instructions provided by the Assistant United States Attorney supervising the interception. Special attention shall be given to minimize all privileged communications.

### 1. Special Considerations Regarding Packet Data Copies of Voice Calls

Electronic communications over the target phone will be intercepted, pursuant to the Communications Assistance for Law Enforcement Act ("CALEA"), 47 U.S.C. 1001 *et seq.*, in part through receipt from the service provider of "packet data," an electronic data stream. That packet

9

2019.06.27

USAO_000131

data stream, pursuant to CALEA, will be delivered to the HSI's electronic communications collection system, and when certain technology (including VoIMS, VoLTE, 4G, and others) is employed by the cellular service provider, that packet data stream will include a complete copy of all voice calls (which are wire communications) occurring over the target phone. Those voice calls in the packet data stream are duplicates of wire communications that may be intercepted through the HSI's wire communications collection system and minimized in real-time. The packet data, including the copies of voice calls, cannot be minimized in real-time. Therefore, HSI will utilize a filter program in its electronic communications collection system that will automatically identify and block voice calls (which are wire communications) from being intercepted by filtering them out of the electronic communications packet data stream before they enter the electronic communications collection system and are recorded. In the rare event that a voice call is not filtered out of the packet data stream and is recorded, the call will not be monitored or otherwise accessed through the electronic communications presentation system, and HSI will preserve and seal such communications in the manner used for other intercepted electronic communications.

### 2. Minimization of Electronic Communications

Electronic communications generally cannot be reviewed on a real-time basis during transmission because service providers generally produce files containing the electronic communications to the investigating agency in batches. The electronic communication files will generally be separated by type, and the types of communications most likely to contain pertinent information will be subjected to further review. Thereafter, based on factors such as the identities of the sender and recipient, the content of the message, or the content/information relating to electronic communications other than messages, monitoring personnel will determine as soon as

10

USAO_000132

practicable after interception whether the electronic communication appears to be relevant to the investigation or otherwise criminal in nature. If an electronic communication appears to be relevant to the investigation or otherwise criminal in nature, it will be marked "pertinent" and may be shared with the other agents and monitors involved in the investigation.  If the electronic communication does not appear to be criminal in nature, the electronic communication will be marked "non-pertinent;" and if the electronic communication appears to be privileged, it will be marked "privileged." If an electronic communication is marked "non-pertinent" or "privileged," it will be secured in a manner to prevent its dissemination to other members of the investigative team, except as may be necessary to comply with eventual disclosure obligations in a subsequent criminal prosecution.  All intercepted electronic communications will be sealed with the court upon the expiration of the court's order authorizing the interception.

It is anticipated that the monitoring location will not be staffed at all times, but will be staffed at regular hours, at which time intercepted communications will be monitored, examined, and minimized in accordance with the foregoing (including those intercepted at hours when the location was not staffed).  However, even when unmanned, the monitoring location will be kept secured with access limited to only authorized monitoring personnel and their supervising agents.

### M.  Prior Applications

I have been informed that reviews of the electronic surveillance files were conducted for the Drug Enforcement Administration ("DEA"), the Federal Bureau of Investigation ("FBI"), United States Immigration and Customs Enforcement ("ICE"), the Bureau of Alcohol, Tobacco, and Firearm ("ATF") on November 9, 2021, and that those reviews revealed no prior applications

11

2019.06.27

for Court authorization to intercept wire, oral, or electronic communications involving the Target Cellphones or the Target Subjects, other than the following:

On October 14, 2021, the Honorable Lewis J. Liman, United States District Judge, Southern District of New York, issued an Order of Interception authorizing the interception of wire and electronic communications by the Target Subjects over Smith Phone-1 and Jackson Phone-1 (the "October 14, 2021 Order"). Interceptions under the October 14, 2021 Order began on October 15, 2021, and are scheduled to end on November 14, 2021. Attached hereto, and incorporated by reference herein, is Exhibit A, the agent affidavit in support of the October 14, 2021 Order.

## II. The Investigation and Probable Cause
### A. Probable Cause

For the reasons set out in this affidavit, I respectfully submit that there is probable cause to believe that one or more of the Target Subjects have committed, are currently committing, and will continue for at least the next 30 days to commit one or more of the Target Offenses; that one or more of the Target Subjects, during the period of interception sought, will use the Target Cellphones in furtherance of, in connection with, to facilitate, to accomplish, and to commit the Target Offenses specified herein; that additional communications of the same type will occur during the period of interception requested; and that the interception sought herein will achieve the Objectives of the Interception.

### B. Basis and Scope of Declarations

This case is being investigated by HSI, the FBI, the New York City Police Department ("NYPD"), New York City's Department of Investigation ("DOI," and together with HSI, FBI, and NYPD, the "Investigating Agencies"). I have personally participated in the investigation and

2019.06.27

I make this affidavit based on my personal participation in this investigation, and based on reports made to me by agents, analysts, and other law enforcement authorities from the Investigating Agencies. The technical information set forth herein is additionally based on agency training, information obtained from service providers, and review of other wiretap applications. Except where otherwise noted or the context otherwise makes clear, (i) the information set forth in this affidavit may include information provided to me by other law enforcement agents who have assisted in the investigation; (ii) wherever in this affidavit I assert that a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have read and reviewed; (iii) such statements are reported in substance and in part; (iv) where I refer to the contents of previously recorded conversations (*e.g.*, consensual recordings), my quotations and descriptions are based on preliminary draft transcripts of those conversations; and (v) information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance. Further, because this affidavit is being submitted for the limited purpose of securing an order authorizing the interception of wire and electronic communications, I have not included details of every aspect of this investigation to date.  Facts not set forth herein are not being relied on in reaching my conclusion that orders should be issued.  Nor do I request that this Court rely on any facts not set forth herein in reviewing this application for an order authorizing the interception of wire and electronic communications.

13

2019.06.27

## C. Details of the Investigation
### 1. Background to the Investigation

As discussed in more detail in my affidavit in support of the October 14, 2021 Order,

attached hereto as Exhibit A, since approximately March of 2021, the Investigating Agencies have

been investigating a fire mitigation company based in Brooklyn, New York named First Response

Cleaning Corp. ("First Response").  The investigation began after an insurance company made a

report to law enforcement, specifically the National Insurance Crime Bureau ("NICB"), about how

First Response had hired Bloods to work for the company.  Personnel at NICB then passed along

the report to the Investigating Agencies.

Based on my participation in this investigation, including my discussions with other

members of law enforcement, I have learned that when properties suffer fire damage, the property

owners sometimes hire a public adjuster to investigate and process the insurance claim.  Public

adjusters are independent contractors licensed by the state.  The public adjuster, in turn, hires an

emergency mitigation service, or "EMS," to clean up the damaged property, which often includes

sweeping up and removing debris, airing out the property, and boarding up the property.  First

Response is an EMS.  As set forth in Exhibit A, it appears that employees of First Response have

been threatening public adjusters with violent force unless the public adjusters hire First Response

as their EMS.  I understand that costs associated with emergency mitigation services, like those

provided by First Response, are ultimately borne by insurance companies, many of which have

customers across the United States.

Based on the investigation to date, I believe that the Target Subjects and others as yet

unknown constitute an "enterprise," as that term is defined in Title 18, United States Code, Section

2019.06.27

USAO_000136

1961(4), that is, a group of individuals associated in fact.  They are an organized criminal group that operates in the Southern District of New York and elsewhere in order to enrich First Response. The investigation has shown that employees of First Response, some of whom are members of the Bloods gang, are profiting through extortion, fraud, and assault, including using their status as gang members to intimidate competitors. As described further below, the Investigating Agencies have determined that CARL and CHARLOTTE WALSH are the owners of First Response and co-conspirators in the extortion scheme, and JATIEK SMITH is an employee of First Response who exercises substantial authority over criminal activities undertaken on First Response's behalf. Among the investigative goals for the requested interceptions are to determine the hierarchy and ascertain a complete picture as to the respective role of these and other Target Subjects.

### 2. The Target Subjects

Target Subjects JATIEK SMITH, a/k/a "Tiek," SEQUAN JACKSON, a/k/a "Supa," ANTHONY MCGEE, a/k/a "Touch," KAHEEN SMALL, a/k/a "Bizz," a/k/a "Biz," CARL WALSH, CHARLOTTE WALSH, and OCTAVIO PERALTA are described in more detail in Section C(1) of Exhibit A.

Target Subject MANUEL PEREIRA is believed to be an employee of First Response and who is engaged in the Target Offenses.  Among other things, my review of the contents of Smith Phone-1 showed that on or about November 13, 2020, PEREIRA sent SMITH a video of what appears to be the assault of Victim-1, described in more detail in Exhibit A.

15

USAO_000137

### 3. The October 2021 Wiretap

As set forth in Exhibit A, and based on my involvement in this investigation, JATIEK SMITH is believed to use Smith Phone-1 in furtherance of the Subject Offenses, and SEQUAN JACKSON is believed to use Jackson Phone-1 in furtherance of the Subject Offenses. Interceptions pursuant to the October 14, 2021 Order, including intercepted communications in which the user of the phones self-identifies, have confirmed that SMITH uses Smith Phone-1 and that JACKSON uses Jackson Phone-1. Interceptions pursuant to the October 14, 2021 Order have also confirmed that both Smith Phone-1 and Jackson Phone-1 are used in furtherance of the subject offenses. Some of these communications are described below.

### a. Calls Relating to an October 18, 2021 Assault

Based on my review of NYPD reports and my discussions with other members of law enforcement, I know that on or about October 18, 2021, at approximately 3:08 p.m., a 911 caller reported a disturbance at a construction site in Staten Island, New York, which involved four men with guns. When police arrived, an individual at the scene ("Victim-5") reported, in substance and in part, that he had been punched in the eye. Police observed a laceration and swelling to Victim-5's left eye. Based on further investigation, including an HSI interview of Victim-5, I have learned that Victim-5 works for a construction company that was repairing the roof of a Staten Island home (the "Property") that had been damaged by fire. First Response was the company hired to provide services for the Property. At some point during the repair, the roof of the Property was left open, and some of the sheetrock in the Property suffered rain damage. On the day of the assault, while Victim-5 was performing work on the roof of the Property, unknown males wearing

16

2019.06.27

First Response gear told Victim-5 to come downstairs immediately or else they would "punch your face." One of the men then told Victim-5 that someone had to pay for the sheetrock damage, and that if no one pays, he would start punching. One of the men then punched Victim-5 twice in the face. One of the other men took a copy of Victim-5's identification card and took a picture of it, which Victim-5 perceived as a threat that the man knew where he lived.

Calls intercepted over Smith Phone-1 and Jackson Phone-1 confirm that First Response carried out the assault on Victim-5, and that JATIEK SMITH and SEQUAN JACKSON were involved in the assault.

On or about October 17, 2021, beginning at approximately 3:19 p.m., multiple calls were intercepted over Jackson Phone-1 between JACKSON and multiple individuals believed to be affiliated with First Response, in which the participants discussed the fact that the roof of the Property had been left uncovered and the owner was complaining about water damage. At approximately 3:56 p.m., JACKSON, using Jackson Phone-1, reported the damage to SMITH, using Smith Phone-1. In this call, JACKSON told SMITH, "This house is wet. We gonna need like 24 fans and like five DUs. The roof is open but the, uh…the rear on the second floor is open also." In response, SMITH told JACKSON to "make Primo get the fuck up. . . . 'Cause we would have to pay. . . . Make Primo get up, bro. Make Primo get up now. Word." Based on my training and experience and participation in this investigation, I believe that in this call, SMITH is ordering JACKSON to make "Primo," believed to be the First Response employee in charge of the work being done at the Property, to attend to the damages.

17

USAO_000139

On or about October 18, 2021, at approximately 11:16 a.m., a call was intercepted over Jackson Phone-1 between JACKSON and an individual with First Response believed to be named Damon Dore, using phone number 347-861-1248, in which JACKSON directed Dore to go to the Property with a display of authority so "they'll see that authority there and they'll continue to move strong." JACKSON instructed Dore that he needs to show the construction workers "that we not playing [with] them" and to "just pull up on 'em." At approximately 11:29 a.m., JACKSON again spoke to Dore, using Jackson Phone-1. In this call, Dore appeared to be physically present at the Property and describes to JACKSON a previous conversation had with the constructions works at the site said to Dore, "Who you work for?," and Dore replied, "I said I'm the boss." Based on my training and experience and my participation in this investigation, I understand that in these calls, JACKSON is instructing Dore to make a show of force at the scene of the Property, and that Dore is then reporting to JACKSON that he did so.

Later in the day, at approximately 3:40 p.m., a call was intercepted over Jackson Phone-1 between JACKSON and an individual who uses the name "Primo," using phone number 917-577-9439, in which Primo told JACKSON that "the little guy called the police. The polices are here. I know, say nothing. Nobody say nothing, but, I wanted to let you know that. Okay?" At approximately 3:49 p.m., another call was intercepted over Jackson Phone-1 between JACKSON and Primo, which included the following conversation:

    **PRIMO**: Hello?

    **JACKSON**: Yo, Primo.

    **PRIMO**: Yes, Sir.

2019.06.27

USAO_000140

JACKSON: What's up, what's going on over there?

PRIMO: Every, Every--Nothing, nothing. Everybody left. He no, he say nothing. He say that he only wanted leave from here. He no, he no say nothing.

JACKSON: [CHUCKLE]

PRIMO: He just call him be, eh, the guy that, the guy that you hitted.

JACKSON: What?!

PRIMO: The guy that you hitted, he called the police, right?

JACKSON: Who called the--Oh, he--

[VOICES OVERLAP]

PRIMO: Hello?

JACKSON: --Called the police?

PRIMO: Yeah. And then when they come he say he, "I only want to go, get out from here" "But you want to charge, charge or something?" "No, no, I only want to go out." And then everybody left. They try to go to the neighbor house to see the, the camera, but they no see nothing. So, they left. Everybody left. I mean, that guy, he, and the police. Everybody left.

JACKSON: Okay, goodbye.

PRIMO: Okay.

In this call, Primo appears to be discussing the fact that JACKSON assaulted Victim-5 ("the guy that you hitted"), and that the police left because Victim-5 was not cooperative and the police could not find security camera footage of the incident.

Wire interceptions over Smith Phone-1 indicate that SMITH was also at or near the scene of the assault. On or about October 18, 2021, at approximately 2:27 p.m., a call was intercepted over Smith Phone-1 between SMITH and a female named Michelle Morello, using phone number 917-991-1820, who, based on the investigation and the context of the call, I believe to be an

19

2019.06.27

employee of First Response.  In the call, SMITH asks Morello about an individual named "Edgar," who is described as the "roofing guy," and whether Morello "got a picture of his ID."  In the call, SMITH states, "He's standing here with me right now," which I understand to refer to Edgar.  The geolocation information associated with this call shows that SMITH was in the vicinity of the Property at the time the call was placed.

On or about October 19, 2021, at approximately 8:40 p.m., phone number 917-416-4899, believed to be used by Octavio Peralta, sent Smith Phone-1 the following text message: "How did it go with the roofer?"  At approximately 9:35 p.m., Smith Phone-1 responded, "I didn't hit him." Based on my training and experience and my participation in this investigation, I understand that in this communication, Peralta is asking SMITH about the altercation with the construction worker at the Property, and SMITH is acknowledging that someone—but not SMITH—hit the worker.

### b. Calls on Smith Phone-1

On or about October 19, 2021, at approximately 1:29 p.m., a call was intercepted over Smith Phone-1 between SMITH and an unidentified male using phone number 609-591-1639 whom SMITH refers toas "Cee," and whom NYPD records indicate is "Carlos Flores."  On the call, "Cee" appears to be asking SMITH to help him get business, showing SMITH's control over the industry and SMITH's enforcement of a rotation system.  The call includes the following conversation:

CEE: I've been- I've been fucking hurting…

[VOICES OVERLAP]

SMITH: Right…

20

USAO_000142

**CEE**: Trust me I've been fucking hurting and that's why I'm making this phone call to get your approval on something.

**SMITH**: Thought you was my guy man. What's up man?

**CEE**: Nothing. Fucking-.

[VOICES OVERLAP]

**SMITH**: [STAMMERS] 'Cause it gotta [sic] be about that two alarm shit.

**CEE**: Well that's why I'm calling for your approval to do it. We got a called in from this service company. I'm like "Yo, I'm nowhere around."

**SMITH**: Who, Traveler? Who Travelers?

**CEE**: I- I believe so. Is it State Farm or Travelers?

**SMITH**: Oh, by 96 or 98?

**CEE**: Um, 98, but you know me, I don't step on toes, bro.

**SMITH**: [AUDIO BREAKS]

**CEE**: Hello?

**SMITH**: Um… No, no I'm here. Sorry, sorry, I was talking to my secretary. Um… Who's supposed to be coming down?

[VOICES OVERLAP]

**CEE**: I mean I haven't gotten a-… I haven't gotten something in two months, bro. I'm not even lying to you bro. I'm really fucking hurting out here bro…

[VOICES OVERLAP]

**SMITH**: Yo, I understand, I understand that, bro, but look…

**CEE**: Yeah, talk to me.

**SMITH**: The same way the pride, bro, like, look when we, when we pushing the [U/I] you know how many times we opened the door for AJ and Mark. And be like, "Yo, like pull up. Yo, we got something for ya. Yo, we got something-." Yo, shit-. Yo, Cee-

21

USAO_000143

[VOICES OVERLAP]

**CEE**: Nobody tells me nothing, bro. Nobody tells me nothing.

**SMITH**: Cee, hold on. You took yourself out the picture, Cee. You stopped calling. You wasn't returning my messages. No nothing. Like I was answering to you.

**CEE**: Nah.

**SMITH**: I don't [AUDIO BREAKS] nigga. I was answering to you. I was, I was answering to you every minute. Like think about what happened at the [U/I] fire. Nigga, you told me what it was. Uh, yo, listen, bro, yo, yo-…

**CEE**: Right.

**SMITH**: … and I walked away. Yo, look, "oh, hey, sorry." [STAMMERS] I was answering to you, Cee. Not these dudes, man.

**CEE**: I know that, bro.

**SMITH**: Then you, you took yourself out the equation, brother, like – so what was, what was supposed to happen when like I tell you – you their boss. Why am I-? I ain't talking to them. And I ain't fuck with them like that.

**CEE**: Right.

**SMITH**: But, but now it's not like – a'ight. You know how many times we call - so look, we got into a situation where Mark and AJ signed the loss in Brooklyn.

**CEE**: Right.

**SMITH**: Some, some other dudes are trying to snatch it from them.

**CEE**: Really? Hold on. I know about that.

**SMITH**: So-.

**CEE**: You got it back from them.

**SMITH**: Yeah. [STAMMERS] And I'm just saying like, yo, look, like I told them dudes, they tryin' feed their family like, yo, they had it for three days now.

**CEE**: Right.

22

USAO_000144

**SMITH**: Ya wanna come and do corny shit. That's whack. Like, they, they already got it. They started servicing it. Come on like – they'll be other fires.

**CEE**: Facts.

**SMITH**: Then Mark is like, "Nah, if we get it, we gonna walk away." What the fuck did you even call me for then?

**CEE**: Nah, yeah, why did he call you then?

**SMITH**: Why you call me to be like, "Nah, we just gonna walk away." Like, but, what I'm saying is this? I understand you saying ya ain't getting a little [U/I] but where's the help at. We, we need help so many times and we call him like, "Yo, Mark, AJ, what's up?" "Nah, we just fuck with Jersey now." A'ight. Everybody saying that, now it's a Staten Island fire.

**CEE**: You know what, you know what…

**SMITH**: Oh.

**CEE**: And you know what, I don't even get calls about it. I don't know why they won't call and tell me something like that. That's fucked up.

**SMITH**: No, but, they, they shouldn't have to. Cee, you took yourself out of the equation. I would've called you. I would've called you at every moment.

**CEE**: No, I know that, B. Facts.

**SMITH**: Like I was doing before. Everything was me and you going with each other. You and me talking. Me and you putting everything together. It's not, I wasn't talking to them.

**CEE**: Yeah…

**SMITH**: I wasn't even speaking to them.

**CEE**: Yeah. I know that.

**SMITH**: I know you. You was giving me pointers. You was teaching me things. You was showing me things. I don't know them. They…

[VOICES OVERLAP]

**CEE**: Yeah, I know…

23

2019.06.27

**SMITH**: … they ain't never had no type of love for me.

**CEE**: Yeah, I know…

**SMITH**: [MUMBLES] Like- Yeah like so like I say, now is like—[ASIDE: I gotta pay? It's metered parking. Fuck that. Fuck that yeah.] Yeah hold on. [ASIDE: I ain't paying for no parking when its free down there.] So, so now like I said it's like alright so it's a Staten Island fire. It's a Staten Island fire but where is all the help when we needed help and there's so many times- But I'll show the text messages to Mark and AJ like; "yo bro, none of us is around, you gonna snatch up that um… the [U/I]…" "no bro we in Jersey. No, no thank you we in Jersey. No, no thank you we in Jersey". We gotta call Upper or we gotta call Serverpro… " Oh can y'all- y'all, can y'all go snatch that Staten Island fire…

**CEE**: Yeah…

**SMITH**: We already got too many- we already got too many this month. We are telling people "yo, we got too many this month can somebody else go get it"

**CEE**: God damn bro see I didn't hear about…

[VOICES OVERLAP]

**SMITH**: Like we're telling people… Like come on.

[VOICES OVERLAP]

**CEE**: See I would never turn down a loss bro. I got fucking kids bro. Turning down a loss? What the fuck! Damn!

**SMITH**: Yeah like so like I said now but, Supa and them been there for hours. I – Hold on, hold on, let me put them on… well you know that… [CHUCKLES] he's been there for hours.

**CEE**: Yeah that's why I- you know me, I don't go bothering or step on no one toes bros.

**SMITH**: Hold on.

Based on my training and experience and my involvement in this investigation, I believe that Cee is affiliated with a public adjuster or other similar participant in the fire insurance industry. Cee appears to recognize that SMITH holds power over who gets what jobs, and in the call Cee asks

24

2019.06.27

SMITH to give hm work.  SMITH tells Cee that Cee previously "took [himself] out of the picture," which I understand to mean that Cee stopped communicating directly with SMITH about jobs. SMITH also discusses his process for allocating work to other companies, saying that he was telling some companies that they had too many jobs this month.

On or about October 26, 2021, at approximately 11:51 a.m., a call was intercepted over Smith Phone-1 between SMITH and Octavio Peralta, a public adjuster who is suspected of conspiring with SMITH and other members of First Response, and who was using phone number 917-416-4899.  An unidentified male who the participants refer to as "Cliff" also speaks on the call.  Based on my training and experience and participation in this investigation, I believe that in this call, the participants are agreeing to try to hide from the insurance company the fact that a property has an unlawful occupant and is therefore not a covered loss.  The call includes the following:

**CLIFF**:  Um, do we have any blueprints for 54th Street?

**OCTAVIO**:  No. Blueprints are usually…

[VOICES OVERLAP]

**CLIFF**:  Can we get 'em?

[VOICES OVERLAP]

**OCTAVIO**:  …we don't do blueprints ourselves. If you-okay, so, number one, when the contractor does the job, if they're gonna put permits they, they do the blueprints. In this particular case, I don't think you could do that because of the way she occupies that basement. That bedroom downstairs may not go through if you try to pull permits. And that's where she lives.

[VOICES OVERLAP]

25

USAO_000147

**CLIFF**: You said it may not...[CLEARS THROAT]...you said it may not go through if we got permits?

**OCTAVIO**: Yeah, I mean, basements are not usua-are not supposed to be liveable space.

**CLIFF**: Right. So, but the plumber, the plumber is just asking me for blueprints. And he said uh, he's gonna blueprints to do the job over there. He can't just go off the scope.

**OCTAVIO**: Okay. So, time to get a new plumber.

**CLIFF**: Get another plumber, right?

**OCTAVIO**: That's what it sounds like, brother. [CHUCKLES]

**CLIFF**: [CHUCKLES]

**OCTAVIO**: [CHUCKLES]

**CLIFF**: [CHUCKLES] A'ight, copy.

**OCTAVIO**: Sounds like [CHUCKLES] doesn't sound like that's your plumber. [CHUCKLES]

**CLIFF**: [CHUCKLES] A'ight, copy.

**OCTAVIO**: You got it.

**CLIFF**: I do got another guy who-thank you, though.

**OCTAVIO**: Take it easy.

**CLIFF**: If anything, I'll have-I'll call back.

**SMITH**: A'ight

**CLIFF**: A'ight, chief.

Based on my training and experience and participation in this investigation, I believe that the participants in this call appear to be discussing the fact that a plumber who has been hired to repair a damaged property has asked for the blueprints for the basement of the property. Peralta states

2019.06.27

USAO_000148

that they cannot provide the blueprints because the homeowner is still occupying the home. I

believe that this refers to the fact that the blueprints would show that the basement of the home

was being illegally used as a residence, which would mean that insurance would not cover the loss.

Peralta states, in substance, that if the plumber is asking for blueprints, they need to get a new

plumber. I understand this to mean that SMITH and Peralta want to find a plumber who will not

reveal to the insurance company that the basement was being illegally occupied so that the

insurance company will in fact cover the loss.

On or about October 28, 2021, multiple calls were intercepted over Smith Phone-1 in which

SMITH and other members of First Response appear to threaten a public adjuster named

Christopher Persky over a dispute involving a $25 million fire loss in Queens, New York. At

approximately 10:48 a.m., a call was intercepted between Smith Phone-1 and phone number 917-

440-9803 in which SMITH tells Persky that he is calling with other members of First Response,

including JACKSON, target subjects Carl Walsh and Charlotte Walsh, and a person who identifies

himself on the phone as "Demo." This call includes the following conversation:

> **PERSKY**: The owners never asked the question. And truth be told, I was never aware that, that invoice was gonna be put in until it was ultimately put in four, five months into the claim after, after you guys had gone your separate way. It was never brought to our attention that it was gonna be on the spreadsheet and it was never on the first two spreadsheets that we received from Carl's office.

> **DEMO**: No, I understand that but that's not, that's not something-.

> **SMITH**: Wait, hold on. Hold on. Hold on. Hold on. As a matter of fact, I ain't gonna lie we [U/I] pissed, um, matter of fact, I got time today. Pull up. Yeah, y'all could pull up. Y'all could pull up. I got time today. I got-, y'all could pull up. And we not gonna do this shit over the phone. We not gonna do this shit over the phone. I'm not gonna sit here-, but don't, don't make it seem-. They're playing

27

USAO_000149

themselves later on. They-, uh-huh. Them play themself [sic] later on. What time we meeting? Yeah.

**PERSKY**: Are you asking, are you asking me?

**JACKSON**: Yeah, you. What time we meeting guys?

**SMITH**: [U/I].

**PERSKY**: I have appointments all day. What time are you guys looking to do this at? I, I don't-, [STAMMERS] I have...

**SMITH**: All day.

...

**PERSKY**: Larry what's your day like? Guys, [STAMMERS] I just wanna say like it's not us saying that your bill shouldn't be paid. It's not, it's not us saying that. You provided us the bill. We provided the whole bill to the insured. But we don't-, we can't control what they pay and what they don't pay.

**JACKSON**: No listen. I think the point of-, the reason of, uh, meeting up is so we could get a better understanding in person because obviously the phones just suck. We have, we have fifteen people here. It's just not gonna work.

**PERSKY**: Let me, um, let me see if I can shuffle things around. Can you give me a few minutes and I'll call you back?

**SMITH**: A'right, a'right.

Based on my training and experience and participation in this investigation, I believe that in this call, Persky appears to question the validity of an expensive invoice that SMITH's company, Solid Smith Corp., submitted in connection with the job, purportedly for "consulting" services. SMITH angrily tells Persky to "pull up," which I understand to mean that SMITH wants to meet with Persky face-to-face. I have listened to the call, and SMITH's voice when delivering this message is angry and threatening. Persky's voice then becomes hesitant, as if he were intimidated in response.

28

2019.06.27

Later in the day, at approximately 1:01 p.m., a call was intercepted over Smith Phone-1 in which SMITH calls Carl Walsh, using phone number 917-440-4044.  Based on the context of the call, Persky appears to be with SMITH in person during this call.  This call includes the following conversation:

> **PERSKY**: I don't want to do it. I don't want have a problem. I'll admit it. I don't want to have a problem. But I don't want to guarantee something to you that I can't guarantee. I'm 57 years old. I've done this for 30 years, Tiek. Okay. I'm trying to make this as amicable for everything. We don't ever – and not that we would, if we get called on this, we call you. We're honorable people. We're not always [PH] trustworthy and…

[VOICES OVERLAP]

**SMITH**: Stop right there, brother.

**PERSKY**: Okay. I'm just, I just, I need to say that. I'm sorry.

[VOICES OVERLAP]

**SMITH**: Stop right there. I say this -, no, but let me say this though.

**PERSKY**: Okay.

> **SMITH**: There's [sic] things I know, and I truly just choose to bypass it. The reason I choose to bypass it – is for my own well-being. For my own well-being. That's the only reason I choose to bypass it. So, when I speak to people, I speaking on truth. We could step outside right now. Tell all the police officers standing there. We all sit here with them and I told all of 'em, "I'll knock ya the fuck out." Matter of fact, he mushed one of them. We ended up scuffling with them and not one of us got locked up 'cause the same thing they understand about me is, I'm gonna tell the truth no matter what. I don't care. I don't, my, my heart doesn't look like that. I cannot be a sucker. Like I said we could step outside right now and ask these folk-, as a matter of fact, I was fighting with my mother the other day. I was fighting with my mother the other day. I kicked my mother's door in and everything. And, told the po-, and I told the police, "the moment one of ya touch me, I'mma fuck ya'll up." They called a bunch of different cops. And they came and they all just stood there. They all just stood there. Then the captain came. Not the captain. She runs the precent. She came. We talked. She made everybody leave and then that was the matter of that. But

29

USAO_000151

if you don't believe me, you could go ask my mother right now. Or you could go ask 'em. There's a big ass hole in this door right there that I put right here. It's a big ass hole in this door on the side that I put in the door. I'm gonna always speak the truth to my heart to everybody with no problem. But all I ever say is, like my integrity runs deep. For real, my integrity runs deep. Not the fake, not me just telling people-, it's shit I don't have to do that I do. So, [STATIC]. When you're ready to speak to me honest, then you speak to me. But brother, I know shit that ya think I don't know. I just choose not to say nothing. I just, I truly choose for my own well-being, my own well-being and everybody around me, and everybody around me, I truly choose not to say something 'cause I don't want to see them sit in jail. They got children like I got children. I don't want to see them sit in jail for a matter of me, and the matter of my own ego. I don't want to see them sit in jail for that. So, we gonna stick to 34. We gonna stick to 34.

Based on my training and experience and participation in this investigation, I believe that on this

call, SMITH threatens Persky with violence if Persky does not negotiated for the charges SMITH

submitted to be paid. When SMITH then tells Persky that "we could step outside right now," and

proceeds to tell Persky about a recent incident in which he kicked in the door of his mother's house

and was confronted by the police, SMITH appears to be sending a message that he will use violence

against Persky if Persky does not cause the charges to be paid.

On October 28, 2021, at approximately 12:02 p.m., a call was intercepted over Smith

Phone-1 between SMITH and Jordan Boryk, using phone number 718-787-6720, and whom I

believe to be an employee of an EMS company other than First Response. On the call, SMITH

conferences in SEQUAN JACKSON, using Jackson Phone-1. This communication includes the

following conversation:

> **BORYK**: And what about, and what about the rest o' game [in New Jersey], are they giving it up like, like here or is it different?

2019.06.27

USAO_000152

**JACKSON**: Well, a lot of those guys they all work together like, like, like, big companies work with other companies like a construction company will work with a restoration company to get the job.

**BORYK**: Are people getting punched in the face?

**JACKSON**: No, but it's a lot of bozos out there. It's a lot of people who think they are, they are who they are once they, once, once -, it's like a lot of rejects out there. So, you know [U/I].

[VOICES OVERLAP]

**SMITH**: Well, remember they, they, remember Mike, Mike, remember Mike went out there and signed three, four fires. Remember they surrounded them, um.

**JACKSON**: Yeah.

**SMITH**: Remember they surrounded him, drive [PH] him off and then he had to really like go to the police to get out of there.

**BORYK**: No shit.

**JACKSON**: I know that's there's a lot of, a lot of the, um, anything that's, that's anybody who they consider like I guess the tough guys out there, uh, like they're not. If that makes sense. They're not. So, it's, it's all an intimidation game how it was out here at one point. That's it. They not really-, the only issues that I always seen was Newark. Newark was like, I don't know. It's just always a issue with Newark.

**BORYK**: A'right.

[VOICES OVERLAP]

**SMITH**: A issue, how?

**JACKSON**: But I don't-, like, like a lot of the homies lived in Newark so when there was a fire, you have thirty people in Newark trying to get the fire all for one [AUDIO BREAKS] kinda thing. Like just a mob. You know what, you know what I'm talking about? They'll, they'll-, literally a mob in Newark. Because Newark, you gotta sign [U/I].

[VOICES OVERLAP]

**SMITH**: So somebody that owned a company probably told all o' them…

31

USAO_000153

**JACKSON**: Yes.

**SMITH**: … "Yo, I give you a commission. You get the fire for me." So now they all out there [U/I].

[VOICES OVERLAP]

**JACKSON**: Pretty much, I know who, I know [AUDIO BREAKS] out there. Their muscle out there is not really, they're not really, they're not, their muscle is not smart. They're not really doing nothing. It's just they only there by numbers.

Based on my training and experience and participation in this investigation, I believe that in this call, Boryk is referring to the violent tactics SMITH and JACKSON used to control the EMS industry (i.e., "Are people getting punched in the face?"), and how SMITH changed the dynamics of the industry by implementing the rotation system.

On or about November 5, 2021, at approximately 7:39 p.m., a text message was intercepted over Smith Phone-1 between SMITH and Octavio Peralta, using phone number 917-416-4899, in which Peralta stated, "Signed Ron this afternoon." Based on my training and experience and participation in this investigation, I understand this to be a communication between SMITH and Peralta about a new customer that Peralta has signed, and for which Peralta will serve as the public adjuster. Though I do not at this point know the full extent, the signing of "Ron" as a client may be part of the illegal extortion scheme to provide First Response with clients.

On or about November 7, 2021, at approximately 1:02 p.m., a call was intercepted over Smith Phone-1 between SMITH and Jordan Boryk, using phone number 718-787-6720. SMITH states on the call that JACKSON is with him in person, and JACKSON also speaks on the call. On the call, SMITH and JACKSON discuss with Boryk the process for assigning jobs to members of the industry. The call includes the following conversation:

32

USAO_000154

**SMITH**: I told you to—I told you myself the problem. Remember, I told you myself what the problem is. Motherfuckers is really not working. Motherfuckers is truly just not working. Because, if, if the dynamic of me never happened, what would everybody do? They would do full court press to get shit. They would go full court press. They'll be talking to owners' kids, neighbors…their grandmother in the nursing home. Niggas would be doing everything to get it. Whatever 'in' they could get, everybody would be doing it. Everybody would be going hard. But that's not what's happening now. And we seeing, we seeing a lack of, of [SMACKS TEETH].

**JACKSON**: [U/I].

**SMITH**: We truly, we truly seeing a lack of effort. We seeing a lack of, of, of, of…You—whatever this, whatever this, whatever this 'incentive' thing was, I don't know what it was said…

[BACKGROUND: NOISE]

**SMITH**: …I don't know what was truly said, or how it was said it [sic]. That's why I'd rather everybody get on the fucking phone—so, let's get this straight again. The incentive doesn't mess wit' nobody but Paulie. The incentive doesn't mess with nobody but Paulie. But then let's say this, too, though: my guys is getting to the fires first. They getting there. They working it. They doing all types of shit. And then they like, "Aight, well, it's going to EFS." Why the fuck would ya' guys get a commission for that? But, I know you, you probably still giving them commission in the background.

[VOICES OVERLAP]

**BORYK**: [CHUCKLE] Naw, no, no.

**SMITH**: I know you.

[VOICES OVERLAP]

**BORYK**: Eh, that's at all what I was talking about, though. I wasn't, first of all, I wasn't talking about my guys. I don't think I ever said that. I used one (1) particular example, just because I don't even know everybody's names anymore. But, the example that I used, and believe me, it's not specific to him, it's, it was just the fact that used, "Elvin," because I know his name. What I said is, [SIGHS]--

**SMITH**: And you see Elvin out there more now?

**BORYK**: Yeah. Yeah…

33

USAO_000155

[VOICES OVERLAP]

**SMITH**: Elvin signed that fire for y'all.

**BORYK**: …Hundred percent (100%).

**SMITH**: Because like I told Benny, like I told Benny, "That nigga don't need to be out here, then." If he ain't gonna get up, if he think he goin' chase from his motherfucking bed, he don't need to be out there, then.

[VOICES OVERLAP]

**BORYK**: But Tiek, I wasn't complaining. I have, I have a much, I think I have a much deeper understanding, based on, you know, a long-term experience in this. Things have been working out for me pretty alright. So, I real-, I hope—Super, I hope you didn't take it like I was complaining for you to fucking do something for me? That was—[SIGHS].

**JACKSON**: Naw, I didn't take it that way. I didn't--

**SMITH**: No.

Based on my training and experience and my participation in this investigation, I understand that in this call, SMITH and JACKSON are discussing the impact SMITH has had on the fire insurance industry and the control he exerts over the industry (e.g., "Because, if, if the dynamic of me never happened, what would everybody do?"; "Every single issue is to be brought to me. . . . Everything is to be brought to me.").

### c. Jackson Phone-1

On or about October 20, 2021, at approximately 10:51 a.m., a call was intercepted over Jackson Phone-1 between JACKSON and a person believed to be Target Subject Anthony McGee, a/k/a "Touch," using phone number 347-233-9164  This call included the following conversation:

**JACKSON**: Yo.

USAO_000156

**MCGEE**: Alrighty, um… I know we still gotta get Flag. Oh, I know that we got a DOA over here. There's another one in Brooklyn. What do you um…? Do you want me to send Manny there? Or do you want me to head there? And-and who's up next?

**JACKSON**: You…you should know all this shit already, bro. I ain't gonna lie. I don't even know. You.. you manage the daytime. You can send Manny over there. I don't work in the daytime. I know I'm the manager but this is stuff that you should be doing. You can tell Manny: "A'ight. You know what? There's a fatal over there. I'm sending Manny over there." [BACKGROUND: NOISES] And who's up next? It's whoever didn't get…

**MCGEE**: So, the only person that didn't get- Flag, but I'm saying, if we get Flag on one of them, what do we do with the next one?

**JACKSON**: Give it to ServPro. Double up on the other companies.

[VOICES OVERLAP]

**MCGEE**: Okay. Copy.

**JACKSON**: Double up on the other companies. That's what you do.

**MCGEE**: Alright.

**JACKSON**: Double up on all these other companies. Let them get two.

**MCGEE**: No problem.

**JACKSON**: Everybody gets two fires real quick. Let everybody… And then, yeah… Let everybody get two fires.

**MCGEE**: Got it.

**JACKSON**: Go through the cycle again of other companies.

**MCGEE**: Understood.

**JACKSON**: A'ight.

Based on my training and experience and participation in this investigation, I believe that in this call, JACSKON and McGee are discussing the rotation system, in which First Response decides

35

2019.06.27

who in the insurance industry gets which jobs based on a system that SMITH has set up, and that the co-conspirators enforce through threats of force. In this call, McGee appears to ask JACKSON who should get a certain job ("Who's up next?"), and JACKSON tells him to "give it to ServPro," and then "double up on the other companies." JACKSON implements the rotation system by instructing McGee to "let everybody get two fires," and to then "go through the cycle again of other companies."

On or about October 28, 2021, at approximately 12:40 p.m., Jackson Phone-1 sent a text message to phone number 718-605-4600 in which he stated, "This is Sequan the manager for first response." Based on my training and experience and my participation in this investigation, I understand that in this text message, JACKSON is confirming his role with First Response.

On or about November 1, 2021, at approximately 4:18 p.m., a call was intercepted over Jackson Phone-1 between JACKSON and a person identified as Giovanni Villon, using phone number 929-224-6106. That call included the following conversation:

**JACKSON**: Yo, what's up?

**VILLON**: Yeah, who's up for P-A's [Public Adjusters]?

**JACKSON**: Anybody, bro.

**VILLON**: Huh?

**JACKSON**: Anybody but, anybody but Octavio.

**VILLON**: Alright. 'Cause, um, this one is--

[VOICES OVERLAP]

**JACKSON**: Call Johnny Bells. Yeah, yo, you know, yeah 'cause—[STAMMERS]. No, there's a, there's a daytime supervisor...you can contact, and like, if anything,

36

USAO_000158

I'll put it in the chat. But, bro, we all know the P-A's that, who—Octavio just got something, B-Life just got something.

[VOICES OVERLAP]

**VILLON**: Nah, my fault. Nah, 'cause, 'cause, 'cause the last couple times that I asked...

[VOICES OVERLAP]

**JACKSON**: [AUDIO BREAKS] this kind of stuff. [AUDIO BREAKS] ... got stuff...

[VOICES OVERLAP]

**VILLON**: ...You about the P-A's. you—You, um, you d-, direc-, redirected me to Tiek, that's why.

**JACKSON**: No I never do that ... No, no, that's what I'm saying. But, think about it, though. Think about it. Octavio just got, New York just—is about to get. King just got.

**VILLON**: The reason why I'm asking is...

[VOICES OVERLAP]

**JACKSON**: So--

**VILLON**: ...Because, fucking, this shit is a dub for any, like, resto. But, but, but Lou Ortega's here, and they definitely need a P-A. So, before I even push him on, I just want to know.

[VOICES OVERLAP]

**JACKSON**: Oh! See that, fuck nigga, then say that. Say, "Hey, listen, L-, Lou Ortega— and, nothing is, if they need a P-A, they need a resto, bro.

**VILLON**: Ah, the thing is that this guy, he told me straight up, he's like, "Yo, I gotta a whole family of contractors. I'm a plumber, my brother's an electrician. My other fucking brother's a fucking contract-, a general contractor. Like, we gonna do everything in the house." He just told me, straight up. He got somebody on the way to do the board up for him, and Cipco's right here. 'Cause I was like, "Yo, I got my guys right here with the wood and everything. We'll close everything off." He was like, "Nah, I got people on the way. It's a whole family of contractors." That's what he just told me. But they got a illegal kitchen in the

37

USAO_000159

> basement, so I know he's gonna need a P-A. So, instead of nobody making money I guess we'll at least try to throw a P-A. on this.

**JACKSON**: Fuck that nigga, then! Let that nigga claim get denied for—fuck that nigga, then!

**VILLON**: [LAUGHS] A'ight. Fuck it.

[VOICES OVERLAP]

**JACKSON**: Fuck that nigga. Fuck that nigga!

**VILLON**: A'ight.

Based on my training and experience and participation in this investigation, I believe that on this call, Villon and JACKSON are discussing the rotation system that First Response has implemented on the industry. Villon asks JACKSON which public adjuster is next in the rotation, and JACKSON tells him anyone but "Octavio," who I understand to mean Octavio Peralta. On the call, Villon also talks about the fact that there is an illegal kitchen in the basement of the property, so they will need a specific public adjuster to handle the job. I interpret this to mean that they will try to get a public adjuster who will hide the illegal kitchen from the insurer.

On or about November 5, 2021, at approximately 9:19 p.m., a call was intercepted over Jackson Phone-1 between JACKSON and a person using phone number 917-853-0374 and whom JACKSON refers to as "Robert," and who appears, based on the context of the call, to be the owner of a property that suffered fire damage. JACKSON appears to be soliciting business on the call. Among other things, JACKSON says to Robert, "you had a fire, had some tenants, whatever the case is, let's leave things off the record." Based on my training and experience and my participation in this investigation, I understand that in this call, JACKSON is offering to hide information about illegal occupants in the building from the insurance company so that the loss

38

2019.06.27

will be covered.  On or about November 6, 2021, at approximately 9:24 a.m., JACKSON sent a

text message to 917-853-0374 from Jackson Phone-1 which stated, "Good morning, blessing.  If

there's any guidance you may need regarding your claim feel free to give me a call."  Based on

my training and experience and my participation in this investigation, I understand that in this text

message, JACKSON is confirming the phone call he had with Robert, in which he had offered to

hide information from the insurance company.

### III.  Normal Investigative Techniques
#### A.  Interceptions To-Date Have Not Yet Accomplished All the Goals of the Investigation
To date, the wire and electronic interceptions pursuant to the October 14, 2021 Order have

furthered the objectives of the investigation.  Among other things, the calls have corroborated what

witnesses have told us about how SMITH and other members of First Response have exerted

control over the fire insurance industry, including by implementing a rotation system and assigning

jobs to mitigation companies and public adjusters.  The calls have also corroborated what witnesses

have told us about how SMITH and other members of First Response use physical violence, and

threats of physical violence, to control the industry, and that SMITH and other members of First

Response conspire to hide material information from insurance companies in order to ensure that

a loss is covered.  And the interceptions have provided insight as to all other target subjects of the

investigation, including CARL WALSH, CHARLOTTE WALSH, and OCTAVIO PERALTA

interact with SMITH, and what they know about his tactics.

While the wiretap interceptions have furthered the investigation, they have not yet

established, among other things, the full scope of the racketeering and extortion conspiracy,

including the full scope of the Target Subjects' involvement in the conspiracy.  For example, while

USAO_000161

the interceptions have shown that CARL and CHARLOTTE WALSH participate on calls in which SMITH makes threats to others in the insurance industry, they have not shown the degree to which the WALSHES are complicit in these threats, or the knowledge they have about the actual violence some of the conspirators have carried out. Similarly, while the interceptions have shown that SMITH and PERALTA communicate about jobs and discuss hiding material information from insurance companies in order to ensure that a loss is covered, interceptions to date have not established the full scope of PERALTA's relationship to First Response, including the details of any financial arrangement through which PERALTA's company gets jobs, or the full scope of PERALTA's knowledge about SMITH's use of violence. For these reasons, continued interceptions are necessary to understand the full scope of the racketeering and extortion conspiracy.

### B. Insufficiency of Alternative Investigative Techniques

Consistent with 18 U.S.C. § 2518(3)(c), I respectfully submit that, for the reasons discussed below, normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to achieve the Objectives of the Interception herein sought.

#### 1. Undercover Officers

Law enforcement will not be able to accomplish the objectives of this investigation through the use of undercover officers. On or about February 4, 2021, law enforcement officers sent an NYPD undercover officer to a fire-damaged property in Staten Island, New York in an effort to obtain evidence of extortion. The attempt was ultimately unsuccessful because JATIEK SMITH did not show up at the property and the undercover officer was unable to initiate communications.

2019.06.27

USAO_000162

Any further efforts are likely to be similarly unsuccessful and provoke suspicion among the Target Subjects. Some of the co-conspirators share a gang affiliation and, accordingly, are wary of outsiders and unlikely to discuss the extortion scheme with outsiders. They are similarly unlikely to discuss the full extent of their activities with an "outsider" or any individual who has been recently introduced to their group. An undercover agent is accordingly unlikely to be made aware of the full scope of the activities of the Target Subjects. Furthermore, based on my training and experience and my involvement in this investigation, even if an undercover agent were successfully introduced to First Response, it would be dangerous to the investigation and potentially to the agent for the agent to inquire about the extortion scheme. Were an undercover agent to attempt to gain employment at First Response, for example, they would not have any plausible reason to inquire about tactics used to intimidate co-conspirators, and inquiries on these subjects would, at the very least, likely arouse suspicion of the agent. Accordingly, it is unlikely that an undercover agent would have the ability to obtain information sought through the requested interceptions.

I am also aware that attempting to introduce an undercover agent into a gang inherently comes with risks for the agent, particularly if any of the Target Subjects suspect that he or she may be a law enforcement officer. It is very possible that attempting to introduce an undercover agent into the gang may place that person in danger without promising any significant investigatory advantage.

2019.06.27

USAO_000163

### 2. Confidential Informants and Cooperating Witnesses

Law enforcement officers have spoken with a particular confidential source ("CS-1"), who was a public adjuster with insight into the industry.[1] CS-1 participated in several interviews and described JATIEK SMITH's efforts to exert control over the industry. CS-1 has provided information that is substantially similar to other victims and witnesses, *infra* §III.A.8. However, CS-1 was not situated to provide an insider's view of the extortion scheme or the racketeering enterprise and accordingly is not a substitute for the interception requested here. At this time, I am aware of no other confidential source, or likely confidential source, who has information that could accomplish the investigation's objectives, or the ability to significantly assist the investigation.

Nevertheless, law enforcement continues to look for opportunities to develop additional confidential sources. If the opportunity were to arise, agents would interview persons involved to determine what, if any, information they had about the Target Subjects. However, given the limitations with confidential sources in general, there is a need for wire surveillance to identify fully the nature and scope of the extortion scheme and the gang that is perpetrating this scheme.

Without the evidence obtained from court-authorized interceptions, the objectives of this investigation cannot be met. The goal of further investigation is to identify, as broadly as possible, the Target Subjects, the co-conspirators, and the scope of their activities. I do not believe that

---

[1] CS-1 participated in interviews in contemplation of being signed up as a confidential source for HSI, but was never formally signed up with HSI. CS-1 was never paid and did not receive any other form of compensation, and voluntarily provided information to law enforcement. CS-1 does not have any criminal history. CS-1's information has proven reliable and been corroborated by, among other things, other witness accounts and communications from the Smith Phone-1.

42

USAO_000164

confidential informants and cooperating witnesses alone will enable the government to achieve the stated goals of the investigation. Given the limitations with confidential sources in general, there is a need for wire surveillance to identify fully the nature and scope of the Target Subjects' activities.

### 3. Physical Surveillance

Over the course of this investigation, law enforcement officers have conducted physical surveillance of the Target Subjects in particular locations that are relevant to the investigation or to the Target Subjects. Although law enforcement has advanced the objectives of this investigation by physical surveillance, given the nature of the criminal conduct, physical surveillance is insufficient to achieve the Objectives of Interception.

For example, law enforcement officers have undertaken surveillance at the First Response office located at 3504 Avenue S, Brooklyn, New York. Officers have observed several individuals, including ANTHONY MCGEE, entering the office. Given that this is a workplace, surveillance does not allow law enforcement officers to determine whether any particular individual's presence is criminal or innocent. There is limited value in determining any Target Subject's presence at the First Response office given that many of these individuals are known to be employed by First Response, and the relevant investigative question is their involvement in the extortion activities being perpetrated by some subset of First Response employees.

As another example, law enforcement officers have attempted surveillance in the vicinity of 416 Jersey Street in Staten Island, New York. That area is known to be frequented by JATIEK SMITH. Law enforcement officers have observed that individuals in this area demonstrate sensitivity to the presence of outsiders, particularly law enforcement. Given the circumstances of

43

2019.06.27

USAO_000165

the area, law enforcement officers cannot conduct physical surveillance in the area without endangering the covert nature of the investigation.

Furthermore, the nature of the criminal activity complicates efforts to conduct surveillance the Target Subjects' acts of intimidation or violence. The investigation to date has shown that many of the violent acts occur at the sites of fires or at other random locations. Fires can occur at any time and in any place, and any surveillance is necessarily reactive. Law enforcement officers cannot be on every street all day in anticipation of the criminal activity of the Target Subjects. While law enforcement officers can attempt to conduct surveillance at the scene of a fire, the Target Subjects are often outside the residences after fires raising the possibility that they will detect the present of law enforcement officers conducting surveillance. Interceptions over the Target Cellphones will assist in efforts to conduct meaningful surveillance.

### 4. Pole Camera

Similarly, pole cameras cannot easily be deployed given the nature of this particular extortion scheme. Specifically, the extortion scheme and the assaults on various public adjusters have occurred in various sites where fires have occurred, according to multiple witness and victim accounts. Given that law enforcement officers cannot predict in advance where the incidents of intimidation and/or violence where occur, they cannot place pole cameras in locations that further these investigative goals.

Moreover, the extortion scheme is also being deployed on behalf of a business that may have some legitimate business activities. Accordingly, though there are certain locations that have significance, like the First Response office at 3504 Avenue S, Brooklyn, New York, which may be the targets for future search warrants, surveillance of those locations does not presently shed

USAO_000166

light on the mechanics of the scheme.  Surveillance of individuals known to be associated with First Response entering or exiting the office location does not shed light on their knowledge and participation in the extortion scheme.   And even in meetings between particular individuals observed, a pole camera – as with physical surveillance --would not allow law enforcement to know the purpose or content of those meetings, nor determine that the meeting relates to criminal conduct versus ordinary business activities.

### 5. Geolocation Information
Geolocation information will also be insufficient to accomplish the full objectives of the investigation.  Geolocation information can help law enforcement determine the particular locations that an individual frequents, but it does not reveal which of those locations are visited for innocuous reasons and which are visited in connection with criminal activities. Thus, even if geolocation information is used successfully to identify locations frequented by the Target Subjects or their co-conspirators, that information by itself will be insufficient to determine whether those locations are connected to the Target Offenses.  Similarly, and because it cannot differentiate between criminal and non-criminal movement, geolocation information is not a substitute for the requested interceptions.

Law enforcement officers have not yet obtained any geolocation information on either cellphones or vehicles used by the Target Subjects.  The Target Subjects travel to fire sites themselves, but frequently send their subordinates to use violence on behalf of the enterprise. Fires occur at random locations and at unpredictable time.  While location information might be useful at a later stage in the investigation, when there is a better understanding of how the Target Subjects control and deploy individual members to conduct acts of violence on behalf of the enterprise, at

45

USAO_000167

present, such geolocation information would not substantially further the investigation. The requested interceptions will allow law enforcement officers to make better use of location information.

### 6. Telephone Records and Pen Registers

Telephone toll records, although they have been used and are continuing to be used in this investigation, provide only limited information.   Toll records, unlike the requested interceptions, cannot provide the content of communications, which is an essential tool in identifying a criminal organization's members, interdicting its activities, and developing evidence of those activities.  It is only through the combination of wire surveillance, visual surveillance, and other investigatory tools that law enforcement expects to identify fully the nature and scope of this criminal organization, including the identities of the individuals engaged in the Target Offenses.

### 7. Search Warrants

Search warrants have been executed on certain social media accounts and a phone, as described below.  These warrants were executed surreptitiously; accordingly, to my knowledge, the Target Subjects are unaware of the ongoing investigation.  These searches confirmed the existence of the extortion scheme and provided information about the particulars.  These searches did not, or, are not anticipated to, provide insight into the hierarchy of the conspiracy, the transfer of proceeds between co-conspirators, and the identity of all co-conspirators and/or their particular roles.  No other search warrants, whether for electronically stored information or for physical premises, have been executed.

As discussed above, *see supra* § II.C, law enforcement officers accessed SMITH's phone – the Smith Phone-1 -- during a border crossing and extracted a forensic copy of the phone.  Law

USAO_000168

enforcement officers subsequently obtained a warrant to search the forensic copy of the phone. The contents of that phone corroborated SMITH's role in the extortion scheme, other co-conspirators, the methods used by various co-conspirators, and information about possible extortion victims. However, the search of SMITH's phone provided historical information and accordingly, has and will not assist the Investigating Agencies in conducting surveillance or identifying future victims.

On or about September 2, 2021, the Honorable Debra Freeman, United States Magistrate Judge, signed a search warrant for certain social media accounts, including SMITH's. *See* 21 Mag. 8601. The return was received on or about September 13, 2021 and is still being reviewed. The search warrant was based, in part, on visible postings in which SMITH appeared to discuss gang business and his affiliation with the Bloods, and made reference to his employment with First Response. For example, in a July 16, 2017 post, SMITH listed the dates of his membership in various Bloods sets ("GKB 1997, KSB 2004, TSG 2007"). In a post from approximately April 2021, SMITH wearing First Response gear, wrote: "Last week i secured a 3.4 million job and thought it was a highlight!!! Then i woke up in go mode and secured a $24 million dollar job!!! Oh it's definitely play time!!!!" Based on the postings that law enforcement officers were able to view, it seems likely that the social media search warrant will provide useful information about, among other things, SMITH's gang affiliation and his relationship with co-conspirators. However, given the nature of a social media account and its purpose, the search warrant is unlikely to provide a detailed look at the mechanics of the extortion scheme.

47

2019.06.27

In other words, the search warrants to date have provided a glimpse into the extortion scheme but not a comprehensive picture of its scope.

### 8. Witness Interviews

Law enforcement officers, as described above, have conducted interviews of approximately 16 victims and witnesses with information about the extortion scheme or the Bloods. These interviews include Victim-5, discussed above, who was identified in the course of intercepting communications pursuant to the October 14, 2021 Order. These interviews have largely been voluntary, however, law enforcement officers have served a limited number of grand jury subpoenas to reluctant witnesses. As demonstrated in the witness accounts discussed herein, of Victim-1, Victim-2, Victim-3, Victim-4, and Victim-5, these interviews have provided a picture of historical acts of violence and methods of intimidation that are being used by the Target Subjects, in furtherance of the Target Offenses. The Investigating Agencies have learned about particular assaults committed by the Target Subjects and have learned how they have gained control in the industry. In an interview with Victim-4, the Investigating Agencies learned that SMITH is increasingly directing his victims to call JACKSON to learn which company is the next in the rotation system. Victim-4 believes that JACKSON is assuming this role so that SMITH can evade law enforcement detection. Accordingly, JACKSON is expected to have increasing interactions with victim public adjusters who are complying with the rules set for the industry. Witness and victim interviews have and will provide important information about interactions with victims.

However, the victims have limited insight into the internal operations of the racketeering scheme and cannot explain the enterprise from their perspective as victims. Furthermore, in the

48

2019.06.27

USAO_000170

course of the extortion scheme, these victims have been intimidated by the Target Subjects in an effort to cause fear and induce their compliance with the Target Subjects' industry rules. As a result, those the victims are speaking with law enforcement voluntarily, they are sensitive to, and fearful of, retaliation. Their cooperation with the investigation to-date is important but they are, to varying degrees, wary of their cooperation becoming exposed. While law enforcement officers will continue to build rapport, law enforcement officers are mindful of the victims' reluctance and/or wariness and, accordingly, do not intend to use the victims for any proactive investigative steps at present. Given this reality, victims and witnesses are not an alternative for the requested interceptions. In addition, the witness interviews do not provide an alternative for the requested interception given that they provide limited information about the full scope of the extortion scheme, including, for example, how the co-conspirators interact with each other and distribute proceeds.

Subpoenaing co-conspirators through grand jury process is not presently a viable option for developing additional categories of evidence concerning the extortion scheme. Any co-conspirators who could provide additional relevant evidence to a grand jury would themselves be participants in the racketeering activities under investigation. Such individuals would face prosecution themselves; it is unlikely therefore that any of them would testify voluntarily. Nor would it be desirable at this time to seek immunity for such individuals and to compel their testimony, as immunizing them could thwart the public policy that they be held accountable for their crimes. Moreover, issuance of a grand jury subpoena to the Target Subjects would

2019.06.27

USAO_000171

undoubtedly alert both the subpoenaed witness and the Target Subjects to this investigation, which could jeopardize its progress.

### 9. Cooperating Witnesses

Arresting any of the Target Subjects or their co-conspirators and attempting to obtain their cooperation in investigating the extortion scheme would require revealing significant portions of the investigation and thus jeopardize its objectives. If they are unsuccessful, arrests or attempted arrests of Target Subjects and attempts to obtain their cooperation in the current investigation would alert the remaining Target Subjects to the full extent of the investigation, causing them to take defensive measures that would seriously jeopardize the investigation. Accordingly, the risks of failure in attempting to obtain the Target Subjects' cooperation at this stage of the investigation greatly outweigh any likely benefits, and make that investigative technique unavailable. Nonetheless, we continue to work to identify additional individuals who might be removed a distance from the Target Subjects that we could potentially arrest in order to attempt to obtain their proactive cooperation.

### 10. Trash Searches

Trash searches are also not a reasonable alternative to the requested interceptions. To begin with, the extortion operations are unlikely to produce trash that will provide further information about the Target Offenses. The extortion scheme, for example, is operated primarily through in-person interactions. Moreover, the risk of exposing the investigation by attempting to collect the trash from any identified location is too great to undertake such measures at this time.

### 11. Grand Jury Process and Financial Investigation

Certain documents, such as telephone and bank records, can and have been obtained through grand jury subpoenas. Telephone records have been extensively analyzed to show how

often the Target Subjects are in communication with each other and/or with victims.  This information is helpful to understanding the links between the various members of the racketeering enterprise, but is not a substitute for the content of those communications.

In addition, the investigation has also obtained through grand jury subpoenas a number of financial records including, among other things, the following: bank records, records from other institutions including Zelle, JPay, TransUnion, and Experian, and payroll records for First Response.  These financial records are useful to determining the scope of the criminal activity, and to assessing how proceeds of the Target Offenses are distributed among the Target Subjects.  For example, these financial records have provided insight into how individuals like ANTHONY MCGEE, KAHEEN SMALL, SEQUAN JACKSON, and JATIEK SMITH receive payment from First Response.  What I have observed is that CARL and CHARLOTTE WALSH are on First Response's regular payroll, but that MCGEE, SMALL, JACKSON, and SMITH are not.  Bank records instead show that payments are made out of a corporate account belonging to CHARLOTTE WALSH, where the named corporate entity is "Beach 128th Street Corp." doing business as "First Response Cleaning."  The payments are made either to the Target Individuals or to corporate entities associated with them (like, for example, to Juniors Boards Up  – which is associated with JACKSON and, indeed, the memo lines of checks to that entity list "Sequan Jackson").   Accordingly, I believe that this financial arrangement, particularly the use of this corporate account with a different named corporation, allows the Target Subjects to keep criminal proceeds away from First Response's official books.  Furthermore, this arrangement insulates

51

USAO_000173

CARL and CHARLOTTE WALSH from direct association with the other Target Subjects, who are instead paid as independent contractors and not listed on First Response's payroll.

In addition to this grand jury process, on November 8, 2021, the Honorable Analisa Torres, United States District Judge for the Southern District of New York, issued an order for the Internal Revenue Service to provide several years of tax returns for the Target Subjects of the investigation and certain corporate entities they control. I believe that this information will provide further information about the Target Subjects' criminal proceeds and how they conduct their scheme.

Grand jury process is not an appropriate substitute for the requested interceptions because records and documents provide only limited insight into the commission of the Target Offenses. The financial investigation has provided information about how proceeds are distributed, which conveys some limited information in how the co-conspirators work together and how the enterprise is structured. Such records cannot typically allow for the identification of victims, determination of the location of particular assaults, the details about which co-conspirator has committed assaults, among other relevant facts.

## IV. Ancillary Investigative Orders

I respectfully submit the following additional facts and circumstances in support of the Government's Application for certain ancillary investigative orders necessary to effectuate the purposes of the Order of Interception and the needs of this Investigation.

### A. Order to Service Provider
#### 1. Technical Assistance to Accomplish the Interception

Consistent with 18 U.S.C. § 2518(4), to effectuate the Order of Interception, HSI will require the Service Provider for the Target Cellphone, and any Successor Service Provider for the Target Cellphone, to furnish the technical assistance necessary to accomplish the interception

USAO_000174

unobtrusively and with a minimum of interference with services to the persons whose communications are to be intercepted, and maintain service to the Target Cellphone for the period of interception and any extensions thereto.  Reasonable expenses incurred pursuant to this activity will be processed for payment by the HSI.

### 2.  Pen Register and Trap and Trace Information

The pen register and trap and trace information sought in the Government's Application (incorporated by reference but for the sake of brevity not repeated herein) is needed to identify who is calling, and who is being called from, the Target Cellphone. This information is relevant to the investigation in this matter, and indeed is essential to assist in achieving the Objectives of the Interception.

### 3.  Geolocation Information and Delayed Notice and Return

Providers of cellular telephone service generally have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service. The most common geolocation information consists of (i) cell-site data, also known as "tower/face information" or cell tower/sector records; and (ii) E-911 Phase II data, also known as GPS data or latitude-longitude data. Cell-site data identifies the cell towers (*i.e.*, antenna towers covering specific geographic areas) that receive a radio signal from the cellular telephone and, in some cases, the sector (*i.e.*, $120°$ face) of the towers to which the telephone connects. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. In some instances the service provider may send a signal to the cellphone to facilitate or trigger the generation and collection of geolocation

53

2019.06.27

USAO_000175

information. I respectfully submit that there is probable cause to believe that the geolocation information sought in the Government's Application (incorporated by reference but for the sake of brevity not repeated herein) will assist in achieving the Objectives of the Interception by allowing location of, and as appropriate, the surveillance of, the Target Cellphone and its user, at times relevant to the commission of the Target Offenses. No physical installation of a tracking device, as discussed in Fed. R. Crim. P. 41(e)(2)(C), will be required; this information will be provided by means available to the Service Provider. But to the extent this request is otherwise deemed to fall within the confines of that rule, it is further requested, pursuant to 18 U.S.C. § 3103a(b) and Rule 41(f)(3), that the Court authorize delay of notice of the acquisition of the geolocation information until 120 days after the date of the Court's order authorizing that acquisition. It is also requested that the return on the warrant for geolocation information under Rule 41(f) be made, by analogy to the requirements for a tracking warrant, within 10 days after acquisition of the geolocation information (including any extensions) has ended, under seal. Delay of notice is justified under 18 U.S.C. § 3103a(b) and Rule 41(f)(3) because the Target Subjects are known to resort to violence against victims and could be expected to use violence to thwart the investigation; and further, if the suspects learn they are under investigation, they can easily dispose of evidence and contraband, flee, or go under cover to avoid arrest and prosecution. Certainly if the user of the Target Cellphones learns that geolocation information for the Target Cellphones has been provided to law enforcement authorities, he may be expected to take immediate measures to thwart the investigation.

2019.06.27

USAO_000176

### 4. Non-Disclosure

For the reasons discussed herein, it is necessary that the Service Provider and any Successor Service Provider and their respective agents and employees not disclose or cause the disclosure of the Order to Service Provider to any person other than those of their agents and employees who require said information to accomplish the interception ordered, and that, in particular, the Service Provider and any Successor Service Provider and their respective agents and employees shall in no event make such disclosure to the telephone user involved, or to any actual or potential interceptee.

### 5. Successor Service Provider

As discussed above, because a cellphone user can change the service provider that provides service to a particular cellphone, it is important, to avoid interruption in the execution of the Order of Interception and ancillary orders requested, that the Order to Service Provider be immediately applicable to any Successor Service Provider without the delay attendant upon obtaining a new order of this court. To effectuate the Order of Interception and ancillary orders requested, it is also necessary for the Service Provider and any Successor Service Provider to inform the HSI immediately if the service provider changes during the course of the Interception Period, or if the information needed to change Service provider for the Target Cellphones are supplied to another service provider.

### B. Order for Expedited Provision of Information Concerning Communications Devices Related to the Interception

During the course of the interception the pen register and trap and trace devices discussed above will indicate, among other things, the identifying numbers (*e.g.*, telephone numbers) of telephones and communications devices calling, or being called via, the Target Cellphones. To the

2019.06.27

USAO_000177

extent new numbers surface during the interception it will be essential to obtain as quickly as possible subscriber and service information for those numbers to permit identification of the users of those numbers and pertinent further investigation. This type of information is available under 18 U.S.C. § 2703(d) pursuant to grand jury subpoena, administrative order, and court order or warrant. However, because some service providers do not process grand jury and administrative subpoenas as quickly as these circumstances require, a court order with a 24-hour time limit is necessary to obtain the subscriber and service information sought in the Government's Application (incorporated by reference but for the sake of brevity not repeated herein) in a timely manner. The court order herein sought, which does not specify a particular telephone number or service provider, will only be used for the duration of this interception for telephone numbers calling or being called by the Target Cellphone. Pursuant to 18 U.S.C. § 2705(b), for the same reasons discussed above, it is requested that this order include a direction that the service provider not provide notice to the subscriber or customer as to whom information is provided  (i) for six months following the date of this order, (ii) and thereafter, without ten (10) days prior notice to the Investigating Agency in case a further delay in providing notice is warranted.

**V.  Sealing**

It is further requested that to avoid premature disclosure of the investigation, guard against flight of suspects or the loss of evidence, and to better ensure the safety of agents and others, this Application, including the Affidavit and accompanying proposed orders, as well as any Periodic Reports, be sealed and placed in the custody of the United States Attorney's Office for the Southern District of New York until ordered unsealed by the Court or by another judge of competent jurisdiction, except that copies of the Order of Interception, Order to Service Provider, and

2019.06.27

USAO_000178

ancillary orders requested herein may be provided to the Investigating Agencies and to the

Government, and be served on service providers as may be necessary to effect the order's purpose.


William Clark
Special Agent, HSI


Sworn to before me this
12__th day of November, 2021


THE HONORABLE LEWIS J. LIMAN
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

57

2019.06.27

USAO_000179

# EXHIBIT A

2019.06.27

USAO_000180

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In the Matter of the Application of the United States of America for Authorization to Intercept Wire and Electronic Communications Occurring over the Cellular Telephones Initially Identified as 929-320-8554 and 347-662-1334; USAO Reference No. 2021R00338. | **Affidavit in Support of Application for Order Authorizing the Interception of Wire and Electronic Communications over Cellular Telephones**<br><br>**Sealed** |

## Contents

I. Specifications .................................................................................................................... 3

  A. Affiant ............................................................................................................................ 3

  B. Purpose of Affidavit ...................................................................................................... 4

  C. Target Subjects. ............................................................................................................. 5

  D. Target Offenses ............................................................................................................. 5

  E. Objectives of the Interception ....................................................................................... 5

  F. Target Cellphones and Service Providers ...................................................................... 6

    1. Target Cellphone and Successor Target Cellphone Identifiers ..................................... 6

    2. Successor Service Provider ........................................................................................... 7

    3. Application to Successor Target Cellphones and Successor Service Provider. ............. 7

  G. Communications Features of Target Cellphone ............................................................ 7

    1. Wire Communications Capabilities .............................................................................. 7

    2. Electronic Communications Capabilities ...................................................................... 8

  H. Background Conversations ............................................................................................ 8

  I. Territorial Scope and Jurisdiction ................................................................................... 8

  J. Period of Interception .................................................................................................... 9

  K. Monitoring Agents and Personnel ................................................................................. 9

  L. Minimization of Wire Communications ........................................................................ 9

    1. Special Considerations Regarding Packet Data Copies of Voice Calls ...................... 10

    2. Minimization of Electronic Communications ............................................................. 11

  M. Prior Applications ....................................................................................................... 12

II. The Investigation and Probable Cause .......................................................................... 12

  A. Probable Cause ............................................................................................................ 12

USAO_000181

B. Basis and Scope of Declarations ................................................................................. 13

C. Details of the Investigation ........................................................................................ 14

1. Background to the Investigation ............................................................................ 14

2. Victim and Witness Interviews.............................................................................. 20

a. Victim-1 ........................................................................................................... 21

b. Victim-2............................................................................................................ 23

c. Victim-3 ........................................................................................................... 23

d. Victim-4............................................................................................................ 24

3. The Target Cellphones Are Used in the Commission of the Target Offenses............. 25

a. Smith Phone-1.................................................................................................. 26

b. Jackson Phone-1 .............................................................................................. 31

D. Analysis of Communications Records for Target Cellphones......................................... 38

1. Analysis of Communication Records for Smith Phone-1 .......................................... 38

a. Communication with CARL WALSH at 917-440-4044 .......................................... 38

b. Communication with KAHEEN SMALL at 718-414-9771 ..................................... 39

c. Communication with ANTHONY MCGEE at 347-233-9164 .................................. 39

d. Communication with OCTAVIO PERALTA at 917-416-4899 ............................... 39

2. Analysis of Communication Records for Jackson Phone-1 ........................................ 40

a. Communication with CARL WALSH at 917-440-4044 .......................................... 40

b. Communication with KAHEEN SMALL at 718-414-9771 ..................................... 40

c. Communications with ANTHONY MCGEE at 347-233-9164.................................. 40

d. Communications with OCTAVIO PERALTA at 917-416-4899 ............................. 41

III. Normal Investigative Techniques .................................................................................. 41

A. Insufficiency of Alternative Investigative Techniques .................................................... 41

1. Undercover Officers............................................................................................... 41

2. Confidential Informants and Cooperating Witnesses ................................................ 42

3. Physical Surveillance ............................................................................................ 43

4. Pole Camera ......................................................................................................... 45

5. Geolocation Information......................................................................................... 45

6. Telephone Records and Pen Registers ..................................................................... 46

7. Search Warrants ................................................................................................... 47

2019.06.27

USAO_000182

8. Witness Interviews.................................................................................................. 48

9. Cooperating Witnesses........................................................................................... 50

10. Trash Searches ..................................................................................................... 51

11. Grand Jury Process and Financial Investigation................................................. 51

IV. Ancillary Investigative Orders.................................................................................. 52

A. Order to Service Provider..................................................................................... 53

1. Technical Assistance to Accomplish the Interception ...................................... 53

2. Pen Register and Trap and Trace Information.................................................. 53

3. Geolocation Information and Delayed Notice and Return ............................... 53

4. Non-Disclosure ................................................................................................. 55

5. Successor Service Provider............................................................................... 55

B. Order for Expedited Provision of Information Concerning Communications Devices Related to the Interception .................................................................................. 56

V. Sealing........................................................................................................................ 56

State of New York        )
County of New York      ) ss.:
Southern District of New York  )

WILLIAM CLARK, a Special Agent with Department of Homeland Security, Homeland

Security Investigations ("HSI"), being duly sworn, deposes and states:

## I. Specifications
### A. Affiant

I am an investigative or law enforcement officer of the United States within the meaning

of 18 U.S.C. § 2510(7)—that is, an officer of the United States who is empowered by law to

conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I have

been a special agent with HSI for approximately five years. Prior to that, I was a special agent

with Internal Revenue Service's Criminal Investigation for approximately five years. During that

time, I have participated in investigations of offenses involving extortion, racketeering, and gang-

3

related violence, similar in nature to the suspected offenses outlined below, and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of electronic evidence, and have participated in investigations that included the interception of wire and electronic communications. Through my training, education and experience, I have become familiar with the manner in which extortion schemes are operated.

### B. Purpose of Affidavit

I respectfully submit this Affidavit in support of the Application of Assistant United States Attorney Mary E. Bracewell pursuant to the provisions of Chapter 119 of Title 18, United States Code ("Title III"), for an Order of Interception authorizing the interception and recording of wire and electronic communications by the Target Subjects specified below over the Target Cellphones specified below. I further submit this Affidavit in support of the Government's Application for ancillary orders and warrants (a) to the Service Provider, and any Successor Service Provider, for (i) necessary technical support to accomplish the interception, pursuant to 18 U.S.C. § 2518(4); (ii) pen register and trap and trace information for the Target Cellphones pursuant to 18 U.S.C. §§ 3121 *et seq.*; and (iii) geolocation information for the Target Cellphones, pursuant to Fed. R. Crim. P. 41, with delayed notification to the person affected pursuant to Rule 41(f)(3) & 18 U.S.C. § 3103a(b); and (b) to any wire and electronic communications service provider, pursuant to 18 U.S.C. § 2703(d) for expedited provision of subscriber, toll and service records for telephones and communications devices in communication with the Target Cellphones.

2019.06.27

USAO_000184

**C. Target Subjects.**

As also set forth in the Application, the Target Subjects whose communications are sought to be intercepted are: JATIEK SMITH, a/k/a "Tiek," SEQUAN JACKSON, a/k/a "Supa," ANTHONY MCGEE, a/k/a "Touch," KAHEEN SMALL, a/k/a "Bizz," a/k/a "Biz," CARL WALSH, CHARLOTTE WALSH, OCTAVIO PERALTA, and others unknown.

**D. Target Offenses**

As also set forth in the Application, the Target Offenses that are the subject of this Application, each of which is predicate offense under 18 U.S.C. § 2516, are: extortion and extortion conspiracy, in violation of 18 U.S.C. § 1951; possession and use of firearms, in violation of 18 U.S.C. § 924(c); racketeering and racketeering conspiracy (specifically, conducting the affairs of an "enterprise"—that is, a group of individuals associated in fact, although not a legal entity, the activities of which affect interstate and foreign commerce—through a pattern of racketeering activity consisting of multiple acts of extortion and extortion conspiracy in violation of New York Penal Law §§ 155.40(2), 155.05(2)(e)(i), 155.05(2)(e)(ii), 105.10 and 20.00, and violations of federal law, namely 18 U.S.C. § 1951) in violation of 18 U.S.C. §§ 1962(c) and (d) and punishable under 18 U.S.C. § 1963.

**E. Objectives of the Interception**

As also set forth in the Application, the objectives of the interception sought herein are to reveal to the greatest extent possible: (i) the nature, extent and methods of the Target Subjects' commission of the Target Offenses; (ii) the identities of the Target Subjects, to the extent currently unknown, as well as their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iii) the source, receipt, and distribution of money involved in those activities; (iv) the locations and items used in furtherance of those activities; (v) the existence and

5

2019.06.27

locations of records; (vi) the locations and sources of resources used to finance their illegal activities; (vii) the locations and disposition of the proceeds from and relating to those activities; and (viii) the location and other information necessary to seize and or forfeit money and items of value, and other evidence of or proceeds of the commission of the Target Offenses. In addition, these interceptions are expected to constitute admissible evidence of the commission of the Target Offenses.

### F.   Target Cellphones and Service Providers
#### 1.   Target Cellphone and Successor Target Cellphone Identifiers

The current telephone number of Target Cellphones, as well as their Subscriber, Service Provider, IMEI and/or IMSI, are listed below. The IMEI, variously referred to as International Mobile Equipment Identifier or International Mobile Station Equipment Identity, is like a serial number for the particular cellphone device.  The Target Cellphones also have a serial number, somewhat the equivalent of a customer account number, called, variously, the International Mobile Subscriber Identity (or Identification or Identifier)—the IMSI.  The IMSI is stored on a small chip, referred to as a SIM card.  At this time, the key identifier for the Target Cellphones, and the means by which it will be identified to the Service Provider for installation of the intercept, is the telephone number:

| Target Cellphone & User | Phone Number | Service Provider | Subscriber & Service Address | IMEI: | IMSI |
|---|---|---|---|---|---|
| Smith Phone-1<br><br>JATIEK SMITH | 929-320-8554 | T-Mobile | SOLIDSMITHCORP<br><br>70 Van Pelt Ave<br>Staten Island, NY | 353897100042680 | 310260240063546 |
| Jackson Phone-1<br><br>SEQUAN JACKSON | 347-662-1334 | T-Mobile | JUNIORSBOARDUPINC<br><br>191 Rensselaer Ave<br>Apt 2<br>Staten Island, NY | 354703754852340 | 310260297118054 |

2019.06.27

USAO_000186

A user of a cellphone like the Target Cellphone may switch the SIM card from one cellphone to another; may obtain a new SIM card (for example, a pre-paid card) for use with the same telephone number; or may request the service provider to port a new telephone number to the SIM card. It is to capture communications after certain such switches in customer service that authorization to intercept "Successor Target Cellphones" is also sought.  By "Successor Target Cellphones" is meant (a) a cellphone with the same telephone number as the Target Cellphone, but where the SIM card's IMSI has changed; or (b) a cellphone with a new telephone number, but where the SIM card's IMSI remain the same.

**2.  Successor Service Provider**
I know from the foregoing that the user of such a cellphone can switch the provider of service to that cellphone from one service provider to another service provider ("Successor Service Provider").

**3.  Application to Successor Target Cellphones and Successor Service Provider.**
To avoid interruption in the execution of the Order of Interception, it is requested that the Order of Interception apply without further order of this Court to any Successor Target Cellphones, as well as to any Successor Service Provider for any of the Target Cellphones. Further, unless otherwise indicated, references herein to the "Target Cellphones" or "Service Provider" include any successors thereto.

**G.  Communications Features of Target Cellphone**
**1.  Wire Communications Capabilities**
In addition to normal voice communications capabilities, the Service Provider for the Target Cellphones have confirmed that the Target Cellphones have voicemail capabilities. It is

7

2019.06.27

USAO_000187

requested that the Order of Interception also apply to messages left to, and retrieved from, voicemail, that are otherwise subject to interception under Title III.

### 2. Electronic Communications Capabilities

The Target Cellphone also has certain electronic communications capabilities. It is requested that the Order of Interception also apply to electronic communications transmitted over the Target Cellphone, including but not limited to, text messages and Internet traffic.

### H. Background Conversations

It is common practice that individuals using cellphones frequently speak in the presence of and while personally communicating with other individuals on the subjects related to the cellphone communication. It is accordingly requested that the Order of Interception also apply to background conversations overheard over the Target Cellphones while the Target Cellphones are active or otherwise in use, that are otherwise subject to interception under Title III.

### I. Territorial Scope and Jurisdiction

Pursuant to 18 U.S.C. § 2518(3), interception of wire and electronic communications that are subject to interception under Title III occurring within the Southern District of New York is hereby authorized; and in the event that the Target Cellphones are used outside the territorial jurisdiction of this Court, interceptions may continue in the Southern District of New York, the location where communications over the Target Cellphones will first be heard and/or read and minimized. Interception of messages that are subject to interception under Title III left to or retrieved from voicemail for the Target Cellphones; and interception of background conversations that are subject to interception under Title III occurring in the vicinity of the Target Cellphones while the telephones are active or otherwise in use, are also hereby authorized.

8

2019.06.27

**J.  Period of Interception**

As set forth in the Application, HSI will execute the Order of Interception as soon as practicable after it is signed. Inasmuch as the illegal operation described herein is a continuing conspiracy involving numerous persons as yet unidentified and unknown, it is requested that authorization to intercept not automatically terminate when the first communication described herein has been obtained, but rather continue until the Objectives of the Interception are fully achieved, or for a period of thirty (30) days, whichever is earlier. The thirty days are measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under the Order of Interception, or ten days from the date of that Order.

**K.  Monitoring Agents and Personnel**

Consistent with 18 U.S.C. § 2518(5), the interceptions for which authorization is sought will be conducted only by Government personnel, and by individuals operating under a contract with the Government under the supervision of an investigative or law enforcement officer authorized to conduct the interception.

**L.  Minimization of Wire Communications**

Consistent with 18 U.S.C. § 2518(5), monitoring agents and personnel will conduct the interception in such a way as to minimize the interception of wire communications not otherwise subject to interception under Title III. Monitoring of conversations will terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Title III. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the Target Subjects or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.  If a

9

2019.06.27

USAO_000189

conversation has been minimized, the monitoring agents will spot check to ensure that the conversation has not turned to criminal matters. In the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization will be accomplished as soon as practicable after such interception.   Monitoring agents and personnel will also operate under specific Minimization Instructions provided by the Assistant United States Attorney supervising the interception.   Special attention shall be given to minimize all privileged communications.

### 1.   Special Considerations Regarding Packet Data Copies of Voice Calls

Electronic communications over the target phone will be intercepted, pursuant to the Communications Assistance for Law Enforcement Act ("CALEA"), 47 U.S.C. 1001 *et seq.*, in part through receipt from the service provider of "packet data," an electronic data stream. That packet data stream, pursuant to CALEA, will be delivered to the HSI's electronic communications collection system, and when certain technology (including VoIMS, VoLTE, 4G, and others) is employed by the cellular service provider, that packet data stream will include a complete copy of all voice calls (which are wire communications) occurring over the target phone. Those voice calls in the packet data stream are duplicates of wire communications that may be intercepted through the HSI's wire communications collection system and minimized in real-time. The packet data, including the copies of voice calls, cannot be minimized in real-time. Therefore, HSI will utilize a filter program in its electronic communications collection system that will automatically identify and block voice calls (which are wire communications) from being intercepted by filtering them out of the electronic communications packet data stream before they enter the electronic communications collection system and are recorded. In the rare event that a voice call is not filtered

10

2019.06.27

USAO_000190

out of the packet data stream and is recorded, the call will not be monitored or otherwise accessed through the electronic communications presentation system, and HSI will preserve and seal such communications in the manner used for other intercepted electronic communications.

## 2. Minimization of Electronic Communications

Electronic communications generally cannot be reviewed on a real-time basis during transmission because service providers generally produce files containing the electronic communications to the investigating agency in batches. The electronic communication files will generally be separated by type, and the types of communications most likely to contain pertinent information will be subjected to further review. Thereafter, based on factors such as the identities of the sender and recipient, the content of the message, or the content/information relating to electronic communications other than messages, monitoring personnel will determine as soon as practicable after interception whether the electronic communication appears to be relevant to the investigation or otherwise criminal in nature. If an electronic communication appears to be relevant to the investigation or otherwise criminal in nature, it will be marked "pertinent" and may be shared with the other agents and monitors involved in the investigation. If the electronic communication does not appear to be criminal in nature, the electronic communication will be marked "non-pertinent;" and if the electronic communication appears to be privileged, it will be marked "privileged." If an electronic communication is marked "non-pertinent" or "privileged," it will be secured in a manner to prevent its dissemination to other members of the investigative team, except as may be necessary to comply with eventual disclosure obligations in a subsequent criminal prosecution. All intercepted electronic communications will be sealed with the court upon the expiration of the court's order authorizing the interception.

11

2019.06.27

USAO_000191

It is anticipated that the monitoring location will not be staffed at all times, but will be staffed at regular hours, at which time intercepted communications will be monitored, examined, and minimized in accordance with the foregoing (including those intercepted at hours when the location was not staffed). However, even when unmanned, the monitoring location will be kept secured with access limited to only authorized monitoring personnel and their supervising agents.

### M.  Prior Applications

I have been informed that reviews of the electronic surveillance files were conducted for the Drug Enforcement Administration ("DEA"), the Federal Bureau of Investigation ("FBI"), United States Immigration and Customs Enforcement ("ICE"), the Bureau of Alcohol, Tobacco, and Firearm ("ATF") on September 17, 2021, and that those reviews revealed no prior applications for Court authorization to intercept wire, oral, or electronic communications involving the Target Cellphones or the Target Subjects.

## II.  The Investigation and Probable Cause
### A.  Probable Cause

For the reasons set out in this affidavit, I respectfully submit that there is probable cause to believe that one or more of the Target Subjects have committed, are currently committing, and will continue for at least the next 30 days to commit one or more of the Target Offenses; that one or more of the Target Subjects, during the period of interception sought, will use the Target Cellphones in furtherance of, in connection with, to facilitate, to accomplish, and to commit the Target Offenses specified herein; that additional communications of the same type will occur during the period of interception requested; and that the interception sought herein will achieve the Objectives of the Interception.

12

2019.06.27

**B.  Basis and Scope of Declarations**

This case is being investigated by HSI, the FBI, the New York City Police Department ("NYPD"), New York City's Department of Investigation ("DOI," and together with HSI, FBI, and NYPD, the "Investigating Agencies"). I have personally participated in the investigation and I make this affidavit based on my personal participation in this investigation, and based on reports made to me by agents, analysts, and other law enforcement authorities from the Investigating Agencies. The technical information set forth herein is additionally based on agency training, information obtained from service providers, and review of other wiretap applications. Except where otherwise noted or the context otherwise makes clear, (i) the information set forth in this affidavit may include information provided to me by other law enforcement agents who have assisted in the investigation; (ii) wherever in this affidavit I assert that a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have read and reviewed; (iii) such statements are reported in substance and in part; (iv) where I refer to the contents of previously recorded conversations (*e.g.*, consensual recordings), my quotations and descriptions are based on preliminary draft transcripts of those conversations; and (v) information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance. Further, because this affidavit is being submitted for the limited purpose of securing an order authorizing the interception of wire and electronic communications, I have not included details of every aspect of this investigation to date.  Facts not set forth herein are not being relied on in reaching my conclusion that orders should be issued.  Nor do I request

13

USAO_000193

that this Court rely on any facts not set forth herein in reviewing this application for an order

authorizing the interception of wire and electronic communications.

### C.  Details of the Investigation
#### 1.  Background to the Investigation

Since approximately March of 2021, the Investigating Agencies have been investigating a

fire mitigation company based in Brooklyn, New York named First Response Cleaning Corp.

("First Response").  The investigation began after an insurance company made a report to law

enforcement, specifically the National Insurance Crime Bureau ("NICB"), about how First

Response had hired Bloods to work for the company.  Personnel at NICB then passed along the

report to the Investigating Agencies.

Based on my participation in this investigation, including my discussions with other

members of law enforcement, I have learned that when properties suffer fire damage, the property

owners sometimes hire a public adjuster to investigate and process the insurance claim.  Public

adjusters are independent contractors licensed by the state.  The public adjuster, in turn, hires an

emergency mitigation service, or "EMS," to clean up the damaged property, which often includes

sweeping up and removing debris, airing out the property, and boarding up the property.  First

Response is an EMS.  As set forth below, it appears that employees of First Response have been

threatening public adjusters with violent force unless the public adjusters hire First Response as

their EMS.  I understand that costs associated with emergency mitigation services, like those

provided by First Response, are ultimately borne by insurance companies, many of which have

customers across the United States.

14

2019.06.27

USAO_000194

Based on the investigation to date, I believe that the Target Subjects and others as yet unknown constitute an "enterprise," as that term is defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. They are an organized criminal group that operates in the Southern District of New York and elsewhere in order to enrich First Response. The investigation has shown that employees of First Response, some of whom are members of the Bloods gang, are profiting through extortion, fraud, and assault, including using their status as gang members to intimidate competitors. As described further below, the Investigating Agencies have determined that CARL and CHARLOTTE WALSH are the owners of First Response and co-conspirators in the extortion scheme, and JATIEK SMITH is an employee of First Response who exercises substantial authority over criminal activities undertaken on First Response's behalf. Among the investigative goals for the requested interceptions are to determine the hierarchy and ascertain a complete picture as to the respective role of these and other Target Subjects.

Based on witness accounts, review of financial records, phone communications, social media accounts, among other records, the Investigating Agencies have identified the following Target Subjects:

 a. JATIEK SMITH, a/k/a "Tiek," is a member of the Bloods gang, and self-identified as such on or about April 3, 2019, after being arrested and housed at Riker's Island. On or about March 2, 2021, officers with Customs and Border Protection located and detained SMITH at Newark International Airport after he returned from international travel. Special Agents with HSI seized an Apple iPhone pursuant to HSI's border search authority and extracted a forensic copy. (Earlier witness accounts had identified

15

USAO_000195

SMITH as one of the individuals perpetrating violence against public adjusters on behalf of First Response.) The iPhone was associated with the number 929-320-8554, *i.e.*, the Target Cellphone identified herein as Smith Phone-1. After the forensic copy was created, the actual phone was returned to JATIEK SMITH and he has continued to use it, as discussed further below. On or about April 9, 2021, based upon witness accounts regarding SMITH's conduct, as well as a preliminary review of the contents of the Smith Phone-1 pursuant to the border search, the Honorable Stewart D. Aaron, United States Magistrate Judge, signed a warrant authorizing the search of the forensic copy of Smith Phone-1. *See* 21 Mag. 3891. Based on my review of the content of Smith Phone-1, among other sources, I believe that SMITH is an employee of First Response and directs the use of violence against various competitors who do not follow his directives. For example, during my review of the Smith Phone-1, I determined that JATIEK SMITH had saved audio files of certain conversations that he had with other individuals, including conversations in which he discussed the extortion scheme and certain Target Subjects' role in the scheme (the "Smith Phone-1 Recordings"). In one such recording, which the metadata suggests was made on or about June 19, 2020 (the "June 19, 2020 Recording"), JATIEK SMITH states, in part: "I make the policy. That's it. None of them -- nobody standing here makes policy. I make the policy, man." Based on my training and experience and involvement in the investigation, I believe that SMITH is conveying that he is in charge of setting the "rules" that have been imposed on public adjusters and conveying that his listeners have to obey his directives.

16

2019.06.27

USAO_000196

b. SEQUAN JACKSON, a/k/a "Supa," is an employee of First Response and acts as SMITH's lieutenant conducting violent assaults on his behalf in furtherance of the extortion scheme.   For example, during my review of the Smith Phone-1, I viewed a number of stored video recordings depicting assaults conducted by employees of First Response. One such recording shows JACKSON assault an unidentified individual.

c. ANTHONY MCGEE, a/k/a "Touch," KAHEEN SMALL, a/k/a "Biz" or "Bizz," are also employees of First Response.  Based on my review of communications from the Smith Phone-1, and as described further below, I believe that MCGEE and SMALL act as subordinates to SMITH in carrying out his directives with respect to the extortion scheme.

d. CARL WALSH and CHARLOTTE WALSH are the owners of First Response, pay SMITH as an employee of First Response, and financial records show that they have reaped substantial financial benefits from the extortion scheme.  An investigative goal for the requested interceptions is determining SMITH's relationship with CARL and CHARLOTTE WALSH. While SMITH seems to direct the violence, CARL and CHARLOTTE WALSH still appear to maintain control over First Response and appear to have authority over SMITH.  In text communications reviewed on the Smith Phone-1, SMITH requests compensation from CARL and CHARLOTTE WALSH, suggesting that while he believes himself to be a valuable employee with the leverage to request payments, the ultimate control of the company remains with the WALSH's. Accordingly, I believe that CARL and CHARLOTTE WALSH are co-conspirators

17

USAO_000197

who are overseeing SMITH's activities from a distance and for substantial financial reward.

e.  OCTAVIO PERALTA is a public adjuster associated with Alpha Adjusters and works extensively with First Response.  Based on my training, experience, and involvement in this investigation, I have learned that an EMS (like First Response) works with a public adjuster.  Public adjusters have substantial control over the amount of the claim ultimately submitted to the insurance company and they receive payment as a percentage of the loss ultimately paid out by the insurance company to the insured (typically three to six percent).  Public adjusters are frequently on the scene of a fire to solicit work, however, PERALTA is designated as the public adjuster by First Response after First Response solicited and obtained the loss.  Based upon witness statements, law enforcement officers have learned that, unlike other public adjusters, PERALTA does not actively solicit work.  JATIEK SMITH and First Response direct a substantial percentage of the fires that they win to PERALTA. Based on a review of financial records associated with First Response, First Response has paid PERALTA approximately $160,000.  Based on my review of financial records and the Smith Phone-1, it appears that PERALTA pays a portion of the money received from First Response to SMITH.  At least some of the memo lines on payments from PERALTA to SMITH suggest that PERALTA is paying what appear to be kickbacks for particular properties.  In addition, based on my review of the Smith Phone-1 Recordings, I believe that PERALTA is a trusted associate of JATIEK SMITH.  In one particular recording,

18

USAO_000198

SMITH stated, in substance and in part: "These PA's gonna follow our rules. Like these big -- like it's a different relationship. Everybody here fucks with Octavio. Everybody here fucks with him on a personal level. So we ain't gotta worry about Octavio putting nobody in a predicament." Based on my training, experience, and involvement in this investigation, I believe that SMITH is referring to OCTAVIO PERALTA and conveying that PERALTA is a trusted member of the group, and that PERALTA is personally involved with SMITH and other Target Subjects. In particular, SMITH's statement that "we ain't gotta worry about Octavio putting nobody in a predicament" indicates that PERALTA is aware of the scheme and can be trusted with information about it, and will not betray anyone to law enforcement. Accordingly, I believe that PERALTA is a co-conspirator in the scheme, furthering its ends for his own substantial financial benefit.

Based on my review of the Smith Phone-1, review of interview reports, and involvement in the investigation, I have learned that JATIEK SMITH references his use of force and his willingness to use force to enforce the rules that he has imposed on public adjusters in the industry. SMITH states in the June 19, 2020 Recording, in part that: "These PA's gonna follow our rules." I believe "PA's" is an abbreviation for public adjusters. I believe that SMITH is describing that public adjusters have to "follow our rules," meaning the rules that SMITH imposes on the industry. Based on my training and experience and involvement in this investigation, I believe that SMITH is referencing the rules that he has imposed on the industry. Witnesses have described to the Investigating Agencies that SMITH requires public adjusters to follow a rotation system.

19

USAO_000199

Witnesses have described that the first ten fires of every month must go to First Response,[1] whether those fires are during the day or during the night.  After the first ten fires, public adjusters are supposed to rotate between a number of other companies, and they are directed to call JATIEK SMITH or, in the alternative, to call SEQUAN JACKSON, to find out which EMS company is next in the rotation.

Also on the June 19, 2020 Recording, SMITH is heard saying, in part: "Oh, but then listen, the nighttime belongs to us. Point blank. The nighttime belongs to us. Like we really shot it out for the nighttime. The overnight belongs to us. If something happened overnight, niggas got to call and check in, B. Niggas gotta call and check in because every one these niggas standing here -- well, not -- not them. My night crew, every one of them, niggas took the risk of bullets and going to jail behind chasing fires at night which I know what time it is -- I know --" Witnesses have also explained that all night fires are supposed to go to First Response.  Accordingly, during this recording, I believe that SMITH is referencing the fact that night fires "belong" to First Response, as per SMITH's rules (*i.e.*, "The nighttime belongs to us. Point blank.").

### 2. Victim and Witness Interviews

To date, law enforcement officers with the Investigating Agencies have interviewed approximately 15 victims and/or witnesses. The accounts of particular witnesses, identified below

---

[1] One witness, identified herein as Victim-4, *see infra* §II.C.2.d, in a recent interview, described that SMITH's rotation system now requires that first 11 fires of each month go to First Response. Victim-4 further explained that First Response now has 11 "chasers," referring to individuals who travel to particular scenes, and accordingly, that the rotation system ensures that each of those chasers has a fire before any other company receives business.

20

USAO_000200

as Victim-1, Victim-2, Victim-3, and Victim-4, are described below; these victims spoke voluntarily with law enforcement officers, no compensation was offered or promised in return for their information, nor am I aware of any pending charges against these victims for which they might be seeking leniency. Based on these interviews, I have learned about particular incidents where the Target Subjects have used force with public adjusters to ensure that the public adjusters hire First Response as the EMS or comply with the rotation system implemented and enforced by SMITH.

### a. Victim-1

Law enforcement agents interviewed a public adjuster based in Queens, New York ("Victim-1").[2]  Victim-1 described, in substance and among other things, that, in or about December 2019, Victim-1 heard that employees of First Response were intimidating competitors, including the owner of a competing EMS who was assaulted and put into a coma. At about the same time, Victim-1 spoke to Target Subject CARL WALSH, who appeared nervous and who told Victim-1 that a First Response employee named "Teak" now makes the decisions for the company, not WALSH.

Victim-1 also described that has had approximately three interactions with the person he knows as "Teak." During one of Victim-1's interactions with "Teak," "Teak" told Victim-1 that he "knocked out" the other EMS company. Based on my involvement in this investigation, I

---

[2] Information provided by Victim-1 has proven reliable and been corroborated by other evidence, including, among other things, police reports has been corroborated by, among other things, police reports and information obtained from the Smith Phone-1. Victim-1 does not have any criminal history.

2019.06.27

USAO_000201

believe that Victim-1's description of "Teak" is consistent with the physical appearance of Target Subject JATIEK SMITH, a/k/a "Tiek."

Victim-1 further described that, in approximately 2020, Victim-1 responded to a house fire. When Victim-1 arrived at the house, Victim-1 was approached by an employee of First Response, who asked Victim-1 to hire First Response as the EMS. The First Response employee then told Victim-1 that "Teak" would like a word, and handed Victim-1 a cellphone; Victim-1 spoke briefly to the person he knew as "Teak." Victim-1 then entered the house and photographed the damage. Upon exiting the house, Victim-1 noticed that the First Response employee was still present. While Victim-1 was having the homeowner sign a retainer for the job, Victim-1 was punched in the head and fell to the ground, hitting a cement pillar. During my review of the Smith Phone-1, I located a particular video recording that I believe, based upon a review of the video and data associated with the file shows the assault of Victim-1. In particular, the metadata of the video file indicates that it was created on or about November 13, 2020, which I believe was the date of Victim-1's assault based upon my review of an NYPD report related to the incident. (In the video file, the assailant is only visible from the back and is wearing a hooded sweatshirt; accordingly, the assailant has not yet been identified.)

Victim-1 has also heard about other incidents in which members of First Response assaulted a public adjuster, including an assault against an employee of the public adjuster that Victim-2 (discussed below) worked for. Victim-1 stated that First Response has attempted to establish "rules" in the industry, including the rule that any fire that happens between 8pm and 8am belongs to First Response, and that the first ten fires of every month belong to First Response.

2019.06.27

USAO_000202

**b. Victim-2**

In addition, law enforcement officers have also interviewed a public adjuster based in Long Island, New York ("Victim-2").[3]  Victim-2 stated, in substance and among other things, that on or about September 15, 2020, Victim-2 had responded to a call of a house fire in Queens.  Victim-2 was attacked at the scene.  Victim-2 sustained a lip laceration and brain bleeding, and lost a tooth,. The injuries required Victim-2 to stay overnight in the hospital.   Law enforcement officers have also interviewed the Queens, New York homeowner ("Witness-1") who witnessed the attack of Victim-2 on or about September 15, 2020.  Witness-1 described that, after striking Victim-2, the assailant walked approximately five to 10 feet away and then shouted "pay my fucking money" towards Victim-2.   Based on my training, experience, and involvement in this investigation, I believe that the assault of Victim-2 is consistent with other assaults committed by the Target Subjects, and illustrates the methods of retaliation being deployed against public adjusters who are not following the "rules" imposed by SMITH to provide fires to First Response.

**c. Victim-3**

Law enforcement agents interviewed a public adjuster ("Victim-3").[4]  Victim-3 described that JATIEK SMITH worked for First Response, which had taken over the entire restoration industry. Victim-3 further described that, over the prior six months (so beginning in approximately

---

[3] Information provided by Victim-2 has proven reliable and been corroborated by other evidence, including, among other things, police reports and other witness accounts.  Victim-2 has a 2017 state misdemeanor conviction for driving while intoxicated.

[4] Information provided by Victim-3 has proven reliable and been corroborated by other evidence, including, among other things, phone records and other witness accounts.   (Victim-3 was convicted in 2010 of a misdemeanor scheme to defraud, under New York Penal Law Section 190.60, but that conviction was vacated in 2011.)

23

USAO_000203

January 2021), SMITH had been having issues with Victim-3 and had threatened both Victim-3 and his family.  Victim-3 learned about rules that SMITH had put in place for the industry, which, among other things, provided any fire job that occurred between 7 p.m. and 7 a.m. was considered to be a night fire and belonged to SMITH.

### d. Victim-4

Law enforcement officers interviewed a public adjuster who resides in Staten Island, New York ("Victim-4").[5]  Victim-4 told law enforcement that, on several occasions, SMITH had told Victim-4 that "one of you niggas needs to die," which Victim-4 understood as a reference to public adjusters.  Victim-4 described to law enforcement officers that Victim-4 was aware of multiple public adjusters "bowing down" to SMITH and believes that these adjusters have put SMITH on their payroll. Based on my training and experience and involvement in this investigation, I believe that these public adjusters putting SMITH on their payroll suggest that they are extortion victims and that they are providing money to SMITH so that he will minimize his intimidation and interference with their businesses.  Victim-4 also described to law enforcement officers that, due to SMITH, Victim-4 was afraid, no longer "chased fires," and intended to find another place to make a living.  Based on my training, experience, and involvement in this investigation, I believe that Victim-4's fear indicates that SMITH's threats of violence are effectively controlling public adjusters like Victim-4 such that victims feel they have to comply or else suffer physical retaliation.

---

[5] Information provided by Victim-4 has proven reliable and been corroborated by other evidence, including, among other things, police reports, phone records, and other witness accounts. Victim-4 has a 1994 infraction for driving while impaired by the consumption of alcohol, a 2004 misdemeanor conviction for driving while intoxicated, and a 2005 misdemeanor conviction for driving while intoxicated.

2019.06.27

USAO_000204

### 3. The Target Cellphones Are Used in the Commission of the Target Offenses

Based on my involvement in this investigation, I believe that JATIEK SMITH uses Smith Phone-1 and SEQUAN JACKSON uses Jackson Phone-1.

With respect to Smith Phone-1, the Investigating Agencies have confirmed that JATIEK SMITH was using Smith Phone-1 based on their seizure of the Smith Phone-1 during the border search as well as from statements of witnesses and victims interviewed during the investigation.

With respect to Jackson Phone-1, the Investigating Agencies have confirmed that SEQUAN JACKSON was using Jackson Phone-1 based on, among other things, JACKSON's communications with Smith Phone-1 reviewed pursuant to the search warrant as well as from statements of witnesses and victims interviewed during the investigation. In messages exchanged by the Smith Phone-1, on or about January 15, 2021, SMITH sends a message to another individual (Jaquan Smith) including a VCF file (*i.e.*, a file containing contact information) with the address of 191 Rensselaer Avenue and SMITH identifies it as "Supa's address" – *i.e.*, JACKSON's alias. In addition, based on my review of subscriber records, I have learned that, prior to March 3, 2021, the provider for the number associated with Jackson Phone-1 was Sprint, and the subscriber was listed as SEQUAN JACKSON. On or about March 3, 2021, the provider was switched to T-Mobile, and the subscriber name updated to JUNIORSBOARDUPINC. As described herein, I believe the user of Jackson Phone-1 remains SEQUAN JACKSON and that "JUNIORSBOARDUPINC" refers to a corporate entity used by the Target Subjects. The billing address associated with JUNIORSBOARDUPINC is 191 Rensselaer Ave, Apt 2, Staten Island, New York, which is an address associated with SEQUAN JACKSON.

25

USAO_000205

I have learned about particular communications involving SMITH on Smith Phone-1 and JACKSON on Jackson Phone-1 from Victim-3 and Victim-4. These communications were not recorded. During interviews with law enforcement officers, Victim-3 and Victim-4 generally described particular communications involving the Target Cellphones. Victim-3 and Victim-4 spoke with law enforcement officers on a voluntary basis and provided information about historical incidents. Victim-3 and Victim-4, like the other witnesses and victims described above, have described the methods of intimidation employed by the Target Subjects and their fear of the Target Subjects and have demonstrated a degree of reluctance in speaking with law enforcement. Based on my training and experience, I have observed that witnesses who fear retaliation from perpetrators are often reluctant to speak with law enforcement. Accordingly, law enforcement officers do not expect that these victims will record conversations with the Target Subjects or undertake other proactive steps at this time.[6]

### a. Smith Phone-1

Based on my review of the Smith Phone-1 pursuant to the judicially authorized search warrant, my review of interview reports, and phone records, I have determined that JATIEK SMITH uses Smith Phone-1 to speak with co-conspirators, subordinates, and victims regarding First Response, his payment, and his use and instructions to others regarding the use of violence to further the extortion scheme.

---

[6] For example, in approximately August 2021, law enforcement officers requested that Victim-3 make recordings of conversations with the Target Subjects and Victim-3 refused the request.

2019.06.27

USAO_000206

For example, SMITH uses the Smith Phone-1 number to discuss his financial arrangement with CARL and CHARLOTTE WALSH, the owners of First Response. For example, on or about December 11, 2020, SMITH using Smith Phone-1 sent a message to CARL WALSH using 917-440-4044 that stated: "Change of plans…gotta go slap someone[.]" Based on my training, experience, and review this and other similar messages, I believe that SMITH was informing CARL WALSH that his availability had changed suddenly because of a need to go use force against a public adjuster who was not following SMITH's instructions.

As a second example, on or about February 24, 2021, SMITH using Smith Phone-1 sent a message to CARL WALSH using 917-440-4044 that stated: "I need a favor… I need a $49,600 advance. That's 16 weeks of pay. I would start getting paid my the $3100 again in June. It would only be commissions and Johnny lights money given to me. Or we can add those in as we go[.]" Based on my training, experience, and review this and other similar messages, I believe that SMITH's message sheds light on the financial compensation he is receiving from First Response for the implementation of the extortion scheme, and suggests that CARL WALSH is providing financial incentives to SMITH to do so. SMITH, in the above message, requests a nearly $50,000 payout, from his employer, providing information about his ability to make such demands of his ostensible employer and providing information about the profits ("commissions") that have been generated. At approximately the same time, also on February 24, 2021, SMITH using Smith Phone-1 sends the same message to CHARLOTTE WALSH using 917-763-2706.

Similarly, on or about January 5, 2021, SMITH using Smith Phone-1 exchanged the following text messages with CHARLOTTE WALSH using 917-763-2706:

27

USAO_000207

| | |
|---|---|
| **SMITH:** | Good morning I need to ask a favor My sons mom needs paystubs to get an apartment |
| **WALSH:** | Hi. Ok I'll do them. What weekly salary do you want on it? Need name and social too |
| **SMITH:** | Tonowha Dotts 600 Canal st #b7 Easton PA 18042 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 $1800 a week |
| **WALSH:** | Ok. I'll give you a few month of stubs, but I'll calculate the gross yearly pay to show she worked all year. |
| **SMITH:** | Ok thank you |

Based on my training, experience, and involvement in this investigation, I understand that SMITH requested that CHARLOTTE WALSH generate fictitious paystubs as a personal favor, and that CHARLOTTE WALSH agreed to do so. SMITH then provided personal information about his son's mother, including name, address, and social security number, so that WALSH could generate paystubs identifying her as an employee that showed an annual income with an amount provided by SMITH. This communication is of investigative significance as it reveals the relationship between SMITH and CHARLOTTE WALSH, and ways in which they provide incentives to SMITH. These kinds of communications constitute proof of the racketeering enterprise in that they indicate how SMITH interacts with CHARLOTTE and CARL WALSH, how they are working together in furtherance of the criminal enterprise. Furthermore, interception of SMITH's communications with both CARL and CHARLOTTE WALSH is particularly important for the investigative goal of understanding the hierarchy of the scheme and their roles, particularly given that they are profiting from the extortion but remain at arm's length from the assaults being perpetrated on behalf of their company.

28

2019.06.27

USAO_000208

Based on my participation in the investigation, including discussion with other law enforcement officers and review of reports about interviews of witnesses and victims, I have also learned that SMITH uses Smith Phone-1 to communicate with victims and to direct his subordinates' communications with victims.

In a recent interview, Victim-4 described an incident that occurred at the site of a fire in Brooklyn, New York, in the afternoon of September 17, 2021. Victim-4 was outside the residence when Victim-4 was approached by KAHEEN SMALL, a/k/a "Biz," a/k/a "Bizz." SMALL handed the phone to Victim-4 and said, in part: "Hold on, my boss wants to speak to you." As SMALL handed over the phone, Victim-4 observed that the screen of the phone identified the caller on the other end as "Jatiek Smith." Victim-4 started the conversation by saying "First of all," which provoked SMITH who "went off" on Victim-4. Victim-4 indicated that Victim-4 recognized "Tiek's voice" – referring to JATIEK SMITH. Victim-4 conveyed to law enforcement officers that SMITH did not like being "counted off on." Based on my training and experience, I believe that SMITH started yelling at Victim-4 as soon as SMITH heard Victim-4's voice on the phone line. Based on my training and experience, I believe that SMITH's use of verbal aggression against his victims is part of his methods of intimidation and extortion. Such verbal aggression similarly causes fear among victims and induces compliance with the rules that he is imposing on public adjusters like Victim-4, particularly when it is coupled, as it was here, with physical violence, as described further below. SMITH's communications, including the fact that he used SMALL to deliver the phone so that SMITH could then deliver a message to Victim-4, also demonstrates SMITH's control over his subordinates and provides proof of how the enterprise operates.

29

USAO_000209

Victim-4 then handed the phone back to SMALL, who took the phone with his left hand. As SMALL took the phone, SMALL punched Victim-4 in the face with his right hand, leaving visible swelling on Victim-4's face. SMALL then fled the scene. As he left, he passed several other public adjusters and said, in substance, "Tell [Victim-4] I'm sorry, I'm just following orders." Victim-4 conveyed to law enforcement officers that Victim-4 believed the assault was retaliation for recent activity and SMITH's belief that Victim-4 had broken the rules. Based on my review of police reports, I have learned that a 911 call was made about the Brooklyn fire at approximately 1:00 p.m. on or about September 17, 2021. Based on my review of toll records, I have learned that Smith Phone-1 called SMALL at 718-414-9771 at 1:46 p.m. and the call lasted until 1:50 p.m., and that SMALL, using the 718-414-9771 number, called Smith Phone-1 at 1:54 p.m. and the call lasted until 1:57 p.m. I have also learned that these two calls were the only communications between SMITH and SMALL on September 17, 2021.

Based on my training and experience and involvement in the investigation, I believe that SMITH intended to verbally and physically intimidate Victim-4 consistent with SMITH's efforts to intimidate other public adjusters with similar outbursts. I also believe that Victim-4's assault by SMALL was directed by SMITH as an act of violence in furtherance of the extortion, as a way of punishing Victim-4 for what SMITH perceived as Victim-4's violating the rules. The toll activity, shortly after the fire was reported, is consistent with Victim-4's account of the assault occurring on the scene of the fire while Victim-4 responded to solicit the job. I believe that the two calls in rapid succession indicate either that SMALL spoke with SMITH before the assault to receive instructions (as SMALL indicated to the public adjusters when he stated "I'm just

30

USAO_000210

following orders"), or SMALL spoke to SMITH after the assault to report about what happened. I believe that the two calls, occurring around the time of the assault at the scene of a fire, constitute racketeering proof in that they show how SMITH directs and receives updates about the activities of his subordinates.

Victim-4 ultimately did meet with SMITH on or about June 8, 2021.  SMITH questioned Victim-4 about his activity soliciting fires and his adherence to the rules that SMITH had set.  In response, during the meeting, Victim-4 indicated that Victim-4 would stop soliciting work in New York and would continue working as a public adjuster in New Jersey.  Based on my involvement in the investigation, I believe that Victim-4 stopped working for a period of months in the New York City area and resumed his activity only in approximately September of 2021.  Based on my training and experience, I believe that the meeting was an effort by SMITH to interrogate Victim-4 about his compliance with the rules set by SMITH, in furtherance of the extortion scheme.

**b.     Jackson Phone-1**

Based on my review of the Smith Phone-1 pursuant to a judicially authorized search warrant, I have learned that the Target Subjects, including JACKSON using Jackson Phone-1, engaged in group conversations about the extortion scheme.  For example, on or about September 12, 2020, JACKSON, using Jackson Phone-1, engaged in a group conversation – through the Whats App application – with multiple individuals, including MCGEE using 347-233-9164,

31

2019.06.27

USAO_000211

SMALL using 718-414-9771, and SMITH using the number associated with Smith Phone-1 and

929-263-5126 ("Smith Phone-2").[7] The participants exchanged the following messages, in part:

| | |
|---|---|
| MCGEE ("Touch"): | The Brooklyn fire that popped not to long ago He said he was called in |
| SMALL ("Biz"): | 1426 Remsen |
| JACKSON ("Supa"): | I have a feeling they're lying Benny owns upper east side of Manhattan But got called into a bk fire that's wicked for them to get called into a bk fire what's the odds |
| SMITH (Smith Phone-2): | That's why I'm gonna call him Touch go pull up on him Call Supa |
| MCGEE ("Touch"): | Doing it now |
| SMITH (Smith Phone-2): | Tell him he's subcontracting it to us |
| […] | |
| MCGEE ("Touch"): | Lou is here |
| SMITH (Smith Phone-1): | So Fuck NY Matter of fact |
| JACKSON (a/k/a "Supa"): | Lol |
| SMITH (Smith Phone-1): | Biz have someone come slap him |
| MCGEE (a/k/a "Touch"): | It's whatever you want done |

_____

[7] Based on my review of the Smith Phone-1 pursuant to that judicially authorized search warrant, I have also learned, in substance and among other things, that SMITH utilizes two different phone numbers and sometimes participates in conversations using both phone numbers. Accordingly, although the Smith Phone-1 was associated with Smith Phone-1, there are message exchanges recovered from the phone showing content sent and received by SMITH using 929-263-5126, *i.e.*, Smith Phone-2.

32

2019.06.27

USAO_000212

| SMITH (Smith Phone-1): | Why biz not active in the chat |
| SMALL (a/k/a "Biz"): | Yo |
| SMITH (Smith Phone-1): | There you go |
| SMALL (a/k/a "Biz"): | Lou? |
| SMITH (Smith Phone-1): | Lou Ortega |
| SMALL (a/k/a "Biz"): | Kopy |

Based on my training and experience, I believe that, in the above exchange, SMITH is directing MCGEE ("Touch") and SMALL ("Biz") to intimidate and assault competitors who are trying to take business that SMITH wants (*i.e.*, "Touch go pull on him" and "Biz have someone come slap him").

In another group exchange on the Whats App platform, on or about August 19, 2020, SMITH, using Smith Phone-1, asked: "What companies are there." JACKSON, using Jackson Phone-1, responded: "Efs. Dude that I punched in the face. Lol. Jorden fires AD an hired this nigga lol." Based on my training, experience, and involvement in this investigation, I believe that "Efs" refers to Emergency Fire Services, which is a competitor of First Response. In addition, I believe that JACKSON is referring to a particular employee of Emergency Fire Services, against whom JACKSON previously used physical violence ("Dude that I punched in the face. Lol.").

Based on my participation in the investigation, including discussions about, and review of reports regarding, interviews of witnesses and victims, I have also learned that JACKSON also uses Jackson Phone-1 to engage directly with victims of the extortion scheme – including Victim-3 and Victim-4.

33

2019.06.27

USAO_000213

In an interview with law enforcement officers, Victim-3 described that, in approximately June of 2021, he received threats from SMITH at a night fire in Queens, New York. Victim-3 had signed a fire that evening and gave it to First Response. After departing the location, Victim-3 spoke with JACKSON, using Jackson Phone-1, who told Victim-3 that Tiek (referring to SMITH) wanted Victim-3 to return to the residence in Queens.[8] Based on my review of toll records, I have observed that Victim-3 had multiple phone communications with SMITH and JACKSON during June of 2021. Based on my involvement in this investigation, I believe that the phone activity from the evening of June 1, 2021 is consistent with the incident that Victim-3 described. Toll records suggest that Victim-3 tried to call JACKSON on Jackson Phone-1 two times at 7:23 p.m. and again at 7:24 p.m., but the length of those calls (respectively, six and seven seconds) suggests that they went unanswered. At 7:25 p.m., Victim-3 called SMITH, using Smith Phone-1, and the call lasted approximately 53 seconds. At 7:33 p.m., Victim-3 received a call from JACKSON, using Jackson Phone-1, and the call lasted approximately 37 seconds.[9] Given the time of the calls and the approximate time of sunset on June 1, 2021, I believe that these calls occurred around

---

[8] Toll records show that, on or about June 1, 2021, SMITH, using Smith Phone-1, and JACKSON, using Jackson Phone-1, spoke for approximately 83 seconds at 3:33 p.m. Based on Victim-3's recollection of the timing of the fire, I do not believe that this communication related to the incident described herein.

In addition, tolls from the remainder of the month of June 2021 show the following additional activity: on or about June 10, 2021, SMITH, using Smith Phone-1, spoke with Victim-3 for approximately 179 seconds; and on or about June 25, 2021, JACKSON, using Jackson Phone-1, spoke with Victim-3 for approximately 177 seconds.

[9] Also, on June 1, 2021, the toll records reflect that JACKSON, using Jackson Phone-1, had a call at 0:00 that was zero seconds. Based on my training and experience, I believe that could reflect that JACKSON sent a text message to Victim-3.

34

USAO_000214

night-time. Based on a review of reports about interviews conducted with Victim-3, I believe that Victim-3 called both SMITH and JACKSON. Victim-3 first reached out to JACKSON, the second-in-command, then reached out to and connected with SMITH. Victim-3 was trying to contact JACKSON and then SMITH to determine which company that Victim-3 was supposed to award the fire, consistent with the rotation system that SMITH enforced. During the conversation with SMITH, and consistent with the rules established for public adjusters, I believe that Victim-3 inquired about which EMS company was next in the rotation. Eight minutes later, agents believe JACKSON returned Victim-3's telephone calls and told Victim-3 to return to the scene to the fire. Agents believe JACKSON told Victim-3 to return to intimidate Victim-3 in furtherance of the extortion scheme based on what happened when Victim-3 arrived. Based on my training and experience, I believe that SMITH and JACKSON were both working together in order to intimidate and threaten Victim-3. I believe based on subsequent events and statements by Victim-3, and consistent with the toll activity, that SMITH and JACKSON coordinated the intimidation and assault of Victim-3 in furtherance of their extortion scheme. I understand from Victim-3 that, with respect to this particular fire, Victim-3 intended to follow the rotation system and to select the company that SMITH and JACKSON directed, as reflected in his calls to SMITH and JACKSON to learn which company was next in the rotation. Victim-3 believed that SMITH and JACKSON were suspicious of his activities and threatened Victim-3 in order to ensure and enforce his continued compliance with the rules.

At the residence, SMITH was holding a meeting, with JACKSON and numerous other individuals present. At the meeting, Victim-3 recounted that SMITH put another unidentified male

USAO_000215

into a head lock, SMITH took off his own shirt, asked those present if anyone was scared, referred

to himself as "Bad Blood" and then asked if anyone knew who he was.  SMITH proceeded to

inform Victim-3 that he would kill his whole family if Victim-3 did not comply with the rules

about rotation.  Based on my training, experience, and involvement in the investigation, I believe

that this incident shows the respective roles of SMITH and JACKSON in intimidating and

communicating threats to victims of their schemes, shows that SMITH does communicate directly

with his victims, and that SMITH also deputizes JACKSON to communicate threats or directives

on his behalf.

Victim-4 described, in substance and among other things, that on or about June 8, 2021,

Victim-4 spoke with SEQUAN JACKSON, using Jackson Phone-1.  The calls were not recorded,

but Victim-4 later described JACKSON's statements to law enforcement agents.

Based on a review of call data from June 8, 2021, I have learned tat call activity on the

afternoon of June 8, 2021 corroborates Victim-4's statements to law enforcement.   At

approximately 12:39 p.m. JACKSON, using Jackson Phone-1, called Victim-4 and the call lasted

approximately 28 seconds.  Victim-4 then called JACKSON, using Jackson Phone-1, at 1:05 p.m.,

and the call lasted approximately 96 seconds.  Victim-4 recalled that, during their communications

on June 8, 2021, JACKSON asked if Victim-4 had signed a loss in Queens, New York.  Based on

my training and experience and involvement in this investigation, I understood that "signed a loss"

means that the particular public adjuster was hired by the property owner to investigate and process

the insurance claim.  Victim-4 explained to law enforcement officers that Victim-4 had stopped

soliciting fires because of Victim-4's fear of the Target Subjects. Victim-4 told JACKSON that

2019.06.27

USAO_000216

Victim-4 was not working in New York anymore. JACKSON then indicated that Victim-4 had to meet with JATIEK SMITH.  JACKSON provided a location for the meeting in Staten Island, New York and informed Victim-4 that the meeting with SMITH would be at 2:00 p.m.  Victim-4 recalled that, a short time before the meeting (Victim-4 recalled approximately 45 minutes before the meeting), JACKSON indicated that the location for the meeting had changed and provided a second location also in Staten Island, New York.  Toll records do not reflect that there was a 1:15 p.m. communication on the meeting location.  However, there were communications shortly before 2:00 p.m. that, based on subsequent events and the statements by Victim-4, likely related to the location of the meeting.  Specifically, and based on my review of toll records, I have learned that at approximately 1:42 p.m., Victim-4 sent a text message to JACKSON at Jackson Phone-1. (I believe it was a text message because the call detail records indicate that the duration is 0 seconds.) Then, at 1:55 p.m., JACKSON, using Jackson Phone-1, called Victim-4 and the call lasted approximately 17 seconds.  I believe that, during the latter communication, at 1:55 p.m., JACKSON likely informed Victim-4 about the change of meeting locations.

Based on my training and experience and involvement in this investigation, I believe that JACKSON's communications were an effort to intimidate Victim-4 on behalf of First Response, to ensure that Victim-4 was complying with the rotation system imposed by First Response, and to verify that Victim-4 was not trying to keep First Response ignorant of Victim-4's business. Based on this and other prior interactions with JACKSON and JATIEK SMITH, Victim-4 understood that JACKSON was JATIEK SMITH's second in command.  Based on my training and experience, I believe that JACKSON's communications are consistent with such a hierarchy.

2019.06.27

USAO_000217

For example, JACKSON communicated the location of a meeting that Victim-4 was supposed to

have with SMITH on the same day, and then provided an updated location.  Furthermore, based

on my involvement in a recent interview with Victim-4, I understand from Victim-4 that the Target

Subjects frequently changed the location of meetings at the last minute, which I believe is an effort

to evade law enforcement detection.  The pattern of communications on June 8, 2021 is consistent

with this activity, such that JACKSON describes one location for a meeting and then suddenly

changes the location at the last minute.  Furthermore, I believe that JACKSON's call was in

furtherance of the Target Offenses and their racketeering enterprises, and corroborates Victim-4's

account of JACKSON's role as SMITH's second in command.

### D.   Analysis of Communications Records for Target Cellphones

In connection with this investigation, law enforcement officers have also analyzed toll

records for wire communications (voice calls) and electronic communications (text messages) on

the Target Cellphones between September 7, 2021 and September 27, 2021 (the "Covered

Period").  According to these records, those phones are active.  For the reasons detailed above,

there is probable cause to believed that those phones are being used in connection with the Target

Offenses.  The toll analysis has shown the following, in substance and in part:

#### 1.   Analysis of Communication Records for Smith Phone-1

During the Covered Period, Smith Phone-1 had a total of 765 voice calls and 358 electronic

communications, including communications with the following Target Subjects.

##### a. Communication with CARL WALSH at 917-440-4044

During the Covered Period, Smith Phone-1 exchanged six voice calls with WALSH at 917-

440-4044 with the most recent call occurring on September 22, 2021.  I believe WALSH is using

38

USAO_000218

917-440-4044 because, among other things, the number is subscribed to in his name ("Carl Walsh").

### b. Communication with KAHEEN SMALL at 718-414-9771

During the Covered Period, Smith Phone-1 exchanged approximately seven voice calls with KAHEEN SMALL at 718-414-9771 with the most recent call occurring on September 27, 2021. I believe that SMALL is using 718-414-9771 because, among other things, the number is subscribed to in his name ("Kaheen I. Small").

### c. Communication with ANTHONY MCGEE at 347-233-9164

During the Covered Period, Smith Phone-1 exchanged approximately 23 voice calls with ANTHONY MCGEE (347-233-9164) with the most recent call occurring on September 24, 2021. I believe that MCGEE is using 347-233-9164 based on, among other things, review of communications from the Smith Phone-1. For example, the user of the phone associated with 347-233-9164 identifies himself as "Touch" (MCGEE's alias) and responds to directives from SMITH for "Touch." For example, in one message exchange from on or about September 9, 2020, MCGEE using 347-233-9164, stated: "This touch checking in." In addition, in a communication between SMITH and another associate on or about July 3, 2020, SMITH stated the following: "(347) 233-9164 Anthony Touch."

### d. Communication with OCTAVIO PERALTA at 917-416-4899

During the Covered Period, Smith Phone-1 exchanged approximately 34 voice calls and 14 text messages with OCTAVIO PERALTA (917-416-4899) with the most recent call occurring on September 27, 2021 and most recent text message occurring on September 22, 2021. I believe that PERALTA is using 917-416-4899 based on, among other things, subscriber records from the service provider. These records show that: 1) the subscriber name is listed as

USAO_000219

"ALPHAADJUSTERSINC," which is the public adjuster company where PERALTA works,

2) the customer name is listed as Peralta, and 3) the service and billing address is 16 Parsons Place,

Staten Island, New York, which is PERALTA's home address as listed in New York State

Department of Motor Vehicle records.  In addition, the Smith Phone-1 contains communications

between Smith Phone-1 and PERALTA at 918-416-4899, which confirm that PERALTA is the

user of the phone number.  For example, on or about September 24, 2020, PERALTA using 918-

416-4899 and Smith Phone-1 exchanged messages, during which PERALTA sent a picture of a

check made out to Alpha Adjusters from First Response.

### 2. Analysis of Communication Records for Jackson Phone-1

During the Covered Period, Jackson Phone-1 had a total of 1179 voice calls and 848

electronic communications, including communications with the following Target Subjects.

#### a. Communication with CARL WALSH at 917-440-4044

During the Covered Period, Jackson Phone-1 exchanged approximately 10 voice calls with

CARL WALSH at 917-440-4044 with the most recent call occurring on September 23, 2021.

#### b. Communication with KAHEEN SMALL at 718-414-9771

During the Covered Period, Jackson Phone-1 exchanged approximately 22 voice calls with

KAHEEN SMALL at 718-414-9771 with the most recent call occurring on September 27, 2021.

#### c. Communications with ANTHONY MCGEE at 347-233-9164

During the Covered Period, Jackson Phone-1 exchanged approximately 79 voice calls with

ANTHONY MCGEE (347-233-9164) with the most recent voice call occurring on September 27,

2021.

2019.06.27

USAO_000220

### d. Communications with OCTAVIO PERALTA at 917-416-4899

During the Covered Period, Jackson Phone-1 exchanged approximately 18 calls and

approximately 44 text messages with OCTAVIO PERALTA at 917-416-4899 with the most recent

call on September 23, 2021 and the most recent text message on September 22, 2021.

## III.   Normal Investigative Techniques
### A.   Insufficiency of Alternative Investigative Techniques

Consistent with 18 U.S.C. § 2518(3)(c), I respectfully submit that, for the reasons discussed

below, normal investigative procedures have been tried and have failed or reasonably appear to be

unlikely to succeed if tried or to be too dangerous to achieve the Objectives of the Interception

herein sought.

### 1.   Undercover Officers

Law enforcement will not be able to accomplish the objectives of this investigation through

the use of undercover officers.  On or about February 4, 2021, law enforcement officers sent an

NYPD undercover officer to a fire-damaged property in Staten Island, New York in an effort to

obtain evidence of extortion.  The attempt was ultimately unsuccessful because JATIEK SMITH

did not show up at the property and the undercover officer was unable to initiate communications.

Any further efforts are likely to be similarly unsuccessful and provoke suspicion among the Target

Subjects.  Some of the co-conspirators share a gang affiliation and, accordingly, are wary of

outsiders and unlikely to discuss the extortion scheme with outsiders.  They are similarly unlikely

to discuss the full extent of their activities with an "outsider" or any individual who has been

recently introduced to their group.  An undercover agent is accordingly unlikely to be made aware

of the full scope of the activities of the Target Subjects.  Furthermore, based on my training and

experience and my involvement in this investigation, even if an undercover agent were

41

2019.06.27

USAO_000221

successfully introduced to First Response, it would be dangerous to the investigation and potentially to the agent for the agent to inquire about the extortion scheme. Were an undercover agent to attempt to gain employment at First Response, for example, they would not have any plausible reason to inquire about tactics used to intimidate co-conspirators, and inquiries on these subjects would, at the very least, likely arouse suspicion of the agent. Accordingly, it is unlikely that an undercover agent would have the ability to obtain information sought through the requested interceptions.

I am also aware that attempting to introduce an undercover agent into a gang inherently comes with risks for the agent, particularly if any of the Target Subjects suspect that he or she may be a law enforcement officer. It is very possible that attempting to introduce an undercover agent into the gang may place that person in danger without promising any significant investigatory advantage.

### 2. Confidential Informants and Cooperating Witnesses

Law enforcement officers have spoken with a particular confidential source ("CS-1"), who was a public adjuster with insight into the industry.[10] CS-1 participated in several interviews and described JATIEK SMITH's efforts to exert control over the industry. CS-1 has provided information that is substantially similar to other victims and witnesses, *infra* §III.A.8. However, CS-1 was not situated to provide an insider's view of the extortion scheme or the racketeering

---

[10] CS-1 participated in interviews in contemplation of being signed up as a confidential source for HSI, but was never formally signed up with HSI. CS-1 was never paid and did not receive any other form of compensation, and voluntarily provided information to law enforcement. CS-1 does not have any criminal history. CS-1's information has proven reliable and been corroborated by, among other things, other witness accounts and communications from the Smith Phone-1.

2019.06.27

USAO_000222

enterprise and accordingly is not a substitute for the interception requested here. At this time, I am aware of no other confidential source, or likely confidential source, who has information that could accomplish the investigation's objectives, or the ability to significantly assist the investigation.

Nevertheless, law enforcement continues to look for opportunities to develop additional confidential sources. If the opportunity were to arise, agents would interview persons involved to determine what, if any, information they had about the Target Subjects. However, given the limitations with confidential sources in general, there is a need for wire surveillance to identify fully the nature and scope of the extortion scheme and the gang that is perpetrating this scheme.

Without the evidence obtained from court-authorized interceptions, the objectives of this investigation cannot be met. The goal of further investigation is to identify, as broadly as possible, the Target Subjects, the co-conspirators, and the scope of their activities. I do not believe that confidential informants and cooperating witnesses alone will enable the government to achieve the stated goals of the investigation. Given the limitations with confidential sources in general, there is a need for wire surveillance to identify fully the nature and scope of the Target Subjects' activities.

### 3. Physical Surveillance

Over the course of this investigation, law enforcement officers have conducted physical surveillance of the Target Subjects in particular locations that are relevant to the investigation or to the Target Subjects. Although law enforcement has advanced the objectives of this investigation by physical surveillance, given the nature of the criminal conduct, physical surveillance is insufficient to achieve the Objectives of Interception.

43

2019.06.27

USAO_000223

For example, law enforcement officers have undertaken surveillance at the First Response office located at 3504 Avenue S, Brooklyn, New York.   Officers have observed several individuals, including ANTHONY MCGEE, entering the office.   Given that this is a workplace, surveillance does not allow law enforcement officers to determine whether any particular individual's presence is criminal or innocent.   There is limited value in determining any Target Subject's presence at the First Response office given that many of these individuals are known to be employed by First Response, and the relevant investigative question is their involvement in the extortion activities being perpetrated by some subset of First Response employees.

As another example, law enforcement officers have attempted surveillance in the vicinity of 416 Jersey Street in Staten Island, New York.   That area is known to be frequented by JATIEK SMITH.   Law enforcement officers have observed that individuals in this area demonstrate sensitivity to the presence of outsiders, particularly law enforcement.   Given the circumstances of the area, law enforcement officers cannot conduct physical surveillance in the area without endangering the covert nature of the investigation.

Furthermore, the nature of the criminal activity complicates efforts to conduct surveillance the Target Subjects' acts of intimidation or violence.   The investigation to date has shown that many of the violent acts occur at the sites of fires or at other random locations.   Fires can occur at any time and in any place, and any surveillance is necessarily reactive. Law enforcement officers cannot be on every street all day in anticipation of the criminal activity of the Target Subjects. While law enforcement officers can attempt to conduct surveillance at the scene of a fire, the Target Subjects are often outside the residences after fires raising the possibility that they will

44

USAO_000224

detect the present of law enforcement officers conducting surveillance.  Interceptions over the

Target Cellphones will assist in efforts to conduct meaningful surveillance.

### 4.  Pole Camera
Similarly, pole cameras cannot easily be deployed given the nature of this particular

extortion scheme.  Specifically, the extortion scheme and the assaults on various public adjusters

have occurred in various sites where fires have occurred, according to multiple witness and victim

accounts.  Given that law enforcement officers cannot predict in advance where the incidents of

intimidation and/or violence where occur, they cannot place pole cameras in locations that further

these investigative goals.

Moreover, the extortion scheme is also being deployed on behalf of a business that may

have some legitimate business activities.  Accordingly, though there are certain locations that have

significance, like the First Response office at 3504 Avenue S, Brooklyn, New York, which may

be the targets for future search warrants, surveillance of those locations does not presently shed

light on the mechanics of the scheme.  Surveillance of individuals known to be associated with

First Response entering or exiting the office location does not shed light on their knowledge and

participation in the extortion scheme.   And even in meetings between particular individuals

observed, a pole camera – as with physical surveillance --would not allow law enforcement to

know the purpose or content of those meetings, nor determine that the meeting relates to criminal

conduct versus ordinary business activities.

### 5.  Geolocation Information
Geolocation information will also be insufficient to accomplish the full objectives of

the investigation.  Geolocation information can help law enforcement determine the particular

45

USAO_000225

locations that an individual frequents, but it does not reveal which of those locations are visited for innocuous reasons and which are visited in connection with criminal activities. Thus, even if geolocation information is used successfully to identify locations frequented by the Target Subjects or their co-conspirators, that information by itself will be insufficient to determine whether those locations are connected to the Target Offenses. Similarly, and because it cannot differentiate between criminal and non-criminal movement, geolocation information is not a substitute for the requested interceptions.

Law enforcement officers have not yet obtained any geolocation information on either cellphones or vehicles used by the Target Subjects. The Target Subjects travel to fire sites themselves, but frequently send their subordinates to use violence on behalf of the enterprise. Fires occur at random locations and at unpredictable time. While location information might be useful at a later stage in the investigation, when there is a better understanding of how the Target Subjects control and deploy individual members to conduct acts of violence on behalf of the enterprise, at present, such geolocation information would not substantially further the investigation. The requested interceptions will allow law enforcement officers to make better use of location information.

### 6. Telephone Records and Pen Registers

Telephone toll records, although they have been used and are continuing to be used in this investigation, provide only limited information. Toll records, unlike the requested interceptions, cannot provide the content of communications, which is an essential tool in identifying a criminal organization's members, interdicting its activities, and developing evidence of those activities. It is only through the combination of wire surveillance, visual surveillance, and

46

USAO_000226

other investigatory tools that law enforcement expects to identify fully the nature and scope of this criminal organization, including the identities of the individuals engaged in the Target Offenses.

### 7.  Search Warrants

Search warrants have been executed on certain social media accounts and a phone, as described below.  These warrants were executed surreptitiously; accordingly, to my knowledge, the Target Subjects are unaware of the ongoing investigation.  These searches confirmed the existence of the extortion scheme and provided information about the particulars.  These searches did not, or, are not anticipated to, provide insight into the hierarchy of the conspiracy, the transfer of proceeds between co-conspirators, and the identity of all co-conspirators and/or their particular roles.  No other search warrants, whether for electronically stored information or for physical premises, have been executed.

As discussed above, *see supra* § II.C, law enforcement officers accessed SMITH's phone – the Smith Phone-1 -- during a border crossing and extracted a forensic copy of the phone.  Law enforcement officers subsequently obtained a warrant to search the forensic copy of the phone. The contents of that phone corroborated SMITH's role in the extortion scheme, other co-conspirators, the methods used by various co-conspirators, and information about possible extortion victims.  However, the search of SMITH's phone provided historical information and accordingly, has and will not assist the Investigating Agencies in conducting surveillance or identifying future victims.

On or about September 2, 2021, the Honorable Debra Freeman, United States Magistrate Judge, signed a search warrant for certain social media accounts, including SMITH's. *See* 21 Mag. 8601.  The return was received on or about September 13, 2021 and is still being reviewed. The

47

USAO_000227

search warrant was based, in part, on visible postings in which SMITH appeared to discuss gang business and his affiliation with the Bloods, and made reference to his employment with First Response. For example, in a July 16, 2017 post, SMITH listed the dates of his membership in various Bloods sets ("GKB 1997, KSB 2004, TSG 2007"). In a post from approximately April 2021, SMITH wearing First Response gear, wrote: "Last week i secured a 3.4 million job and thought it was a highlight!!! Then i woke up in go mode and secured a $24 million dollar job!!! Oh it's definitely play time!!!!" Based on the postings that law enforcement officers were able to view, it seems likely that the social media search warrant will provide useful information about, among other things, SMITH's gang affiliation and his relationship with co-conspirators. However, given the nature of a social media account and its purpose, the search warrant is unlikely to provide a detailed look at the mechanics of the extortion scheme.

In other words, the search warrants to date have provided a glimpse into the extortion scheme but not a comprehensive picture of its scope.

### 8. Witness Interviews

Law enforcement officers, as described above, have conducted interviews of approximately 15 victims and witnesses with information about the extortion scheme or the Bloods. These interviews have largely been voluntary, however, law enforcement officers have served a limited number of grand jury subpoenas to reluctant witnesses. As demonstrated in the witness accounts discussed herein, of Victim-1, Victim-2, Victim-3, and Victim-4, these interviews have provided a picture of historical acts of violence and methods of intimidation that are being used by the Target Subjects, in furtherance of the Target Offenses. The Investigating Agencies have learned about particular assaults committed by the Target Subjects and have learned

48

USAO_000228

how they have gained control in the industry.  In a recent interview with Victim-4, the Investigating Agencies learned that SMITH is increasingly directing his victims to call JACKSON to learn which company is the next in the rotation system.  Victim-4 believes that JACKSON is assuming this role so that SMITH can evade law enforcement detection.  Accordingly, JACKSON is expected to have increasing interactions with victim public adjusters who are complying with the rules set for the industry.  Witness and victim interviews have and will provide important information about interactions with victims.

However, the victims have limited insight into the internal operations of the racketeering scheme and cannot explain the enterprise from their perspective as victims. Furthermore, in the course of the extortion scheme, these victims have been intimidated by the Target Subjects in an effort to cause fear and induce their compliance with the Target Subjects' industry rules.  As a result, those the victims are speaking with law enforcement voluntarily, they are sensitive to, and fearful of, retaliation. Their cooperation with the investigation to-date is important but they are, to varying degrees, wary of their cooperation becoming exposed.  While law enforcement officers will continue to build rapport, law enforcement officers are mindful of the victims' reluctance and/or wariness and, accordingly, do not intend to use the victims for any proactive investigative steps at present.  Given this reality, victims and witnesses are not an alternative for the requested interceptions.  In addition, the witness interviews do not provide an alternative for the requested interception given that they provide limited information about the full scope of the extortion scheme, including, for example, how the co-conspirators interact with each other and distribute proceeds.

2019.06.27

USAO_000229

Subpoenaing co-conspirators through grand jury process is not presently a viable option for developing additional categories of evidence concerning the extortion scheme. Any co-conspirators who could provide additional relevant evidence to a grand jury would themselves be participants in the racketeering activities under investigation. Such individuals would face prosecution themselves; it is unlikely therefore that any of them would testify voluntarily. Nor would it be desirable at this time to seek immunity for such individuals and to compel their testimony, as immunizing them could thwart the public policy that they be held accountable for their crimes. Moreover, issuance of a grand jury subpoena to the Target Subjects would undoubtedly alert both the subpoenaed witness and the Target Subjects to this investigation, which could jeopardize its progress.

### 9. Cooperating Witnesses

Arresting any of the Target Subjects or their co-conspirators and attempting to obtain their cooperation in investigating the extortion scheme would require revealing significant portions of the investigation and thus jeopardize its objectives. If they are unsuccessful, arrests or attempted arrests of Target Subjects and attempts to obtain their cooperation in the current investigation would alert the remaining Target Subjects to the full extent of the investigation, causing them to take defensive measures that would seriously jeopardize the investigation. Accordingly, the risks of failure in attempting to obtain the Target Subjects' cooperation at this stage of the investigation greatly outweigh any likely benefits, and make that investigative technique unavailable. Nonetheless, we continue to work to identify additional individuals who might be removed a distance from the Target Subjects that we could potentially arrest in order to attempt to obtain their proactive cooperation.

50

2019.06.27

### 10. Trash Searches

Trash searches are also not a reasonable alternative to the requested interceptions. To begin with, the extortion operations are unlikely to produce trash that will provide further information about the Target Offenses. The extortion scheme, for example, is operated primarily through in-person interactions. Moreover, the risk of exposing the investigation by attempting to collect the trash from any identified location is too great to undertake such measures at this time.

### 11. Grand Jury Process and Financial Investigation

Certain documents, such as telephone and bank records, can and have been obtained through grand jury subpoenas. Telephone records have been extensively analyzed to show how often the Target Subjects are in communication with each other and/or with victims. This information is helpful to understanding the links between the various members of the racketeering enterprise, but is not a substitute for the content of those communications.

In addition, the investigation has also obtained through grand jury subpoenas a number of financial records including, among other things, the following: bank records, records from other institutions including Zelle, JPay, TransUnion, and Experian, and payroll records for First Response. These financial records are useful to determining the scope of the criminal activity, and to assessing how proceeds of the Target Offenses are distributed among the Target Subjects. For example, these financial records have provided insight into how individuals like ANTHONY MCGEE, KAHEEN SMALL, SEQUAN JACKSON, and JATIEK SMITH receive payment from First Response. What I have observed is that CARL and CHARLOTTE WALSH are on First Response's regular payroll, but that MCGEE, SMALL, JACKSON, and SMITH are not. Bank records instead show that payments are made out of a corporate account belonging to

51

USAO_000231

CHARLOTTE WALSH, where the named corporate entity is "Beach 128th Street Corp." doing business as "First Response Cleaning." The payments are made either to the Target Individuals or to corporate entities associated with them (like, for example, to Juniors Boards Up — which is associated with JACKSON and, indeed, the memo lines of checks to that entity list "Sequan Jackson"). Accordingly, I believe that this financial arrangement, particularly the use of this corporate account with a different named corporation, allows the Target Subjects to keep criminal proceeds away from First Response's official books. Furthermore, this arrangement insulates CARL and CHARLOTTE WALSH from direct association with the other Target Subjects, who are instead paid as independent contractors and not listed on First Response's payroll.

Grand jury process is not an appropriate substitute for the requested interceptions because records and documents provide only limited insight into the commission of the Target Offenses. The financial investigation has provided information about how proceeds are distributed, which conveys some limited information in how the co-conspirators work together and how the enterprise is structured. Such records cannot typically allow for the identification of victims, determination of the location of particular assaults, the details about which co-conspirator has committed assaults, among other relevant facts.

## IV. Ancillary Investigative Orders

I respectfully submit the following additional facts and circumstances in support of the Government's Application for certain ancillary investigative orders necessary to effectuate the purposes of the Order of Interception and the needs of this Investigation.

2019.06.27

USAO_000232

### A.   Order to Service Provider

#### 1.   Technical Assistance to Accomplish the Interception

Consistent with 18 U.S.C. § 2518(4), to effectuate the Order of Interception, HSI will

require the Service Provider for the Target Cellphone, and any Successor Service Provider for the

Target Cellphone, to furnish the technical assistance necessary to accomplish the interception

unobtrusively and with a minimum of interference with services to the persons whose

communications are to be intercepted, and maintain service to the Target Cellphone for the period

of interception and any extensions thereto.  Reasonable expenses incurred pursuant to this activity

will be processed for payment by the HSI.

#### 2.   Pen Register and Trap and Trace Information

The pen register and trap and trace information sought in the Government's Application

(incorporated by reference but for the sake of brevity not repeated herein) is needed to identify

who is calling, and who is being called from, the Target Cellphone. This information is relevant to

the investigation in this matter, and indeed is essential to assist in achieving the Objectives of the

Interception.

#### 3.   Geolocation Information and Delayed Notice and Return

Providers of cellular telephone service generally have technical capabilities that allow them

to collect and generate information about the locations of the cellular telephones to which they

provide service. The most common geolocation information consists of (i) cell-site data, also

known as "tower/face information" or cell tower/sector records; and (ii) E-911 Phase II data, also

known as GPS data or latitude-longitude data. Cell-site data identifies the cell towers (*i.e.*, antenna

towers covering specific geographic areas) that receive a radio signal from the cellular telephone

and, in some cases, the sector (*i.e.*, 120° face) of the towers to which the telephone connects. E-911

2019.06.27.

USAO_000233

Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. In some instances the service provider may send a signal to the cellphone to facilitate or trigger the generation and collection of geolocation information. I respectfully submit that there is probable cause to believe that the geolocation information sought in the Government's Application (incorporated by reference but for the sake of brevity not repeated herein) will assist in achieving the Objectives of the Interception by allowing location of, and as appropriate, the surveillance of, the Target Cellphone and its user, at times relevant to the commission of the Target Offenses. No physical installation of a tracking device, as discussed in Fed. R. Crim. P. 41(e)(2)(C), will be required; this information will be provided by means available to the Service Provider. But to the extent this request is otherwise deemed to fall within the confines of that rule, it is further requested, pursuant to 18 U.S.C. § 3103a(b) and Rule 41(f)(3), that the Court authorize delay of notice of the acquisition of the geolocation information until 120 days after the date of the Court's order authorizing that acquisition. It is also requested that the return on the warrant for geolocation information under Rule 41(f) be made, by analogy to the requirements for a tracking warrant, within 10 days after acquisition of the geolocation information (including any extensions) has ended, under seal. Delay of notice is justified under 18 U.S.C. § 3103a(b) and Rule 41(f)(3) because the Target Subjects are known to resort to violence against victims and could be expected to use violence to thwart the investigation; and further, if the suspects learn they are under investigation, they can easily dispose of evidence and contraband, flee, or go under cover to avoid arrest and prosecution. Certainly if

54

USAO_000234

the user of the Target Cellphones learns that geolocation information for the Target Cellphones has been provided to law enforcement authorities, he may be expected to take immediate measures to thwart the investigation.

### 4. Non-Disclosure

For the reasons discussed herein, it is necessary that the Service Provider and any Successor Service Provider and their respective agents and employees not disclose or cause the disclosure of the Order to Service Provider to any person other than those of their agents and employees who require said information to accomplish the interception ordered, and that, in particular, the Service Provider and any Successor Service Provider and their respective agents and employees shall in no event make such disclosure to the telephone user involved, or to any actual or potential interceptee.

### 5. Successor Service Provider

As discussed above, because a cellphone user can change the service provider that provides service to a particular cellphone, it is important, to avoid interruption in the execution of the Order of Interception and ancillary orders requested, that the Order to Service Provider be immediately applicable to any Successor Service Provider without the delay attendant upon obtaining a new order of this court. To effectuate the Order of Interception and ancillary orders requested, it is also necessary for the Service Provider and any Successor Service Provider to inform the HSI immediately if the service provider changes during the course of the Interception Period, or if the information needed to change Service provider for the Target Cellphones are supplied to another service provider.

2019.06.27

USAO_000235

**B.  Order for Expedited Provision of Information Concerning Communications Devices Related to the Interception**

During the course of the interception the pen register and trap and trace devices discussed above will indicate, among other things, the identifying numbers (*e.g.*, telephone numbers) of telephones and communications devices calling, or being called via, the Target Cellphones. To the extent new numbers surface during the interception it will be essential to obtain as quickly as possible subscriber and service information for those numbers to permit identification of the users of those numbers and pertinent further investigation. This type of information is available under 18 U.S.C. § 2703(d) pursuant to grand jury subpoena, administrative order, and court order or warrant. However, because some service providers do not process grand jury and administrative subpoenas as quickly as these circumstances require, a court order with a 24-hour time limit is necessary to obtain the subscriber and service information sought in the Government's Application (incorporated by reference but for the sake of brevity not repeated herein) in a timely manner. The court order herein sought, which does not specify a particular telephone number or service provider, will only be used for the duration of this interception for telephone numbers calling or being called by the Target Cellphone. Pursuant to 18 U.S.C. § 2705(b), for the same reasons discussed above, it is requested that this order include a direction that the service provider not provide notice to the subscriber or customer as to whom information is provided (i) for six months following the date of this order, (ii) and thereafter, without ten (10) days prior notice to the Investigating Agency in case a further delay in providing notice is warranted.

**V.  Sealing**

It is further requested that to avoid premature disclosure of the investigation, guard against flight of suspects or the loss of evidence, and to better ensure the safety of agents and others, this

56

USAO_000236

Application, including the Affidavit and accompanying proposed orders, as well as any Periodic

Reports, be sealed and placed in the custody of the United States Attorney's Office for the Southern

District of New York until ordered unsealed by the Court or by another judge of competent

jurisdiction, except that copies of the Order of Interception, Order to Service Provider, and

ancillary orders requested herein may be provided to the Investigating Agencies and to the

Government, and be served on service providers as may be necessary to effect the order's purpose.

 

William Clark
Special Agent, HSI

Sworn to before me this
14th day of October, 2021

THE HONORABLE LEWIS J. LIMAN
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

57

2019.06.27

USAO_000237