# EXHIBIT E

M8M7MCG

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   -------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                           22 Cr 00352 (JSR)

5   ANTHONY MCGEE,

6

7              Defendant.

8                                          Bail Application
    -------------------------------x
9
                                           New York, N.Y.
10                                         August 22, 2022
                                           3:05 p.m.
11

12  Before:

13
                        HON. JED S. RAKOFF,
14
                                           District Judge
15
                            APPEARANCES
16
    DAMIAN WILLIAMS
17       United States Attorney for the
         Southern District of New York
18  BY:  RUSHMI BHASKARAN
         Assistant United States Attorney
19
    RUHNKE & BARRETT
20       Attorney for Defendant
    BY:  JEAN DESALES BARRETT
21

22

23

24

25

1          THE COURT:  Good afternoon.

2          All right.  So we're here on a bail application for

3  Defendant McGee.

4          I'll ask each counsel, when they talk, to go to the

5  rostrum because you can take off your mask there and that makes

6  it much easier to understand you.  We'll begin with counsel for

7  the defendant.

8          MS. BARRETT:  Yes, your Honor.

9          Your Honor, I first would like to identify some of the

10 people who have come today in support of Mr. McGee.  His

11 fiancée and future wife is here, Simone Ramirez.  Next to her

12 is Jaelynn Johnson, who is the goddaughter who wrote a very

13 lovely letter.  In the back of the room, the young child is his

14 godson.  There are other family members, other friends to

15 support him.  In addition to that, your Honor, Mr. Sonny

16 Miranda who wrote a letter on behalf -- and he's affiliated

17 with the Central Family Life Center -- your Honor, he is here.

18 He has said that not only would he welcome Mr. McGee back to

19 the program -- and he's happy to give your Honor some more

20 information about the program -- in addition to that, he has a

21 job offer, which is the third job offer that he has.

22         There's Mr. Lopez.  And then I didn't note in my

23 memorandum that Mr. Morales wrote a letter.  On page 15 of the

24 letters, Mr. Morales says that he, as well, would have a

25 position available for Mr. McGee if Mr. McGee were permitted to

1    be free on bond.

2              THE COURT:  I'm delighted to have all those folks

3    here.  Thank you very much for bringing them.

4              MS. BARRETT:  Would you like to hear from Mr. Miranda

5    about Mr. McGee's experience with his --

6              THE COURT:  I think maybe at some point, but let's set

7    the stage, so to speak.

8              MS. BARRETT:  Sure.

9              Your Honor, my focus here is on the language of our

10   Second Circuit that the Bail Reform Act presumes release and a

11   small, very small, identifiable group of individuals should be

12   incarcerated.  I understand, and Mr. McGee understands that his

13   criminal history is something that weighs against him in this

14   particular situation.  But I believe that all of the letters

15   and the willingness of people to sign a bond for him -- six

16   different people are willing to sign a bond -- all of those

17   promises for work, the assurance of his probation officer from

18   the City of New York, and the assurance from Mr. Miranda and

19   the manager of the Central Family Life Center, all attesting to

20   Mr. McGee's character and his change in his life.

21             THE COURT:  Bear with me one second.  I'll tell you

22   why in a second.

23             (Pause)

24             THE COURT:  The reason I interrupted, I don't think I

25   ever saw the -- presumably, there was a pretrial officer's

| | |
|---|---|
| 1 | recommendation that was made to Magistrate Aaron when this case |
| 2 | was first presented, but I don't think I've seen that. |
| 3 | Do either counsel happen to have a copy of that? |
| 4 | MS. BARRETT:  We are not allowed to take them. |
| 5 | MS. BHASKARAN:  Same, your Honor.  The pretrial |
| 6 | officer recommended detention. |
| 7 | THE COURT:  Yes.  But I would have liked to have seen |
| 8 | what he had to say. |
| 9 | THE DEPUTY CLERK:  I'm going to call the magistrate. |
| 10 | Give me a second. |
| 11 | THE COURT:  Go ahead.  I'm sorry for the interruption. |
| 12 | MS. BARRETT:  Sure. |
| 13 | I neglected to identify that Daquan McGee, who is |
| 14 | Mr. McGee's younger brother.  He also wrote a letter of |
| 15 | support.  I think the letters from Daquan and their sister, |
| 16 | Melissa, are telling that they acknowledge his history, they |
| 17 | acknowledge that he has been in a bad place, but they say he's |
| 18 | in a good place now, and they want him to continue to be in |
| 19 | that good place.  They all believe that Mr. McGee has gone |
| 20 | through a rehabilitative experience.  And it would be difficult |
| 21 | to ignore the feelings of all of these people and their |
| 22 | willingness -- |
| 23 | THE COURT:  What am I to make of anything -- and maybe |
| 24 | the answer is nothing -- of the fact that Mr. McGee was one of |
| 25 | numerous defendants in this case who sent letters to the Court |

1   saying that they were overriding their counsel's advice and

2   were asking that no pretrial motions be made and that the

3   matter proceed more quickly to trial?

4          What struck me about those letters is they were all

5   virtually word for word the same, suggesting that the

6   defendants in this case are still in close coordination.  Now,

7   that may be perfectly legitimate, but it seems, perhaps, a

8   little inconsistent with the notion that Mr. McGee has turned

9   his life around and is on a different path.

10         MS. BARRETT:  Your Honor, we have been over this in

11  detail.  It is my understanding that Mr. McGee wants to

12  withdraw that letter, that he personally did not send it.

13         THE COURT:  Well, if that's true, I think I need to

14  inquire of him directly --

15         MS. BARRETT:  Sure.

16         THE COURT:  -- if you have no objection to it.

17         MS. BARRETT:  I have no objection, your Honor.

18         THE COURT:  All right.  So, Mr McGee, you know the

19  letter I'm talking about?

20         THE DEFENDANT:  Yes, your Honor.

21         THE COURT:  You're withdrawing it?

22         THE DEFENDANT:  Yes, your Honor.

23         THE COURT:  You say you didn't send it?

24         THE DEFENDANT:  My fiancée and me had a discussion

25  about said letter and we were under the impression at the time

M8M7MCG

1   that it was one of a good decision, but I didn't have a visual

2   look at it.

3          THE COURT:  So, how had this letter come to be

4   written?

5          THE DEFENDANT:  It was given to her.

6          THE COURT:  Given to?

7          THE DEFENDANT:  My wife.

8          THE COURT:  Who then passed it on to you?

9          THE DEFENDANT:  Yes.

10         THE COURT:  Do you know who gave it to her?

11         THE DEFENDANT:  No.

12         THE COURT:  Well, she's here, yes?  Let's ask her.

13         MS. BARRETT:  Your Honor, I don't think it was ever

14  passed to Mr. McGee, just to clarify that.

15         THE COURT:  I'm sorry?

16         MS. BARRETT:  I believe the letter was never passed to

17  Mr. McGee.  It was not mailed from --

18         THE COURT:  Oh, I'm sorry, it was never --

19         THE DEFENDANT:  It was never presented to me.  I spoke

20  to my wife about it.  She felt comfortable, so I agreed for her

21  to push it.

22         THE COURT:  So maybe counsel can clarify this.

23         From your discussions, what is your understanding of

24  exactly what occurred here?

25         MS. BARRETT:  My understanding is that Ms. Ramirez

M8M7MCG

| | |
|---|---|
| 1 | discussed this letter, which she received from someone else. |
| 2 | She discussed it with Mr. McGee.  They were under a very |
| 3 | different understanding as to the significance of this letter. |
| 4 | Unfortunately, they didn't run it by me first, which would have |
| 5 | been good.  But they both have since conferred after both of |
| 6 | them talking to me.  I spent a good deal of time discussing |
| 7 | this matter with them and they both agree that it was a |
| 8 | mistake. |
| 9 | THE COURT:  So, two different questions. |
| 10 | Back to you, Mr. McGee.  First, are you withdrawing |
| 11 | that letter and the request made in that letter? |
| 12 | THE DEFENDANT:  Yes, sir. |
| 13 | THE COURT:  Second, what is your understanding as to |
| 14 | who that letter originally came from? |
| 15 | THE DEFENDANT:  I believe it came from Mr. Smith. |
| 16 | THE COURT:  Okay.  All right.  Go ahead, counsel. |
| 17 | MS. BARRETT:  Thank you, your Honor.  I'm glad we |
| 18 | could clarify that matter. |
| 19 | So, your Honor, I guess what I was addressing the |
| 20 | Court about was the support of the members of the family, the |
| 21 | support of friends, the support of coworkers, the support of |
| 22 | people who supervise him, including the probation officer and |
| 23 | Mr. Miranda who supervised him at the Central Family Life |
| 24 | Center.  That program is called True 2 Life.  It's my |
| 25 | understanding that Mr. Miranda was hoping that Mr. McGee could |

 1    take on a mentorship role as a person demonstrating that he has

 2    turned his life around.

 3          Your Honor, with regard to the other -- it was one

 4    other thing that I really wanted to focus on, and it just flew

 5    out of my head.

 6          THE COURT:  Being considerably older than you are, I

 7    understand that completely.

 8          MS. BARRETT:  You flatter me, your Honor.

 9          THE COURT:  Anyway, why don't we go to the government

10    and I'll give you a chance to respond in any event.

11          MS. BARRETT:  Thank you.

12          MS. BHASKARAN:  Thank you, your Honor.

13          I know your Honor now has some familiarity with the

14    nature of the case and the allegations in the case, so I'll be

15    brief in this description.

16          THE COURT:  Well, forgive me for interrupting.

17          Do I understand that the government does not contend

18    that Mr. McGee is a flight risk and is basing this solely on

19    danger to the community?

20          MS. BHASKARAN:  That's correct, your Honor.

21          THE COURT:  There is a reference made to his prior

22    record, but that's one of the reasons -- I'm sorry, I didn't

23    see the pretrial --

24          THE DEPUTY CLERK:  It's coming.

25          THE COURT:  All right.  Maybe the government

1    presumably has the information.

2             What is his prior record?

3             MS. BHASKARAN:  It's extensive, your Honor.  I believe

4    it demonstrates a continuous pattern of misconduct.

5             So, to summarize it, his first criminal conviction was

6    in February of 2008.  That was a conviction for felony robbery.

7    He received one to three years'.

8             THE COURT:  How old was he there?

9             MS. BHASKARAN:  I believe he was 18 years old.

10            At the same time, on April 9 of that same year, 2008,

11   he was also convicted of assault in the third degree.  I

12   believe that was a misdemeanor.  Perhaps that was wrapped up

13   with the other case, but he received a conditional discharge

14   for that case.  He was released from prison in October 2010.

15            He's next arrested in April of 2012, so about a year

16   and a half later.  The plea in that case is to criminal

17   possession of a weapon in the fourth degree.  He received a

18   short sentence there, I believe.  There's also some bench

19   warrants that were associated with that offense.  The next

20   arrest after that is October 16, 2013.  He ultimately pleads

21   guilty to robbery in the third degree.  Again, that's his

22   second felony robbery conviction.  This time he gets a term of

23   imprisonment of two to four years.  There are bench warrants

24   associated with that conviction as well.  I believe then he's

25   released from prison in June of 2016 and and his following

1    arrest after that is in August of 2019. The plea there is to

2    assault in the third degree. Again, there's notations of bench

3    warrants there, and he received a conditional discharge.

4            The next arrest, most recent arrest, not including the

5    arrest from the federal offense here, was from March 4, 2021,

6    so a year and some change ago. There, he pleaded guilty to

7    disorderly conduct. The arrest charges were for something more

8    serious, criminal possession of a weapon, but, obviously, we

9    would focus here on the plea, which was just disorderly

10   conduct.

11           THE COURT: Well, maybe I missed something.

12           Although, there were those very serious robbery

13   charges, do I understand, if I followed you correctly, that the

14   only felony pleas or convictions since 2013 were one for which

15   you received a conditional discharge and one that was for

16   disorderly conduct?

17           MS. BHASKARAN: That's correct. So the last felony

18   conviction was from -- he was arrested for that offense on

19   October 16 of 2013.

20           THE COURT: Well, obviously, that's a serious record.

21           Why isn't that at least arguably consistent with the

22   defense argument that is independently supported by the various

23   things they've submitted that he has basically turned his life

24   around, unless we look at the events that he's charged with

25   now, which we're going to get to in a minute?

1          But my point is not to minimize those two subsequent

2   matters, but they do not seem at the same level of his earlier

3   misconduct.

4          MS. BHASKARAN:  I agree, your Honor.  There's been

5   some diminution in the degree of his criminal convictions as

6   he's gotten older.  But, again, I think these prior criminal

7   convictions are very serious.  The fact that he's continued to

8   have arrests for conduct that is violent in nature should be

9   troubling.  The fact of the matter is that --

10         THE COURT:  Well, do we know much about the facts of

11  the disorderly conduct?

12         MS. BHASKARAN:  I don't, your Honor, other than I know

13  that the arrest charges included criminal possession of a

14  weapon.  And for the charge before that, the August 29 arrest,

15  the plea there was for assault in the third degree.

16         THE COURT:  Okay.  Now, he is listed in the

17  indictment, if I recall correctly, as number three of the

18  various defendants.  I assume the indictment basically tracks

19  the government's view of approximate culpability, yes?

20         MS. BHASKARAN:  I think that's right, your Honor.

21         THE COURT:  So the defense says in their submission,

22  for which I am very grateful, that he is not alleged to have

23  been present for or participated in acts or threats of violence

24  in terms of the pending indictment; is that correct?

25         MS. BHASKARAN:  Yes, your Honor.  It is difficult to

 1    pinpoint each and every participant in the numerous acts of

 2    violence that occurred in this case.  There are numerous acts

 3    of violence.  Victims could not always identify their

 4    assailants because these events happened very quickly.  Someone

 5    runs up to them, sometimes multiple people run up to them and

 6    they are sucker punched to the ground.  And all of these

 7    assaults are unprovoked.  And there are insurance investors

 8    going to homeowners --

 9            THE COURT:  Well, I don't mean to minimize the overall

10    allegations and the indications on the face of the papers that

11    they involve both violence and threats of violence of a very

12    serious nature, but what I'm trying to focus in on is

13    Mr. McGee's involvement.

14            So, what led the government to place him as number

15    three in the indictment hierarchy?

16            MS. BHASKARAN:  Your Honor, so our investigation

17    included numerous interviews.  It also included wire taps on

18    two of his codefendant's phones, Mr. Jatiek Smith and Sequan

19    Jackson.  We also recovered a significant amount of evidence

20    from various other phone extractions.  Mr. McGee was

21    intercepted on numerous occasions on the Title 3 where it's

22    very clear that he is fully aware of the tactics that this

23    enterprise used, including the use of this extortion of

24    rotations systems where companies that wanted to stay in the

25    industry could only do so if they made these extortion payments

1    to First Response.  It is amply clear from those interceptions

2    that he's very much a part of administering that rotation

3    system.

4            THE COURT:  Remind me of the event you're referring to

5    now, such as, the evidence from the wire tap relates to what

6    period of time?

7            MS. BHASKARAN:  This would be from 2020.  I think we

8    started from October 2020 from June of 2022.

9            THE COURT:  Okay.

10           MS. BHASKARAN:  In addition, we have a chat where

11   Mr. McGee and several codefendants are discussing a situation

12   where a competitor was trying to take business away from First

13   Response.  Mr. Smith, Jatiek Smith -- there's two Smith

14   defendants in this case -- instructs Mr. McGee to go pull up on

15   him and show some authority.

16           Later, Jatiek Smith says that someone should go slap

17   the competitor.  McGee's response to the comment about slapping

18   is, "It's whatever you want done."  And I think there, there's

19   a fair inference that can be drawn that he understands the

20   violence that is being used by the enterprise to control the

21   industry and he's fully supportive of the violence that's being

22   used.

23           The only other point that I'll note, your Honor, at

24   least at this juncture, unless there's further questions, is

25   that Mr. McGee is, from what I understand, a self-professed

1    member of the Bloods gang, which we all know is a very violent
2    street gang.  Many members of the enterprise that were charged
3    were also members of the Bloods.  And I think that fact is
4    important for the Court to consider in assessing whether there
5    are any conditions or combination of conditions that could
6    address the danger that they possessed.
7         But from the government's perspective, what we think
8    is a very significant criminal history, his gang membership,
9    and his participation in this offense which occurred while he
10   was on probation suggests to us that there aren't any
11   conditions that would reasonably protect against the danger
12   that he possesses.
13        THE COURT:  All right.  Thank you very much.  Let's go
14   back to defense counsel.
15        MS. BARRETT:  Well, your Honor, what I heard the
16   government saying was it's difficult to pinpoint what
17   Mr. McGee's role was in this so-called administration of
18   violent acts.  Difficult to pinpoint sounds to me like there
19   there's no proof that he was involved in physical violence
20   against anybody.
21        THE COURT:  Well, that may well be true based on what
22   I've heard so far.  But on the other hand, they indicate that
23   he had knowledge and was, at a minimum, fully on board in the
24   use of violence.
25        MS. BARRETT:  Well, let me put it this way.  We're

1    here with the presumption of innocence.  That's the

2    government's interpretation of a conversation in which we had

3    no access and no ability to explain or determine context, what

4    was the mood of the individuals engaged in this conversation.

5    All we have is an allegation of some words on the part of Smith

6    to Mr. McGee and Mr. McGee saying something that sounds to me

7    particularly gratuitous.

8            So, what I'm saying here, Judge, is --

9            THE COURT:  I don't think it has to do with the

10   presumption of innocence.  Because while I hold that very dear

11   to my heart, the immediate question is a factual one, and it's

12   one where the standard is essentially preponderance.  And it

13   is, in this particular case, whether him making that statement

14   that was just quoted, it was more likely than not that he was

15   approving the use of violence.

16           Now, you are quite right that you haven't had the

17   extensive discovery that the government is in the course of

18   providing that may shed further light on this.  That, of

19   course, was one of the reasons why I think Mr. McGee has

20   exercised excellent judgment in withdrawing his letter.

21   Otherwise, if I were to follow the path suggested in those

22   letters, we might have a trial in this matter without defense

23   counsel having more than the most trivial idea of what the

24   government's proof was, whereas under the present schedule, the

25   government is required to produce extensive discovery that

1    defense counsel would then have a chance to look at.

2            But my point is this:  As in every bail hearing, it is

3    always subject to further consideration if you discover new

4    information later that casts a different light.  But I, like

5    every judge in this point, have to make a determination as to

6    what I think is more likely than not about any given factual

7    assertion that is being made.  And it does sound to me that

8    it's more likely than not, on the limited amount of information

9    that I have, that it was acquiescence in a proposed act of

10   violence.

11           Why shouldn't I draw that conclusion?

12           MS. BARRETT:  Because that conclusion was the

13   conclusion that -- if you take the context there and the words

14   without putting it into the context of an entire conversation,

15   it's not fair to make that determination and to adopt the

16   government's version of what that conversation was about.

17   Words are words.  Very different.

18           THE COURT:  Well, let me ask a broader question.

19           MS. BARRETT:  Sure.

20           THE COURT:  And I think this is really one of the

21   issues that is at the heart of this application.

22           By the way, I commend the defense for their very

23   excellent presentation, both in writing and now orally in this

24   bail application.  But having had the pleasure and privilege of

25   Ms.  Barrett's presentations before, I wasn't surprised that it

M8M7MCG

1   was a terrific job.

2          MS. BARRETT:  Thank you, your Honor.

3          THE COURT:  But here is what I think is the problem is

4   that you face.  It's, if you will, two inconsistent pictures.

5   We have, on the one hand, your version of what's happened to

6   Mr. McGee supported not just by family members, although, they

7   are always important to the Court, but by independent persons

8   as well, saying this guy not only has turned his life around,

9   he's really become a very helpful participant in the various

10  programs he's involved in and so forth, and he has several

11  employment prospects.  What good will it be to lock him up for

12  X number of months when he has shown his ability to do things

13  the right way?

14         On the other hand, we have the government saying,

15  forget about the prior criminal history.  Although, that's not

16  irrelevant, obviously.  But what we have the government saying

17  is based on their investigation of the facts in this very case,

18  that within a very recent couple of years or so, he was

19  directly involved in a very, very serious racketeering

20  conspiracy.  So that's, I think, the clash that needs to be

21  resolved.

22         MS. BARRETT:  I think your Honor is capable of

23  resolving that clash because I am very familiar with the Court

24  as well.  But I would also point out that it has to be if your

25  inclination was the decision must be release.

M8M7MCG

|    |    |
|----|----|
| 1  | THE COURT:  I understand that, and I agree with that |
| 2  | completely.  But usually, the facts are not 50/50, they're |
| 3  | usually at least 51/49. |
| 4  | MS. BARRETT:  Right. |
| 5  | THE COURT:  One of the things that trouble me -- |
| 6  | that's why I asked the question earlier -- is if he really had |
| 7  | turned his life around in the way that you're suggesting, why |
| 8  | was he directly, or as it seems, indirectly participating in |
| 9  | this letter campaign that was presented to the Court, which |
| 10 | suggests a degree of continuing association with the people, |
| 11 | many of whom the evidence is very strong. |
| 12 | MS. BARRETT:  Your Honor, I think -- and I'm not going |
| 13 | to ask anybody to back up my thoughts here -- but my intuition |
| 14 | or inference based on what I know is that there may have been |
| 15 | pressure applied to Ms. Ramirez in a way that led her to |
| 16 | believe that it would be in Mr. McGee's best interest to go |
| 17 | along with this letter writing campaign. |
| 18 | THE COURT:  So, now, if I do grant bail, in these |
| 19 | kinds of situations, one of the normal conditions is that the |
| 20 | defendant have no further contact with anyone involved.  And I |
| 21 | would interpret that to mean not just direct contact, but |
| 22 | indirect contact, other than through counsel, of course. |
| 23 | So if, for example, I received another letter of that |
| 24 | nature from someone in his family who had shown it to Mr. McGee |
| 25 | and then sent it to the Court -- I'm making this up as a |

M8M7MCG

1   hypothesis -- would it not be proper at that point for me to

2   feel that he had violated the conditions of release and revoke

3   bail?

4          MS. BARRETT:  Absolutely.  There is no question about

5   that.

6          I think that Mr. McGee and Ms. Ramirez fully

7   understand the Court's position with regard to this, and they

8   regret deeply that they became involved with this without

9   discussing it with counsel.  They understand that there's

10  absolutely no contact with anyone associated with the other

11  defendants in this case.

12         THE COURT:  Now, if you know and if you want to tell

13  me, is he still a member of the Bloods?

14         MS. BARRETT:  Your Honor, there's a thing about gangs

15  that I'm sure the Court is aware, it's that you can be

16  categorized in that fashion unless you actually take some sort

17  of affirmative action that's required.  You don't -- it's sort

18  of like once a Blood, or once a whatever, Trinitarios, or once

19  this, once that, you're always that, no matter what.  He could

20  be 100 and they could still be saying that about him.

21         So, I can tell you that he is not engaged with any

22  kind of criminal activity with regard to their gang.

23         THE COURT:  So if I were to release him, again, one of

24  the conditions, it seems to me, would have to be that he not

25  associate with anyone that he knows is a member of the Bloods.

M8M7MCG

1          MS. BARRETT:  Certainly.

2          THE COURT:  That would cover quite a lot of people, I

3     suspect, in his particular venue.

4          MS. BARRETT:  Yeah, well, I believe that if he were

5     released, he would like to reside with Ms. Ramirez in Newark.

6     So he would be away from the area where he, as a very young

7     man -- and by the way, he was 17 for that first arrest -- and

8     as a very young man became involved because of where he was,

9     because of his family's economic circumstances, the fact of

10    growing up in a single-parent home.  All of those things, we

11    know, expose young men to very negative influences.  He has

12    overcome that.  He is working very hard to take care of his

13    family.  He takes care of his children, the two youngest

14    children every weekend.  He obviously is a mentor and support

15    to Jaelynn Johnson, who is here.  His family is willing to

16    support him.  Everybody is willing to stand by.  Everybody

17    understands that one step over the line would mean

18    incarceration again, should the Court grant his release.  But I

19    do want to emphasize that.

20          I know the Court knows this, because I know the Court

21    sat through a capital case and has heard experts testify about

22    aging out and that process of basically growing up and how that

23    doesn't really happen when you're automatically 18 years old.

24    It takes a while for that brain to start making good decisions

25    and functioning well from an executive functioning point of

M8M7MCG

1   view.

2          THE COURT:  Give me, again, the bail conditions that

3   you would propose.

4          MS. BARRETT:  Proposing electronic monitoring with

5   home detention so that he could work, and that he would be

6   residing with Ms. Ramirez on South 11 Street in Newark.

7          By the way, your Honor, I also have -- and I'll just

8   tell you about it and I won't necessarily burden the Court with

9   more paperwork, but Ms. Ramirez canvassed her neighborhood and

10  had her neighbors sign a letter saying that they welcome

11  Mr. McGee's return to that community in Newark.  He would be

12  away from all of these people.  Also, there are six individuals

13  who are willing to sign a bond and --

14         THE COURT:  How much of a bond are you proposing?

15         MS. BARRETT:  I would think 250,000 would be an

16  appropriate bond.

17         THE COURT:  Cosigned by?

18         MS. BARRETT:  By Ms. Ramirez.  Jon Lopez would be

19  signing it.  Two of the individuals are managers at Duane Reade

20  where Ms. Ramirez is employed, and they've come to know

21  Mr. McGee through that.  Mr. Marrero.  There's one who is

22  employed in Walmart in Newburgh and is a salesclerk.

23         Obviously, these are not people who are wealthy, but

24  as I pointed out in the letter, they understand the

25  significance of making this kind of sacrifice.  And the moral

M8M7MCG

 1    suasion involved is really important.  I think it's important

 2    for Mr. McGee.

 3         He hasn't received a copy of the letters because mail

 4    is what it is, but I have read some of the letters to him this

 5    afternoon and he was brought to tears with gratitude for what

 6    people are willing to sacrifice for him.

 7         THE COURT:  All right.  Let me go back to the

 8    government.  First, anything you'd like to say, and then, also,

 9    I have a question for you.

10         If I were to release Mr. McGee on bail, are there any

11    other conditions that you would propose?

12         MS. BHASKARAN:  Yes, your Honor.

13         I believe the other defendants in this case who have

14    been released have a condition to have no contact with certain

15    industry participants.  I don't have the precise details of how

16    we put that in effect, but I believe we provided pretrial with

17    a list of certain companies in the industry that the defendant

18    would not be able to contact.

19         THE COURT:  Okay.  That's important.

20         Well, I am leaning that way.  So if there's something

21    else you want to say that you think might change my mind, now

22    is the time to say it.

23         MS. BHASKARAN:  I don't know that I have any

24    additional points, your Honor, other than to say that it is the

25    government's view that detention is appropriate here and that

1    is very much driven by the criminal history, the prior gang

2    membership, and his acquiescence to violence and extortion in

3    this case.

4              THE COURT:  Those are all important points and well

5    stated.

6              This is, as you might imagine, a somewhat close call.

7    Although, I don't think it's determined by presumption, I am,

8    of course, fully aware and devoted to the provision of our

9    Constitution that favors the release on bail.  But to my mind,

10   it always has to be decided on an as complete and careful

11   analysis of the specific facts as the Court can look at at this

12   still relatively early stage in the litigation.

13             The government does not contend that this defendant is

14   a flight risk, and it seems clear from the support he's

15   received that that's very unlikely.  Although, I will still

16   impose, when we get to the provisions, a bond, because I think

17   that has its own moral suasion of a more general sort.

18             I am struck by the fact that Mr. McGee, despite his

19   participation in the past in serious criminal activity, does

20   and has given signs in maturing in just the way defense counsel

21   mentioned.  It's always difficult for someone who has joined a

22   gang at an early age and looked to the gang for leadership and

23   support to suddenly come to the realization that that is the

24   path to ruin, to a lifetime of incarceration at one point or

25   another, to the disregard for the family and other people who

1   place such great faith in him.  That realization comes slower

2   to some and faster to others, but I do think defense counsel

3   has made a persuasive showing that Mr. McGee is moving in that

4   direction in meaningful ways.  And it is impressive that that

5   position is supported not just by family, but by prospective

6   employers, by participants and programs in which he's played a

7   role and so forth.  This is as full of support as one could

8   imagine in these circumstances.

9        I'm also persuaded that the evidence so far presented

10  to the Court of Mr. McGee's own involvement in violence or even

11  acquiescence in the violence of others is modest at best

12  compared with some other defendants in this case.  It is quite

13  modest.  So it seems to me that there is a set of conditions

14  that reasonably could warrant Mr. McGee's release and assure

15  against further danger to the community.

16       Although, I want to emphasize to Mr. McGee that even

17  the slightest violations of the conditions I'm about to set

18  would almost certainly change my mind and result in your bail

19  being revoked.  But I'm sure you understand that; yes?

20       THE DEFENDANT:  Yes, your Honor.

21       THE COURT:  So the first condition is that the

22  defendant will be subject to electronic monitoring as

23  determined by the pretrial services, and that he will reside,

24  at all times, at Ms. Ramirez's residence in Newark, as I

25  understand it, except when he receives prior pretrial approval.

1     Now, this could be for employment, for example, it could be for

2     medical purposes, it could be for meeting with counsel, but it

3     always requires prior approval of pretrial services.  If I ever

4     hear, for example, oh, gee, it was an emergency, I just had to

5     leave, so I didn't have time to call pretrial services, or, I

6     couldn't reach pretrial services, forget it; I would revoke

7     bail.  So any release requires pretrial services' prior

8     approval.

9           Third, the defendant is restricted to the District of

10    New Jersey and the Southern District of New York.  Fourth, the

11    defendant will not associate with anyone who he knows to be a

12    member of the Bloods, and/or with any member associated with

13    any of the defendants in this case, and/or with anyone who he

14    knows has been previously convicted or was charged with pending

15    crimes.  Mr. McGee has so many good people who support him that

16    he doesn't need to worry about being lonely.

17          Fifth, he will not associate with companies, and I'll

18    adopt by reference and we'll get the exact wording from the

19    previous bail conditions regarding that provision.  I'll leave

20    that for counsel for both sides to work out.  Finally, he must

21    provide a $300,000 recognizance bond cosigned by at least four

22    financially responsible people.  And the government will make

23    the initial determination as to whether that has been met.

24          Now, it follows from that last condition that he will

25    not be released today because we'll have to put all these

M8M7MCG

1    arrangements in place.  But if there are any difficulties

2    expeditiously putting all of this into place, counsel should

3    jointly call the Court and we'll make sure this gets expedited

4    so that Mr. McGee shall be released in the next few days, even

5    though he can't be released today.

6            All right.  Is there anything else anyone else wants

7    to raise at this time?

8            MS. BHASKARAN:  No, your Honor.

9            THE COURT:  Defense?

10           MS. BARRETT:  No, your Honor.

11           THE COURT:  Very well.

12           (Adjourned)