M991SMIC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                           22 Cr. 352 (JSR)

JATIEK SMITH,

               Defendant.                Conference
------------------------------x

                                         New York, N.Y.
                                         September 9, 2022
                                         3:11 p.m.

Before:

                    HON. JED S. RAKOFF,

                                         District Judge


                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  MARY E. BRACEWELL, ESQ.
     RUSHMI BHASKARAN, ESQ.
     Assistant United States Attorneys

THE VITALIANO LAW FIRM, PLLC
     Attorneys for Defendant
BY:  MICHAEL VITILIANO, ESQ.

ALSO PRESENT:  EVELYN ALVAYERO, U.S. Pretrial Services Officer
```

M991SMIC

(Case called)

THE DEPUTY CLERK: Will everyone please be seated and will the parties please identify themselves for the record.

MS. BRACEWELL: Good afternoon, your Honor. Mollie Bracewell appearing for the government, with my colleague, AUSA Rushmi Bhaskaran, and also at counsel table is Pretrial Officer Evelyn Alvayero.

THE COURT: Good afternoon.

MR. VITALIANO: Good afternoon, your Honor. For Mr. Smith, Michael Vitaliano.

THE COURT: Good afternoon.

So we have several matters to take up. The first is arraignment. So let me ask defense counsel whether you have gone over Indictment 22 Cr. 352 with Mr. Smith and whether you want it read again here in open court or whether you waive the public reading.

MR. VITALIANO: I waive the public reading, your Honor, and I have reviewed the indictment with Mr. Smith.

THE COURT: Would you like a plea of not guilty entered at this point?

MR. VITALIANO: Yes, Judge.

THE COURT: A plea of not guilty will be entered.

Now we had previously, at the request of all the defense counsel, set a trial date of May 1st of next year, and also dates for the submission of various motions, but I

M991SMIC

received a letter from Mr. Smith which, in the first paragraph, reads as follows:

"I'm writing to you regarding my criminal case, No. 22 Cr. 352. I'm wishing to waive my rights to file any motions and proceed to a speedy trial. I understand the purpose of the motions, and my lawyer has advised me as best he can. I am disregarding his advice and would like to proceed with trial."

So let me find out, both from counsel and from Mr. Smith, whether that is still his position.

MR. VITALIANO: Judge, may I have one moment to confer with my client.

THE COURT: Yes.

(Mr. Vitaliano conferring with the defendant)

MR. VITALIANO: Your Honor, against advice of counsel, Mr. Smith still at this time wants to have a speedy trial.

THE COURT: Okay. Mr. Smith, is that your position?

THE DEFENDANT: Yes.

THE COURT: And you don't want your counsel to file any motions?

THE DEFENDANT: No.

THE COURT: Okay. So let's see. Under the Speedy Trial Act, that would mean that the case should be tried within 70 days. Let me look at my trial schedule.

So about how long a trial are we talking about, just

M991SMIC

1  against Mr. Smith?

2          MS. BRACEWELL:  Because he is the lead defendant, I
3  would still expect our proof to be in the order of three weeks.

4          THE COURT:  Well, I'm skeptical, but I hear what you
5  say.  So I think we can set it down for early November.

6          What day of the week is November 7th?

7          THE DEPUTY CLERK:  It is a Monday.

8          THE COURT:  Okay.  And I know we have a civil trial
9  that week, which we can move.  Anything the following week?

10         THE DEPUTY CLERK:  You are sitting by designation in
11 Phoenix.

12         THE COURT:  But that may be, as it's turning out, only
13 three days, so we can still have two or three days of trial
14 that week.

15         THE DEPUTY CLERK:  And I also should tell you that
16 Tuesday, November 8th, this year the courthouse is closed for
17 Election Day; and the Friday of that week, November 11th, is
18 Veterans Day, and the courthouse is closed.

19         THE COURT:  All right.  Let's go back to October 17th.
20 We have a civil case, again, which I can move.

21         THE DEPUTY CLERK:  Right.

22         THE COURT:  We have a criminal case starting the next
23 week, but we can move that a little bit too, I think.  Anything
24 else the following week?

25         THE DEPUTY CLERK:  No, just a continuation of the

M991SMIC

other trial.

    THE COURT:  So I think we can try this case beginning October 17th.  Any problems with that on the part of the defense?

    MR. VITALIANO:  No, Judge.

    THE COURT:  Okay.  So we will put the case down for October 17th against Mr. Smith.  All the other defendants are hereby severed, and we'll continue with the trial schedule and motion schedule that they have set in place.  Some of them filed letters after Mr. Smith's letter that were suspiciously very similar to Mr. Smith's letter, almost word for word, but at least one has already withdrawn that, a second one has indicated his intention to withdraw it, and I have a feeling that only Mr. Smith wants to proceed in the manner he's just indicated.

    So I will exclude from calculations under the Speedy Trial Act all time between now and October 17th, finding that it's not really necessary, that will be a speedy trial, but that in any event, that is a reasonable time for he and his counsel to prepare for the trial, and that for those and other reasons evident from this proceeding, the best interests of justice in excluding such time substantially outweighs the interests of the public and the defendant in a speedy trial.

    MS. BRACEWELL:  Your Honor --

    THE COURT:  So anything else regarding that before we

1  turn to bail?

2          MS. BRACEWELL:  Yes, your Honor.  We were wondering if
3  we could revisit slightly the trial date, only because one of
4  the AUSAs is out on paternity leave.  I have another trial that
5  same week.  If we were able to do it in November, we are --

6          THE COURT:  Well, we couldn't find a good date in
7  November.  I mean, the only possibility in November would be
8  late November, where I already have two trials that would have
9  to be moved, and my courtroom deputy points out, one of those
10 two trials on November 30th is a civil trial that's been moved
11 repeatedly and I told counsel we would endeavor not to move it
12 again; the other is a criminal trial, starting November 21st;
13 and sometime in there is Thanksgiving.  So we wouldn't have a
14 full trial week.  So I appreciate that this is a hardship on
15 the government, but I don't see any reasonable alternatives.

16         MS. BRACEWELL:  Your Honor, even if we had to schedule
17 it in January.  You know, given the short turnaround, it would
18 be incredibly difficult for new prosecutors to familiarize
19 themselves with the case and the witnesses.

20         THE COURT:  Well, I understand that, although this is
21 a case that you've been pursuing for some time, and moreover,
22 it's a case that, even under the new trial date, is, what,
23 five, six weeks from now, so it's not like you don't have
24 meaningful time.  And the Speedy Trial Act is something this
25 Court takes very seriously, and Mr. Smith has invoked his

rights under the act.  If there were a November date that would work, I would consider it.  So let's revisit that for a moment.  But I don't see going to January.

      Now just before we consider November again, tell me specifically, in terms of personnel, who is out on maternity leave?

      MS. BRACEWELL:  Adam Hobson, the third AUSA on this case, had a baby just the last couple of weeks.  I believe—though we can confer with him—that he was expecting to be on paternity leave for the next couple of months.

      THE COURT:  All right.  So that's not going to help us either way.

      MS. BRACEWELL:  Right.  Though I think he could -- right.  I have a trial starting on October 24th in front of Judge Torres.

      THE COURT:  In front of Judge?

      MS. BRACEWELL:  Torres.

      THE COURT:  So I would certainly be happy to call Judge Torres and see if I can get her to adjust that schedule.  What is that, a multidefendant case or --

      MS. BRACEWELL:  It's a one-defendant case.  It's a retrial of a case that was tried this past May.

      THE COURT:  I'm sorry?

      MS. BRACEWELL:  Sorry.  I missed the microphone.

      It's a short trial, approximately one week.

1  THE COURT: So let me ask you this: Would you prefer
2  to move that up earlier and get it done in September, assuming
3  she has availability, or would you rather have it pushed to
4  like December?
5  MS. BRACEWELL: You know, I'm amenable to any schedule
6  that the Court can accommodate. I don't want to speak for --
7  there's other trial team members as well whose schedules are
8  being negotiated and implicated, so I can't speak sort of
9  broadly.
10  THE COURT: All right. So I will call Judge Torres—I
11  have no guarantee, of course, it's up to her, but—see if she is
12  amenable to moving -- what's the name of the case?
13  MS. BRACEWELL: U.S. v. Timothy Shea.
14  THE COURT: And the docket number, if you happen to
15  have it?
16  MS. BRACEWELL: I should have it, but I don't.
17  THE COURT: All right. Just send it to me by email
18  after this proceeding.
19  MS. BRACEWELL: Understood.
20  And your Honor, just for the record, and given the
21  statements we've made about the volume of discovery, in our
22  view, it would be helpful to allocute the defendant --
23  particularly given defense counsel's representations today that
24  this is over his advice, if the defendant is allocuted on the
25  fact that this trial schedule may implicate his and defense

1    counsel's ability to review the discovery.
2             THE COURT:  Yes.  Well, of course, that's
3    self-evident.  But let me go through that, and then we'll talk
4    to both Mr. Smith and his counsel.
5             So the reason this case was put on an extended track
6    is because all your co-defendants' counsel, when they learned
7    that the government had lots of discovery to give to counsel,
8    and that it would take an extended time to review that
9    discovery, and also because they wanted to see whether there
10   were important motions that could be brought to limit the case,
11   and because, as responsible counsel, they thought that it would
12   be very seriously harmful to their clients to proceed on a
13   swift track, they all suggested—wasn't even my suggestion, it
14   was their suggestion—that we move the case much later, and they
15   felt—and this, of course, is something that lawyers have much
16   more expertise than defendants about—that they couldn't really
17   do a good job of defending their clients until they had had
18   extensive time to review the discovery, until they had seen
19   whether any of that discovery was subject to motion practice
20   that might eliminate some of the government's proof or even
21   some of the government's charges, and that they then wanted the
22   opportunity to talk to their own witnesses and investigate the
23   matter.  And so I am sure you recognize, but just let me
24   confirm, that you understand all that and you still want to go
25   to trial in October.

1         THE DEFENDANT:  Yes.

2         THE COURT:  Okay.  And the government will therefore
3    do their best to provide the discovery to Mr. Smith's counsel
4    as rapidly as possible, but he will not be heard to complain
5    that it's voluminous or that he doesn't have enough time to
6    review it or anything of the sort.

7         And similarly, because of the considerable
8    difficulties that the government will be put to by Mr. Smith's
9    lawful election of his speedy trial rights, no requests for
10   extension under any circumstances whatsoever by the defense
11   will be granted.

12        So I hope you know what you're doing, Mr. Smith, but
13   it's your choice.

14        So let's turn to the bail application.

15        So I've received the application from defense counsel,
16   and I thank also the many fine people who submitted letters.

17        So let me hear first from the government, and then
18   we'll hear from defense counsel.

19        MS. BRACEWELL:  Yes, your Honor.  We are seeking
20   detention, continued detention here, because the defendant is
21   both a danger to the community and because we think there's a
22   substantial risk of flight here.

23        This defendant, as I mentioned a moment ago, is the
24   lead defendant.  He is the mastermind of this entire
25   enterprise.  He was instrumental in taking over First Response,

and he was instrumental in using First Response to take over the industry.  He's intimidated witnesses, he sought to obstruct justice, he's participated in assaults and directed others to conduct assaults, and he's personally threatened and terrorized others.  We think the evidence overwhelmingly shows his dangerousness.  Some examples are already put out in our bail letter, but I'm going to highlight them just for ease of reference.

In an assault on November 13th of 2020, one witness was -- one victim was conversing with Jatiek Smith only moments before he was punched in the head at that same job site.  Jatiek Smith was trying to direct that victim to assign business towards First Response for the particular company it had selected.  Another defendant, Manuel Pereira, then sent Jatiek Smith a video of that assault.  So he was in touch with the person, both before and after, we believe.

In the spring of 2021, we have another witness testimony about Jatiek Smith's involvement in a group assault, an employee of another rival EMS company.  Jatiek Smith was present, along with two other co-conspirators and numerous others.  They encircled this victim and beat him.  They punched him approximately 15 times.  Jatiek Smith was heard at the scene saying, "I got 13-year-old kids out here looking to make a name for themselves.  I'll give them a gun, they can kill you or your family."

Those are the same kinds of words we hear on recordings recovered from the defendant's own phone. There was a phone obtained covertly in the course of the investigation in the context of a border stop. Numerous recordings were found on that phone in which Jatiek Smith describes what he's doing, describes using threats, and in fact records one meeting he had with EMS companies. He says such things as, "Y'all [N word] play with me, I'll kill one of your kids. I'll kill one of your kids just to send a message, to send a message. Who the fuck y'all [N words] think y'all playing with? I'm not a sucker. Y'all [N words] think that fire chasing business is something. I'm a gang member. I been gang banging for years. I'll kill one of you [N words] to send a message. That's the messages I send, man."

That's words that we recovered and transcribed from a recording on his phone. It's entirely consistent with what our witness testimony has corroborated and set out that he is running a violent enterprise to intimidate and bring into line anyone who threatens his business.

He's also been sort of single-handedly responsible for the obstruction of justice and witness tampering that we've discussed with this Court before. Other co-conspirators have been present, but his involvement shows that he is running that portion of the enterprise.

For example, he recently, in late spring of this year,

1  once the investigation was known to him, gathered various
2  people in his presence, he patted them down and he described
3  that he would intimidate them, he would kill -- he would kill
4  the attendees and take them down with him, in the context of
5  discussing the investigation; the implication being, if these
6  individuals cooperated against him, their lives were at stake.
7  And this isn't hyperbole, given that this same language appears
8  again and again in the words that witnesses recount and in the
9  recordings that we have from his phone and in intercepted
10 communications.
11         So the offense conduct here is staggering.  The
12 evidence of it is overwhelming.
13         The defendant's criminal history is also alarming in
14 its length and severity and consistency.  I don't need to tell
15 your Honor what's in the pretrial report, but I would just note
16 that the defendant was on probation from 2017 to 2020.  That is
17 when he was launching this enterprise, and he successfully took
18 over much of the industry.  He is obviously not susceptible to
19 supervision in the community.
20         And I also want to bring to your Honor's attention
21 certain events that have transpired more recently than the
22 indictment being returned.  The defendant was in Puerto Rico at
23 the time of his arrest.  HSI agents and various other law
24 enforcement agents executed that arrest warrant.  He was there
25 with various family members, including his children.  He became

1    very aggressive when law enforcement sought to execute the
2    arrest warrant. He stated -- he swatted the hands away of one
3    of the agents and stated he was not no "B word" and he wasn't
4    gonna let any of us arrest him and, "You all, you are going to
5    have to kill me." He then kept the phones in his hands,
6    refused to hand them over or surrender to law enforcement. It
7    took nearly one hour and 45 minutes for them to actually
8    execute the arrest. This was in the presence of his family
9    members and the children that are cited extensively in defense
10   counsel's submission.
11            I'm saying all that because I think it's very clear
12   from the context of this arrest that there's a flight risk
13   here. The defendant is now increasingly aware of the
14   overwhelming proof that there is against him. It's clear that
15   his family was present then and he certainly wasn't brought
16   into line or, you know, didn't respond to clear directives or
17   the fact of the arrest warrant.
18            He's also had two other recent criminal incidents
19   related to him. On June 4th of 2022, he was arrested at Home
20   Depot stealing things with co-conspirator Sequan Jackson.
21   June 20, 2022 --
22            THE COURT: Let me take the liberty of interrupting
23   you.
24            MS. BRACEWELL: Sure.
25            THE COURT: You've brought to my attention a number of

1    allegations that bear on danger to the community.  What is your

2    evidence with respect to danger of flight?

3             MS. BRACEWELL:  Right.  So risk of flight, first, I

4    think the context of his arrest -- my detailing of the arrest

5    in Puerto Rico I think is illustrative.  His refusal to

6    surrender to law enforcement certainly suggests that his

7    detention is potentially necessary.

8             Additionally, I would note that the pretrial report

9    describes a number of bench warrants; it describes various

10   criminal conduct while he's on supervision.  That's what I was

11   alluding to in the 2017-2020 period.  This is someone who has a

12   long criminal record and has never -- has proven himself not to

13   be susceptible to community supervision, which is necessary if

14   he's released.

15            A few other points just to drive home.  We discussed

16   various references to guns.  At the time of the search, we

17   recovered four guns in the First Response office that was

18   controlled by the defendant.  So in addition to his frequent

19   references and threats with guns, he was in fact in possession

20   of various guns that he can and would use.

21            So the evidence, in our view, is overwhelming, the

22   danger to the community is overwhelming, but particularly with

23   the nature of the allegations, the credible allegation of

24   witness tampering and obstruction of justice, this is not a

25   defendant that can be safely released into the community.

1  THE COURT:  All right.  Let me hear from defense
2  counsel.
3  MR. VITALIANO:  Thank you, Judge.
4  First, I'd like to introduce Mr. Smith's family and
5  friends who are all in the courtroom today.  That is a
6  testament to Mr. Smith's character as a person.  These
7  individuals know Mr. Smith's past.  They know that Mr. Smith
8  has now begun to make better choices in his life.  And your
9  Honor, as detailed in the multitude of letters, Mr. Smith is a
10 leader in his community.  He cares for his community, he cares
11 about people, he cares about his children.
12 And your Honor, first, I would like to just touch on
13 the flight risk.
14 Mr. Smith is absolutely not a flight risk.  Mr. Smith
15 was in Puerto Rico.  He was there celebrating the graduation of
16 his daughter.  When the agents came, it's my understanding that
17 Mr. Smith went willingly with the agents.  The only thing that
18 upset Mr. Smith was the fact that his kids were searched by the
19 agents.
20 And one of the letters that your Honor received was
21 from an old attorney of Mr. Smith's.  That attorney spoke about
22 how Mr. Smith was out on bail during trial, was convicted, was
23 sentenced, and he still returned to court.  I think that is
24 overwhelming evidence that Mr. Smith is someone who is not a
25 flight risk.

1          As to the dangerousness to the community, as stated in
2    all the previous letters --
3          THE COURT:  Well, everything you say is important.  If
4    I read that letter from the lawyer correctly, just to correct
5    the record, he was acquitted of the two main charges.  He was
6    only convicted of a lesser charge.  I don't think it detracts
7    from your point, but I just want to make the record clear on
8    that.
9          MR. VITALIANO:  Yes.
10         THE COURT:  And then later on, the government dropped
11   the third charge --
12         MR. VITALIANO:  Correct.
13         THE COURT:  -- as well.
14         MR. VITALIANO:  But throughout the pendency of that
15   case, the point is that Mr. Smith continued --
16         THE COURT:  No, no, your point is still valid.  I just
17   wanted to make the record clear.
18         MR. VITALIANO:  As to the dangerousness to the
19   community, again, these are all allegations against Mr. Smith.
20   As the letters detail, they are diametrically opposed to what
21   the government details Mr. Smith as.  I think the defense
22   investigation is eventually going to show the Court and show
23   the government that Mr. Smith wasn't an instigator of any of
24   these fights.  Mr. Smith quelled the violence.  He was someone
25   who --

1         THE COURT:  What about all those recordings?

2         MR. VITALIANO:  Judge, I think a lot of the

3    recordings, it's true that -- it's mere hyperbole, it's mere

4    speech.  He's not someone who's going to act out.  He's someone

5    who tries to do his best for the community.

6         And your Honor, I know the government brought up some

7    of his prior convictions.  And, you know, the Bail Reform Act,

8    they're not -- someone's prior criminal history should not

9    impact whether or not he should be detained.

10        I think the conditions that we have proposed for your

11   Honor, with the $750,000 bail, five financially responsible

12   persons signing the bail, his home being at risk, I think all

13   of those conditions can satisfy safety to the community; it

14   will ensure his appearance in court.  And I know your Honor

15   read about Mr. Smith's incarceration prior to being here today,

16   and the struggles that he endured.  I think the prospect of

17   Mr. Smith going back into prison while he's a presumed innocent

18   man is enough of a deterrence to ensure the safety of the

19   community.

20        THE COURT:  All right.  Well, thank you very much.

21        And I want to thank, again, the various members of

22   Mr. Smith's family and circle of friends for their important

23   letters that they submitted as well.

24        With respect to the question of flight, I think there

25   probably are reasonable conditions that could assure against

M991SMIC

1  flight.  But I'm going to deny bail because I think the
2  government has shown quite convincingly, clearly and
3  convincingly, that there is no set of conditions that will
4  assure against danger to the community.  Mr. Smith
5  unquestionably has done some very positive things, which I
6  applaud and I see that as one part of his personality.  But the
7  government has strikingly strong evidence, as recounted, of his
8  involvement in a series of violent and threatened violent acts
9  over a period of time, orchestrated by him, and that I think
10 shows a very different side of the defendant's personality.
11         I'm glad that he has elected a speedy trial because
12 therefore, we will bring this to a conclusion one way or the
13 other within a matter of a couple of months or less.  But even
14 if he had elected the longer schedule that his co-defendants
15 have elected, I would still be persuaded by the government that
16 there is too great a danger here to allow his release.
17         All right.  Anything else we need to take up today?
18         MR. VITALIANO:  No, Judge.
19         MS. BRACEWELL:  Not from the government.  Thank you.
20         THE COURT:  Very good.  Thanks a lot.
21         THE DEPUTY CLERK:  All rise.
22                              o0o