UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA,

       - v. -                                  22 Cr. 352-1 (JSR)

JATIEK SMITH, et al,,

       Defendants.
------------------------------------------------------X

**MEMORANDUM OF LAW
IN SUPPORT OF MOTION BY
DEFENDANT JATIEK SMITH**

Respectfully submitted,

THOMAS H. NOOTER
Freeman, Nooter & Ginsberg
75 Maiden Lane, Suite 907
New York, NY 10038
(212) 608-0808

JILL R. SHELLOW
15 Chester AvenuE
White Plains, NY  10601
(212) 792-4911

ATTORNEYS FOR DEFENDANT
JATIEK SMITH

**Table of Contents**

Facts relevant to the seizure of the cellular phone contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Facts Related to the Selective Prosecution Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Questions Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      POINT I

      THE SEARCH OF DEFENDANT JATIEK SMITH'S
      CELLULAR TELEPHONE AND SEIZURE OF THE
      "FORENSIC" IMAGE  OF ITS CONTENTS ON MARCH 2,
      2021 AT NEWARK AIRPORT WAS NOT SUBJECT TO THE
      "BORDER SEARCH" EXCEPTION AND THEREFORE
      VIOLATED HIS RIGHT TO BE SECURE FROM AN
      UNREASONABLE SEARCH AND SEIZURE. . . . . . . . . . . . . . . . . . . . . . . . . . 4

      POINT II

      THE INDICTMENT SHOULD BE DISMISSED BECAUSE
      THE DEFENDANTS WERE UNFAIRLY SELECTED FOR
      PROSECUTION FOR AN UNJUSTIFIABLE REASON.. . . . . . . . . . . . . . . . . . 13

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Table of Cases and Authorities**

<u>Cases</u>

*Crediford v. Shulkin*, 877 F.3d 1040  (Fed. Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Hudick v. Wilkie*, 755 F. App'x 998, 1005 (Fed. Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Morton v. Ruiz*, 415 U.S. 199 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Riley v. California*, 573 U.S. 373  (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Rose v. Mitchell*, 443 U.S. 545, 565 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 11

*United States v. Ajlouny*, 629 F.2d 830 (2d Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Alameh*, 341 F.3d 167 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*United States v. Al Jibori,* 90 F.3d 22 (2d Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Armstrong*, 517 U.S. 456 (1996 ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Benevento*, 836 F.2d 60 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Berrios*, 501 F.2d 1207 (2d Cir. 1974)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Cano,*  934 F.3d 1002 (9th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

 *United States v. Fares*, 978 F.2d 52  (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*United States v. Flores-Montano*, 541 U.S. 149 (2004)(passim) . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Kamaldoss,* 2022 U.S. Dist. LEXIS 73897; 2022 WL 1200776
    (E.D.N.Y, 19-CR-543 (ARR), Allyne R. Ross, U.S.D.J., April 22, 2022) . . . . . . . . . . 5, 6

*United States v. Kolsuz,* 890 F.3d 133 (4th Cir. 2018)(passim) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Sun Myung Moon*, 718 F.2d 1210 (2d Cir. 1983). . . . . . . . . . . . . . . . . . . . . . 14

 *United States v. Thompson,* 2013 WL 6246489 at *5 (S.D.N.Y. Dec. 3, 2013) . . . . . . . . . . . . 15

*United States v. Viera*, 2015 WL 3833797 at *2 (S.D.N.Y. June 19, 2015). . . . . . . . . . . . . . . . . . 15

Statutes

8 INA §101(a) (13)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,

      - v. -                                       22 Cr. 352-1 (JSR)

JATIEK SMITH, et al,,

                Defendants.
-------------------------------------------------------X

## MEMORANDUM OF LAW

Facts relevant to the seizure of the cellular phone contents

On March 2, 2022 Mr. Smith boarded an airplane at Newark Airport bound for Jamaica, West Indies, for a vacation. At the airport in Jamaica he was rejected for entry into Jamaica and was put onto the same airplane he had arrived in which departed within about 45 minutes back to Newark Airport.

When he arrived at Newark Airport agents of the United States Customs and Border Patrol took Mr. Smith's cellular telephone claiming that as Mr. Smith was entering the United States at a border they were entitled to search the contents of the telephone without his consent. Mr. Smith initally resisted providing a password so that the phone could be opened for the agents to see the contents, but eventually after being told that he would not be permitted to leave the airport he provided the password. The agents then did a "preliminary" examination of the contents of the phone and proceeded to keep it so that they could make a "forensic" copy of all of the contents of the device. They made the copy and returned the device to Mr. Smith several days later.

Prior to making a further search of the contents of the forensic copy (which they aleaady had made) they applied for a search warrant before Magistrate Judge Stewart Aaron of the Southern District of New York on April 9, 2021. In an affidavit signed that date by Special Agent William Clark of Homeland Security Investigations ("HSI") he outlined the history of the investigation of emergency mitigation service companies ("EMS")(which are companies hired to clean up and board up properties that have been damaged by fire) and what he described as a pattern of criminal activity which was being investigated by HSI and the Federal Bureau of Investigation ("FBI"). The affidavit states that beginning some time in early 2020 "reports" of violence began circulating in the insurance industry involving an EMS company called "First Response." (See Affidavit, **Exhibit A**, (submitted under seal because of the protective order in this case) at pages 4 – 6). The affidavit does not state when the FBI or HSI began their investigation of these reports of violence, or how much of what is provided as "probable cause" was known to HSI and the FBI on March 2, 2021. Some of the facts stated occurred after March 2, 2021 (cf., paragraph 13 at page 6 of the affidavit).

The affidavit states that on March 2, 2021 at approximately 7:00 a.m. HSI was notified that Mr. Smith was boarding a plane at Newark Airport which was bound for Jamaica. "A few hours later, HSI was informed that SMITH was returning from Jamaica the same day and would be landing at Newark International Airport at approximately 5:00 p.m." (Affidavit, **Exhibit A**, page 6 paragraph 14). Note that this time-frame corroborates Mr. Smith's declaration in which he states he was only at the Jamaican airport for 45 minutes prior to being put back on the airplane in which he had arrived to be sent back to Newark. The affidavit states that agents of HSI performed an "initial and preliminary review" of the cellular telephone possessed by Mr. Smith,

which showed what appeared to be communications involving Mr. Smith describing himself as a member of the "Bloods" gang, gang activity, work with First Response (an EMS company), his remuneration, and his "rules" about responding to fires, as well as communications with insureds or public adjustors. (**Exhibit A**, pages 6 – 7, paragraph 15).

Facts Related to the Selective Prosecution Motion

The defendants in this case are all Black and brown-skinned men. Many of them were, in their past, members of one or more sets of the Bloods street gang; others are alleged to be connected to the Bloods by virtue of their association with the former members. All the defendants are charged with participating in a RICO enterprise that operated in the emergency mitigation services ("EMS") industry in the Southern District of New York. In sum, EMS companies provide clean-up services to properties damaged by fires and work with "adjusters" – public and independent – to negotiate settlement of claims for loss or damage.

The alleged RICO enterprise is First Response, an EMS company. The indictment charges that the defendants used First Response to extort their competition and assert control over the industry by using violence, threats of violence, kickbacks and other illegal conduct. Long before these defendants became involved with First Response, companies in this industry competed for business using among other means the same violence, threats of violence, and kickbacks and other illegal conduct with which these defendants are charged.

The evidence shows that competition in this industry is fierce. The owners of the companies condoned these illegal tactics because they produced profits. None of the other participants in the industry – owners, whites and those without gang affiliation -- are charged with crimes. The government and law enforcement have singled out for investigation and

prosecution these minority defendants because they are minorities and because of their past association with a street gang not because of their alleged conduct.

Questions Presented:

The facts of the search of Mr. Smith's device and the downloading of a forensic image of it prior to getting a search warrant to review the detailed contents of the device raise several legal questions. First, did Mr. Smith ever cross a border if he was not admitted to Jamaica as a tourist but rather rejected and put back on the plane he arrived in? Can the search be justified on the basis of the "border search" exception to the probable cause requirement because Mr. Smith was intending to depart from the United States earlier that day? Can either the "preliminary and initial" search of the device, or the download of the forensic copy, be done pursuant to the "border search" exception where the evidence sought was not related to a cross-border crime? Whether making the "forensic" copy of the device before seeking a warrant was permitted under a "border search" exception to the normal warrant and probable cause requirements for such searches, and what standard of suspicion is required to justify making the forensic copy of the device? Whether getting a warrant to search the forensic copy of the device more than a month after the forensic copy was seized on or within a few days of March 2, 2021 cures any constitutional defects in the search and seizure of the forensic copy of the device?

Argument

POINT I

THE SEARCH OF DEFENDANT JATIEK SMITH'S
CELLULAR TELEPHONE AND SEIZURE OF THE
"FORENSIC" IMAGE OF ITS CONTENTS ON MARCH 2,
2021 AT NEWARK AIRPORT WAS NOT SUBJECT TO THE
"BORDER SEARCH" EXCEPTION AND THEREFORE

VIOLATED HIS RIGHT TO BE SECURE FROM AN
UNREASONABLE SEARCH AND SEIZURE.

<u>The Law</u>

The law on searches conducted at the border of the United States is evolving. Several Circuits have made rulings regarding the limits on justifying a search at the border based on the formerly well-accepted "border search" exception to the requirements for probable cause or reasonable suspicion where the item to be searched requires a more extensive search (called an "advanced search" in the CBP Directive attached as **Exhibit B**), and where the search is not being conducted in connection with a crime that involves the border (such as importation of narcotics).

Normally, of course, the search of the contents of a cellular telephone requires obtaining a warrant on probable cause. See *Riley v. California*, 573 U.S. 373, 134 S. Ct. 2473 (2014). The question here is whether the fact that the search was conducted at a border by CBP agents fits within an exception to the warrant requirement.

In recent years the principle of law that routine "searches made at the border . . . are reasonable simply by virtue of the fact that they occur at the border," *United States v. Ramsey*, 431 U.S. 606, 616 (1977) has been refined, particularly in light of the extraordinary intrusiveness of cellular telephone and other electronic devices that can be performed by downloading an image of all of the user's data stored in the device. Cf., the discussion in *United States v. Kamaldoss,* 2022 U.S. Dist. LEXIS 73897; 2022 WL 1200776 (E.D.N.Y, 19-CR-543 (ARR), Allyne R. Ross, U.S.D.J., April 22, 2022). As Judge Ross stated,

> <u>Although this exception is broad, it is not unfettered</u>. While the Supreme Court has not spoken to the precise circumstances under which some level of suspicion

> is required for a border search, it has suggested that "in the case of highly intrusive searches" where salient "dignity and privacy interests" are at stake, "a requirement of . . . suspicion" might be supported. [*United States v.*] *Flores-Montano*, 541 U.S. [149 (2004)] at 152; *see also United States v. Kolsuz, 890 F.3d 133, 138 (4th Cir. 2018)*, *as amended* (May 18, 2018). (*Kamaldoss* at page 30-31 of the opinion).[Emphasis added].

Judge Ross noted that even prior to searches of electronic devices became routine, other kinds of especially intrusive border searches (like body cavity searches) were already deemed by U.S. courts to require a higher level of reasonable suspicion than none at all. Examples of cases from the Second and other Circuits are provided on page 32 of the decision. Judge Ross continued: "In the context of searches of electronic devices, this distinction between routine and nonroutine searches is an area of evolving jurisprudence." Id. She notes that "neither the Supreme Court nor the Second Circuit has addressed the issue of border searches of electronic devices." Id.

U.S. Customs and Border Protection agency itself, as of 2018, in its own policy on border searches, makes the distinction between "manual" (just eye-balling the contents of a device) and "advanced" (downloading a forensic copy of the contents of a device) in the Directive attached to this motion as **Exhibit B**. Note that agencies must follow their own rules. See, e.g., *Crediford v. Shulkin*, 877 F.3d 1040, 1047 (Fed. Cir. 2017), and *Hudick v. Wilkie*, 755 F. App'x 998, 1005 (Fed. Cir. 2018). Even when an agency's rules lack the force of law, it may still be compelled to follow them. See, e.g., *Morton v. Ruiz*, 415 U.S. 199 (1974). The 'Directive defines "advanced" searches as follows, and directs that reasonable suspicion is need to conduct an advanced search for evidence of contraband or crime:

> "5 .1.4 Advanced Search. An advanced search is any search in which an Officer connects external equipment, through a wired or wireless connection, to an electronic device not merely to gain access to the device, but to review, copy, and/or analyze its contents. In instances in which there is reasonable suspicion of

<u>activity in violation of the laws enforced or administered by CBP</u>, or in which there is a national security concern ..." See Directive, at page 5, **Exhibit B**. [Emphasis added].

The Fourth and Ninth Circuits have concluded that forensic searches of electronic devices, which "generally entail[] the connection of external equipment and/or the use of specialized software," *United States v. Aigbekaen*, 943 F.3d 713, 718 n.2 (4th Cir. 2019), are nonroutine and thus require reasonable suspicion. See id. at 720 ("If the border exception applies to the ... forensic searches of [the defendant's] devices, these searches **...** were sufficiently intrusive to be 'nonroutine' and so required some level of individualized suspicion."). See also, *United States v. Cano,* 934 F.3d 1002, 1016 (9th Cir. 2019)(*cert. denied*, 141 S. Ct. 2877): "[W]e hold that manual searches of cell phones at the border are reasonable without individualized suspicion, whereas the forensic examination of a cell phone requires a showing of reasonable suspicion."

What is key to making any exception to the "probable cause" requirement for border searches is the fact that the almost unfettered permission for border agents to search persons and property coming over the border is granted because of the right of a sovereign to guard its own borders from criminal intrusion. Fourth Circuit clarified in *United States v. Aigbekaen*, *supra*, at 943 F.3d 713, that "to conduct [a forensic search] under the border search exception . . . the [g]overnment must have individualized suspicion <u>of an offense that bears some nexus to the border search exception's [historic] purposes of protecting national security</u>, collecting duties, blocking the entry of unwanted persons, or <u>disrupting efforts to export or import contraband</u>," *Aigbekaen*, 943 F.3d at 721 [Emphasis added.]. Thus, as the Court stated, a warrantless forensic search may not be justified by the government's "generalized interest in law enforcement and

combatting crime." *Aigbekaen*, 943 F.3d at 721 (internal quotation marks and citation omitted). Under this framework, <u>evidence that a traveler has committed *domestic* crimes, for example, would not provide reasonable suspicion to search an electronic device because domestic offenses are untethered from the historic rationales of the border search exception</u>. *See id. at 721-22*. [Emphasis added.]

      The Ninth Circuit also relied on the "nexus" between protecting the border from cross-border related criminal activity and searches at the border, distinguishing those searches from those conducted to gather evidence for domestic criminal activity unrelated to the cross-border travel of the person whose devices are searched. In *United States v. Cano*, *supra*, the Ninth Circuit stated that "[t]he detection of . . . <u>contraband</u> is the strongest historic rationale for the border-search exception. Id., at 934 F. 3d 1018." The *Cano* court held that border searches are restricted in scope to searches for contraband, and, as a corollary, that <u>forensic searches at the border require reasonable suspicion that the device itself contains contraband.</u>" <u>Id</u>. [Emphasis added]. Child pornography would be an example of digital contraband on a device.

      These cases and the CBP Directive of 2018 show that "reasonable suspicion" is needed in most cases where a forensic download of the contents of an electronic device is made by agents at the border. The cases also show that the "reasonable suspicion" has to be connected to a concern about cross-border violations, like importation of narcotics or violations of laws controlling the export of currency, and not for obtaining evidence of some "domestic" criminal activity unrelated to the crossing of an international border. The holdings of the Ninth and Fourth Circuits have not been adopted or rejected by the Second Circuit. Thus we are asking the Court to adopt those holdings, which are consistent with the "evolving" development of the law on both

border searches and extremely intrusive searches.

The following are arguments proposed in support of suppression of the fruits of both the "routine" search of Mr. Smith's cellular telephone and the "advanced" or more extreme search of the device by downloading (thereby seizing) the contents of the device prior to obtaining a warrant.

<u>There was no border crossing here, and therefore the border exception does not apply:</u>

The first question to be resolved is whether Mr. Smith was crossing a border at all, after he was rejected for entry into Jamaica and immediately sent back to New Jersey, where upon his arrival his cellular telephone was searched, and the forensic image was made. Under U.S. law a person is not "admitted" into the country as a tourist or for any other purpose (unless he or she is "paroled in" subject to the admissibility being determined), unless he or she has been inspected and admitted by a border or immigration agent. Thus, Mr. Smith as a U.S. citizen presented himself at the border of Jamaica, and if the law of Jamaica is similar to ours, his rejection was a failure to admit him and he did not cross the border into Jamaica. See, 8 INA §101(a) (13)(A): "The terms "admission" and "admitted" mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."

While it is also true that a border search can be conducted of a passenger who is traveling across the U.S. border <u>out</u> of the United States, (see *United States v. Ajlouny*, 629 F.2d 830, 834 (2d Cir. 1980), *cert. denied*, 449 U.S. 1111 (1981); and *United States v. Benevento*, 836 F.2d 60, 67 (2d Cir. 1987), *cert. denied*, 486 U.S. 1043);  in this case Mr. Smith was clearly not doing that at the time the cellular telephone was seized and searched at Newark Airport.

The search for evidence of the EMS racketeering crimes

<blockquote>had no relationship with Mr. Smith attempting to cross the border, and therefore the "border exception" to the probable cause needed <u>to search his device does not apply.</u></blockquote>

First, the evidence provided in discovery – primarily the affidavits in support of various eavesdropping and search warrants – do not make clear when the federal law enforcement agencies became involved in the investigation of the activity which led to the charges made in the indictment in this case. Thus, when the Clark Affidavit in support of the warrant to search the already downloaded forensic image of the device says that HSI officers learned that Mr. Smith was traveling to Jamaica and was (against his will) returning that same day, it is not clear how much they knew at that time, or whether the CBP officers who looked at and then downloaded the contents of the device knew about what they were looking for. Because the purposes of the search are now relevant as a result of the evolving state of the law on border searches and because of the CBP Directive of 2018 it is likely that the government will either have to submit more evidence of what was allegedly known at the time of the search or that a hearing will be required to make that determination.

We submit that the border exception to the requirement of probable cause (not just "reasonable suspicion") would not apply here because it is abundantly clear from the Clark Affidavit of April 9, 2021 that the crimes being investigated had no relationship whatsoever to the crossing of the border into Jamaica or back, and therefore not only is there at the very least a requirement of "reasonable suspicion," according to agency rules and the cases from the Fourth and Ninth Circuit, but that in fact probable cause is required because of the complete lack of a relationship between the border crossing and the crime. "Reasonable suspicion" normally applies when a crime is in the process of being committed in the presence of the law enforcement officer

who then conducts a search of some kind (pat-down or whatever other intrusion into the privacy of the suspect), which would be true if the evidence sought related to a cross-border crime (like importation of narcotics or currency law violations). As is discussed in the Fourth and Ninth Circuit cases, the requirement of a warrant and probable cause is <u>the rule</u>; searches and seizures conducted without a warrant or on less than probable cause are <u>the exceptions</u>, and those exceptions have to be justified by various exceptional circumstances clearly delineated in the law. See *United States v. Aigbekaen*, *supra*, 934 F.3d at 720 – 722 and *United States v. Cano*, *supra*, at 934 F.3d 1016-1018. (Indeed *Cano* even draws a distinction between searches for contraband and searches for evidence of cross-border crime that is not itself contraband which is not relevant to our case.)

Thus, the first point is that because the search, assuming it was conducted by HSI agents with the intention of locating evidence of the EMS crimes under investigation by other HSI and FBI agents, had nothing to do with the fact that Mr. Smith intended to cross a border, or in fact was coming back across the border, and therefore the justification for the exception is not present. If the agents at the border really thought they were looking for evidence of the EMS crimes they should have applied for a warrant.

The second point is that even after looking at the contents of the device that could be seen without an "advanced" search or forensic download, they did not have probable cause to conduct the advanced search, and they did not have a reasonable suspicion that a crime was being committed in their presence related to Mr. Smith crossing the border. In fact, the agents just used the knowledge that they had somehow obtained that he would be traveling to Jamaica as an opportunity to do a search that they otherwise did not have sufficient evidence to conduct, or at

least, would not have been able to conduct without obtaining a warrant.

The third point is that even after the "preliminary" examination of the telephone the agents did not have sufficient reasonable suspicion (assuming that is the standard which would apply to a non-cross-border crime, which we argue it is not) to justify doing the forensic download of the contents of the device without first obtaining a warrant.

Finally, while the Clark Affidavit, submitted five weeks after the seizure of the phone and at least four weeks after the contents were downloaded by the agents, may have supported probable cause at that point, there is no evidence that probable cause existed at the time the contents of the phone were downloaded (and thereby "seized"), and trying to make up for the defect of a lack of a warrant or lack of probable cause five weeks after the seizure is not acceptable under the Fourth Amendment.

Because the search and download of the forensic data from Mr. Smith's cellphone was conducted in violation of the Fourth Amendment, the evidence seized therefrom, including the forensic download itself, should be suppressed.

Moreover, the fruits of those searches (the preliminary and the "advanced" searches of the device) were used extensively in the affidavit by HSI Agent William Clark in support of his Application for a Title III Interception (Eavesdropping) Warrant dated October 12, 2021 (see Exhibit A submitted under seal with the motion to suppress made by co-defendant SEQUAN JACKSON). Indeed, the affidavit is replete with information and quotations from data taken from the forensic download of Mr. Smith's cellular phone taken from him at Newark Airport on March 2, 2021. Without that information we submit that there is not sufficient evidence to independently support the issuance of an eavesdropping warrant based on the Affidavit of

William Clark dated October 14, 2021. Thus the evidence obtained by use of that warrant and the extensions (see **Exhibits B** through **G** of the Jackson motion) should all be suppressed as to Mr. Smith, whose phone was one of of the target devices of the eavesdropping warrant.

## POINT II

### THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE DEFENDANTS WERE UNFAIRLY SELECTED FOR PROSECUTION FOR AN UNJUSTIFIABLE REASON.

Selective prosecution claims are rooted in "the equal protection component of the Due Process Clause of the Fifth Amendment, which dictates that "the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." *United States v. Armstrong*, 517 U.S. 456, 464 (1996).[1]

"The requirements for a selective-prosecution claim draw on ordinary equal protection standards. The claimant must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. To establish a discriminatory effect in a race case, the claimant mist show that similarly situated individuals of a different race were not prosecuted." *Id.* at 465.

For an indictment to be dismissed on selective prosecution grounds, a defendant must provide "clear evidence that the prosecutorial decision had both a "discriminatory effect ... and was motivated by a discriminatory purpose." *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003). To establish discriminatory effect, a defendant "must show that similarly situated individuals of a different race were not prosecuted." *United States v. Armstrong*, 517 U.S. 456

---

[1] Unless otherwise noted, citations omit all internal quotation marks, case citations, footnotes and alterations.

(1996) at 465.

To prove discriminatory purpose, a defendant must show "the government's discriminatory selection of him for prosecution has been invidious or in bad faith, *i.e.,* based on impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *United States v. Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983); *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974) (sometimes referred to as "intentional and purposeful discrimination"). *See United States v. Fares*, 978 F.2d 52, 58 (2d Cir. 1992).

The defendants in this case are all black or brown skinned and, according to the affidavits in support of the warrant to search Mr. Smith's cellphone and the affidavit in support of the Title III wiretaps, had some association or connection with the Bloods Street gang. The defendants connections to the Bloods figure prominently in the description of the investigation. The discussion of the Bloods street gang in applications for search warrants is prima facie evidence that the defendants were charged because of their race and because of their free exercise of association, to wit the Bloods. In his declaration, Mr. Smith states that when he started, the industry was in chaos – EMS companies survived because their employees broke the law. The white people in the industry – owners and employees – have not been indicted. Failure to prosecute these "similarly situated" whites establishes a discriminatory effect. Mr. Smith's allegations that he and the other defendants were chosen for prosecution based on their race is sufficient to support an inference that the defendants were selected for prosecution based on their race and gang connections.

The standard for obtaining discovery on a selective prosecution claim is "not identical to

the standard applied to the merits." *United States v. Alameh,* 341 F.3d 167, 173 (2d Cir.2003. *See United States v. Viera*, 2015 WL 3833797 at *2 (S.D.N.Y. June 19, 2015); *United States v. Thompson,* 2013 WL 6246489 at *5 (S.D.N.Y. Dec. 3, 2013). To obtain discovery, Smith must make a *prima facie* showing of "some evidence tending to show the existence of the essential elements and that the documents in the government's possession would … be probative of these elements." *United States v. Fares*, 978 F.2d at 59. A *prima facie* case is one that if unrebutted will lead to a finding of selective prosecution. It shifts to the Government the burden of rebutting the presumption of unconstitutional action. *See Rose v. Mitchell*, 443 U.S. 545, 565 (1979). Smith relies on the affidavits filed in support of the search of his cell phone and the Title III wiretaps as evidence of discriminatory effect and intent including "evidence that similarly situated defendants of other races could have been prosecuted but where not." *United States v. Alameh*, 3412 F.3d at 173–74. S*ee also United States v. Al Jibori,* 90 F.3d 22, 25 (2d Cir.1996) ("Under the *Armstrong* standard a defendant must make at least a credible showing of different treatment of similarly situated persons to establish a colorable basis for a finding of discriminatory effect and consequently to become eligible for discovery.")

The skin color of the defendants, Mr. Smith's declaration and the affidavits filed by the government in support of the search warrants combine to make a credible showing of different treatment of similarly situated white persons, and thus Smith is entitled to discovery from the government to corroborate his selective prosecution claim and an evidentiary hearing.

CONCLUSION

For the foregoing reasons the relief sought in the Notice of Motion should be granted by

this Court.

Dated:    New York, New York
          February 15, 2023

                              Yours, etc.,

                              */s/ Thomas H. Nooter*
                              THOMAS H. NOOTER


                              */s/ Jill R. Shellow*
                              JILL R. SHELLOW
                              Attorneys for Defendant Jatiek Smith