UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                                             :

UNITED STATES OF AMERICA

                                             :

        - v -

                                               :           22 Cr. 352 (JSR)

JATIEK SMITH,

                                             :

                      Defendant.

                                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN
OPPOSITION TO DEFENDANT JATIEK SMITH'S MOTION FOR BAIL**

                                           DAMIAN WILLIAMS
                                           United States Attorney for the
                                           Southern District of New York
                                           One St. Andrew's Plaza
                                           New York, NY 10007

Mollie Bracewell
Rushmi Bhaskaran
Elizabeth A. Espinosa
Adam S. Hobson
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

I.   FACTUAL BACKGROUND ................................................................................. 1

A.   The Racketeering and Extortion Conspiracies, and the Danger that Smith Poses to the Community .................................................................................................................. 1

B.   Procedural History............................................................................................. 5

II.  THE COURT SHOULD DENY SMITH'S THIRD MOTION FOR BAIL ................. 11

A.   Applicable Law ............................................................................................... 11

   1.   The Speedy Trial Act ......................................................... Error! Bookmark not defined.

B.   Argument ......................................................................................................... 14

III. CONCLUSION ............................................................................................... 18

i

## Table of Authorities

### Cases

*United States v. Lynch*, 726 F.3d 346 (2d. Cir. 2013).................................................. 17
*United States v. Ambrosio*, 898 F. Supp. 177 (S.D.N.Y. 1995). ................................ 11
*United States v. Conley*, No. 19 Cr. 131 (PAE) (S.D.N.Y. Mar. 31, 2020)................................ 18
*United States v. Friedman*, 837 F.2d 48 (2d Cir. 1988)............................................. 14
*United States v. Gonzales Claudio*, 806 F.2d 334 (2d Cir. 1986).................................. 11
*United States v. Payden*, 620 F. Supp. 1426 (S.D.N.Y. 1985) ( ..................................... 12
*United States v. Pena*, 793 F.2d 486 (2d Cir. 1986) ........................................ 12, 14, 17
*United States v. Pikus*, 39 F.4th 39 (2d Cir. 2022). ................................................... 13
*United States v. Piteo*, 726 F.2d 50 (2d Cir. 1983).................................................... 12
*United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007); ............................................. 14
*United States v. Vilar*, 568 F. Supp. 2d 429 (S.D.N.Y. 2008) .................................... 12
*Zedner v. United States*, 547 U.S. 489 (2006) ........................................................... 13

### Statutes

18 U.S.C. §  3161(h)(6).................................................................................................. 11
18 U.S.C. § 3161(h)(7)(B)(ii).......................................................................................... 13
18 U.S.C. § 3161(h)(6); ................................................................................................. 14
18 U.S.C. § 3161(h)(7)(A)............................................................................................. 12
18 U.S.C. § 3161(h)(7)(B)(iv) ....................................................................................... 16
18 U.S.C. § 3142(f)........................................................................................................ 13
18 U.S.C. § 3164(b) ...................................................................................................... 11

The Government respectfully submits this memorandum of law in opposition to defendant Jatiek Smith's third motion for release on bail on the basis of: (i) 18 U.S.C. § 3164 and, and (ii) his concerns regarding medical treatment at the Brooklyn Metropolitan Detention Center ("MDC").   For the reasons set forth below, the Court should deny Smith's motion in its entirety. At the outset, Smith's detention since his June 28, 2022 arrest has not exceeded the time limits proscribed in Section 3164, and Smith offers no legal or factual support that he should be released pursuant to that section.   Smith's medical issues, moreover, do not counsel his release.   As discussed below, and as the Government has updated the Court in prior teleconferences, the MDC is continuing to address Smith's medical issues.   Moreover, given Smith's years-long campaign of violence, threatened violence, witness intimidation, and obstruction of justice, this Court has *twice* held that Smith poses a significant danger to the community, and Smith does not—because he cannot—show that he no longer poses that risk.   Accordingly, Smith should be detained pending trial.

## I.      Factual Background

### A.   The Racketeering and Extortion Conspiracies, and the Danger that Smith Poses to the Community

At trial, the Government expects to prove that Jatiek Smith, along with his co-defendants, seized control of First Response Cleaning Corp. ("First Response")—and then, the broader fire mitigation industry at large—through a sustained and public display of intimidation, violence and threatened violence.   Smith was the leader of the enterprise (the "Enterprise"), and was responsible for committing or directing numerous acts of violence against industry participants, including rival EMS companies and public adjusters.

1

Smith—an admitted member of the violent Bloods street gang—is the leader of an Enterprise that used violence, threats of violence, and intimidation to terrorize the fire restoration industry.   At Smith's direction, members of a fire restoration company known as "First Response" committed numerous assaults against other industry participants, including against employees of competitor companies.   Smith and his underlings have threatened numerous others, and these threats have been explicit.   Smith has threatened to kill victims or their family members.   These intimidatory tactics are backed by numerous acts of actual violence, during which members of the Enterprise have hit, kicked, or punched victims—including elderly civilians.   In some instances, the Enterprise recorded its assaults on video and then circulated those videos among participants of the industry.   Smith has also solidified his control over the industry with witness tampering and obstruction of justice, threatening victims not to speak to the authorities about his violence.

This violence carried out against innocent members of the fire mitigation industry has left the industry in terror.   Even a small sample of First Response's violence shows why industry members felt they had no choice but to submit.   For example:

- On May 5, 2020, at approximately 6:30 a.m., a group of First Response members ran up to the owner of a rival EMS company as the owner was walking to the company's storage facility.   The First Response members punched the man so hard he fell to the ground. That competitor refused to pay First Response's extortion payments and is no longer in business.   The assault was captured on video.   There is evidence that Smith participated in or directed the assault.   Smith's phone shows that he looked up the address of the storage facility about an hour before the assault, and Smith's phone contains an image file with a 6:31a.m. timestamp that appears to be a snapshot of the assault.

- On the morning of September 15, 2020, a public adjuster was signing a loss with a homeowner when someone from First Response walked up and punched him so hard that he suffered a brain bleed and had to stay overnight in the hospital.   As the assailant walked away, he yelled, "Pay my fucking money."   Phone evidence shows that a member of Smith's crew had sent Smith a picture of the victim at the scene of the assault approximately one hour before the assault occurred—evidence that it was Smith who directed the assault.

2

- On November 13, 2020, at approximately 12:45 p.m., a public adjuster was signing a loss when a First Response worker came up and told him that "Tiek" wanted to speak to him. On the phone, Tiek—i.e., Smith—told the public adjuster to give the loss to the EMS company that was next in the rotation.   When the public adjuster refused, someone ran up and punched him in the head so hard that he fell and hit a cement pillar.   The victim was still recovering from open-heart surgery at the time of the assault and he suffered physically for two-to-three months after the attack.   Defendant Pereira sent Smith a video of the assault immediately afterward, and the video has spread as a warning throughout the industry.   That video was recovered from Smith's phone and is part of the evidence in this case.

- In the spring of 2021, a large group from First Response—including Smith—assaulted an employee of a rival EMS company because that company signed more losses than they were allowed under the rotation.   The group from First Response circled around the employee and beat him.   Altogether they punched him at least 15 times.   Witnesses at the scene saw at least one First Response member with a gun, and Smith said to people at the scene, "I got 13-year old kids out here looking to make a name for themselves, I'll give them a gun, they can kill you or your family."

- On October 18, 2021, Smith and his lieutenant, Sequan Jackson, ordered an attack on a construction worker who was working at a residence for which First Response was providing fire mitigation services.   Conversations about the assault were captured on a Title III wiretap in real time.   Members of First Response punched the victim, then took a photograph of his identification card as a threat.   A 911 caller reported a disturbance at the construction site and stated that it involved four men with guns.

These are only some of the instances of violence that Smith directed and carried out in the industry.   As of result of this sort of violence, Smith imposed rules on industry participants who feared violent reprisals if they disobeyed.   These rules transformed the fire restoration industry, such that at the time of the takedown, the Enterprise controlled who could seek or sign any job. To obtain work under the Enterprise's regime, Smith first required extortionate payments from victim EMS companies and public adjusters.   In other words, EMS companies had to pay Smith in order to receive any jobs.   A victim's failure to pay resulted in threats of violence, actual violence, and the inability to participate in the industry.   These demands for payment only increased over time, with Smith demanding weekly payments that were crippling for his victims.

3

Smith has also engaged in obstruction of justice and witness tampering to protect himself and the Enterprise and thwart law enforcement's efforts to hold him accountable.   In approximately November 2021, Smith learned that law enforcement was investigating his activities.   Smith then took active steps to impede and obstruct that investigation.   Those steps included threats of violence and retaliation against potential witnesses in a blatant attempt to deter witnesses from cooperating with law enforcement.   Some victims were so scared of Smith that they moved.   Even today, witnesses continue to fear Smith's reprisal, and are terrified of testifying at trial.

Smith sometimes recorded his threats, and some of these recordings have been recovered from his phone.   These recordings show why Smith's victims are so scared of him.   For example, in a 30-minute recording dated June 19, 2020, Smith addresses an audience of other restoration companies to tell them about the new rules in the industry.   Smith's language is aggressive and he repeatedly discusses his willingness to commit violence against anyone who breaks the rules or disrespects him.   For example, Smith says:

> **When anybody is ready to put on a vest and get a gun, they come on out and play man.**   Come on out and play, man, like, but Santos, don't you ever call and talk like that again, nigga.   Santos.   **I will pick you up and slam you on your fucking head if you ever call me and talk to me like that again, B.**

Later in the recording, Smith becomes even more aggressive and threatens gun violence:

> Come on play.   **Get your fucking guns and come out and play because I ain't going to be diplomatic.**   I ain't gonna play with niggas.   . . . If a nigga want to fight right now—if a nigga wanna fight right now or anything a nigga want to do, I'm open to do it right now.   Nobody gonna in it—no nothing.   I'm open to do it. I'm open to do it, but you niggas don't ever fucking play with me because if I didn't want niggas to chase [fires], I'd shoot any one of you niggas.   I'd shoot any one of you niggas, but y'all screw y'all faces up.

At one point, Smith addresses an individual named "Mike" and threatens his children:

4

Mike, did we not get your address, Mike?  **I'll kill that niggas's kid.   Y'all, niggas play with me, I'll kill one of your kids.   I'll kill one of your kids just to send a message, B.   To send a message.**   Who the fuck y'all niggas think y'all playing with?   I'm not a sucker.   Y'all niggas think this fire chasing business is something.   I'm a gang member.   I been gang banging for years.   I'll kill one of you niggas to send a message.   That's the messages I send, man.

Smith's threats of gun violence are particularly alarming because we know that First Response had a large supply of firearms.   On the day of the arrests, six guns were recovered.   Two were recovered under the bed of Sequan Jackson, Smith's right-hand man.   Four more were recovered in Smith's First Response office.   Smith and Jackson were both convicted felons who were prohibited from having firearms.

### B.  Procedural History

On or about June 23, 2022, a grand jury sitting in this District returned a sealed, two-count Indictment charging Smith and his co-defendants with racketeering and extortion conspiracies.   (Dkt. 2).   On June 28, 2022, the indictment was unsealed.   (Dkt. 3).   That same day, Smith was arrested in Puerto Rico, while his co-defendants were arrested in the New York City area.

As Smith admits in his affidavit, prior to his arrest, he suspected that he was under law enforcement investigation.   Smith Aff. ¶ 3.   When the agents identified themselves and told Smith that they had a federal warrant for his arrest, he refused to open the door.   When Smith finally opened the door, Smith started yelling at the agents in a hostile manner and telling them that he was not going to let them arrest him.   When the agents tried to place him under arrest, he swatted them away, and said that he was "not no bitch," that he "wasn't gonna let any of [the agents] arrest him," that "you are going to have to kill me."   He told one agent that "he would go down the deep end with all of us that were in the room" and that he was "going to take some of us down."   Smith continued yelling and making threats, in a fighting stance, for an hour.   After an

5

hour, Smith finally appeared willing to comply—but then, when told that the agents had a warrant for his cell phones, Smith stopped complying and tried to break one of the phones—which contained substantial evidence of Smith's crimes, including documentary evidence of assaults that Smith had ordered.   Smith then resumed his fighting stance and continued making hostile comments for another 45 minutes.   After a total of one hour and forty-five minutes, the agents finally managed to put Smith under arrest.

On July 28, 2022, Smith's co-defendants were presented in Magistrate Court that day. During those presentments, Magistrate Judge Stewart D. Aaron excluded time (or confirmed that he had already done so) until July 5, 2022, on the basis of 18 U.S.C. § 3161(h)(7)(A).   *See* Minute Entries for June 28, 2022 Presentments of Sequan Jackson, Rahmiek Lacewell, Anthony McGee, Hasim Smith, Octavio Peralta, Kaheen Small, Damon Dore, and Manuel Pereira.

On July 5, 2022, while Smith awaited removal to this District, the Court held a pretrial conference.   During that conference, the Court set a trial date for May 1, 2023.   That decision was based on, in part, the Government's proffer regarding the voluminous discovery in the case (including, among other things, financial records, wiretap recordings from two cellphones, and multiple phone and electronic device extractions); the logistics of reviewing that discovery with incarcerated defendants; the use of a discovery coordinator to assist the defense with processing the discovery; the time needed to adequately prepare motions; and the trial schedules of defense counsel.   (Dkt. 50, at 4-15.)   The Court further ordered that, "[p]ursuant to Section 3161 of Title 18, I will exclude from calculations all time between now and May 1, 2023, finding such time is necessary for the completion of the voluminous discovery, the evaluation of the discovery, the meeting with the defendants under these difficult circumstances, and the drafting of any motions as well as subsequent trial preparation, and the accommodating of counsels' various schedules.

6

For those and other reasons, the best interests of justice in excluding such time substantially outweigh the interests of the public and the defendants in a speedy trial[.]"   (Dkt. 50 at 15-16).

On or about August 1, 2022, Smith wrote a *pro se* letter to the Court, whereby he stated that, against his counsel's advice, he waived his right to file motions and requested a "speedy trial." Several of Smiths' co-defendants, including Jackson, Lacewell, and McGee, filed nearly identical, uncounseled letters with the Court that week. In response, the Court scheduled a conference for September 13, 2022, for all defendants to further consider the trial schedule.

In early September 2022, Smith arrived in this District.   During Smith's September 9, 2022 arraignment, Smith reiterated his request for a speedy trial.   The Court accordingly severed Smith's trial from that of his co-defendants, and scheduled Smith's trial to begin on October 17, 2022.   With respect to the Speedy Trial Act, the Court "exclude[d] from calculations under the Speedy Trial Act all time between now and October 17th, finding that it's not really necessary, that will be a speedy trial, but that in any event, that is a reasonable time for he and his counsel to prepare for the trial, and that for those and other reasons evident from this proceeding, the best interests of justice in excluding such time substantially outweighs the interests of the public and the defendant in a speedy trial."   (Dkt. 156, at 5).

At the September 9, 2022 conference, the Court also denied Smith's first motion for bail. During that hearing, the Government detailed some of the evidence against Smith, including his statements threatening to kill victims and their family members.   The Court concluded: "[T]he government has shown quite convincingly, clearly and convincingly, that there is no set of conditions that will assure against danger to the community. . . .   But the government has strikingly strong evidence, as recounted, of his involvement in a series of violent and threatened violent acts over a period of time, orchestrated by him, and that I think shows a very different side

7

of the defendant's personality." (Dkt. 156, at 19).   The Court further held: "[E]ven if [Smith] had elected the longer schedule that his co-defendants have elected, I would still be persuaded by the government that there is too great a danger here to allow his release."   (Dkt. 156, at 19).

On September 12, 2022, the Government wrote to the Court, with consent from Smith, requesting that the Court adjourn Smith's trial to approximately mid-November 2022.   At a conference held on September 13, 2022, which was attended by all defendants in the case, the Court noted that this modest adjournment "makes a lot of sense, because then you would have much more ample opportunity to prepare for trial."   (Dkt. 89, at 7).   The Court scheduled the trial of Smith, as well as co-defendants Jackson, Dore, and Lacewell, to begin on November 28, 2022; trial for the remaining defendants was to take place, as scheduled, on May 1, 2023.[1]   With respect to the Speedy Trial Act, the Court stated: "I've already excluded time through May 1, but I think it's also important to also separately exclude time, which I will now do, through November 28, finding that it represents a fair accommodation of both the requests of the government and the requests of the defendants, as well as the underlying speedy trial and preparation for trial issues, and that for those and other reasons the best interests of justice in excluding all time through November 28 as to the defendants who are requesting a speedy trial is appropriate, and that the best interest of the public and the defendants in the speedy trial is to the tiny extent that this goes over the 70-day limit is more than outweighed by the interest of the public and the full administration of justice."   (Dkt. 89 at 17).

On November 4, 2022, the Court denied Smith's second motion for bail.   At the hearing, the Government recounted how, in preparing for trial, the Government learned the full extent of

---

[1] Lacewell and Dore later withdrew their request for the November 28, 2022 trial, and opted to proceed to trial on May 1, 2023.

Smith's terror on the victim witnesses, who were terrified to take the stand.   The Government also highlighted certain audio recordings where Smith threatened to kill children of victims and bragged about his access to guns.   In addition, the Government detailed recent efforts by Smith to obstruct justice.   In denying bail for the second time, the Court stated: "I'm going to leave the situation as previously set, the defendant will continue to be detained.   I think, if anything, that the evidence of his potential danger to the community is even stronger than I thought it was at the time of his original detention."   (Dkt. 109, at 7.).

On November 14, 2022, the counsel for Jackson and Smith filed letters requesting an adjournment of the November 28, 2022 trial date, over their clients' objections.   The court held conferences for Jackson and Smith to address those requests on November 17, 2022.   At the outset of the proceeding for Jackson, the Court noted that the case involved witness statements of over 40 witnesses; the potential need for defense experts; the complexity of the case (including the number of defendants, claims and the years-long scheme charged by the Government); and substantial amounts of audio and video discovery.   The Court further stated that, with respect to the May 1, 2023 trial date, the constitutional speedy trial issue was "moot," and that decisions with respect to adjournments under the Speedy Trial Act are vested with counsel, not the defendants. The Court expressed concern that Jackson would not have a fair trial if trial began on November 28, 2022.   Therefore, in order to ensure a "fair trial," which "overrides everything else," the Court adjourned the Smith and Jackson trial to May 1, 2023.   The Court further restored Jackson and Smith's right to file pretrial motions.   With respect to the Speedy Trial Act, the Court stated: "[P]ursuant to section 3161 of Title 18, I will exclude from calculations under the Speedy Trial Act all time between now and May 1st, finding that such time is necessary for adequate preparation for all the reasons previously stated, and that for those and other reasons, most importantly

ensuring a fair trial, the best interests of justice in excluding such time substantially outweighs the interests of the public and the defendant in a speedy trial."  (Dkt. 113, at 5).

Immediately following the proceeding for Jackson, the Court held a proceeding for Smith. The Court reiterated that it would adjourn Smith's trial to May 1, 2023, because it had "become convinced that [Smith] cannot get a fair trial" on November 28, 2022.  (Dkt. 131, at 4).  With respect to the Speedy Trial Act, the Court stated: "[P]ursuant to Section 3161 of Title 18, I will exclude all time between now and May 1st from calculations under the Speedy Trial Act for the reasons stated both here and in the earlier proceeding with Mr. Jackson, and also because the best interests of justice in excluding such time substantially outweighs the interest of the public and the defendant in a speedy trial precisely because that's the only way, whether he realizes it or not, that Mr. Smith can get a fair trial."  (Dkt. 131, at 7).

In sum, and as detailed below, no days have come off of the statutory Speedy Trial clock in this case.  Time has been excluded through the May 1, 2023 trial date.

C.  **The Defendant's Medical Issues**

In his February 9, 2023 motion, the defendant made various claims that his medical needs were not being met at the MDC.  These claims include allegations that: (i) he was not provided with an update on certain lab reports; (ii) he has ongoing medical concerns that have not been addressed by the MDC; and (iii) the MDC is not providing him with an appropriate diet.

Once the Government learned of these allegations, it immediately reached out to the MDC. As the Government has updated the Court in recent teleconferences, the MDC has taken numerous steps to address those medical issues.  In addition to providing Smith with information on his prior laboratory results, the MDC's medical team met Smith on February 14, 2023.  MDC's medical team informed Smith that his symptoms were determined to be the result of his food

allergies, not another, potentially more serious, disease.   They have also arranged for him to meet

with a specialist again, and are evaluating what steps can be taken to address his dietary concerns.

At the conclusion of his February 14, 2023 medical visit, Smith told the MDC's medical team that

he did not have concerns that were not being addressed.   Mr. Smith has subsequently met with

MDC medical staff several times and has an appointment scheduled with a specialist.

## II.    The Court Should Deny Smith's Third Motion for Bail

### A.    Applicable Law

#### 1.    *The Speedy Trial Act*

The Speedy Trial Act provides, in Title 18, United States Code, Section 3164(b), the trial

of a defendant that is detained "shall commence not later than ninety days following the beginning

of such continuous detention[.]"   However, excludable periods of time under the Speedy Trial Act

are applicable in computing the 90-day period of Section 3164.   18 U.S.C. § 3164(b); *see United*

*States v. Gonzales Claudio*, 806 F.2d 334, 339 (2d Cir. 1986) ("permissible periods of delay under

the Speedy Trial Act, 18 U.S.C. § 3161(h), are to be excluded in determining whether that Act's

ninety-day limit for trial of detained defendants has been violated[.]"); *United States v. Ambrosio*,

898 F. Supp. 177, 191–92 (S.D.N.Y. 1995).

As relevant here, Section 3161(h)(6) excludes from the speedy trial clock "[a] reasonable

period of delay when the defendant is joined for trial with a codefendant as to whom the time for

trial has not run and no motion for severance has been granted."   18 U.S.C. § 3161(h)(6).   The

Second Circuit has explained the purpose of this exclusion:

> Congress clearly intended that, where appropriate,
> joint trials of defendants should continue to be
> available as a means of promoting judicial efficiency
> by avoiding duplicative proof at successive trials.
> It thus intended that reasonable speedy trial time be

> excludable under Section 3161(h)(7) when necessary to
> enable joint trials to go forward.

*United States v. Pena*, 793 F.2d 486, 489–90 (2d Cir. 1986) (*citing* 18 U.S.C. § 3161(h)(6)

(formerly (h)(7))).[2]   "The effect of [§ 3161(h)(6)] is that a unitary 'Speedy Trial Clock' is applied

to all of the defendants."   *United States v. Payden*, 620 F. Supp. 1426, 1427 (S.D.N.Y. 1985)

(*citing United States v. Piteo*, 726 F.2d 50, 52 (2d Cir. 1983)).   Therefore, in cases with multiple

defendants, there is "a single speedy trial clock," and "delay attributable to any one defendant is

charged against the single clock, thus making the delay applicable to all defendants."   *Pena*, 793

F.2d at 489; *see also United States v. Vilar*, 568 F. Supp. 2d 429, 444 (S.D.N.Y. 2008) (same).

    The Speedy Trial Act also provides Courts with discretion to exclude time under the ends-

of-justice exclusion set forth in 3161(h)(7)(A).   That provision permits the court to exclude time

*sua sponte* or on a party's motion so long as the court grants "such continuance on the basis of his

findings that the ends of justice served by taking such action outweigh the best interest of the

public and the defendant in a speedy trial."   18 U.S.C. § 3161(h)(7)(A).   "This provision gives

the district court discretion—within limits and subject to specific procedures—to accommodate

limited delays for case-specific needs."   *Zedner v. United States*, 547 U.S. 489, 499 (2006).   The

Act provides set of non-exhaustive factors that a judge shall consider in determining whether an

ends-of-justice exclusion is appropriate.   Those factors include, among other things, "[w]hether

the case is so unusual or so complex, due to the number of defendants, the nature of the

prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect

adequate preparation for pretrial proceedings or for the trial itself within the time limits

---

[2]    Unless otherwise noted, case text quotations omit internal quotation marks, citations, footnotes, and previous alterations.

12

established" by the Act or "whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii) . . . would deny counsel for the defendant . . . the reasonable time necessary for effective preparation[.]"   18 U.S.C. § 3161(h)(7)(B)(ii), (iv).   While the Second Circuit has never required courts to utter "magic words" to invoke an ends-of-justice exclusion, it has "stressed that whenever possible the district court should make the findings required by [§ 3161(h)(7)] at the time it grants the continuance." *United States v. Pikus*, 39 F.4th 39, 52-53 (2d Cir. 2022).

### 2.   The Bail Reform Act

If a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).   In seeking pretrial detention, the Government bears the burden of showing, by a preponderance of the evidence, that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community, and that no condition or combination of conditions can sufficiently address those risks. *See* 18 U.S.C. § 3142(f); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988).

In determining bail, the court must consider several factors, including: (1) "the nature and circumstances of the offense charged, including whether the offense is . . . a violation of section 1591"; (2) "the weight of the evidence against the person"; (3) the "history and characteristics of the person," including the person's criminal history; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

Once the Court has ruled on bail or detention, "[t]he hearing may be reopened . . . at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the haring and that has a material bearing" on detention or release.   18 U.S.C. § 3142(f).

**B.  Argument**

*1.      Smith is Not Entitled to Release Under Section 3164 of the Speedy Trial Act.*

In his motion, Smith appears to argue that none of the Court's Speedy Trial Act exclusions actually apply, and that Smith has been detained for over 90 days in violation of Section 3164. Smith's arguments ignore the law, the facts, and the clear, timely, and record-based findings that the Court made when it excluded time in this case.   Indeed, in this multi-defendant case, not a single day has run on Section 3164's 90-day clock.

Smith was arrested on June 28, 2022, the same day that his co-defendants were arrested and presented in this District.   On June 28, 2022, Magistrate Judge Aaron excluded time at his co-defendants' presentment, on the basis of 3161(h)(7)(A), until July 5, 2022.   That exclusion applied to every defendant in the case.   *Pena*, 793 F.2d at 488-89 ("any delay attributable to one defendant is also charged to all codefendants.").   Then, on July 5, 2022, the Court made an ends-of-justice finding on the record and excluded time under the Speedy Trial Act until May 1, 2023, which again applied to all defendants in the case, including Smith.

Smith's later arraignment in this District reset the Speedy Trial clock.   18 U.S.C. § 3161(h)(6); *see also Pena*, 793 F.2d at 489–90.   When the Court severed Smith's trial from his co-defendants, there were two speedy trial clocks operating in this case: one for the May 1, 2023 trial defendants, and another for Smith's October 17, 2022 trial.   Even though there were two Speedy Trial Act clocks, no time had elapsed on either.   As discussed above, the Court had already

14

excluded time until May 1, 2023 for the May trial defendants, and on September 9, 2022, the Court ordered, with sufficient findings, that time was excluded until Smith's October 17, 2022 trial.

On September 13, 2022, the Court adjourned the October 17, 2022 trial to November 28, 2022. Once again, no time elapsed on the Speedy Trial Act clock because the Court ordered, with sufficient findings, that time was excluded until November 28, 2022. Then, on November 17, 2022, the case reverted to a single Speedy Trial Act clock when it adjourned Smith and Jackson's trial to May 1, 2023, the date of the co-defendants' trial. Once again, no time elapsed on the Speedy Trial Act clock because the Court once again ordered, with sufficient findings, that time was excludable under Section 3161(h).

Notwithstanding all of these timely, record-based exclusions of time and ends-of-justice findings, Smith argues, with no legal or factual support, that the Court's findings and orders have no force or were unnecessary. However, each and every exclusion of time made by the Court was proper and effective under the Speedy Trial Act: at the time those exclusions were made, the Court stated, on the basis of facts in the record, the reasons why the end-of-justice counseled for continuances. *See* Dkt. 50, at 4-16 (excluding time on July 5, 2022 until May 1, 2023 to, among other things, permit defense counsel to review the discovery in the case, draft and file motions, and prepare trial, and making an ends-of-justice finding); Dkt. 156, at 5 (excluding time for Smith on September 9, 2022 until October 17, 2022, to allow counsel to prepare for trial, and making an ends-of-justice finding); Dkt. 89, at 17 (excluding time on September 13, 2022 for Smith, Jackson, Dore and McGee until November 28, 2022, to allow for adequate trial preparation, and making an ends-of-justice finding); Dkt. 113 at 5 and Dkt. 131 at 7 (excluding time, on November 17, 2022, for Smith and Jackson until May 1, 2023, to ensure that they receive a fair trial, and making an ends-of-justice finding). Accordingly, by making these proper ends-of-justice continuances, no

15

time ran on Section 3164's 90-day clock, which excludes from computation all period of time excludable under Section 3161.   18 U.S.C. § 3164(b).

Smith's remaining arguments to moot the Court's proper exclusions of time all fail.   His argument that "preparation for trial" is not a basis to exclude time under Section 3161(h) is belied by the Speedy Trial Act, which specifically directs district courts to consider whether the failure to grant a continuance would "deny counsel for the defendant . . . the reasonable time necessary for effective preparation."   18 U.S.C. § 3161(h)(7)(B)(iv).   His argument that Section 3161(h)(1)(F)'s provision for excludable travel time cabins excludable time from an out-of-district arrest to arrival in the prosecuting district to 10 days is similarly misplaced.   That argument ignores the core principle in multi-defendant cases that there is only one Speedy Trial Act clock, which begins to run upon the arraignment of the defendant who last arrives in the District—in this case, September 9, 2022.   *See Pena*, 793 F.2d at 489.   It also fails to consider binding Second Circuit precedent, which holds that Section 3161(h)(1)(F)'s 10-day limit applies "only applies to travel time after [the defendant's] arraignment" in the district that brought the indictment, *i.e.*, in this District.   *U.S. v. Lynch*, 726 F.3d 346, 352-53 (2d. Cir. 2013). Finally, Smith is wrong that the Court did "not make any ruling with respect to the time that had passed between Mr. Smith's detention in Puerto Rico (June 28, 2022) until September 9, 2022." Br. at. 9.   As discussed above, Judge Aaron and the Court excluded time, on the basis of 18 U.S.C. § 3161(h), from July 28, 2022 to July 5, 2022, and then from July 5, 2022 to May 1, 2023.   Furthermore, even though no time had elapsed on the Speedy Trial Clock while Smith was pending removal to this District, all calculations began anew when Smith arrived in the District on September 9, 2022.

16

2.     *Smith Remains an Extreme Danger to the Community*

In his motion, Smith makes no attempt to address the danger to the community that his release would present.   That is because he cannot.   He has a long and violent criminal history, and upon his most recent release from jail, he used violence, threats of violence, and intimidation to extort the fire mitigation industry, intimidate witnesses, and obstruct justice.   This Court has twice held that Smith poses a danger to the community that cannot be addressed by even the most restrictive bail conditions.   Nothing has changed since the Court last made that determination on November 4, 2022.

Smith's medical issues, moreover, do not warrant his release.[3] *See, e.g.*, *United States v. Conley*, No. 19 Cr. 131 (PAE) (S.D.N.Y. Mar. 31, 2020) (Dkt. 366 at 1-2) (denying bail application by inmate with multiple medical conditions placing him at high risk, in light of the inmate's danger to community).   As the Government has noted in its updates to the Court, the MDC has sought to address Smith's medical issues at the MDC, and it appears that the parties have made substantial progress to resolve any issues regarding Smith's medical treatment and are continuing to work to that end.   Mr. Smith has been several more times my MDC medical professionals and has a specialist appointment scheduled.

Ultimately, Smith's medical concerns warrant appropriate treatment and care at the MDC, an institution that remains fully capable of addressing his and other inmates' medical needs.   His medical issues, however, do not warrant the release of a dangerous, convicted felon who has repeatedly used violence and intimidation to extort his victims and prevent witnesses from coming

---

[3] Nor do they amount to "material" new information not known to Smith at the time of the prior two detention determinations.   *See* 18 U.S.C. § 3142(f).

17

forward to law enforcement. Smith offers no authority—because there is none—authorizing the release of a dangerous defendant like himself under similar circumstances.

## III. Conclusion

For the foregoing reasons, the Government respectfully submits that the defendant's motion for bail should be denied.

Dated: New York, New York
        February 22, 2023

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:      _/s/_____
         Rushmi Bhaskaran
         Mollie Bracewell
         Elizabeth A. Espinosa
         Adam S. Hobson
         Assistant United States Attorneys
         (212) 637-2439 / 2218 / 2216 / 2484