UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    :
UNITED STATES OF AMERICA
                                                    :
        - v -
                                                    :        22 Cr. 352 (JSR)
JATIEK SMITH, *et al.*
                                                    :
                          Defendants.
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN
OPPOSITION TO THE MOVING DEFENDANTS' MOTION FOR SEVERANCE AND
FOR SUPPRESSION OF WIRETAP EVIDENCE**

                                        DAMIAN WILLIAMS
                                        United States Attorney for the
                                        Southern District of New York
                                        One St. Andrew's Plaza
                                        New York, NY 10007

Mollie Bracewell
Rushmi Bhaskaran
Elizabeth A. Espinosa
Adam Hobson
Assistant United States Attorneys
        *Of Counsel*

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.  FACTUAL BACKGROUND ...................................................................................... 1
  1.   Industry Background ................................................................................................ 2
  2.   The Enterprise ......................................................................................................... 3
  3.   The Investigation: The Wiretap .............................................................................. 6

III. THE MOVING DEFENDANTS SHOULD STAND TRIAL WITH SMITH ...................... 7

A.  Applicable Law ......................................................................................................... 7

B.  Discussion ............................................................................................................... 11

IV.  THE WIRETAP AFFIDAVIT ESTABLISHES NECESSITY AND SHOULD NOT BE
SUPPRESSED ......................................................................................................... 19

A.  Applicable Law ....................................................................................................... 19

B.  Discussion ............................................................................................................... 21

V.   CONCLUSION ........................................................................................................ 27

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Aratari v. Cardwell*,   357 F. Supp. 681 (S.D. Ohio 1973)..................................................18, 19

*Franks v. Delaware*,
    438 U.S. 154 (1978)...........................................................................................................26

*Richardson v. Marsh*,
    481 U.S. 200 (1987).............................................................................................................8

*Rivera v. United States*,
    928 F.2d 592 (2d Cir. 1991)..............................................................................................26

*United States v. Ambrosio*,
    898 F. Supp. 177 (S.D.N.Y. 1995) ....................................................................................21

*United States v. Awadallah*,
    349 F.3d 42 (2d Cir. 2003)................................................................................................26

*United States v. Bellomo*,
    954 F. Supp. 630 (S.D.N.Y. 1997) ...............................................................................20, 21

*United States v. Blount*,
    291 F.3d 201 (2d Cir. 2002)................................................................................................9

*United States v. Brown*,
    744 F. Supp. 558 (S.D.N.Y. 1990) ...................................................................................26

*United States v. Cannon*,
    776 F. App'x 740 (2d Cir. 2019) .......................................................................................10

*United States v. Cardascia*,
    951 F.2d 474 (2d Cir. 1991)..........................................................................................8, 11

*United States v. Carson*,
    702 F.2d 351 (2d Cir. 1983)........................................................................................10, 15

*United States v. Casamento*,
    887 F.2d 1141 (2d Cir. 1989)............................................................................................11

*United States v. Concepcion*,
    579 F.3d 214 (2d Cir. 2009)....................................................................................20, 21, 27

*United States v. Delgado*,
    972 F.3d 63 (2d Cir. 2020)................................................................................................16

*United States v. DeVillio*,
    983 F.2d 1185 (2d Cir. 1993).............................................................................................11

*United States v. Diaz*,
    176 F.3d 52 (2d Cir. 1999).......................................................................................9, 11, 20

*United States v. Falso*,
    544 F.3d 110 (2d Cir. 2008)..............................................................................................26

*United States v. Feyrer*,
    333 F.3d 110 (2d Cir. 2003)..............................................................................................10

*United States v. Friedman*,
    854 F.2d 535 (2d Cir. 1988)..............................................................................................12

*United States v. Fury*,
    554 F.2d 522 (2d Cir. 1977)..............................................................................................21

ii

*United States v. Gambino,*
 734 F. Supp. 1084 (S.D.N.Y. 1990)......................................................... 22, 27

*United States v. Ghavami,*
 No. 10 Cr. 1217 (KMW), 2012 WL 2878126 (S.D.N.Y. Jul. 13, 2010) ................ 15

*United States v. Gilbert,* 504 F. Supp. 565 (S.D.N.Y. 1980)....................................... 17

*United States v. Hernandez,*
 85 F.3d 1023 (2d Cir. 1996)........................................................................ 10

*United States v. House,*
 636 F. App'x 50 (2d Cir. 2016) .................................................................... 22

*United States v. Ianniello,*
 621 F. Supp. 1455 (S.D.N.Y. 1985)............................................................... 20

*United States v. Kozak,* 2014 WL 1281914 (D. Neb. Mar. 27, 2014) ........................... 19

*United States v. Klump,*
 536 F.3d 113 (2d Cir. 2008)......................................................................... 26

*United States v. Lanza,*
 790 F.2d 1015 (2d Cir. 1986)......................................................................... 9

*United States v. Lilla,*
 699 F.2d 99 (2d Cir. 1983)........................................................................... 20

*United States v. Locascio,*
 6 F.3d 924 (2d Cir. 1993)............................................................................... 9

*United States v. Magaddino,*
 496 F.2d 455 (2d Cir. 1974)......................................................................... 21

*United States v. McGuire,*
 307 F.3d 1192 (9th Cir. 2002) ..................................................................... 21

*United States v. Miller,*
 116 F.3d 641 (2d Cir. 1997)...................................................................... 8, 20

*United States v. Nerlinger,*
 862 F.2d 967 (2d Cir. 1988)......................................................................... 12

*United States v. Page,*
 657 F.3d 126 (2d Cir. 2011)......................................................................... 17

*United States v. Panza,*
 750 F.2d 1141 (2d Cir. 1984)......................................................................... 9

*United States v. Rittweger,*
 524 F.3d 171 (2d Cir. 2008)..................................................................... 10, 12

*United States v. Rodriguez,* 08 CR 1311 (RPP),
 2009 WL 2569116 (S.D.N.Y. Aug. 20, 2009)......................................... 20, 22, 26

*United States v. Rosa,*
 11 F.3d 315 (2d Cir. 1993)........................................................................... 11

*United States v. Salameh,*
 152 F.3d 88 (2d Cir. 1998)..................................................................... 8, 9, 12

*United States v. Santiago,*
 174 F.Supp.2d 16 (S.D.N.Y. 2001) ...................................................... 15, 23, 25

*United States v. Santos,*
 541 F.3d 63 (2d Cir. 2008)........................................................................... 10

*United States v. Spinelli,*
   352 F.3d 48 (2d Cir. 2003)................................................................. 9, 11, 16
*United States v. Stewart,*
   433 F.3d 273 (2d Cir. 2006).................................................................. 14, 15
*United States v. Swanson,*
   210 F.3d 788 (7th Cir. 2000) ...................................................................... 26
*United States v. Torres,*
   901 F.2d 205 (2d Cir.1990)................................................................... 21, 27
*United States v. Turoff,*
   853 F.2d 1037 (2d Cir. 1988)........................................................................ 8
*United States v. Uccio,*
   917 F.2d 80 (2d Cir. 1990)......................................................................... 12
*United States v. Wagner,*
   989 F.2d 69 (2d Cir. 1993)......................................................................... 21
*United States v. Young,*
   822 F.2d 1234 (2d Cir. 1987)...................................................................... 20
*United States v. Yousef,*
   327 F.3d 56 (2d Cir. 2003).......................................................................... 11
*United States v. Zafiro,*
   945 F.2d 881 (7th Cir. 1991) ........................................................................ 8
*Zafiro v. United States,*
   506 U.S. 534 (1993)........................................................................... 8, 9, 10

## **Statutes**

18 U.S.C. § 1951 ........................................................................................... 1
18 U.S.C. § 1962(d) ...................................................................................... 1
18 U.S.C. § 2518(1)(c) ................................................................................ 19
18 U.S.C. § 2518(3)(c) ................................................................................ 19

## I.        Preliminary Statement

The Government respectfully submits this memorandum of law in opposition to defendants Anthony McGee's, Kaheen Small's, Damon Dore's, Rahmiek Lacewell's, and Sequan Jackson's (the "Moving Defendants") pre-trial motions to: (1) sever their trial from co-defendant Jatiek Smith ("Smith") (Dkt. No. 144); and (2) suppress the wiretap of Smith's and Jackson's phones (Dkt. No. 138).[1]  In this case, where all defendants are charged in the same racketeering and extortion conspiracies, the defendants should be tried in a single trial.  The Moving Defendants fail to satisfy their heavy burden that the federal system's strong preference for joint trials should be set aside in favor of severance.  In addition, the Moving Defendants arguments that Judge Liman incorrectly found that the wiretap was "necessary" fail to overcome the presumption of validity.  Accordingly, the Court should deny the Moving Defendants' motions in their entirety.

## II.       Factual Background

The Moving Defendants, together with Smith, Hasim Smith ("Hasim"), Manuel Pereira, and Octavio Peralta (collectively, the "defendants"), participated in crimes, including violence and threats of violence, through which they seized control of the fire restoration industry in the New York City area.   For this conduct, the defendants are charged in a two-count Indictment with participating in a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and participating in an extortion conspiracy, in violation of 18 U.S.C. § 1951.   Trial is scheduled to begin on May 1, 2023.

---

[1]        Certain of the Moving Defendants (McGee, Lacewell, Small, and Dore) filed motions *in limine* with their pre-trial motions, including: (1) a motion for advance notice of materials to be offered under Federal Rules of Evidence 404(b) and 801(d)(2)(E); (2) a motion to exclude cell-site evidence; and (3) a motion to exclude evidence regarding gang affiliation.  *See* Dkts. Nos. 145, 147 (gang affiliation); 148 (cell site evidence); 149 (evidence under Rule 404(b) and 801(d)(2)(E)).   With the consent of those defendants, and with the Court's permission, the Government will address these motions with other *in limine* briefing.

### 1.  Industry Background

As alleged in the Indictment, the defendants and their enterprise took control of the fire restoration industry, which refers to the businesses involved in mitigating damages and undertaking repairs resulting from fires.

As background, when properties suffer fire damage, property owners often hire an emergency mitigation service ("EMS") company to clean up the damaged property, which includes sweeping up, removing debris, and ventilating the property.    Adjusters are another component of the fire restoration industry. Property owners typically rely upon adjusters, either a "public adjuster" or an "independent adjuster," to investigate, process, and submit the insurance claims to the property owner's insurer.   A public adjuster acts on behalf of the property owner in negotiating the settlement of a claim for loss or damage with the insurance company.   A public adjuster is paid by the property owner with a percentage of the settlement paid out by the insurer on the insurance claim, and is an independent contractor licensed by the state.

EMS companies compete to sign projects (or "losses") by approaching a property owner directly.   One way EMS companies compete for work is by arriving on the scene of a fire soon after it has occurred, sometimes called "chasing a fire."   If a property owner hires a particular EMS company, the EMS company will often make a referral for a particular public adjuster to process the associated insurance claim.   Public adjusters also compete to sign projects by approaching the property owner, and, in turn, make referrals to the property owner for EMS companies.   Based upon state licensing requirements, public adjusters cannot solicit work from property owners overnight.   EMS companies can solicit work from property owners at any time, including after business hours and overnight.

2.      *The Enterprise*

As the Government expects to prove at trial, Smith was hired by First Response Cleaning Corp., a Brooklyn-based EMS company, in approximately October of 2019.   Although not technically the owner of First Response, Smith assumed control over the company's business, its hiring decisions, its ongoing activities, and its finances.   As part of Smith's hiring decisions, Smith hired various of his co-defendants to work under him at First Response.

The defendants formed an enterprise that extorted and assaulted competitors in the fire restoration industry (the "First Response Enterprise" or "Enterprise"), including competitors who operated or were based in the Southern District of New York.   Within the First Response Enterprise, Smith was the leader and Jackson served as Smith's lieutenant.   Other members, including Small, McGee, Dore, Hasim, and Lacewell functioned as the muscle and participated in various threats of force and acts of violence to assert and enforce First Response's control over other industry members.   They also had roles communicating the Enterprise's orders to EMS companies and public adjusters regarding which companies or adjusters could be hired for particular fires and administering the rotation system described further below.   Pereira monitored the activities of other industry participants at the scenes of fires, including by recording particular acts of violence against industry participants who did not comply with the Enterprise's rules. Smith's preferred public adjuster, Peralta, became the public adjuster for the Enterprise, assisting it with submitting fraudulent insurance claims.

Together, the First Response Enterprise embarked upon a sustained course of violence and intimidation, including through establishing a system of rules that competitors were required to follow, assaulting competitors who violated the Enterprise's rules, and extorting payments from competitors.   Over the course of the Enterprise's existence, its members and associates, led by

3

Smith, engaged in extortion of other industry members, wire fraud through a scheme to defraud insurance companies and further enrich First Response, and obstruction of justice by tampering with witnesses in an effort to hamper the federal investigation that led to the Indictment in this case.   Some of the means and methods of the Enterprise, as alleged in the Indictment, are described below.

### a.   Rotation System and Rules

Beginning in approximately 2020, the Enterprise pushed out its leading competitor through violence and extortion.   After successfully eliminating its main competitor, the defendants then imposed rules on other participants in the fire restoration industry by threatening other EMS companies and public adjusters with violent assaults if they did not obey the directives of the Enterprise.   To participate in this rotation system—and under threats of violence—EMS companies in the rotation system were required to make regular extortionate payments to the Enterprise.   In some cases, and as a part of their extortionate payments, EMS companies had to put particular First Response members on their payroll.   If industry participants continued to solicit fires without paying the Enterprise's extortion demands, they were threatened or attacked.

Under First Response's industry rules, First Response got the first few jobs every month, as well as all nighttime fires.   For jobs that did not have to go to First Response, First Response decided which public adjuster and which EMS company were allowed to sign the fire loss. Among the rules that First Response imposed, EMS companies and public adjusters had to make extortionate payments to Enterprise members in order to sign any fire loss.

### b.   Use of Violence and Threats of Violence

The defendants used threats of force, and on multiple occasions, actual violence, to extort victims, cement their control over the industry, and enforce the rules that they imposed.   The violence was directed at EMS companies, public adjusters, and other industry participants to show

4

that the Enterprise was willing to resort to violence to maintain their control.    Furthermore, the Enterprise threatened violence (including threats involving guns) against the owners of EMS companies, including their family members.    Furthermore, members of the Enterprise made video recordings of at least some of these acts of violence and circulated such recordings among industry participants in order to threaten other potential victims, further cementing the Enterprise's control.

### c.   Alterations at Fire Damaged Properties

Payments on losses caused by fire damage are typically paid by a homeowner's insurance carrier.    Certain conditions at a loss, including for example, illegal kitchens or rental units, can render a property ineligible for insurance coverage.    Accordingly, the Enterprise partnered with a corrupt public adjuster and Enterprise member Peralta to ensure insurance coverage on multiple losses by fraudulently representing to insurance companies that properties were eligible for insurance.    In furtherance of this scheme, First Response's cleanup crew and technicians—including Lacewell—either removed or attempted to remove disqualifying features from fire sites that could render a loss uninsurable.    As a result, the Enterprise caused false claims to be submitted to insurance companies, resulting in payments from those companies to the Enterprise.

### d.   Witness Tampering and Obstruction of Justice

The Government intends to introduce evidence that, after the defendants learned of a federal grand jury investigation in approximately November 2021, they made efforts to obstruct justice and tamper with witnesses.    After having learned of the investigation from an industry participant ("Individual-1"), Smith also sought an interview with a case agent in order to provide materially false information about the industry and the activities of First Response, in an apparent effort to deflect law enforcement's attention from the Enterprise.

On November 10, 2021, Smith called one of the Government's case agents ("Agent-1") and asked if he could meet with Agent-1.   On November 11, 2021, Smith then sat down for a voluntary and recorded interview with Agent-1.   In that interview, Smith made a series of false and misleading statements—interspersed with inculpatory admissions—in which he generally denied that First Response was engaged in criminal conduct and falsely claimed that Smith had in fact fixed the industry and stopped violence that was being committed by others.

After his meeting with Agent-1, Smith hosted a dinner at an Italian restaurant in Staten Island.   There, and in the presence of other Enterprise members and industry participants (themselves witnesses or victims to the charged crimes), Smith toasted Individual-1 for not disclosing information to law enforcement.

> ### 3.     *The Investigation: The Wiretap*

As part of its investigation, and as relevant to these motions, law enforcement officers sought and obtained a wiretap of certain of the defendants' phones.   Specifically, on October 14, 2021, the Honorable Lewis J. Liman signed an order authorizing the interception of wire and electronic communications over a cellphone used by Smith and another cellphone used by Jackson. In signing the order, Judge Liman found that there was probable cause to believe that the targets of the investigation, including Smith, Jackson, McGee, Small, and Peralta, "will use the Target Cellphones in connection with, to facilitate, to accomplish, and to commit" multiple acts of extortion and extortion conspiracy as part of the pattern of racketeering acts carried out by the Enterprise.   (Oct. 14 Order at 2-3.)   Judge Liman further found that "it has been adequately established that normal investigative techniques have been tried and have failed or reasonably appear unlikely to succeed if tried or to be too dangerous."   (*Id.* at 4.)

The wiretap intercepted numerous calls that provided valuable evidence of the nature and extent of the racketeering and extortion conspiracy and revealed the hierarchy and organization of the Enterprise.    The wiretap also intercepted calls in which Smith, Jackson, and others discussed specific acts of violence, the rotation system they imposed on the fire mitigation industry, fraudulent acts to ensure insurance coverage of properties likely to be denied coverage, and attempts to obstruct the federal investigation.    (*See* Mot. at 9-13.)

### III.    The Moving Defendants Should Stand Trial with Smith

The Moving Defendants are properly joined with Smith and should stand trial together. The defendants were all involved in the same racketeering and extortion conspiracies and there is a near total overlap of evidence to be offered against them.    The Moving Defendants will suffer no spillover prejudice in a joint trial.

### A.    Applicable Law

Rule 8 of the Federal Rules of Criminal Procedure provides, in pertinent part:

> (a) Joinder of Offenses.   The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or      constitute parts of a common scheme or plan.

> (b) Joinder of Defendants.   The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.   The defendants may be charged in one or more counts together or separately.   All defendants need not be charged in each count.

Rule 14 of the Federal Rules of Criminal Procedure permits severance of properly joined charges or defendants, at the discretion of the trial court, to avoid prejudice to a defendant or the Government.

Balancing Rule 8 against Rule 14, "[t]here is a preference . . . for joint trials of defendants who are indicted together." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (per curiam) (quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993)); *United States v. Miller*, 116 F.3d 641, 679 (2d Cir. 1997).   "This preference is particularly strong where . . . the defendants are alleged to have participated in a common plan or scheme." *See Salameh*, 152 F.3d at 115; *see also United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991); *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988).   As the Supreme Court has explained:

> Many joint trials—for example, those involving large conspiracies to import and distribute illegal drugs—involve a dozen or more co-defendants. . . . It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand.   Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit.   Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

*Richardson v. Marsh*, 481 U.S. 200, 209-10 (1987); *see also United States v. Zafiro*, 945 F.2d 881, 886 (7th Cir. 1991) (noting that joint trials reduce not only litigation costs but also "error costs," *i.e.*, the costs associated from depriving the jury of making its determinations based on "the full picture"), *aff'd*, 506 U.S. 534 (1993).

Simply put, there is a strong and well-settled presumption that defendants who are indicted together will be tried together.   *See*, *e.g.*, *Zafiro*, 506 U.S. at 537; *United States v. Blount*, 291 F.3d 201, 209 (2d Cir. 2002); *United States v. Diaz*, 176 F.3d 52, 102 (2d Cir. 1999).   Given this presumption, the "prejudice" standard is difficult to satisfy.   That is, a defendant is "not entitled

to severance [under Rule 14] merely because [he] may have a better chance of acquittal in [a] separate trial[]." *Zafiro*, 506 U.S. at 540.  Nor is a defendant entitled to severance simply because the evidence against his co-defendants is more damaging or voluminous than the evidence against him.  *See*, *e.g.*, *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003).  Indeed, "joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible."  *United States v. Locascio*, 6 F.3d 924, 947 (2d Cir. 1993).  And even if a particular defendant is somehow prejudiced by joinder, that prejudice must be "sufficiently severe [as] to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials."  *United States v. Lanza*, 790 F.2d 1015, 1019 (2d Cir. 1986) (quoting *United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984)).  Thus, under the Supreme Court's decision in *Zafiro*, a discretionary severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  506 U.S. at 539.

In conspiracy cases, the Court's evaluation of the potential for substantial prejudice must take into account that once a defendant is a member of a conspiracy, "all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant."  *Salameh*, 152 F.3d at 111.  For this reason, the mere fact that there is more extensive evidence regarding one joined co-conspirator is not, standing alone, sufficient to warrant severance.   "The fact that one of several codefendants is tried for a crime not committed by another codefendant does not, without more, create the sort of miscarriage of justice that would require [severance]."  *United States v. Hernandez*, 85 F.3d 1023, 1029 (2d Cir. 1996); *United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008) ("[T]he fact that evidence may be admissible against one defendant but not another does not necessarily require a severance.") (quoting *United*

9

*States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983)).    Further, even when the "risk of prejudice is

high . . . less drastic measures—such as limiting instructions—often suffice as an alternative to

granting a Rule 14 severance motion."    *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003);

*see also Zafiro*, 506 U.S. at 538-39 ("Rule 14 does not require severance even if prejudice is

shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound

discretion.").

It is also well-settled law that a defendant's participation in even "a single transaction" can

bring him into a conspiracy, and that once he joins, he becomes liable for the unlawful acts of other

members of the conspiracy before and after he joined it.    *United States v. Santos*, 541 F.3d 63,

73-74 (2d Cir. 2008).    Each member of a conspiracy "need not know the identities of" every other

member or even be aware of, much less be involved in, all of the details of the conspiracy.    *Id.* at

73.    *See also, e.g.*, *United States v. Cannon*, 776 F. App'x 740, 741-42 (2d Cir. 2019) ("First, it

is not relevant that Cannon did not become involved in the 240 [narcotics] conspiracy until 2015

because he need not have joined in 2010 'in order to incur liability for the unlawful acts of the

conspiracy committed . . . before . . . he . . . became a member.' . . . It is not necessary for him

to have led, managed, or even personally worked with every co-conspirator, or for him to have

worked with the four co-defendants charged with murder, for Cannon to be a member of the

conspiracy." (quoting *Santos*, 541 F.3d at 73)).

Any potential for prejudice can be diminished where the court instructs the jury to consider

separately each individual and each charge.    *Spinelli*, 352 F.3d at 55 (noting that spillover

prejudice may be remedied by limiting instructions); *United States v. DeVillio*, 983 F.2d 1185,

1192-93 (2d Cir. 1993) (finding that the admission of evidence relating to attempted murder was

not sufficient to warrant severance where a limiting instruction was given as to its admissibility

only against certain defendants); *United States v. Cardascia*, 951 F.2d 474, 483 (2d. Cir. 1991) (finding that severance was not required where defendants were forced to sit through a month of unrelated evidence of a separate conspiracy involving co-defendants); *United States v. Rosa*, 11 F.3d 315, 341-42 (2d Cir. 1993) (affirming denial of severance motion of two non-violent defendants, reasoning that each was an integral part of the conspiracy and evidence of the violent nature of the conspiracy would therefore have been admissible at the individual trials of the non-violent defendants had they been tried separately); *United States v. Diaz*, 176 F.3d 52, 102-03 (2d Cir. 1999) (finding that the admission of evidence of eight murders in which the moving defendant did not participate did not cause him substantial spillover prejudice).

Finally, because of the preference for joint trials of defendants indicted together, and the discretion afforded to district courts in addressing any potential prejudice, a defendant seeking review of denial of severance under Rule 14 bears an "extremely difficult burden," *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989), of showing that he was so prejudiced by the joinder that he suffered a "miscarriage of justice" or was denied a constitutionally fair trial.  *See United States v. Yousef*, 327 F.3d 56, 150 (2d Cir. 2003); *Rosa*, 11 F.3d at 341.  Consequently, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial."  *Rosa*, 11 F.3d at 341.

### B.    Discussion

In this case, the Moving Defendants and Smith are charged with participating in the exact same racketeering and extortion conspiracies.   Accordingly, the defendants "are alleged to have participated in a common plan or scheme," and there is accordingly a strong presumption in favor of joinder.  *Salameh*, 152 F.3d at 115.  The charges against them, and the evidence set forth above, clearly meet the requirements for joinder set forth in Rule 8 and controlling Circuit case

11

law, which holds that "joinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants or arise out of a common plan or scheme." *United States v. Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008) (internal quotations omitted). Indeed, "[t]he mere allegation of a conspiracy presumptively satisfies Rule 8(b), since the allegation implies that the defendants named engaged in the same series of acts or transactions constituting an offense." *United States v. Friedman*, 854 F.2d 535, 561 (2d Cir. 1988) (internal quotations omitted); *see also United States v. Uccio*, 917 F.2d 80, 87 (2d Cir. 1990) ("'a non-frivolous conspiracy charge is sufficient to support joinder of defendants under FED. R. CRIM. P. 8(b).'") (quoting *United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988)).

To be sure, Smith was the leader of these conspiracies. This fact, however, does not weigh in favor of the extreme remedy of severance. Virtually all the evidence admissible against Smith is admissible against the Moving Defendants, and that evidence will amply establish that the Moving Defendants were full-fledged members of the Enterprise. Such a near total overlap of evidence means that the Moving Defendants will suffer no spillover prejudice in a joint trial. On the other hand, a severed trial would only mean that there will be two nearly identically and equally long proceedings that place tremendous burdens on the Government's expected witnesses, many of whom have been subjected to violence, intimidated, or extorted. Judicial economy—coupled with the interest in allowing the jury to render a verdict for all defendants based on the fullest information possible—weighs heavily against severing the trial.

In their motion, the Moving Defendants argue that severance is appropriate because: (1) there is evidence (namely, Smith's November 11, 2021 interview with Agent-1) that is admissible only as to Smith; (2) Smith is substantially more culpable than the Moving Defendants; and

12

(3) Smith exhibited disruptive behavior after a court appearance.   None of these arguments satisfies the "heavy burden" they face in seeking a severance.

>    1.    *Smith's Voluntary Interview with Law Enforcement Is Admissible Against the Moving Defendants as a Co-Conspirator Statement and is Not a Basis for a Severance*

The Moving Defendants argue that, while Smith's statements during his November 11, 2021 interview with Agent-1 are admissible against Smith, they would not constitute statements of a co-conspirator to be admissible against a co-defendants.   This argument mischaracterizes Smith's statements to Agent-1, which sought to impede a law enforcement investigation into Smith and his co-defendant's crimes in order to further the objects of the conspiracy. Smith's interview statements were therefore statements in furtherance of the conspiracy and are admissible against his co-conspirators pursuant to Rule 801(d).

As discussed above, the Moving Defendants are charged in an extortion conspiracy and a racketeering conspiracy involving acts constituting extortion, mail and wire fraud, and obstruction of justice.   Smith's statements to law enforcement were designed to thwart law enforcement's investigation into those crimes by deflecting law enforcement's attention away from First Response and onto other EMS companies.   At the start of the interview, Smith stated that he had heard that Individual-1 had been approached by law enforcement.   Throughout the interview, Smith lied and attempted to mislead investigators, while "shrouding" certain of his answers in accurate and incriminating details.   *United States v. Stewart*, 433 F.3d 273, 291 (2d Cir. 2006). For example, he flatly and falsely denied extorting anyone, committing acts of violence, or intimidating industry participants.   *See*, *e.g.*, Def. Ex. E, at 37:25-37:33 ("Like I said, I ain't extorting nobody.   I ain't doing nothing…illegal").   Instead, he posited that violence merely "stopped" because industry participants understood that he had a criminal and gang background,

and those participants decided not to engage in criminal tactics against Smith.  *Id.* at 24:27-25:18 ("[I]…. stopped every single problem.   There's no. . .fights, there's no arguments, there's no nothing. . . . [I told] everybody I'm only here to work.   I let everybody know I'm only here to work.   I don't want no problems with nobody, I don't want no issues with nobody. And that was that."); *see also Id.* at 28:15-28:34; 35:10-35:35: 43:22-43:30.   He disguised the rotation system—itself built on a foundation of violence, threats of violence, and extortionate payments—as a "cohesive" family of industry participants singularly focused working together efficiently. *Id.* at 38:06-38:14.   And the Government expects to offer proof that, following his interview, Smith hosted a dinner, which was attended by several of the Moving Defendants.   During that dinner, Smith toasted Individual-1, praising him for his refusal to cooperate with law enforcement. Accordingly, Smith's false and misleading statements to Agent-1, were understood to further the aims of the conspiracy and, indeed, celebrated by other enterprise members as accomplishing exactly that.

It is of no moment that certain of Smith's statements during the November 11, 2021 interview were incriminating.   As the Second Circuit observed in *Stewart*:

> "[i]t defies logic, human experience and even imagination to believe that a conspirator bent on impeding an investigation by providing false information to investigators would lace the totality of that presentation with falsehoods on every subject of inquiry.   To do so would be to alert the investigators immediately that the conspirator is not to be believed, and the effort to obstruct would fail from the outset."   Stewart, 433 F.3d at 292.

Here, while Smith made certain incriminating admissions concerning the existence of the rotation system, his role in the industry, and his Bloods membership, he did so in an effort to deny that the Enterprise was extorting industry participants, threatening violence, or committing acts of violence.

14

Accordingly, Smith's statements to Agent-1 were clearly in furtherance of the conspiracy and its objective to obstruct justice, and are admissible against the Moving Defendants. Those statements, therefore, are not a basis to sever the trial. And, even if this evidence were admissible against only Smith (which it is not), that still would not necessitate severance. *See United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983) ("[T]he fact that evidence may be admissible against one defendant but not another does not necessarily require a severance."). Any prejudice could be addressed through limiting instructions to the jury. *See United States v. Ghavami*, No. 10 Cr. 1217 (KMW), 2012 WL 2878126, at *14 (S.D.N.Y. Jul. 13, 2010) ("[L]imiting instructions to the jury have emerged as the preferred device for curing any prejudicial spillover that may result from a multi-defendant, multi-count trial.") (quoting *United States v. Santiago*, 174 F.Supp.2d 16, 22 (S.D.N.Y. 2001)).[2]

### 2.    *Smith's Leadership in the Enterprise is Not a Basis to Sever the Trial*

The Moving Defendants next argue that their trial should be severed from Smith's because Smith is significantly more culpable than the Moving Defendants. However, as discussed above, in a multi-defendant racketeering and extortion conspiracy case like this, it is hardly surprising that there may be differing levels of culpability, and different quantums of proof, among the defendants. That alone, however, does not warrant severance. *Spinelli*, 352 F.3d at 55 ("Differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials.") (internal quotations omitted); *United States v. Delgado*, 972 F.3d 63, 81 (2d Cir. 2020) ("As we have explained elsewhere, however, differing

---

[2]    The Government has not made a final determination as to whether it will in fact introduce some or all of Smith's interview at trial. Should the Government seek to introduce some or all of the interview, it intends to seek an *in limine* ruling regarding the admissibility of Smith's statements against his co-defendants. The Court therefore need not make a ruling on their admissibility at this time.

levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials. . . . Indeed, not only are joint trials constitutionally permissible when they place defendants who are . . . marginally involved alongside those heavily involved; they are often particularly appropriate in circumstances where the defendants are charged with participating in the same criminal conspiracy.") (citations and internal quotations omitted).

In any event, the Moving Defendants vastly understate their relative culpability compared to Smith.   Jackson, for one, was Smith's lieutenant in the scheme.   In addition to managing the rotation system, Jackson himself participated in acts of violence, furthered the scheme's efforts to defraud insurance companies (along with Lacewell and Pereira), and assisted Smith in obstructing justice and witness tampering.   McGee, Small, Hasim, Dore, and Lacewell all acted as enforcers, participating in threats of force and assaults of industry participants at Smith's direction.   These co-defendants were therefore responsible for carrying out much of the threats and violence that made the Enterprise such a terrifying force in the industry.

The Moving Defendants' description of unfair prejudice, moreover, fails to recognize that the evidence against Smith and the Moving Defendants substantially overlaps and is admissible against all defendants.   The Government's proof at trial against Smith and the Moving Defendants will include testimony from victims who were assaulted or intimidated by the Moving Defendants; recordings that Smith took of Smith threatening violence against industry participants; WhatsApp messages among Smith and the Moving Defendants enforcing Smith's rules over the industry and the rotation system; historical cellsite evidence showing the approximate location of Smith and the Moving Defendants at several incidents of violence or extortion; and testimony from cooperating witnesses on the roles that the Moving Defendants and Smith played in the conspiracies.   All of

this overlapping evidence—including, as discussed above, Smith's voluntary, pre-arrest interview with the Government—is admissible against the Moving Defendants.   Accordingly, the Moving Defendant's contention that they will be prejudiced by a trial alongside Smith cannot withstand scrutiny.

Finally, to the extent that there is direct evidence admissible against only Smith, any "spillover prejudice" can be adequately addressed through curative instructions.   *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) ("less drastic measures [than severance], such as limiting instructions, often will suffice to cure any risk of prejudice and permit joinder.") (citation and internal quotations omitted).

The cases cited by the Moving Defendants do not counsel a different result.   For example, *United States v. Gilbert*, from 1980, involved a 36-count indictment involving securities fraud offenses charging three defendants.   504 F. Supp. 565, 565 (S.D.N.Y. 1980).   There, the court severed the trial because the moving defendant, who was a latecomer to the conspiracy and described as an "innocent dupe," was charged in only 3 of 36 counts with the lead defendant, and there was a disparity of proof that the court concluded a jury might have difficulty distinguishing. *Id.* at 566, 570.   Here, by contrast, the Moving Defendants are charged in the same counts, and virtually all the evidence admissible against Smith is admissible against the co-defendants.

### 3.    *Smith's In Court Behavior Does Not Justify a Severance*

On November 17, 2022, the Court held a conference at which it adjourned Smith's November 28, 2022 trial to May 1, 2023.   While Smith noted his disagreement with the Court on the adjournment and the Court's suggestion that proceeding *pro se* would be unwise for Smith, he was not disruptive during the proceeding.   After the proceeding, the Government understands that Smith became disruptive in the Marshal's holding cells.   The Government learned of this only

because an AUSA who was present for Smith's conference was also scheduled to appear at the following conference, which was delayed because of the disruption.   The Government and the Court did not observe the disruption directly, but were informed by the Marshals.

None of this disruptive behavior was "in-court," yet the Moving Defendants assert that it was, and from there, leap to the conclusion that Smith will be disruptive during trial.   This entirely speculative claim is unsupported in fact and law.   The Government has not found a single case in this Circuit—and the defendants have cited none—in which a court has granted a severance on similar facts, and the out-of-district cases cited by the Moving Defendants present vastly different circumstances than those here.   *Aratari v. Cardwell* involved particularly egregious behavior by a defendant in the presence of a jury. 357 F. Supp. 681, 683 (S.D. Ohio 1973). In *Aratari*, the court found that a defendant did not receive a fair trial because another defendant repeatedly "shouted insults and obscenities" "during the trial and in the presence of the jury." *Id.* at 682. The judge "had the power to control [the defendant] but she did not exercise that power." *Id.* at 684. Despite the defendant's continued outbursts in the courtroom, the judge did not hold him in contempt or "have him removed from the courtroom when his disturbances were so loud" that jurors had difficulty hearing testimony. *Id.* Since the defendant's activities were of a "prolonged and disruptive nature" during trial, the "occasional instructions" that she gave to the jury to disregard the defendant were insufficient.   *Id.*   Here, however, there is no indication that Smith will in fact be disruptive in the presence of a jury, or that the Court will be unable or unwilling to control Smith, sanction him if he is not compliant, and provide the jury with curative instructions if necessary.

In addition, the defense has cherry-picked language from *U.S. v. Kozak* and in doing so has left out a key reason for the court's decision to grant a severance—the defendant's status as a *pro*

18

*se* defendant.   No. 8:12CR344, 2014 WL 1281914, at *1 (D. Neb. Mar. 27, 2014).   The magistrate judge found that severance was appropriate "by virtue of *pro se* status, extreme misunderstanding of the law, disruptiveness, and refusal to follow court instructions." *Id.*   Here, Smith is represented by counsel, and the Moving Defendants' contention that he will be disruptive in front of the jury—and that the Court will be unable to control him or address any disruptiveness—is speculative at best.

## IV.   The Wiretap Affidavit Establishes Necessity and Should Not Be Suppressed

Jackson, joined by McGee, moves to suppress the wiretap evidence, arguing that Judge Liman incorrectly found that the affidavit in support of the wire established that the wire was "necessary."   This motion should be denied.

### A.     Applicable Law

A Title III application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Similarly, a judge reviewing a wiretap application must determine, as a condition of authorizing the wiretap, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c).

The purpose of these requirements "is not to preclude the Government's resort to wiretapping until after all other possible means of investigation have been exhausted by investigative agents." *United States v. Diaz*, 176 F.3d 52, 111 (2d Cir. 1999) (internal citations and quotations omitted); *accord United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009) ("[T]he Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance.").   Rather, "the statute only requires that the agents inform the authorizing

judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *Diaz*, 176 F.3d at 111 (internal citations and quotations omitted).

Thus, Title III does not establish a "requirement 'that any particular investigative procedures be exhausted before a wiretap be authorized.'" *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987) (quoting *United States v. Lilla*, 699 F.2d 99, 104 (2d Cir. 1983)); *accord United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997). "The issue of whether a normal investigative method has been exhausted must be tested in a practical and common sense manner." *Diaz*, 176 F.3d at 111. "A reasoned explanation, grounded in the facts of the case, and which squares with common sense, is all that is required." *United States v. Ianniello*, 621 F. Supp. 1455, 1465 (S.D.N.Y. 1985), *aff'd*, 808 F.2d 184 (2d Cir. 1985). Establishing necessity "'is far from an insurmountable hurdle'; rather, 'the government must demonstrate only that normal investigative techniques would prove difficult.'" *United States v. Rodriguez*, No. 08 CR 1311 (RPP), 2009 WL 2569116, at *7 (S.D.N.Y. Aug. 20, 2009) (quoting *United States v. Bellomo*, 954 F. Supp. 630, 636 (S.D.N.Y. 1997)).

Applying this commonsense approach, the Second Circuit has had little difficulty finding this requirement established in "complex and sprawling criminal cases involving large conspiracies." *Concepcion*, 579 F.3d at 218; *see also United States v. McGuire*, 307 F.3d 1192, 1197-98 (9th Cir. 2002) (concluding that because of the "special dangers" they pose, "the government is entitled to more leeway in its investigative methods when it pursues a conspiracy."); *United States v. Torres,* 901 F.2d 205, 231-32 (2d Cir.1990), cited with approval by *Concepcion*, 579 F.3d at 218 (holding that evidence of a large-scale narcotics trafficking operation involving participants in multiple locations supported a finding of necessity even though alternative

investigative techniques had experienced some success in developing evidence concerning the conspiracy).

In reviewing a wiretap order, "[a] reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993); *see also Concepcion*, 579 F.3d at 217 (reviewing wiretap order for whether issuing judge abused his discretion in finding that necessity requirement had been met); *Bellomo*, 954 F. Supp. at 639 ("[L]ike the issuing judge's determination of probable cause, a determination that the government has made this [necessity] showing is entitled to substantial deference from a reviewing court."). "[W]iretap orders are entitled to a presumption of validity." *United States v. Ambrosio*, 898 F. Supp. 177, 181 (S.D.N.Y. 1995) (citing *United States v. Fury*, 554 F.2d 522, 530 (2d Cir. 1977), *cert. denied,* 433 U.S. 931 (1978))). Accordingly, the defendants bear the burden of proving that necessity was lacking. *See United States v. Magaddino*, 496 F.2d 455, 459-60 (2d Cir. 1974).

### B.    Discussion

In ordering the interception of electronic communications, Judge Liman correctly determined that normal investigative procedures had been tried and had failed, were too dangerous, or reasonably appeared to be unlikely to succeed. The Clark Affidavit sets forth detailed information about the nature of the investigation, the investigative procedures that had been employed, and *eleven* specific investigative techniques that were tried and failed to accomplish all the objectives of the investigation, that were not reasonably likely to accomplish them, or that were too dangerous. (*See* Clark Aff. at 41-52.) These techniques included undercover officers, confidential sources, physical surveillance, pole cameras, geolocation information, telephone records and pen registers, search warrants, witness interviews, cooperating witnesses, trash

searches, grand jury process and financial investigation.   Where, as here, the affidavit in support

of a wiretap "provided a detailed description of the investigative techniques that had been

attempted or considered and stated the specific reasons why those means were either not feasible

or inadequate," these facts are "minimally adequate to support the determination [of necessity] that

was made."   *United States v. House*, 636 F. App'x 50, 53 (2d Cir. 2016).

Jackson contends that, contrary to Judge Liman's order, the "affidavit failed to demonstrate

that normal investigative methods, both used and unused, were not feasible."   (Mot. at 19.)

While it is true that some of these traditional techniques resulted in valuable evidence, "simply

because the other alternative techniques were successful in obtaining some gain against the . . .

conspiracy does not mean that the challenged wiretap was not needed to investigate fully this . . .

conspiracy."   *Rodriguez*, 2009 WL 2569116, at *7; *see also United States v. Gambino*, 734 F.

Supp. 1084, 1103 (S.D.N.Y. 1990) ("Just because the government had achieved some success in

collecting evidence through informant Giovanni Zarbano and undercover infiltration of the alleged

conspiracy, does not demonstrate the success of 'normal investigative procedures' under Title

III.").   The Clark Affidavit itself recognized the usefulness that these alternative techniques had

to the investigation but also explained why those traditional techniques were not reasonably likely

to achieve the objectives of the investigation.

For example, with respect to conducting witness interviews, which Jackson's motion

claims "provided a wealth of information," (Mot. at 20), the Clark Affidavit explained that while

witnesses had "provided a picture of historical acts of violence and methods of intimidation,"

allowing investigators to learn about specific assaults and to better understand how the defendants

took control of the fire mitigation industry, the victims "have limited insight into the internal

operations of the racketeering scheme" and were fearful of retaliation from the defendants if they

cooperated with law enforcement.   (Clark Aff. at 48-49.)   Because the victims of the defendants

violence and extortion were not themselves part of the enterprise, they were naturally not well

suited to provided adequate details on the inner workings of the conspiracy.   Further, the fear that

the victims had that the defendants would violently retaliate against them if they spoke to law

enforcement cannot be overstated:   victims and witnesses were—and still are—terrified of the

defendants and consequently, often reluctant to cooperate with law enforcement.   That fear was

particularly acute when the investigation was still covert and the defendants were actively carrying

out their campaign of violence and intimidation in the fire mitigation industry.[3]

Similarly, Jackson's claim that the investigators did not make sufficient efforts to recruit a

confidential source to provide inside information into the conspiracy, noting that there "is no

reference to any attempt to recruit any of the scores of other WhatsApp conversation participants—

many of whom, from the face of the investigation, felt aggrieved and would have been more than

willing to assist law enforcement."   (Mot. at 21.)   However, as the Clark Affidavit explained, at

that point in the investigation, the investigators were unaware of a confidential source or likely

confidential source "who has information that could accomplish the investigation's objectives, or

the ability to significantly assist the investigation."   (Clark Aff. at 42-43.)   The defendant appears

to believe that recruiting a confidential source is as simple as contacting participants from the First

---

[3]      Jackson points to the fact that the Government produced 3500 material for 44 witnesses
prior to the November 28, 2022 trial date in support of his argument that witness interviews were
sufficient to provide necessary evidence without the wiretap.   (Mot. at 19.)   This argument
incorrectly conflates the number of witnesses with the level of insight they were able to provide
into the conspiracy.   It also ignores the fact that convincing frightened witnesses to speak to law
enforcement was more feasible after the defendants were arrested and no longer free to engage in
their campaign of violence, intimidation, and extortion.   Jackson also alleges that the
investigators "stopped interviewing witnesses to create the appearance of necessity."   (*Id.* at 20).
This is baseless speculation and again, ignores the significant investigative challenges posed by
the defendant's intimidation and violence.

Response WhatsApp chats in turn until someone agreed to cooperate with investigators.   The reality is far more complicated—before approaching a potential confidential source who has not previously worked with law enforcement, investigators must ascertain whether that person has information important to the investigation *and* that they are unlikely to reveal the investigation to its targets.   In many situations—including the instant case—it is not feasible to make such an approach and maintain the covert nature of the investigation.

Jackson's motion also claims that the Clark Affidavit failed to establish necessity because it "disparaged" other investigative methods such as using pole cameras, pen registers, and analyzing telephone records.   (Mot. at 20.)   As explained in the Clark Affidavit, while these investigative methods can certainly provide valuable evidence, on their own they do not "shed light on [the defendants'] knowledge and participation in the extortion scheme."   (Clark Aff. at 45.)   While pen registers and telephone records can effectively show the timing and volume of communications between coconspirators, investigators cannot learn the substance or nature of those communications from just those records.   Similarly, while pole cameras can demonstrate who was at a particular location at a particular time, they do not include audio and consequently also cannot show the nature and content of any conversations that took place at that location.

The defendants further argue that because fire mitigation companies and first responders are able to quickly arrive at fires across the city, the investigators could similarly send surveillance teams and undercover officers to fires at a moment's notice.   (*See* Mot. at 6-7, 22-23.)   Yet again, the defendants ignore the practical realities that make this infeasible—in order to truly gather effective evidence, a surveillance team or undercover officer would need to be familiar with the investigation, the targets, and the activities of the conspiracy.   The defendant's suggestion would require investigators to maintain a team of officers prepared to rush to the scene of a fire 24/7 to

conduct surveillance of their targets or to attempt to engage in an undercover operation and would not guarantee that the officers would be able to obtain evidence without significant risk to their own safety.[4]

Finally, the defendant argues that because the members of the enterprise regularly used WhatsApp, the wire could not possibly be necessary.   (*See id.* at 25-27.)   While the Government does not dispute that the defendants sent a large number of WhatsApp messages relating to the activities of the conspiracy—as laid out in the Clark Affidavit—toll records showed that the defendants also regularly exchanged voice calls.   (*See* Clark Aff. at 38-41.)   WhatsApp messages and voice calls are two fundamentally different types of communication, with voice calls lending themselves to far more detailed and expansive discussions of the activities of the conspiracy, including conversations about the rotation system, plans to defraud insurance companies by hiding illegal features of properties damaged in fires, and discussions of violence against victims.   And indeed, the wiretap intercepted voice calls between conspirators that, among other things, confirmed the various roles of the participants, the hierarchy between them, and their efforts to avoid detection, and which were different in kind than the group messages described in Jackson's motion.   For example, certain calls intercepted at or around the time of the Smith interview reference Smith's and Jackson's communications upon learning of the federal investigation. There is a substantial difference in the kind of planning demonstrated in these communications, exchanged by the leader and his lieutenant, as compared to the group exchanges that conveyed information and instructions to a broader audience if participants.   The fact that the defendants

---

[4]     Jackson makes the bizarre suggestion that the need for a wiretap could be eliminated by NYPD officers wearing body cameras at fires across the city.   (*See* Mot. at 7.)   The defendants were far less likely to make extortionate demands and engage in physical violence while in earshot of uniformed NYPD officers while their body cameras were activated.

also used encrypted communication systems does not render the wiretap unnecessary.[5]  *See*

*Rodriguez*, 2009 WL 2569116, at *7.

The fact that the target of this investigation was a largescale conspiracy consisting of

various members—including First Response employees and public adjusters—further supports

Judge Liman's finding that the wiretap was necessary.   The Second Circuit has regularly approved

the necessity of wiretaps "in complex and sprawling criminal cases involving large conspiracies."

*Concepcion*, 579 F.3d at 218; *see also Torres*, 901 F.2d at 232 (finding necessity of wiretap where

---

[5]      Throughout his motion, Jackson repeatedly asserts in a conclusory fashion that the Clark
Affidavit was not fully truthful and accurate.   (*See e.g.* Mot. at 22.)    In particular, Jackson
argues that because HSI attempted to send an undercover officer to the scene of a fire in
February 2021, before HSI opened the instant investigation, that Special Agent Clark lied about
the use of an undercover.    In fact, this attempt to send an undercover to the scene of a fire to
meet with Smith was conducted in the course of an overlapping investigation conducted by a
different task force within HSI—the El Dorado Task Force—which had opened its own
investigation into First Response in approximately February 2021.   The Violent Gang Task
Force, of which Special Agent Clark is a member, opened its investigation in approximately
March 2021, consulted with El Dorado about its prior investigative steps, reviewed its case file
(which has been produced in discovery), and ultimately absorbed the investigation.   Special
Agent Clark accurately represented the timeline of HSI's investigative steps.

In any event, Jackson's insinuations and baseless accusations fall far short of the *Franks*
standard.   To invoke the *Franks* doctrine, the defendant must demonstrate that there were
intentional misstatements or omissions in the search warrant affidavit and that those
misstatements or omissions were material.   *See United States v. Awadallah*, 349 F.3d 42, 64 (2d
Cir. 2003).   The defendant bears the burden of establishing both components—*i.e.*, intent and
materiality—by a preponderance of the evidence.   *See United States v. Klump*, 536 F.3d 113,
119 (2d Cir. 2008).   "The *Franks* standard is a high one."   *Rivera v. United States*, 928 F.2d
592, 604 (2d Cir. 1991).   To secure a *Franks* hearing, a defendant must make a "'*substantial
preliminary showing*' that a deliberate falsehood or statement made with reckless disregard for
the truth was included in the warrant affidavit and the statement was necessary to the judge's
finding of probable cause."   *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (emphasis
added) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56, 170-71 (1978)).   The burden to
even obtain a *Franks* hearing is a heavy one, and such hearings are, thus, rare.   *See United
States v. Brown*, 744 F. Supp. 558, 567 (S.D.N.Y. 1990) ("A defendant seeking to have the Court
hold a *Franks* hearing bears a substantial burden."); *United States v. Swanson*, 210 F.3d 788, 790
(7th Cir. 2000) ("These elements are hard to prove, and thus *Franks* hearings are rarely held.").
The defendant does not even attempt to meet this standard here.

the objective of the investigation included "the determination of the dimensions of an extensive drug conspiracy").   Here, it was not reasonable to believe that the full scope of this complex and large conspiracy could be determined through physical surveillance, pole cameras, and phone toll analysis.   Accordingly, the need for a wiretap as set forth in the Clark Affidavit was justified. *See Gambino,* 734 F. Supp. at 1103 ("Due to the large size and scope of the alleged conspiracy, the government's asserted need for wiretap surveillance is justified.").

**V.**    **Conclusion**

For the foregoing reasons, the Government respectfully submits that the Moving Defendants' motions should be denied.

Dated: New York, New York
            February 27, 2023

<div style="margin-left:40%">

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:     _/s/_____
           Rushmi Bhaskaran
           Mollie Bracewell
           Elizabeth A. Espinosa
           Adam Hobson
           Assistant United States Attorneys
           (212) 637-2439 / 2218 / 2216 / 2484

</div>