UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                                     :

UNITED STATES OF AMERICA

                                     :

       - v -

                                     :        22 Cr. 352 (JSR)

JATIEK SMITH,

                                     :

                Defendant.

                                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT JATIEK SMITH'S PRE-TRIAL MOTIONS

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Rushmi Bhaskaran
Mollie Bracewell
Elizabeth A. Espinosa
Adam Hobson
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

I.   FACTUAL BACKGROUND .................................................................................. 2

A.   The Initial Smith Border Search ...................................................................... 2

B.   The Government Obtains a Search Warrant to Search the Forensic Copy of Smith's Phone 3

C.   The Title III Application ................................................................................... 5

II.   THE DEFENDANT'S MOTION TO SUPPRESS SHOULD BE DENIED.......................... 6

A.   Applicable Law ................................................................................................ 6
    1.   The Border Search Authority to Search Electronic Devices Without a Warrant .......... 6
    2.   The Inevitable Discovery Doctrine and the Independent Source Doctrine ................ 11
    3.   The Good Faith Exception ............................................................................ 12
    4.   The Attenuation Doctrine ............................................................................. 13

B.   Discussion ........................................................................................................ 14
    1.   The Review of the Forensic Copy Was Supported By Reasonable Suspicion .............. 14
    2.   Suppression Is Not Warranted On the Basis of the Independent and Inevitable Discovery Doctrines ..................................................................................... 16
    3.   Law Enforcement Acted in Good Faith When They Relied on a Uniform Body of Circuit-Level Case Law Upholding the Warrantless Search of An Electronic Device .. 19
    4.   Law Enforcement Officers Acted in Good Faith Reliance on the Smith Phone First Warrant ...................................................................................................... 22
    5.   Even if the Court Suppresses the Evidence from the Forensic Copy, It Should Not Suppress the Title III Wiretap on the Basis of the Attenuation Doctrine ...................... 23

III.   THE DEFENDANT'S SELECTIVE PROSECUTION CLAIM IS MERITLESS ............. 25

A.   Applicable Law ................................................................................................ 25

B.   Discussion ........................................................................................................ 27
    1.   The Defendant Fails to Show that Similarly Situated Individuals Were Not Prosecuted  28
    2.   The Defendant Fails to Show Discriminatory Purpose.................................... 30

IV.   CONCLUSION................................................................................................... 32

# TABLE OF AUTHORITIES

*Alasaad v. Mayorkas*,
  988 F.3d 8 (1st Cir. 2022) ............................................................................................ 8, 9, 16

*Brown v. Illinois*,
  422 U.S. 590 (1975) ............................................................................................................ 13, 14

*Cobb* v. *Pozzi*,
  363 F.3d 89 (2d Cir. 2004) ...................................................................................................... 26

*Davis v. United States*,
  564 U.S. 229 (2011) ................................................................................................................ 23

*Herring v. United States*,
  555 U.S. 135 (2009) ................................................................................................................ 12

*Hudson v. Michigan*,
  547 U.S. 586 (2006) ................................................................................................................ 14

*Mosby v. Senkowski*,
  470 F.3d 515 (2d Cir. 2006) .................................................................................................... 13

*Murray v. United States*,
  487 U.S. 533 (1988) ...................................................................................................... 11, 18, 19

*Nardone v. United States*,
  308 U.S. 338 (1939) ................................................................................................................ 13

*Navarette v. California*,
  572 U.S. 393 (2014) ............................................................................................................ 7, 14

*Nix v. Williams*,
  467 U.S. 431 (1984) ................................................................................................................ 11

*Riley v. California*,
  573 U.S. 373 (2014) .................................................................................................................. 7

*Segura v. United States*,
  468 U.S. 709 ................................................................................................................ 11, 18, 19

*United States v. Aguiar*,
  737 F.3d 251 (2d. Cir. 2013) ................................................................................................... 21

*United States v. Aigbekaen*,
  943 F.3d 713 (4th Cir. 2019) ............................................................................................ 7, 9, 21

*United States v. Alameh*,
  341 F.3d 167 (2d Cir. 2003) .................................................................................................... 26

*United States v. Armstrong*,
  517 U.S. 456 (1996) ...................................................................................................... 25, 26, 27

*United States v. Bass*,
  536 U.S. 862 (2002) ...................................................................................................... 27, 30, 31

*United States v. Bongiovanni*, 19 Cr. 227 (JLS) (MJR), 2022 WL 17481884 (W.D.N.Y. Aug. 5,
  2022) ........................................................................................................................................... 9

*United States v. Booth*,
  583 F.Supp.3d 545 (S.D.N.Y. Feb. 1, 2022) ........................................................................ 10, 19

*United States v. Burgos*,   20 Cr.182 (VEC),
  2021 WL 3788962 (S.D.N.Y. Aug. 25, 2021) ......................................................................... 13

*United States v. Cano*,
    934 F.3d 1002 (9th Cir. 2019) ................................................................. 7, 8, 9

*United States v. Chemical Foundation, Inc.*,
    272 U.S. 1 (1926) ........................................................................................ 26

*United States v. Dattmore*, 12 Cr. 166A,
    2013 WL 4718614 (W.D.N.Y. Sept. 3, 2013) ................................................ 10

*United States v. Djibo*,
    151 F. Supp. 3d 297 (E.D.N.Y. 2015) ......................................................... 10

*United States v. Drago*,
    2021 WL 3518305 (E.D.N.Y. May 6, 2021) ............................................ 24, 25

*United States v. Eng*,
    971 F.2d 854 (2d Cir. 1992) ..................................................................... 11, 12

*United States v. Fares*,
    978 F.2d 52 (2d Cir. 1992) ............................................................ 26, 27, 28, 31

*United States v. Flores-Montano*,
    541 U.S. 149 (2004) ..................................................................................... 6

*United States v. Gurr*,
    471 F.3d 144 (D.C. Cir. 2006) ..................................................................... 9

*United States v. Hassanshahi*,
    75 F. Supp. 3d 101 (D.D.C. 2014) ............................................................. 24

*United States v. Heath*,
    455 F.3d 52 (2d Cir. 2006) ......................................................................... 11

*United States v. Irving*,
    452 F.3d 110 (2d Cir. 2006) ............................................................. 6, 7, 9, 20

*United States v. Johnson*,
    994 F.2d .......................................................................................... 11, 18, 19

*United States v. Kamaldoss*,
    No. 19-Cr-543 (ARR) 2022 WL 1200776 (E.D.N.Y. Apr. 22, 2022) ......... 16, 23

*United States v. Kim*,
    16 Cr. 191, 2017 WL 5256753 (E.D.N.Y. Nov. 10, 2017) .............................. 12

*United States v. Kolsuz*,
    890 F.3d 113 (4th Cir. 2018) ....................................................................... 9

*United States v. Levy*,
    803 F.3d 120 (2d Cir. 2015) ............................................................... 7, 9, 20

*United States v. Lewis*,
    517 F.3d 20 (1st Cir. 2008) ........................................................................ 28

*United States v. Linarez–Delgado*,
    259 F. Appx. 506 (3d Cir. 2007) ................................................................. 20

*United States v. Molina-Isidro*,
    884 F.3d 287 (5th Cir. 2018) ....................................................................... 8

*United States v. Montoya de Hernandez*,
    473 U.S. 531 (1985) ..................................................................................... 6

*United States v. Moon*,
    718 F.2d 1210 (2d Cir. 1983) ..................................................................... 26

iii

*United States v. Moore,*
  968 F.2d 216 (2d Cir. 1992)..................................................................................... 13

*United States v. Nelson*, 20 Cr. 353 (BMC) (VMS), 2022 WL 18636591 (E.D.N.Y. Oct. 24,
  2022) ........................................................................................................................ 25

*United States v. Oladokun,*
  15 Cr. 559 (BMC), 2016 WL 4033166 (E.D.N.Y. July 27, 2016) ......................... 10

*United States v. Olvis,*
  97 F.3d 739 (4th Cir. 1996) ............................................................................. 28, 29

*United States v. Ramsey,*
  431 U.S. 606 (1977)................................................................................................. 6

*United States v. Raymonda,*
  780 F.3d 105 .......................................................................................................... 12

*United States v. Rosa,*
  626 F.3d 56 (2d Cir. 2010)..................................................................................... 12

*United States v. Sanders,*
  211 F.3d 711 (2d Cir. 2000)................................................................................... 27

*United States v. Singh,*
  811 F.2d 758 (2d Cir. 1987)............................................................................. 13, 18

*United States v. Singh,*
  No. 12 Cr. 121 (DLI), 2012 WL 2501032 (E.D.N.Y. June 27, 2012) ................... 10

*United States v. Smith,*
  231 F.3d 800 (11th Cir. 2000) ............................................................................... 28

*United States v. Stokes,*
  733 F.3d 438 (2d Cir. 2013)................................................................................... 12

*United States v. Touset,*
  890 F.3d 1227 (11th Cir. 2018) .......................................................................... 7, 9

*United States v. Walker,*
  965 F.3d 180 (2d Cir. 2020)................................................................................... 25

*United States v. Wanjiku,*
  919 F.3d 472 (7th Cir. 2019) ............................................................................. 8, 21

*United States v. Williams,*
  942 F.3d 1187 (10th Cir. 2019) ............................................................................... 7

*United States v. Young*, 12 Cr. 210 (RJA) (JJM), 2013 WL 885288 (W.D.N.Y. Jan. 16, 2013) . 10

*United States v. Zodhiates,*
  901 F.3d 137 (2d Cir. 2018)..................................................................... 12, 21, 22

*Utah v. Strieff,*
  579 U.S. 232 (2016)................................................................................................ 13

*Wayte v. United States,*
  470 U.S. 598 (1985)..................................................................................... 26, 27, 31

*Whren v. United States,*
  517 U.S. 806 (1996).................................................................................................. 7

*Wong Sun v. United States,*
  371 U.S. 471 (1963)................................................................................................ 14

iv

The Government respectfully submits this memorandum of law in opposition to motions by defendant Jatiek Smith (the "defendant" or "Smith") to: (1) suppress the contents of the forensic image of his cellphone (the "Forensic Copy") which was taken during a border stop on March 2, 2021, preliminarily reviewed, and then searched pursuant to a judicially-authorized search warrant; (2) suppress the Title III wiretap on his cellphone because it derived from the search of the Forensic Copy; and (3) dismiss the Indictment, or, in the alternative, compel discovery, because he has been selectively prosecuted.

The Court should deny the defendant's motions in their entirety.    The border search of the Forensic Copy comported with the Fourth Amendment because the initial seizure and search was supported by reasonable suspicion.    The evidence from the Forensic Copy, in addition, should not be suppressed in light of the independent source and inevitable discovery doctrines. Moreover, even if the Court were to deem the search unconstitutional, the extreme remedy of suppression would not be appropriate because law enforcement agents acted on the basis of good faith.    Not only did they conduct the search in the context of extensive case law permitting warrantless searches of cellphones at the border, but they also searched the forensic copy of the phone pursuant to a judicially-authorized search warrant that was obtained after informing the magistrate judge of the details of the initial warrantless seizure and search.    Accordingly, because the evidence from the Forensic Copy should not be suppressed, there is no basis to suppress the Title III wiretap on Smith's phone.    Even if the Court were to hold that the evidence from the Forensic Copy should be suppressed, the attenuation doctrine precludes suppression of the Title III wiretap.

With respect to the defendant's claim of selective prosecution, the defendant's motion has no basis in fact or in law and he is not entitled to discovery, much less dismissal of the Indictment.

1

I.      **Factual Background**

A.      **The Initial Smith Border Search**

In February 2021, special agents with the El Dorado ("El Dorado") Task Force of the Department of Homeland Security, Homeland Security Investigations ("HSI"), opened an investigation into First Response Cleaning Corp. ("First Response") for money laundering and extortion.   El Dorado opened the investigation based on information it had received from members of the fire restoration industry that First Response was using members of the Bloods, including Jatiek Smith, to extort the fire restoration industry, and was laundering the proceeds of their illegal activities.

Parallel to El Dorado's investigation, Special Agents from the Federal Bureau of Investigation ("FBI") began their own investigation into Smith and First Response later in February 2021.   That investigation was triggered by a tip from the National Insurance Crime Bureau about gang-related violence in the fire restoration industry.   Prior to the border search on March 2, 2021, the FBI had interviewed two victims of First Response's violence.

As set forth in the affidavit of Special Agent William Clark (Gov't Ex. A, *filed under seal*), on March 2, 2021, at approximately 7:00 a.m., agents with the El Dorado task force were informed that Smith was boarding a plane from Newark International Airport to Jamaica.[1]   Then, just a few hours later, the El Dorado agents were informed that Smith would return from Jamaica that very same day, and would be landing at Newark at approximately 5:00 p.m.   The El Dorado agents therefore requested that the HSI and Customs and Border Protection ("CBP") agents assigned to

---

[1] Special Agent Clark works with the Violent Gang Task Force ("VGTF"), not the El Dorado task force.

Newark conduct a border search of Smith pursuant to HSI's border search authority. Gov't Ex. A, at USAO_000328.

When Smith arrived at Newark, CBP agents detained Smith.   They searched Smith's bag and found just under $10,000 in cash—*i.e.*, a very large amount that appeared to have been designed to be just under the currency reporting requirements.   Smith also had an Apple iPhone. HSI agents seized the Apple iPhone, and asked Smith for the passcode, which he provided.   HSI then took a forensic image of the phone's contents (*i.e.*, the Forensic Copy).   The Apple iPhone was returned to Smith.   *Id.*

In the days after the border search, Special Agents with El Dorado performed a preliminary and initial review of the Forensic Copy.   After the border search, agents with VGTF (which is separate from El Dorado) became aware of El Dorado's investigation.   Then, later in March 2021, the VGTF opened its own investigation—partnering with the FBI—and also conducted its preliminary review of the Forensic Copy.[2]   That review showed evidence of communications in which Smith identified himself as a member of the Bloods and discussed Blood activity.   The Forensic Copy also appeared to contain discussions of Smith's work with First Response, including communications regarding his remuneration arrangement and "rules" on responding to fires, as well as communications with what appeared to be either property owners or public adjusters about submitting fraudulent insurance claims.   *Id.* at USAO_000328-329.

**B.    The Government Obtains a Search Warrant to Search the Forensic Copy of Smith's Phone**

On approximately March 24, 2021, the U.S. Attorney's Office for the Southern District of New York began working on the investigation into First Response with the FBI and VGTF.   On

---

[2] El Dorado's investigation was later absorbed into the VGTF and FBI investigation.

April 9, 2021, out of an abundance of caution, the Government submitted to Judge Stewart D. Aaron a warrant application to search the Forensic Copy for evidence of Hobbs Act extortion, violent crimes in aid of racketeering, and racketeering conspiracy.   In his affidavit in support of that warrant, Special Agent Clark detailed information that three separate witnesses had provided about First Response's crimes.   *See* Gov't Ex. A, at USAO_000325-327.   This included an insurance adjuster who reported that First Response employees had beat up the owner of First Response's main competitor and forced that competitor out of business; that First Response was prohibiting public adjusters from hiring EMS companies without First Response's permission; and that there were reports of First Response using members of the Bloods gang to collect money.   *Id.* The affidavit also included accounts of two victims of First Response's violence, including a public adjuster who was punched at the scene of a fire after speaking on the phone with Smith, and another public adjuster who was attacked at another fire and was sent to the hospital with a brain bleed. *Id.*   In addition to these witness statements, the affidavit described prison records that showed Smith had self-identified as a member of the Bloods gang, and a description of Smith's Facebook account, which appeared to discuss gang business, Smith's affiliation with the Bloods, and posts about First Response.   *Id.* at USAO_000327-28.   None of these facts relied on, or were derived in any way from, the cursory review of the Forensic Copy by El Dorado or VGTF agents.

In addition to the foregoing facts, the affidavit accurately and completely described the border search in which HSI agents obtained the Forensic Copy, and the results of their preliminary reviews.   *Id.* at USAO_328-29.   These facts were consistent with the facts that law enforcement gathered from independent sources, including that Smith was a Blood, worked at First Response, and had imposed various rules on the industry.

4

On April 9, 2021, Judge Aaron issued a warrant for the search of the Forensic Copy.   *Id.* at USAO_00319-322.   The agents thereafter searched the Forensic Copy pursuant to that warrant. The results of that search are the evidence that Smith now moves to suppress.

**C.     The Title III Application**

Six months after Special Agent Clark obtained a warrant for the Forensic Copy, on October 14, 2021, Special Agent Clark submitted an affidavit in support of a Title III Wiretap on Smith's phone, which used the same call number as the Apple iPhone that was imaged on March 2, 2021.

That affidavit (Gov't Ex. B, *filed under seal*) included evidence the Government had identified from the Forensic Copy pursuant to the search warrant issued by Judge Aaron.   In including this evidence, the Government again described the facts surrounding the initial seizure at the border.   *Id.* at 16.   In addition to the phone evidence, the affidavit also included extensive information provided by witnesses, including accounts from four victims who had been assaulted and/or extorted by First Response.   *Id.* at 20-24.   It also included toll analyses showing that the conspirators communicated with each other, and with victims, by using cell phones (*id.* at 38-41); information from a confidential source (*id.* at 41-42), which confirmed the accounts of witnesses or victims who had been assaulted and/or extorted by First Response; results from a warrant on Smith's Facebook account, which showed that Smith was publicly advertising his membership in the Bloods gang (*id.* at 47-48); and analyses of financial records, which showed how some of the defendants were paid (either directly or to related corporations) by First Response (*id.* at 51-52).

On October 14, 2021, Judge Liman issued an order authorizing the wiretaps of Smith's and co-defendant's Jackson's phones.   On November 12, 2021, the Government submitted, and Judge Liman approved, an application for a one-month extension of the wiretaps that included a second affidavit by Special Agent Clark.   The affidavit (Gov't Ex. C, *filed under seal*) detailed several

of the calls that had been intercepted in the first month of the wiretap, including calls ordering and carrying out an assault at a construction site.   *Id.* at 16-39.

## II.      The Defendant's Motion to Suppress Should be Denied

### A.      Applicable Law

#### 1.   The Border Search Authority to Search Electronic Devices Without a Warrant

The "border search" exception is a "longstanding, historically recognized exception to the Fourth Amendment's general principle that a warrant be obtained" for a search.   *United States v. Ramsey*, 431 U.S. 606, 621 (1977).   That longstanding principle reflects that "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border."   *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004).   In addition, "[t]he expectation of privacy [is] less at the border than in the interior."   *United States v. Montoya de Hernandez*, 473 U.S. 531, 539 (1985).   Consequently, the "Fourth Amendment balance between the interests of the Government and the privacy right of the individual is struck much more favorably to the Government at the border."   *Id.* at 540.

Routine searches of an incoming traveler's person and belongings are "not subject to any requirement of reasonable suspicion, probable cause, or warrant."   *Montoya de Hernandez*, 473 U.S. at 538.   "Routine searches include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which, unlike strip searches, do not substantially infringe on a traveler's privacy rights."   *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006).

The Second Circuit has explained that, even for non-routine border searches, no warrant is required.   Rather, a non-routine border search is valid "if it is supported by reasonable suspicion."   *Irving*, 452 F.3d at 124.   The reasonable suspicion standard requires "'considerably less than proof of wrongdoing by a preponderance of the evidence;'" indeed, it requires only "'a

particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Levy*, 803 F.3d 120, 123 (2d Cir. 2015) (quoting *Navarette v. California*, 572 U.S. 393, 396-97 (2014)).   Reasonable suspicion is measured in light of the "totality of the circumstances—the whole picture," *Navarette*, 572 U.S. at 397 (quotation marks omitted), and the "actual motivations of the individual officers involved . . . play no role in [the] Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996).   For this reason, "the validity of a border search does not depend on whether it is prompted by a criminal investigative motive." *Irving*, 452 F.3d at 123.   Rather, "the level of intrusion into a person's privacy is what determines" whether the search is routine or non-routine.   *Id*.

The Second Circuit has not had the opportunity to consider whether the forensic examination of a cellphone is a routine or non-routine border search, and other circuits are divided on the standard that must be met for such searches.   While there is authority that no suspicion is required even for a forensic search, *see, e.g., United States v. Touset*, 890 F.3d 1227, 1233 (11th Cir. 2018) ("We see no reason why the Fourth Amendment would require suspicion for a forensic search of an electronic device when it imposes no such requirement for a search of other personal property."), the balance of authority supports a forensic search of a cellphone if law enforcement agents have reasonable suspicion.   *See United States v. Williams*, 942 F.3d 1187, 1190-91 (10th Cir. 2019) (affirming border search of laptop supported by reasonable suspicion); *United States v. Aigbekaen*, 943 F.3d 713, 720-21 (4th Cir. 2019) (forensic search of a cellphone requires reasonable suspicion); *United States v. Cano*, 934 F.3d 1002, 1016, 1018 (9th Cir. 2019) ("forensic examination of a cell phone requires a showing of reasonable suspicion").   However, no court of appeals has held that the Supreme Court's decision in *Riley v. California*, 573 U.S. 373 (2014), which addressed the search of a cellphone in the domestic interior, imposes a warrant requirement

for the search of phone at the border.   *See Alasaad v. Mayorkas*, 988 F.3d 8, 17 (1st Cir. 2022)

(*"Riley* does not command a warrant requirement for border searches of electronic devices, nor

does the logic behind *Riley* compel us to impose one"); *Cano*, 934 F.3d at 1015 ("post-*Riley*, no

court has required more than reasonable suspicion to justify even an intrusive border search");

*United States v. Wanjiku*, 919 F.3d 472, 483-84 (7th Cir. 2019) ("no circuit court, before or after

*Riley*, has required more than reasonable suspicion for border search of cell phones or

electronically-stored data"); *United States v. Molina-Isidro*, 884 F.3d 287, 291-92 (5th Cir. 2018)

("For border searches both routine and not, no case has required a warrant. . . .   [I]t is telling that

no post-*Riley* decision issued either before or after this search has required a warrant for a border

search of an electronic device.").

Consistent with the caselaw at the circuit-level upholding warrantless searches of

cellphones at the border, CBP has issued a directive (the "Directive") in 2018 to its officers on the

conduct of border searches.   (Dkt. No. 159-1, Def. Ex. B).   Pursuant to the Directive, an

advanced or forensic search may be conducted where "there is reasonable suspicion of activity in

violation of the laws enforced or administered by CBP."   (Def. Ex. B, at 5).   Title 18 of the

United States Code is among the laws enforced by CBP.   *See* "Summary of Laws Enforced by

CBP," *available at* https://www.cbp.gov/trade/rulings/summary-laws-enforced/us-code (last

accessed Mar. 1, 2023).

There is a split of authority as to the kinds of crimes that may be investigated under the

border search authority.   The First Circuit recently held that that Supreme Court precedent makes

clear that the border search doctrine's purpose is not limited to interdicting contraband.   That

court held that "[a]dvanced border searches of electronic devices may be used to search for

contraband, evidence of contraband, or for evidence of activity in violation of the laws enforced

or administered by CBP or ICE." *Alasaad*, 988 F.3d at 21; *see also Touset*, 890 F.3d at 1233 (holding that the Fourth Amendment requires no suspicion of unlawful activity for forensic border searches of electronic devices); *United States v. Gurr*, 471 F.3d 144, 149 (D.C. Cir. 2006) (border search doctrine permits searches of non-contraband evidence of border-related offenses).   In so holding, the First Circuit rejected the Ninth Circuit's view that a border search must be supported by reasonable suspicion that a device contains digital contraband.   *Cano*, 934 F.3d at 1018 (9th Cir. 2019) ("border search exception authorizes warrantless searches of a cell phone only to determine whether the phone contains contraband").   Somewhere in between these aforementioned approaches, the Fourth Circuit has held that "the Government must have individualized suspicion of an offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband."   *Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019); *see also United States v. Kolsuz*, 890 F.3d 113, 143–44 (4th Cir. 2023).

While the Second Circuit has not addressed this question in the context of a forensic search of a cellphone, it has previously held that, because CBP officers are "neither expected not required to ignore evidence of a federal crime," they have "the authority to search and review a traveler's documents and other items at the border when they reasonably suspect the traveling is engaged in criminal activity, even if the crime falls outside the primary scope of their duties."   *Levy*, 803 F.3d at 124; *see also Irving*, 452 F.3d at 123 (2d Cir. 2004) (the validity of a border search "does not depend on whether it is prompted by a criminal investigation motive."); *United States v. Bongiovanni*, 19 Cr. 227 (JLS) (MJR), 2022 WL 17481884, at *8 (W.D.N.Y. Aug. 5, 2022) ("Here, the Court applies the Second Circuit's reasoning in *Levy* and *Irving* and concludes that the officers' decision to search Bongiovanni's phone because he was the subject of a domestic criminal

investigation unrelated to his international travel did not take the search outside the scope of the border exception to the warrant requirement.").

We recognize that district courts in this Circuit have divided as to the standard that must be met for such searches, and the kinds of crimes that may be investigated under the border search authority.   Many district courts have affirmed the validity of border searches of cellphones and other electronic devices based on no more than reasonable suspicion.   *See, e.g.*, *United States v. Oladokun*, 15 Cr. 559 (BMC), 2016 WL 4033166, at \*7 (E.D.N.Y. July 27, 2016) (denying motion to suppress); *United States v. Dattmore*, 12 Cr. 166A, 2013 WL 4718614, at \*4 (W.D.N.Y. Sept. 3, 2013) ("Searches of computers and electronic devices are likewise considered routine searches that may be conducted in the absence of reasonable suspicion."); *United States v. Young*, 12 Cr. 210 (RJA) (JJM), 2013 WL 885288, at \*2 (W.D.N.Y. Jan. 16, 2013) (same); *United States v. Singh*, No. 12 Cr. 121 (DLI), 2012 WL 2501032, at \*3 (E.D.N.Y. June 27, 2012) ("Even assuming, for the sake of argument only, that such a search [of cellphone data] is too invasive to be considered routine, the government's search of [d]efendant's cell phone was proper because it was supported by reasonable suspicion.").   Other courts, including this Court in *United States v. Booth*, 583 F.Supp.3d 545 (S.D.N.Y. Feb. 1, 2022), have suggested that a warrant is required to search a cellphone seized at the border.   *See* 583 F.Supp.3d at 554 (noting the Court's belief that "as in the case of phones seized pursuant to a lawful arrest, the answer to the question of what police must do before searching a cell phone seized" from U.S. citizens crossing the border "is. . .simple—get a warrant.") (quotations omitted);[3] *see also United States v. Djibo*, 151 F. Supp. 3d 297, 309-10 (E.D.N.Y. 2015) (granting motion to suppress evidence obtained from forensic search

---

[3] Of relevance to the good faith argument, we note that the February 1, 2022 decision in *Booth* had not been issued at the time of the March 2, 2021 border search in this case.

of outgoing traveler's cellphone as fruit of an illegal initial search and suggesting that border searches are limited to contraband and national security).

### 2.  The Inevitable Discovery Doctrine and the Independent Source Doctrine

The independent source doctrine permits "second-look" warrants when the "later, lawful seizure is genuinely independent of the earlier, tainted one."   *Murray v. United States*, 487 U.S. 533, 542 (1988); *see also Segura v. United States*, 468 U.S. 709, 797 (exclusionary rule does not apply where police have an independent source for discovery of evidence).   The independent source doctrine requires that: "(1) the warrant [was] supported by probable cause derived from sources independent of the illegal[ity]; and (2) the decision to seek the warrant [was] not . . . prompted by information gleaned from the illegal conduct."   *United States v. Johnson*, 994 F.2d at 987 (citing *Murray*, 487 U.S. at 542).   As to the second prong, the "relevant question is whether the warrant 'would have been sought even if what actually happened had not occurred.'"   *Id*. (citing *Murray*, 487 U.S. at 542 n.3).

The doctrine of inevitable discovery, an exception to the exclusionary rule, provides that unlawfully obtained evidence will not be excluded if the government can "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *United States v. Eng*, 971 F.2d 854, 859 (2d Cir. 1992) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984); *see also United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006) ("Would the disputed evidence inevitably have been found 'but for' the constitutional violation?   If the answer is 'yes,' the evidence seized will not be excluded.").   Deciding whether the inevitable discovery doctrine applies "requires the district court to determine, viewing affairs

11

as they existed at the instant before the unlawful search, what *would have happened* if the unlawful search never occurred." *Eng*, 971 F.2d at 861 (emphasis in original).[4]

### 3. The Good Faith Exception

"As both the Supreme Court and Second Circuit have held, a violation of the Fourth Amendment does not necessarily result in the application of the exclusionary rule." *United States v. Kim*, 16 Cr. 191, 2017 WL 5256753, at *3 (E.D.N.Y. Nov. 10, 2017) (citing *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010) and *Herring v. United States*, 555 U.S. 135, 138 (2009)). "The rule's corrective value justifies its cost when the police 'exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights.'" *United States v. Raymonda*, 780 F.3d 105, 117–18 (quoting *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013)). With those remedial purposes in mind, the good-faith exception asks "whether a reasonably well-trained officer would have known that the search was illegal in light of all of the circumstances." *Herring*, 555 U.S. at 145. "[W]hen the Government acts with an objectively reasonable good-faith belief that their conduct is lawful, the exclusionary rule does not apply." *United States v. Zodhiates*, 901 F.3d 137, 143 (2d Cir. 2018) (quotations omitted).

In the context of a warrant, "[t]he Supreme Court has held that the good-faith exception does not apply in at least four circumstances: '(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable;

---

[4]     The independent source and inevitable source doctrines are closely related.   The former applies when the government obtains evidence through an illegal source, but then independently finds that evidence untainted by the illegality.   The later applies where evidence was not in fact obtained through an independent source, but the court determines with sufficient certainty that the government would have obtained the evidence through lawful means.   *See Murray*, 487 at 539.

and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.'"   *United States v. Burgos*, 20 Cr.182 (VEC), 2021 WL 3788962, at *8 (S.D.N.Y. Aug. 25, 2021) (quoting *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992).

### 4.  The Attenuation Doctrine

The attenuation doctrine is one of several well-established exceptions to the exclusionary rule.   Under the attenuation exception, a mere causal connection between information gained during an illegal search and subsequently obtained evidence does not require automatic exclusion of the evidence because "such connection may have become so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341 (1939).   The attenuation doctrine applies when an arrest or search involved a Fourth Amendment violation, but the connection between the illegal conduct and the subsequent discovery of evidence "become[s] so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost."   *Brown v. Illinois*, 422 U.S. 590, 609 (1975); *Mosby v. Senkowski*, 470 F.3d 515, 521 (2d Cir. 2006) ("The attenuation doctrine allows introduction of evidence obtained after an unlawful arrest when 'the causal link' between a Fourth Amendment violation and a subsequent confession, identification, or other form of evidence is 'so long or tortuous that suppression of the evidence is unlikely to have the effect of deterring future violations of the same type.'" (quoting *United States v. Singh*, 811 F.2d 758, 767 (2d Cir. 1987) (Kearse, J. dissenting))).

Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance[.]"   *Utah v. Strieff*, 579 U.S. 232, 238 (2016).   In considering whether exclusion of evidence is proper, courts do not simply inquire whether the evidence would have been discovered "but for" the illegal conduct.   *See Wong Sun v. United States*, 371 U.S. 471, 487-

13

88 (1963) ("We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police."); *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ("But-for causality is only a necessary, not a sufficient cause for suppression" and "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence.").   Rather, "the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."   *Wong Sun*, 371 U.S. at 487-88 (quotations omitted).

The Supreme Court has identified three factors that bear on the question of attenuation: (1) the amount of time between the illegality and the discovery of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the illegal conduct. *See Brown*, 422 U.S. at 603-04.

### B.   Discussion

#### 1.   The Review of the Forensic Copy Was Supported By Reasonable Suspicion

Smith's motion fails because, assuming that the search of his cellphone at the border is a non-routine border search, the reasonable suspicion standard was met here, and no warrant was required.   At most, a non-routine border search is to be supported by reasonable suspicion of criminal activity, that is, by a "particularized and objective basis for suspecting the particular person stopped" has engaged in "criminal activity."   *Navarette*, 572 U.S. at 396 (quotations omitted).   This standard does not require that the criminal activity suspected be in progress at the precise moment of the stop, only that there is reasonable suspicion that the device will contain relevant evidence of the crime.

Here, approximately one month prior to the border search, federal agents working with El Dorado opened an investigation into Smith and First Response for extortion and money laundering. Also before the border search, the FBI and VGTF started similar investigations and interviewed witnesses, who had described Smith's use of violence to control the industry and extort payments, and his use of phones to further his scheme.    Therefore, at the time of the search, the investigative agents were aware of Smith's efforts to extort the fire restoration industry and were investigating his laundering of illicitly gained proceeds.[5]    In addition to the facts surrounding Smith's extortion scheme, the facts surrounding Smith's trip to Jamaica themselves created reasonable suspicion. Smith flew to Jamaica that morning, was rejected there, and returned 10 hours after he had left. He was transporting just under $10,000 in cash.    These facts separately created reasonable suspicion of money laundering or other illegal behavior and created grounds for the border search.

Smith argues that: (1) he was not "crossing the border," and hence the exception does not apply; (2) any crime under investigation "had no relationship whatsoever to crossing of the border into Jamaica or back."    These arguments fail.    With respect to the first argument, Smith was clearly *at the border*.    He had left the United States, landed in Jamaica, was rejected in Jamaica, and then returned to the United States through Newark International Airport.    The fact that he was rejected from entering Jamaica does not negate the fact that he had left the United States and, upon his return, arrived in the United States from a place outside.    *See* 19 C.F.R. § 162.6 ("All persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a Customs officer.").    Accordingly,

---

[5]    Smith claims that the discovery does "not make clear when the federal law enforcement agencies became involved in the investigation[.]"    Documents related to El Dorado's investigation were, however, produced in discovery on August 16, 2022.

Smith was an inbound passenger at the Newark International Airport subject to the federal government's border search authority.

Next, Smith argues, on the basis of case law in the Fourth and Ninth Circuits that has not been adopted by this or any other Circuit, that "the crimes being investigated had no relationship whatsoever to the crossing of the border into Jamaica or back."   Def. Mot. at 14.   This argument fails.   *First*, the standards in those Circuits do not control here.   *Second*, to the extent that Smith is invoking the Ninth's Circuit singular view that the border search authority extends only to digital contraband, that view, respectfully, "fails to appreciate the full range of justifications for the border search exception beyond the prevention of contraband itself entering the country."   *Alasaad*, 988 F.3d at 21.   Indeed, the First Circuit rejected the Ninth Circuit's approach and concluded in *Alasaad* that the border search exception allows for the search of electronic devices for "contraband, evidence of contraband, or for evidence of activity in violation of the laws enforced or administered by CBP or ICE."   *Id.*   Here, at the time of the border search, federal agents had reasonable suspicion that Smith was committing two Title 18 offenses—extortion and money laundering, *i.e.*, laws enforced or administered by CBP or ICE.   *Id.*   And—contrary to Smith's arguments—they had reason to suspect Smith was engaged in money laundering or other crimes at the time he was crossing the border, because he was crossing the border after a short trip to Jamaica where he was rejected at its border, while transporting a large amount of cash.

### 2.   **Suppression Is Not Warranted On the Basis of the Independent and Inevitable Discovery Doctrines**

Suppression of the evidence from the Forensic Copy is also not warranted because, even if the Court finds fault with the initial border seizure, the seizure and subsequent search of the

Forensic Copy pursuant to Judge Aaron's warrant was supported by both the independent source and inevitable discovery doctrines.

Both prongs of the *Murray* independent source test are met here.   As to the first prong, in April 2021, law enforcement obtained a warrant for the Forensic Copy that fully disclosed the details of the warrantless, forensic search.   The affidavit for that warrant was substantially based on information that was untethered to the cursory reviews of the Forensic Copy.   This included the accounts of victims—who had been interviewed before the border search—that they had been assaulted.   Gov't Ex. A, at USAO_000326-327.   At least one of those victims reported talking to Smith, over a cellphone, just before the assault.   *Id.* at USAO_000326.   The affidavit also described evidence that had been obtained from a review of Smith's public Facebook posts, in which Smith had posted about the Bloods and First Response, and it described prison records that showed Smith had self-reported as a Blood while in prison.   *Id.* at USAO_000327-328.   To be sure, in providing Judge Aaron with a fulsome account of what had happened in the border search, the affidavit also included two sentences noting the initial reviews of the Forensic Copy prior to seeking the warrant, which appeared to include communications about First Response, the Bloods, and the rotation system.   *Id.* at USAO_000328-329.   But this information was cumulative of the facts, independent of the phone review, that had already been described.   Indeed, the cursory review of the Forensic Copy merely confirmed the information that federal agents had independently obtained, including that Smith worked at First Response (from interviews and his public Facebook posts), was a member of the Bloods (from his self-reporting in prison), and that he directed violence and imposed various rules on the fire restoration (from victim interviews). Accordingly, the first prong of the independent source doctrine is met because the warrant was derived from sources independent of any claimed illegality.   *See Johnson*, 994 F.2d at 987

17

(holding that the Government satisfied the first prong of the *Murray* test because it had demonstrated "that there was independent probable cause to listen to the tapes.").

The second prong of the *Murray* test is also met.  The decision to seek the warrant was not prompted "by information gleaned from the [purported] illegal conduct." *Johnson*, 994 F.2d at 987.  Here, the relevant question is "whether the warrant 'would have been sought even if what actually happened had not occurred.'"  *Johnson*, 994 F.2d at 987 (quoting *Murray*, 487 U.S. at 542).  In this case, "the agents would have and could have applied for and been issued a warrant" for the Forensic Copy, regardless of the initial, cursory review. *Johnson*, 994 F.2d at 987.  No "information" from that review led to the decision to seek a warrant.  Rather, the decision to seek the warrant was formed based on the information primarily relied upon in the warrant, *i.e.*, the witness statements, Facebook posts, and prison records.

The Supreme Court's decision in *Segura v. United* States is instructive as to both prongs. The Supreme Court considered whether suppression was warranted when the police initially (and illegally) entered a premises without a warrant, saw narcotics, and then froze the premises for a day in order to obtain a warrant that was premised on probable cause that had been developed independently of the illegal search. *Id.* at 768.  In refusing to suppress the evidence that was taken during the execution of the warrant, the Supreme Court first assumed that there was an illegal seizure when the police officers froze the apartment.  *Id.*  "The illegality of the initial entry[,]" however, was not dispositive because the police officers later obtained a warrant "wholly on information known to the officers before" the illegal entry.  *Id.*  *See also Murray*, 487 U.S. at 542 ("So long as a later, lawful seizure is genuinely independent of an earlier, tainted one (which may well be difficult to establish where the seized goods are kept in the police's possession) there is no reason why the independent source doctrine should not apply.").  The making of the

Forensic Copy of Smith's phone is analogous to the police's freezing of the apartment in *Segura*. Like the premises in *Segura* that were seized, the agents seized Smith's phone by making the Forensic Copy. Any claim of illegality of that initial seizure was cured by Judge Aaron's warrant, just like the initial seizure in *Segura* was cured by a subsequent warrant to search the premises. Furthermore, the Supreme Court noted that a "seizure affects only the person's possessory interests; a search affects a person's privacy interests." *Segura*, 468 U.S. at 806. The Supreme Court further noted "the generally less intrusive nature of a seizure." *Id.* Here, the making of the Forensic Copy did not impinge on Smiths' privacy interests—and it only briefly affected his possessory interests because agents returned the phone to Smith within hours of making the Forensic Copy.

In addition, while the existence of the Forensic Copy aided in the execution of the warrant, the Government would have inevitably discovered the same information obtained through the warrant to review the Forensic Copy through a warrant on Smith's physical phone. The Forensic Copy allowed agents to execute the search on the copy they already possessed, but nothing prevented the agents from using the same probable cause to obtain a warrant to seize and search Smith's phone for the same information. *See Booth*, 583 F. Supp. 3d at 554 ("Nonetheless, the Court denies the motion to suppress, because it is clear that the Government would have inevitably discovered the same information when it searched the phone a few days later pursuant to a duly obtained warrant.").

3. **Law Enforcement Acted in Good Faith When They Relied on a Uniform Body of Circuit-Level Case Law Upholding the Warrantless Search of An Electronic Device**

Even if the Court were to hold that that the initial seizure and search of the Forensic Copy at the border was unlawful, all the agents were clearly acting in good faith when they copied

Smith's phone and conducted their preliminary review of the Forensic Copy.    Therefore, the extreme remedy of suppression is not warranted on the basis of the good faith exception.

The agents possessed an objective, good faith belief that their conduct did not violate the Fourth Amendment given the state of the law at the time Smith's cellphone was seized at the border.    The agents who obtained the Forensic Copy operated in accordance with extensive case law that permitted those agents to take and review a forensic copy of Smith's phone without a warrant.    There was no controlling authority from either the Supreme Court or the Second Circuit holding that border searches of cell phones were not constitutional, and in fact, those courts have strongly indicated that they are permissible.    *See Levy*, 803 F.3d at 124 (CBP officers "have the authority to search and review a traveler's documents and other items at the border when they reasonably suspect that the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties"); *see also United States v. Linarez–Delgado*, 259 F. Appx. 506, 508 (3d Cir. 2007) ("Customs Officers exercise broad authority to conduct routine searches and seizures for which the Fourth Amendment does not require a warrant, consent, or reasonable suspicion. . . .    Data storage media and electronic equipment, such as films, computer devices, and videotapes, may be inspected and viewed during a reasonable border search.") (citations omitted).    The Supreme Court has never required a warrant for any search at the border, and the Second Circuit has affirmed warrantless searches of electronic diskettes, which, like a thumb drive or a cellphone, could contain substantial quantities of digital data.    *Irving*, 452 F.3d at 123-24.[6]    Law enforcement therefore had every reason to believe that they had lawfully

---

[6]       As to the types of crimes that may be investigated pursuant to the border search exception, the recent Fourth and Ninth Circuit are not "binding appellate precedent" for purposes of the good faith analysis.    *See United States v. Aguiar*, 737 F.3d 251, 261 (2d Cir. 2013) ("In the context of statutory interpretation, "binding precedent" refers to the precedent of this Circuit and the Supreme Court.").

obtained a forensic copy of Smith's cellphone based upon reasonable suspicion. Accordingly, the good faith exception would apply to the search and seizure here. *Zodhiates*, 901 F.3d at 143 ("[W]hen the Government acts with an objectively reasonable good-faith belief that their conduct is lawful, the exclusionary rule does not apply.").

The Fourth Circuit's decision in *Aigbekaen* is on point. While the Fourth Circuit held that the border search at issue in that case was unlawful because the crimes being investigated were outside the scope of the border search authority, it nevertheless upheld the use of that evidence on the basis of the good-faith expectation. The Fourth Circuit reasoned, the "HSI agents who searched Aigbekaen's devices in May of 2015 reasonably relied on an established and uniform body of precedent allowing warrantless border searches of digital devices." *Aigbekaen*, 943 F.3d at 725 (4th Cir. 2019) (quotations omitted). It further noted that it was not until the day of its decision that the Circuit had cabined the scope of the border search exception. *Id.* ("Given the uniform body of precedent that permitted warrantless searches at the border in May of 2015, we cannot help but conclude that the good-faith exception applies here."). *See also Wanjiku*, 919 F.3d at 479 (declining to decide whether a warrantless search at the border of a cellphone was lawful and denying a suppression motion because the "agents acted in good faith when they searched the devices with reasonable suspicion to believe that a crime was being committed, at a time when no court had ever required more than reasonable suspicion for any search at the border.").

Under these circumstances, there would be no deterrent benefit to suppressing the Forensic Copy. *Zodhiates*, 901 F.3d at 143. The law enforcement agents who conducted the search acted in good faith, on the basis of case law upholding the warrantless searches of cellphones at the

border.    Accordingly, even if the Court were to conclude that the border search of Smith's phone was unlawful, the evidence should not be suppressed on the basis of the good faith exception.

> ### 4. Law Enforcement Officers Acted in Good Faith Reliance on the Smith Phone First Warrant

The law enforcements agents further acted in good faith by obtaining a search warrant— that fully informed Judge Aaron of the facts surrounding the initial border seizure—prior to conducting a full search of the phone.

The application for the warrant to search the Forensic Copy established probable cause to search the Forensic Copy separate from any information that had been observed during the cursory review after the initial seizure.    These facts included the accounts of victims who had been assaulted at Smith's direction.    Gov't Ex. A, at USAO_00326-327    It also included information that Smith was communicating with his victims and co-conspirators over the phone, and that Smith was advertising his Bloods membership and his involvement with First Response on social media.    *Id.* at USAO_000326-328.    Indeed, the cursory review of the Forensic Copy merely confirmed the information that federal agents had independently obtained, including that Smith was a member of the Bloods, worked at First Response, and had imposed various rules on the industry.    In addition, the application submitted to Judge Aaron fully disclosed the fact that law enforcement had conducted a border search of Smith on March 2, 2021; that pursuant to their border search authority, obtained the Forensic Copy of the phone; and that they had reviewed contents of the phone pursuant to the border search authority.    *Id.* at USAO_000328-29. Therefore, when Judge Aaron authorized the warrant, he did so on the basis of a complete factual record—including the warrantless seizure and subsequent search of the Forensic Copy.

Law enforcement agents conducted their complete review of the Forensic Copy pursuant to Judge Aaron's warrant.   Because the agents only obtained this warrant after fully disclosing the existence of the border search to Judge Aaron, and also providing facts that independently established probable cause to search the Forensic Copy, the agents were acting in good faith when they carried out their search.   Therefore, they acted not only in the context of extensive (though not unanimous) legal authority upholding border searches, but also with the approval of a judge who had been informed of the facts of the border search.   *See United States v. Kamaldoss*, No. 19-Cr-543 (ARR), 2022 WL 1200776, at *17 ("[A] motion to suppress will still be denied if the court finds that the officers who conducted the search acted in good faith reliance on a facially valid warrant.").   There would be no deterrent benefit to suppressing this search when the search followed "objectively reasonable law enforcement activity."   *Davis v. United States*, 564 U.S. 229, 241 (2011) (quotations omitted).   Accordingly, suppression is not warranted on the basis of the good faith exception.

### 5. Even if the Court Suppresses the Evidence from the Forensic Copy, It Should Not Suppress the Title III Wiretap on the Basis of the Attenuation Doctrine

Smith further urges to the Court to suppress, as fruits of a tainted search, the Title III wiretap on Smith's phone.   For the same reasons that the Forensic Copy need not be suppressed, the Title III wiretap should not be suppressed.   But even if the Court were to suppress the Forensic Copy, it should not suppress the wiretap on the basis of the attenuation doctrine.

*First*, the Title III wiretap was obtained beginning in October 2021, six months after agents obtained a warrant for the Forensic Copy and seven months after the Forensic Copy was obtained at the border.   Therefore, the Title III wiretap was temporally remote and removed from the initial, pre-warrant reviews the Forensic Copy, breaking any chain of illegality and weighing in

23

favor of attenuation.   *See United States v. Hassanshahi*, 75 F. Supp. 3d 101, 110 (D.D.C. 2014) (finding that the passage of four months between the unconstitutional search and the challenged laptop examination weighed against suppression).

*Second*, as is clear in the affidavit in support of the wiretap, there were numerous "intervening circumstances" between the search of Smith's phone at the border and the Government obtaining the wiretap.   The probable cause for the wiretap did not hinge on the agent's preliminary review of the Forensic Copy prior to obtaining the warrant.   Instead, the probable cause was based on the results of the search conducted pursuant to the warrant, as well as various other investigative steps that law enforcement had taken between March 2021 and October 2021, including dozens of witness interviews, toll analyses, financial analyses, the review of a Facebook account, and the use of confidential and undercover sources.   Gov't Ex. B, at 20-24, 38-42, 47-48, and 51-52.   These investigative steps show that there were several intervening investigative circumstances, independent from the preliminary review of the Forensic Copy, that weigh in favor of attenuation.   *See United States v. Drago*, 2021 WL 3518305, at *22 (E.D.N.Y. May 6, 2021) (finding the presence of intervening circumstances where, like here, there were numerous additional investigative steps that took place over a period of time).

*Finally*, there is no indication that the agents in this case operated in bad faith or were flagrant.   Here, the Government's application to obtain a Title III wiretap was not "part of any systemic or recurrent police misconduct" or a "suspicionless fishing expedition," or a "dragnet search."   *Strieff*, 579 U.S. S. Ct. at 242, 243.   Nor was it "at most negligent."   *United States v. Walker*, 965 F.3d 180, 188 (2d Cir. 2020) (noting that conduct that is "at most negligent" weighs in favor of attenuation).   Instead, at each and every step, agents operated in good faith, on the basis of consistent and extensive caselaw upholding warrantless searches at the border, and

pursuant to a duly-authorized search warranted signed by a neutral magistrate judge.    Moreover,

law enforcement disclosed the circumstances of the border search in both the application for the

warrant for the Forensic Copy and in the application for the Title III, which was approved by a

federal district court judge.    In the presence of these fulsome disclosures to two federal judges,

there can be no argument that the agents acted flagrantly. *See Drago*, 2021 WL 3518305, at *23

(finding no official misconduct where the "agent who presented the Warrant to the Magistrate

Judge in 2012 set forth the facts of a meticulous investigation prior to presenting the matter to the

judicial officer.").    Under such circumstances, suppression—which is designed to discourage

misconduct—"would not deter misconduct here because the Government did not exhibit a

'deliberate, reckless, or grossly negligent' disregard' for [Smith's] Fourth Amendment rights."

*United States v. Nelson*, 20 Cr. 353 (BMC) (VMS), 2022 WL 18636591, at *14 (E.D.N.Y. Oct.

24, 2022).

### III.    The Defendant's Selective Prosecution Claim is Meritless

The defendant argues that the Court should dismiss the Indictment because he has been

selectively prosecuted, or, in the alternative, compel discovery regarding his selective prosecution

claim.    The defendant's motion has no basis in fact or law and should be denied in its entirety.

#### A.    Applicable Law

A defendant challenging the Government's decision to prosecute him bears a heavy burden.

*United States v. Armstrong*, 517 U.S. 456, 463-64 (1996).    Federal prosecutors retain "broad

discretion to enforce the Nation's criminal laws."    *Id.* at 464 (internal quotation marks omitted).

"As a result, '[t]he presumption of regularity supports' their prosecutorial decisions and, 'in the

absence of clear evidence to the contrary, courts presume that they have properly discharged their

official duties.'" *Id.* (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)); s*ee also, e.g.*, *Wayte v. United States*, 470 U.S. 598, 607 (1985).

To establish a claim of selective prosecution, a defendant must present "clear evidence" that the decision to prosecute not only (1) "had a discriminatory effect" but was also (2) "motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465; *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003); *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992); *United States v. Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983).

With respect to the first of the two required prongs (discriminatory effect), a defendant must establish that "'others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against the defendant'" and that the defendant has been "'singled out.'" *Fares*, 978 F.2d at 59 (quoting *Moon*, 718 F.2d at 1229) (alteration incorporated); *see also Cobb* v. *Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) (same).

With respect to the second of the two required prongs (discriminatory purpose), a defendant must establish that the Government's "selection of [the defendant] for prosecution has been invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *Fares*, 978 F.2d at 59 (internal quotation marks omitted). This means more than that the Government acted with an "awareness of consequences." *Wayte*, 470 U.S. at 610 (internal quotation marks omitted). Rather, it must have "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects." *Id.* (internal quotation marks omitted). Where a defendant "has not shown that the Government prosecuted him *because of*" his protected status or conduct, his claim fails. *Id.* (emphasis in original).

Consistent with the presumption of regularity, the Supreme Court has explained that "the showing necessary to obtain discovery" in support of a selective prosecution claim "should itself be a significant barrier."   *Armstrong*, 517 U.S. at 464.   A defendant must meet a "rigorous standard for discovery in aid of such a claim," *id.* at 468, because the "decision to prosecute is particularly ill-suited to judicial review," and "[e]xamining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy," *Wayte*, 470 U.S. at 607.   To obtain discovery, a defendant accordingly first "must show some evidence of both discriminatory effect and discriminatory intent."   *United States v. Bass*, 536 U.S. 862, 863 (2002) (per curiam); *see also Fares*, 978 F.2d at 59 (same).

"Mere assertions and generalized proffers on information and belief are insufficient" to meet this burden.   *Fares*, 978 F.2d at 59 (internal quotation marks omitted).   A defendant must show evidence supporting both a finding that similarly situated individuals were not prosecuted and a finding that the prosecution resulted from "genuine animus."   *United States v. Sanders*, 211 F.3d 711, 718 (2d Cir. 2000) (applying standard for discovery with respect to selective prosecution claim to discovery with respect to vindictive prosecution claim, and affirming denial).   Neither "a potential motive for prosecutorial animus" nor the "possibility that animus might exist under the circumstances" is enough.   *Id.*

### B.    Discussion

The defendant does not come close to establishing that he is entitled to discovery in support of his claims, much less dismissal. The defendant does not meet either prong of the requisite standard.

1.      **The Defendant Fails to Show that Similarly Situated Individuals Were Not Prosecuted**

As discussed above, with respect to the first required prong, the defendant must show evidence that "others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against [him]." *Fares*, 978 F.2d at 59 (internal quotation marks omitted).   "A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008); *see also, e.g.*, *United States v. Smith*, 231 F.3d 800, 811 (11th Cir. 2000) (defendant "must establish that the government could prove beyond a reasonable doubt that someone else had engaged in the same type of conduct, committing the same crime in that or substantially the same manner"); *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996) ("[D]efendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them.").

Here, the defendant describes generally that other industry participants committed various types of illegal conduct.   His declaration states that other industry participants "settled their differences about who would be credited with the business by using threats of violence, violent [sic], kickbacks and other illegal conduct."   (Dkt. 160 ("Smith Decl."), ¶ 14). The defendant continues that "[t]he only people who are being prosecuted are the minorities who the government alleges had in their past some connection with the Bloods street gang."   (Smith Decl., ¶ 15).   The defendant's entire argument turns on the assumption that other industry participants are materially indistinguishable to the extent that "no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions" exist. *Olvis*, 97 F.3d at 744.   (Dkt. No. 161

("Def. Br.") at 14 ("[W]hite people in the industry -- owners and employees -- have not been indicted. Failure to prosecute these 'similarly situated' whites establishes a discriminatory effect.")). However, that premise is easily rebutted by comparing the charges in the Indictment to the facts as alleged in the defendant's declaration.

The Indictment charges the defendant and his co-defendants with racketeering conspiracy and with extortion conspiracy. Over a period of years, the defendant is charged with participating in a criminal enterprise whose members engaged in, among other things, extortion, wire fraud, mail fraud, witness tampering, and obstruction of justice. (Dkt. No. 2 (the "Indictment), ¶ 6). The Enterprise's means and methods include: "[i]mposing a system of rules upon other EMS companies and on public adjusters"; "[e]xtorting money from employees and owners of EMS companies and public adjusters"; "[u]sing threats of force and intimidation against EMS companies and public adjusters, such as threatening to kill or shoot victims and members of their family"; "[u]sing force against other EMS companies and public adjusters to ensure that they submitted to the rules set by the Enterprise, such as hitting, kicking, and/or punching victims and, on at least some occasions, with multiple members of the Enterprise participating in the acts of violence"; "[c]reating video recordings of acts of violence committed against employees and owners of EMS companies and against public adjusters in order to threaten other victims"; "[c]oncealing or altering circumstances of fire damaged properties, or falsifying insurance claims related to fire damaged properties, to ensure reimbursement from insurance companies"; and "[t]hreatening violence or retaliation against potential witnesses to their crimes in order to deter cooperation with a law enforcement investigation." (Indictment, ¶¶ 10(a) – (h)). In other words, the defendant is alleged to have used extensive violence, threats of violence, recordings of violence, and to have imposed a system of rules for industry participants enforced by violence.

29

The allegations go far beyond the type of conduct that the defendant describes as present in the industry.

Moreover, this defendant is even further apart from the other industry participants that he asserts were similarly situated.   In particular, the Indictment alleges that the defendant was the leader of the enterprise, and its purposes included "[p]reserving and protecting the power of the Enterprise, including the power of its leader, JATIEK SMITH, a/k/a 'Tiek,' the defendant, through violence and threats of violence."   (Indictment, ¶9(b)).

## 2.   The Defendant Fails to Show Discriminatory Purpose

Because the defendant fails to make an evidentiary showing in support of the first required prong, his motion for dismissal or discovery must be denied.   *See, e.g.*, *Bass*, 536 U.S. at 863. But even if this Court were to assume *arguendo* that the defendant had made such a showing, his motion still fails, because the defendant also fails to meet the second required prong.

The defendant's brief offers little discussion of how he has satisfied the showing of a discriminatory purpose, other than to suggest that "discussion of the Bloods street gang in applications for search warrants is prima facie evidence that the defendants were charged because of their race and because of their free exercise of association, to wit the Bloods."   (Def. Br. at 14).   The defendant's argument depends on the assumption that gang affiliation was simply a proxy for race, failing to recognize that gang affiliation or gang activity is a relevant and legitimate law enforcement consideration.   Indeed, and as described in various of the search warrant applications in this case, the defendant's gang affiliation was relevant to the offense conduct in this case.   For example, the wiretap application describes that, at a meeting with an individual identified as Victim-3, the defendant "took off his own shirt, asked those present if anyone was scared, referred to himself as 'Bad Blood' and then asked if anyone knew who he was."   (Gov't

Ex. B, at 35-36).      The defendant then went on to threaten to kill Victim-3's family if he did not

comply with the industry rules imposed by the defendant and the enterprise.      The defendant's

gang affiliation was particularly relevant in this case where there was evidence that the defendant

trumpeted that affiliation to intimidate and threaten victims.      The very documents that the

defendant points to as showing discriminatory purpose in fact prove the opposite – the discussion

of the defendant's gang affiliation was a relevant and permissible part of the Government's

investigation into violent criminal conduct.

Furthermore, the defendant's suggestion that references to a defendant's gang affiliation in

various types of legal process constitute evidence of discriminatory purpose goes too far.      The

defendant's argument seeks to transform gang affiliation itself into a protected status, suggesting

that its mere mention can be taken as evidence of the Government's discriminatory purpose.

*Wayte*, 470 U.S. at 610 (requiring a defendant to prove that he was prosecuted "*because of*" his

protected status or conduct" (emphasis in original)); *Fares*, 978 F.2d at 59 (requiring defendant to

show that "selection of the defendant for prosecution has been invidious or in bad faith, *i.e.*, based

upon such impermissible considerations as race, religion, or the desire to prevent his exercise of

constitutional rights."    (internal quotation marks omitted; alteration incorporated)).      In sum,

brief references in search warrant applications to the defendant's gang affiliation simply do not

constitute "evidence," *Bass*, 536 U.S. at 863, of any kind of discriminatory purpose.

IV.    **Conclusion**

For the foregoing reasons, the Government respectfully submits that the defendant's motions should be denied.

Dated:  New York, New York
        March 1, 2023

                                        Respectfully Submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney for the
                                        Southern District of New York


                                By:     _/s/_____
                                        Rushmi Bhaskaran
                                        Mollie Bracewell
                                        Elizabeth Espinosa
                                        Adam Hobson
                                        Assistant United States Attorneys
                                        (212) 637-2439 / 2218 / 2216 / 2484