UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,

      - v. -                    22 Cr. 352-1 (JSR)

JATIEK SMITH, et al,,

          Defendants.
-----------------------------------------------------X

**REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO SUPPRESS BY
DEFENDANT JATIEK SMITH**

Respectfully submitted,

THOMAS H. NOOTER
Freeman, Nooter & Ginsberg
75 Maiden Lane, Suite 907
New York, NY 10038
(212) 608-0808

JILL R. SHELLOW
15 Chester Avenue
White Plains, NY  10601
(212) 792-4911

ATTORNEYS FOR DEFENDANT
JATIEK SMITH

Table of Contents

Table of Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    The Time Line of Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    The "split" in the Circuits on what is needed for a forensic
    download search at the border . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    The "Inevitable Discovery" and  "Independent Source" Doctrines . . . . . . . . . . . . . . . . . . . 8

    The "good faith" exception. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    The "attenuation" doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## Table of Cases

*Riley v. California*, 573 U.S. 373  (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 7

*United States v. Cano,*  934 F.3d 1002 (9th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6

*United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Flores-Montano,* 541 U.S. 149  (2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Kamaldoss,* 2022 U.S. Dist. LEXIS 73897; 2022 WL 1200776 (E.D.N.Y, 19-CR-543 (ARR)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Kolsuz*, 890 F.3d 113 (4th Cir. 2023). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 8

*United States v. Ramsey*, 431 U.S. 606 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA,


                - v. -                                              22 Cr. 352-1 (JSR)


JATIEK SMITH, et al,,


                        Defendants.
------------------------------------------------------X


## REPLY MEMORANDUM OF LAW

### Argument

        Counsel for defendant Jatiek Smith respectfully submit this reply memorandum to

respond to several of the specific arguments made by the government in their effort to oppose the

suppression of the fruits of the "border search" of the defendant's cellular telephone on March 2,

2021 at Newark International Airport.

The Time Line of Events:

        The time line of events regarding the investigation and examination and seizure of the

forensic copy of Mr. Smith's cellphone is relevant to the issue of what the various agents (the

ones at the airport and the ones who submitted sworn affidavits in support of search and

eavesdropping warrants) knew at important stages of the search and seizure for determining what

level of suspicion or probable cause they had at the time the seizure and they later applications

occurred.

        When HSI Special Agent William Clark signed the "Agent Affidavit in Support of

Application for Search and Seizure Warrant" on April 9, 2021 he provided information

concerning events that dated back to December 2019 (see page 4 of the Affidavit). He did not

state when agents first knew of any of these facts (see, for example, page 2, paragraph 7, that

contains no date for the inception of the investigation). The government's memorandum of law

in opposition to the motion states that the investigation y the "El Dorado Task Force" did not

actually commence until February, 2021, and that agents of the FBI commenced their own

investigation "later in February 2021." (Government Memorandum at page 2). Thus, when agents

from the El Dorado Task Force learned of Mr. Smith's travel plans to Jamaica on March 2, 2021

they could only have been investigating the "money laundering and extortion" conspiracy for a

few weeks.

      The Clark Affidavit (which was not composed until April 9, 2021 – five weeks after the

seizure of the forensic copy of Mr. Smith's cellphone) does not state how much of what is

contained therein was known by the HSI agents by March 2, 2021, which itself seems somewhat

sloppy and at worst was disingenuous and bad faith in seeking the warrant without making clear

to the Magistrate Judge how much suspicion the border agents might have had at the time they

seized the telephone and downloaded the forensic copy. We submit that if the Court agrees that

some level of reasonable suspicion or probable cause is needed to support the search conducted

pursuant to the warrant issued in April, 2021, that further fact-finding may be needed to

determine factually what was known at the time that the forensic download was made. It seems

likely that the agents learned much of what was put into the Clark Affidavit (Government Exhibit

A) after the forensic copy was seized from Mr. Smith on March 2, 2021.

      The government Memorandum lists a series of facts as stated in the Clark affidavit, and

ends the list with a statement that "[n]one of these facts relied on, or were derived in any way

from, the cursory review of the Forensic Copy by El Dorado or VGTF agents." Memorandum at

page 4. The Clark affidavit itself, however, gives, in paragraph 15 a series of those same facts,

including the Bloods membership, Bloods gang activity, work with First Response,

"remuneration arrangement" and the "rules" about responding to fires, as well as

"communications" with insureds or public adjusters about submitting fraudulent claims.

Memorandum at pp. 6-7, paragraph 15. This would appear to either contradict the statement in

the Memorandum or show that the "cursory" examination of the phone or the forensic copy was

hardly cursory.

 The defense maintains that the intrusion that can be described as a seizure, and at the very

least, that can be described as a "cursory" search, occurred on March 2, 2021. Thus, any facts

learned by the investigators between March 2, 2021 and April 9, 2021 (the date of the affidavit)

do not support the forensic download of the contents of the cellphone. To the degree that the

government is arguing that the five-week delay between the seizure and the obtaining of a

warrant is similar to securing a premises (such as a dwelling) for a few hours while a search

warrant is obtained, this is not similar. First, as is obvious, the time frame is hugely different.

Second, the delay in obtaining a warrant for a premises is not intended to provide more time for

agents to seek more probable cause – it is simply designed to prevent destruction of the evidence

sought prior to making the search and seizure of it.

<u>The "split" in the Circuits on what is needed for a forensic download search at the border:</u>

 The defense agrees with the government that the suspicion requirements for the more

intrusive forensic copying and examination of a cellular telephone have not been resolved in the

Second Circuit and that several other Circuits that have considered it have based their findings of

what level of suspicion is needed on different theories. We note, however, that every Circuit other than the Eleventh that has recently considered the issue has come to a conclusion that some degree of suspicion – rather than no suspicion at all – is needed for conducting a forensic download of a traveler's cellphone.

The two rationales provided in cases from the Fourth, Ninth and Tenth Circuits for deciding whether a border search resulting in the seizure and examination of a forensic copy of a cellphone are: 1) that a full search of a cellular telephone is far more intrusive than a "routine examination" of the property of a cross-border traveler (just as a body-cavity search would be) and therefore requires some greater level of suspicion than none, and 2) that a border search can be distinguished from the normal Fourth Amendment concern with the privacy of an individual's personal effects because of the special role of a government in protecting its borders from cross-border crime such as smuggling or carrying digital contraband on the cellphone itself (such as child pornography). The Circuits that look at the latter rationale, such as the Fourth Circuit, find that if a search which happens to be at the border has no relationship to crimes being committed that are related to crossing a border that there is no basis for pushing aside the Fourth Amendment concern with protecting the privacy of individuals in their personal effects. See, *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019) and *United States v. Kolsuz*, 890 F.3d 113, 143-144 (4th Cir. 2023)(as discussed by both parties in their earlier submissions). And, of course, as noted by the government in their Memorandum, the Ninth Circuit in *United States v. Cano,* 934 F.3d 1002 at 1018 (9th Cir. 2019)(the lower "reasonable suspicion" standard is only justified at the border if the search is designed to discover <u>contraband</u> (not just evidence of any crime that is not itself contraband)).

-4-

This Court will be making an analysis of first impression for the Second Circuit and we urge the Court to lean in favor of protecting the privacy rights of any person, including travelers entering or leaving the United States, as the Fourth Amendment intended for citizens within the country, and only allow the broader "exception" to suspicion requirements be applied to border searches where crossing the border or cross-border crime (like smuggling) is involved in the suspected criminal activity.

The government response to the Motion to Suppress discusses with some completeness the alternative approaches taken by the several Circuits that have dealt with the evolving nature of the issue since the Supreme Court's decision in *Riley v. California*, 573 U.S. 373  (2014). The rationale for adapting the border search exception starts first with the nature of the search: it is considered to be very intrusive because of the use of cellphones and computers for storage of very personal and private materials and communications. *Riley* did not involve border searches, but the principle that more intrusive searches than merely examining a traveler's personal property and person with what can be seen superficially may require some higher level of suspicion than nothing was already developing in connection with intrusive personal body searches.

The other prong of a border search that is being developed is the one that justifies an exception to the normal Fourth Amendment requirements of probable cause or reasonable suspicion which stem from the <u>purpose</u> of the search (as opposed to the <u>nature</u> of the search). Each of the exceptions to the warrant requirement that has evolved over time was justified because of some aspect of where and why the search was being conducted, for example, "plain view," the safety to the law enforcement officers questioning a suspect ("stop and frisk"),

-5-

"incident to arrest," and the "vehicle" or "automobile" exception. For border searches the justification for making an exception was articulated in *United States v. Ramsey*, 431 U.S. 606, 616-617 (1977) and *United States v. Flores-Montano,* 541 U.S. 149, 153-154 (2004)[see discussion in the "concurring" opinion of Judge Richardson in *United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019) at 716-727. [Note that we do not agree with his ultimate conclusions but find that his analysis of the history of the development of the border search requirements in the Fourth and other Circuits is thoughtful and thorough.] Differing from the final conclusion of the concurrence in *Aigbakaen*, it makes perfect sense to limit the scope of border searches to the purpose behind the exception, namely, the protection of the United States from cross-border criminal activity, such as the introduction of contraband and the other purposes of border searches: "blocking 'the entry of unwanted persons and effects'" (quoting *Flores-Montoya*, supra, at 473 U.S. 537), and "preventing the introduction of contraband..." (id.). *Aigbakaen* (majority opinion) at 943 F.3d 720. The *Aigbakaen* majority noted that a "non-routine search's *location* is not dispositive of whether the border search exception applies; rather, it is the search's relation to the Government's sovereign interests that is paramount...." (quoting the Fourth Circuit decision in *United States v. Kolsuz,* 890 F.3d 133 (4th Cir. 2018) at 142-143. Id., at 722 [Emphasis in original.]

We also urge this Court to consider the logic of the Ninth Circuit's even more limiting position of the application of the exception in "non-routine" searches at the border as articulated in *United States v. Cano,* 934 F.3d 1002 (9th Cir. 2019), to wit, that only a search for contraband is justified on a lesser standard than probable cause and without obtaining a search warrant because the border search "exception" was created to deal with smuggling of goods and other

contraband, and not as a mechanism for obtaining evidence of other criminality. The *Cano* court first turned to its own en banc decision in *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) (*en banc*), stating: "... the panel held that *manual* cell phone searches may be conducted by border officials without reasonable suspicion but that *forensic* cell phone searches require reasonable suspicion." Id., at 1007 [Emphasis in original.] The *Cano* court also discussed the historical development of exceptions to the general Fourth Amendment prohibition of warrantless searches and the justification of the "border search exception." Id., at 1012-1013. The *Cano* court went on to "clarify" that the purpose of the search and the nature of the "reasonable suspicion" is to locate digital contraband on the cellphone, not just evidence of a crime (even a cross-border crime). See *Cano* at 1016-1017. The court goes on to explain its disagreement with the Fourth Circuit's broader application of the warrant and probable cause exception when the reasonable suspicion supports only the likelihood that the cellphone contains evidence of cross-border crime that is not itself contraband. Id., at 1018-1019.

The logic of both the Ninth and Fourth Circuit positions is compelling, and in our case, either would have required at the very least "reasonable suspicion" at the time of the intrusion, that is, the download of the forensic copy of  Mr. Smith's cellular telephone on March 2, 2021. What is clear from reading the analysis of the facts in the Fourth Circuit case, *United States v. Aigbekaen*, where a great deal of suspicion existed to support a search in that case but the majority held that it was not sufficient to support "reasonable" suspicion [instead they denied the motion on the "good faith" doctrine, which in 2014 pre-dated the DHS Directive of 2018 on "non-routine" searches at the border, Exhibit B of this Motion]. This shows that the amount of knowledge one can reasonably suppose was available to the CBP agents who downloaded the

forensic copy would not have been enough to be considered "reasonable." Moreover it is

abundantly clear that the investigation had no relationship to "contraband" on the phone or any

cross-border criminal activity[1].

<u>The "Inevitable Discovery" and  "Independent Source" Doctrines</u>:

We submit that the government's reliance on either of these two doctrines is flawed

because of the time frame of the search and the ultimate application for a search warrant (five

weeks later). The fact of the ongoing investigation of Mr. Smith's activities would not inevitably

result in the discovery of the contents of the cellphone (or even the existence of it) five weeks

later. The phone was returned to Mr. Smith (who, incidently, had regained an expectation of

privacy in the device, see *United States v. Kamaldoss,* 2022 U.S. Dist. LEXIS 73897; 2022 WL

1200776 (E.D.N.Y, 19-CR-543 (ARR))(discussion on page 44 of the decision (referring to the

Fourth Circuit case *United States v. Kolsuz*, <u>supra</u>). More significantly the continued use of the

phone, or the destruction or replacement of it over time, or the deletion of material on it which

then has its memory overwritten by other activity, would have made the contents different and

therefore the "discovery" of the contents of the forensic copy was absolutely <u>not</u> inevitable.

Here there was no evidence in addition to whatever the HSI agents who directed the CBP

agents to conduct the search had available to them on March 2, 2022. The inevitable discovery

doctrine is not intended to allow time to "correct" the illegality by obtaining more evidence,

---

[1]The implication that Mr. Smith carrying a sum close to $10,000 in cash (over which amount a report has to be filed) gives any support to "reasonable suspicion" of a crime being committed is ludicrous: many people traveling abroad may carry cash for the rental of a property for their vacation or the purchase of an expensive item abroad where a discount is available for payment in cash, and the fact that it was under $10,000 shows that Mr. Smith was <u>following</u> the law, not trying to evade it.

whether that additional evidence is submitted in the form of a search warrant application or a delayed search of what has already been seized. Moreover there was no "independent" evidence obtained that would justify the seizure of the evidence as it existed at the time it was copied on March 2, 2021. Finally, the citation to case law that pre-dates *Riley* and the other cases that have been grappling with the scope of highly intrusive searches of electronic devices is inapposite to the problem of what is needed by way of probable cause or reasonable suspicion for a forensic download of the contents of electronic devices of persons at the border.

The "good faith" exception:

The invocation of the "good faith" exception is particularly inapposite at this point in the development of the law around "non-routine" border searches of electronic devices. While it is true that the law remains somewhat unclear nationwide, the agencies responsible for the search in this case had clear guidance from the Department of Homeland Security as a result of the evolving doctrines on border searches. The CBP Directive of 2018 instructed border agents on exactly how to deal with "routine" and "non-routine" searches (the latter involving forensic downloads of the contents of electronic devices), see Exhibit B to the Motion to Suppress. While agents prior to that might have been confused "in good faith" on what the standards were, once the Directive was issued there was no excuse for the CBP agents to do anything but act on "reasonable suspicion" prior to making a digital copy of the cellphone contents and looking at it (even if in a preliminary or "cursory" way).

The "attenuation" doctrine:

This doctrine does not apply to the specific evidence sought to be suppressed, which in the first instance is the digital copy of the cellphone as it existed on March 2, 2021, where, to all

appearances it was made without even "reasonable suspicion," and in the second instance, to the evidence subsequently obtained using an eavesdropping warrant that relied very heavily on the contents of the forensic copy of the phone as it existed when it was seized on March 2, 2021.

The agents, in continuing their investigation beyond March 2, 2021 up to the time of obtaining an eavesdropping warrant on October 14, 2021, may well have obtained sufficient independent evidence to support a search and seizure of Mr. Smith's cellphone, premises, person, or whatever, at that time. But there is no way to know that because they used the tainted evidence. Moreover, if any additional evidence obtained through independent investigation gave them probable cause to search Mr. Smith's phone in October it would still not have supported a search of the phone in March because it would not be the same evidence to be seized. In short, having a basis for conducting a search of Mr. Smith's cellphone at a later date (using a warrant) does not relate back to supporting the seizure on March 2, 2021.

In addition, the infiltration of so much of what was found on the forensic copy of the phone downloaded on March 2nd with the small amount of additional facts obtained after March that were used to obtain an eavesdropping warrant (apparently sought because the agents did not have enough evidence to make an arrest without the additional evidence they hoped to secure through the wiretap) makes it impossible to parse out the "independent" evidence to determine whether it would have been enough to support the eavesdropping warrant application made in October, 2021.

It appears that the El Dorado agents, having commenced an investigation a few weeks prior to Mr. Smith's trip to and from the airport in Jamaica sought to use a short-cut to getting evidence under the pretext of conducting a border search. They, as agents of the Department of

Homeland Security, should have known better. Their own directive from 2018 prohibited their acting as they did, and they should have been fully aware that the state of the law on when and how a border search can be used to obtain evidence from a cellphone for a criminal investigation of non-border related criminal activity was evolving. In addition, they admitted in the search warrant application that they looked at the contents of the forensic search (in a "cursory" way) prior to seeking the warrant, and they undoubtedly used evidence that they had obtained after March 2nd to seek the warrant five weeks later. This is the kind of bad faith violation of Fourth Amendment rights to have one's personal effects be free of intrusive searches without seeking the independent evaluation of a neutral magistrate that the Fourth Amendment was written to prevent.

<u>Conclusion</u>

The arguments submitted by the government do not support the seizure by digital download of the forensic copy of Mr. Smith's cellular phone by CBP agents at Newark Airport on March 2, 2021, and the evidence obtained therefrom, and the fruits of it obtained by using that evidence to seek further warrants, should be suppressed.

Dated:  New York, New York
        March 14, 2023

                                        Respectfully submitted,

                                        */s/ Thomas H. Nooter*
                                        THOMAS H. NOOTER
                                        And Jill R. Shellow, Esq.
                                        Attorneys for Defendant Jatiek Smith