UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

    -v-

JATIEK SMITH et al.,

        Defendants.

---

22-cr-352 (JSR)

FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND VERDICT

JED S. RAKOFF, U.S.D.J.:

    *Pro se* defendant Jatiek Smith (also known as "Tiek") is charged with one count of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and one count of extortion conspiracy, in violation of 18 U.S.C. § 1951, arising out of allegations that Smith and his co-conspirators engaged in a pattern of extortionate conduct to dominate the fire restoration industry. Prior to trial, Smith elected to proceed *pro se* (but ably assisted by standby counsel, namely Russell Capone, esq.) and to be tried by the Court sitting as jury. *See* Nov. 11, 2023 Memorandum Order (Dkt. 311). Smith's case was tried in a ten-day bench trial between November 27, 2023 and December 11, 2023.

## I.  **Findings of Fact**

    Based on the record presented at trial -- the transcript of which is hereinafter referred to as "Tr." -- and the Court's evaluation of the witnesses' credibility and demeanor -- the Court makes the following findings of fact:

A. <u>**The Fire Restoration Industry**</u>

1.   The "fire restoration industry" refers to the businesses that redress and repair properties that have suffered damage from fires or exposures to fires. Within this industry, "fire restoration companies" (sometimes referred to as "emergency mitigation services companies," or simply "fire mitigation companies" or "restoration companies") provide emergency mitigation services, demolition, and construction services to properties that have suffered such damages. Tr. 547, 667.

2.   Another group of participants in the fire restoration industry are the insurance adjusters, also referred to as "public adjusters." A public adjuster represents the property owners in their claims made against the insurance companies that insure their properties. Tr. 209, 664-66, 838.

3.   The term "chasing fires," as conventionally used in the industry, refers to a fire mitigation company's or public adjuster's efforts to solicit business from the owners of fire-damaged properties. Tr. 197-198, 668. Traditionally, there was an "open market" for chasing fires, with several companies in the fire restoration industry competing at the scene of the fire to solicit the business of the homeowner or owners. Tr. 198, 555, 681, 1294. A fire mitigation company has been "retained" when it signs a contract with a property owner, a process known as "signing a fire." Tr. 556.

4.   While public adjusters and restoration companies serve different roles within the industry, they are nevertheless in indirect

competition. Both public adjusters and restoration companies will chase fires in an attempt to be the first to sign any given fire. If a public adjuster is the first one to sign a fire, that adjuster will then often refer any restoration work to the adjuster's preferred restoration company, and while these recommendations to homeowners are not binding, as a matter of course they are frequently accepted. The same is true in reverse: when a restoration company is the first to sign a fire, they will frequently refer the homeowner to their preferred public adjuster. Tr. 380-81, 688-75.

### B. **Smith's Rise Within First Response**

5.    "First Response" is a fire mitigation company at the center of this action. Tr. 186. While First Response primarily operates in Brooklyn, Queens, and Staten Island, it also does business in the Bronx and Manhattan. GX 1000D; Tr. 467-68, 1225. Insurance companies, which operate across the country, pay for First Response's services. Tr. 556, 666.

6.    Carl Walsh, the owner and founder of First Response, hired Jatiek Smith in approximately October 2019. Tr. 200, 1289. By early 2020, Smith had become a manager for First Response, Tr. 202; GX 206, 207, and in that role Smith assumed responsibility for substantial aspects of First Response's operations, including its hiring decisions, supervision of "chasers" (individuals who solicit business for fire restoration companies), and the selection of public adjusters and sub-contractors to use on a job. Tr. 203-04, 1118-23, 1291-93. While Walsh retained legal ownership of First Response, in practice

Smith effectively took control over many aspects of the business from Walsh and by early 2020 was understood to be its leader. Tr. 185, 203-04, 550, 960, 1086; GX 315D. Smith is a member of the Bloods street gang. Tr. 191-92; 1309-10, 1244.

7. Upon gaining control over hiring decisions at First Response, Smith brought in several individuals who became part of his inner circle at the company. For example, Smith hired Sequan Jackson, another member of the Bloods, who became Smith's second-in-command. Tr. 186, 192, 1120. As early as March 2020 Smith also brought in two of his relatives, Hasim Smith ("Hasim"), also known as "Hoodie," and Jayquan Smith, also known as "Jay." Around the same time, he also hired Anthony McGee (a member of the Bloods), also known as "Touch," and Eric Perez, also known as "Indio." Still others Smith brought into First Response shortly thereafter were Kaheen Small, also known as "Biz" (by May 2020); Manny Pereira (by May 2020); Damon Dore, also known as "Demo" (by September 2020); and Rahmiek Lacewell, also known as "Ready" (by September 2020). Tr. 207, 222, 300, 343, 547-49, 583, 1119-1120, 1290-93; GX 301, 306, 319. Smith's inner circle also included Octavio Peralta, Smith's preferred public adjuster. Tr. 663-664.

8. Smith, Jackson, McGee, Small, Hasim, Lacewell, Dore, Pereira, Jay, Perez, and Peralta constituted an association-in-fact enterprise (the "Enterprise"), which was a continuing unit although the precise membership of the Enterprise somewhat changed over time. The Enterprise closely overlapped with First Response, but the

Enterprise with its own rules, structures, and objectives, extended beyond this legal entity. For example, while Walsh was the legal owner of First Response, in practice Smith as the effective boss of the Enterprise not only ran many aspects of First Response's operations, but also dictated policy to Walsh. Tr. 185, 203-04, 550, 960, 1086; GX 315D. Further, in March 2022, when, as explained below, Walsh fired all of the aforementioned First Response employees, the Enterprise continued in existence, with Smith orchestrating a system whereby other fire restoration companies would hire former First Response chasers and continue to pay those chasers and Smith. Tr. 29-31, 290-95; GX 648. Smith then changed the name of First Response to "Fire Response," also referred to as "Before Tiek After Tiek" or "BTAT," and maintained an ongoing enterprise, also using the company name "Solid Smith." Tr. 294, 325-26.

9.   The members of the Enterprise communicated regularly, including in a WhatsApp group chat. Tr. 211, 554; *see, e.g.*, GX 301, 313, 316, 319, 351, 353A-C, 357A-C, 378. They also frequently met in a parking lot on Knapp Street in Brooklyn, often wearing their red First Response jackets. Tr. 562; GX 326, 509-11. Several of these individuals traveled to Los Angeles together. Tr. 207; GX 204. In a June 2020 meeting, which Jackson, McGee, Hasim, Jay, Perez, and Pereira attended, Smith referred to these individuals as his "family." Tr. 188, 578-79; GX 311B. In a February 9, 2023 recording, Smith, in an apparent reference to these individuals, also stated: "Cause everybody was brothers and everybody was sticking together when we was in the

street. When the money was going and everybody was getting money, everybody was brothers." GX 454, GX 1215.

**C. Clash with AES**

10.   When Smith joined First Response, American Emergency Services ("AES") was First Response's primary competitor. Tr. 1128. It was understood that AES chasers would sometimes use threats and violence at the scene of fires in order to obtain business. Tr. 402–03, 1064, 1100, 1129. AES was particularly dominant when it came to chasing fires at night, as AES apparently felt more willing to exercise threats of violence when it was dark. Tr. 389-90. After Smith became a manager at First Response and hired more fire chasers for the company, tensions between First Response and AES began to escalate.

11.   On May 4, 2020, the dispute between First Response and AES came to a head when, at the scene of a fire, several AES workers got into a physical altercation with several First Response employees, including Jackson, Hasim, Jay, and Perez. Tr. 219-23. Prior to the fight, Smith called Jackson and told Jackson to go to the site of the fire that AES had signed. Smith also directed Jackson to bring a gun. Tr. 221. Once Jackson arrived at the fire, Smith asked Jackson to give him the gun, and Jackson complied. Tr. 221. At one point, someone from AES told First Response, "Y'all Blood n*****s is pussy." Tr. 221. Jackson struck the AES worker with a large Husky flashlight. Tr. 221. A fight ensued, and someone from AES fired a gun at Jackson. Tr. 222. At the end of the fight, Smith returned to Jackson the gun Smith had obtained from Jackson, without it having been discharged. Tr. 222-23.

12.   On May 5, 2020, Smith, along with Jackson and three other members of the Enterprise, went to an AES warehouse to assault AES's owners in retaliation for the events of the prior day. Tr. 224-28; 1322-23. Prior to the assault, Smith and Jackson discussed "stak[ing]" out the warehouse and then "press[ing]" the AES bosses -- *i.e.*, "assaulting them" and "threatening them." Tr. 224. Once they arrived, Smith and his crew waited for the AES bosses -- or the individuals who they thought were the bosses -- to be alone so that they could outnumber them. Tr. 226-27, 1336-37. Once the two individuals who they thought were the AES bosses were alone, Smith directed Jackson to get out of the car. Tr. 227. At Smith's signal, Jackson and other Enterprise members then began punching the AES employees. Tr. 227; GX 701 (video recording of assault).

13.   After assaulting these individuals, who turned out not to be the owners of AES, Smith and several other Enterprise members including Jackson drove to a construction site where AES workers were stationed, in search of the owners of AES. Tr. 227-30. Smith exited the car, walked to the AES workers, and demanded that they put their boss on the phone. The workers obliged. Once on the phone with Eddie McKenzie -- one of the AES owners -- Smith said, within earshot of the AES workers, "I'll beat your workers up right now." Tr. 230, 1178. Jackson and the remaining Enterprise members stood across the street to intimidate the AES workers. Tr. 231. Jackson testified that the

workers looked scared and that the purpose of the intimidation was to keep those workers from returning to work. Tr. 231.[1]

14.   On the evening of May 5, 2020, Smith recorded a conversation with an AES worker named Boggs. Tr. 1338; GX 315A - 315D. During this conversation, Smith effectively acknowledged that he had agreed with others to assault AES workers and that he knew the assaults were criminal. Tr. 1340-41; GX 315B ("They could give us gang assault. They could give us gang assault in the second degree, it was three of us. . . . No, yeah, but—but you see how far I thought? I know the charges. I know the penal laws to it. I know all of that. I know everything that comes with what I'm doing. Only thing that none of us will escape is the con—is the conspiracy. That's what none of—none of will escape the conspiracy. None of us."). Referencing the recent altercations with AES, Smith stated, in part: "If we'd have let that fucking tek go, if there wasn't a precinct around the corner from y'all shop -- if there wasn't a precinct we'd have let that tek go. We'd have let that tek go to send a message." GX 315B. A "tek" referred to an automatic weapon, such as a TEC-9 and the "precinct" referred to a police precinct. Tr. 530-31.[2] In other words, Smith told Boggs -- who worked for AES -- that he would have shot the AES employees "to send

_____

[1]    Smith denies making any such threat to AES workers, but the Court finds Jackson's testimony to be more credible on this score. *See* Tr. 1179-80.

[2]    A New York City Police Department precinct was located around the corner of the AES warehouse where the aforementioned assault occurred. GX 523; Tr. 169.

a message" if there hadn't been a police station around the corner. During this call, Smith also told Boggs that Smith "beat the whole Service Master up," referring to an incident where Smith assaulted two chasers from another restoration company, A.J. and Mark, after they signed a fire on Staten Island which Smith viewed as his own territory. GX 315A, Tr. 248-49, 534; *see infra* ¶ 24.

15.  After the May 5, 2020 assault, Smith, Jackson, Jay, and Hasim met with McKenzie at a Wendy's parking lot. Tr. 233. Smith and McKenzie had a conversation in McKenzie's car. Tr. 234. Jackson observed McKenzie through the car window, and McKenzie appeared as if he was sobbing and scared. Tr. 234-35. After Smith's meeting with McKenzie, Smith told Jackson that he demanded $100,000 from McKenzie for AES to be able to chase fires moving forward. Tr. 234-35. If McKenzie did not pay the $100,000, Smith would not allow AES to work and would continue to use violence against them. Tr. 244.[3]

16.  A few months later, Smith arranged another meeting with McKenzie at the Knapp Street parking lot in Brooklyn. Tr. 235-236; GX 509. Prior to the meeting, Smith met with Jackson, McGee and Small. Tr. 242. Smith gave McGee his gun and told McGee not to kill McKenzie, but if he needed to shoot, only to shoot McKenzie in the leg. Tr. 242.

---

[3]      Smith claims that he never demanded money from McKenzie, but instead that it was McKenzie who offered Smith $100,000 to work for him. Tr. 1187. The Court finds Jackson's contrary testimony in this regard more credible. Further, the Court notes that, if McKenzie made this offer to Smith only after being repeatedly threatened -- as the record demonstrates he was -- that offer to pay Smith would nevertheless be extortionate given the surrounding circumstances.

Small was directed to put McKenzie in the back of Small's truck and ride around with McKenzie to scare him. Tr. 242-43.

17.   When McKenzie arrived at the parking lot, he came with a driver/bodyguard named "Po." Tr. 238. Smith, who knew Po as a fellow member of the Bloods, chastised Po for working for McKenzie, at which point Po declined to assist McKenzie further. Tr. 239. Smith again demanded $100,000 from McKenzie, stating in substance, "Didn't I tell you to pay that bread? Like, didn't I tell you to pay that fucking money? You really think it's a game out here?" Tr. 239. McGee, at Smith's direction, emerged from behind a dumpster and cocked a gun. Tr. 239, 1342. McKenzie appeared scared and pleaded with Smith to take it easy. Tr. 239-40. McGee demanded that McKenzie sit down; when McKenzie did not, McGee pistol whipped him. Tr. 240. Smith again demanded money from McKenzie ("Yo, didn't I fucking tell y'all to make sure, make sure -- like I told you to pay that bread.") and directed Small to pull up to the parking lot and throw McKenzie in the back of the car. Tr. 240. McKenzie then ran away. Tr. 240-41.[4]

_____

[4] The events outlined in this paragraph are based principally on the testimony of Jackson, who was present. Smith recounts a different version of these events wherein McGee and Small were only summoned after a car of four other individuals supporting McKenzie arrived. Smith claims that he never demanded money from McKenzie during this encounter, McKenzie was not pistol whipped and McKenzie ran away the moment he saw McGee brandishing a gun. Tr. 1192-95. Pereira recounted how he overheard Smith bragging about these events on a later occasion, which tends to corroborate Jackson's testimony. Tr. 585-87. To the extent it is material, the Court finds Jackson's version of events to be more credible, although the Court notes that even on Smith's telling, the purpose and effect of this encounter appears to have been to intimidate McKenzie and AES.

18. By approximately June 2020, as a result of Smith's intimidation, AES was no longer chasing fires. Tr. 1343; GX 311A (recording of Smith from June 2020 stating that "AES is not out here. Nobody -- if I'm not capitalizing, if I'm not capitalizing off it, nobody's capitalizing off it."). The Government put forward substantial evidence -- including the testimony of four independent witnesses -- that the reason AES ceased chasing fires was the threats and violence of Smith and co-conspirators. Tr. 219 (Jackson testifying "Q: Ultimately what, if anything, did Tiek do to AES? A: He got them out of the industry. He stopped them from chasing."), 234-235, 682-83 (Peralta testifying that "[t]he outcome of the whole situation [with AES] was that they [AES] were not allowed to come out."), Tr. 884 (Vargas, the owner of another restoration company, testifying he was told by Smith AES "weren't around anymore" because AES "didn't follow [Smith's] rules"), Tr 1128-29 (Walsh testifying he was told by Smith AES was no longer chasing fires because "There was a fight and they were scared to come back in the street"). The fact AES completely exited the industry is particularly striking given that, before May 2020, AES was the largest player in the industry. Tr. 929, 1073.

19. Smith offers a somewhat more complex account of First Response's feud with AES, seeking to characterize AES as the aggressor. For example, Smith and Walsh both testified that, between the first and second meetings with McKenzie described above, someone from AES threatened Smith and conveyed a list of "rules" First Response was required to follow. Tr. 1079, 1181, 1183-84. Smith further testified

that McKenzie hired at least two individuals to "stop" Smith, including one who was supposedly tasked with murdering Smith. Tr. 1190-91. Even if the Court were willing to credit this testimony (which it does not), the Court, as explained more fully in the Court's Conclusions of Law below, finds it to be largely immaterial to the legal questions at issue.

D. **The Enterprise Imposes Rules on the Industry**

20.   After AES left the industry, Smith imposed a set of rules on fire restoration companies that had once competed. Tr. 209, 663, 682; GX 311B ("I make the policy"). These rules came to be known as the "rotation system." Tr. 250-55, 681-82. While the rotation system somewhat evolved over time, the essence of the system was that each fire chaser from each participating restoration company would be allocated one fire in consecutive, rotating order. If a company signed a fire, but it was not their turn in the rotation, they would either hold it for the competitor-company whose turn it was or simply sign the fire on the other company's behalf. Tr. 250-55, 564, 639.

21.   The strictures of the rotation system extended to public adjusters. Tr. 276-77, 684; GX 319. Under this system, public adjusters were supposed to check with Smith (or, later, Jackson once he began running the rotation at Smith's request) before hiring a restoration company. Tr. 278-79; GX 319 (Smith instructing Small to "have someone come slap" a public adjuster, Lou Ortega, in the face). In addition, First Response gave substantial business to Peralta, who received 75 percent to 80 percent of First Response's fires and made more money

through First Response than he had previously. Tr. 684. Furthermore, Smith changed the prevailing fee structure for public adjusters. By law, a public adjuster's fees are capped at 12.5 percent of the loss amount. Tr. 669-70. To get retained by the property owner, adjusters often negotiated a rate lower than 12.5 percent, such as at 4 to 6 percent. Tr. 669-70. However, prior to Smith's entry into the restoration industry, public adjusters routinely got up to 20 percent of the contract by getting a kickback from the restoration company that the adjuster hired. Tr. 669-70. As Smith gained greater control over fires, Smith limited a public adjuster's fee to that specified in the adjuster's contract (i.e., 12.5 percent or less), and kept the kickbacks for himself. Tr. 685.

22. Several features of the rotation system were designed so as to favor Smith and the Enterprise. *First*, fires would be allocated first to chasers from the Enterprise, and only after their quotas had been satisfied would fires be allocated to chasers from the various other participating restoration companies. Tr. 254-55, 564, 881, 1306.

23. *Second*, fires that occurred during the night (i.e., between 8 p.m. and 8 a.m.) belonged to the Enterprise. Tr. 246-47, 883, 1298-99; GX 311F; GX 311G. What this meant in practice appears to have changed over time. At first, after AES was forced out of the industry, First Response appears to have taken AES's place as the dominant force during the nighttime, engaging in intimidation tactics to monopolize nighttime fires. Tr. 247, 1298 (Smith testimony: "Q: But separately, the nighttime belonged to First Response, right? A. That was after the

AES situation."); GX 311F (Smith stating to EFS in June 2020, "Oh, but then listen, the nighttime belongs to us. Point blank. The nighttime belongs to us. Like we really shot it out for the nighttime. The overnight belongs to us."); GX 311G. Later on, once the rotation system became formalized and companies began paying Smith to be a part of the system, there is some evidence that the Enterprise began allocating some night fires through the rotation. Tr. 533, 1301. But critically, the Enterprise retained control over nighttime fires and used them as leverage to ensure members of the rotation system continued paying to participate. Tr. 533 (Jackson testifying: "We [First Response] were signing [fires] for [other restoration companies] because, one, if it was at night, [other restoration companies] wasn't coming out at night. That wasn't happening. So we would sign it for them because they either paid Tiek or had somebody else on the payroll for them that Tiek recommended.").[5]

24.  *Third*, fires that occurred on Staten Island also belonged to the Enterprise. Tr. 248. On one occasion, two chasers from Service Master, "A.J." and "Mark," signed a fire on Staten Island. Tr. 248-249. In response, Smith assaulted A.J. and Mark, and chased down another Service Master worker. Tr. 249. Hasim then signed the fire for First Response. Tr. 249-50; GX 315A (Smith stating: "I beat the whole

---

[5]  To the extent Smith denied monopolizing night fires during trial, his testimony was not credible. For example, when questioned on cross, Smith could offer no plausible explanation for the statement he made to EFS that "the nighttime belongs to us. Point blank. The nighttime belongs to us." GX 311F; *see* Tr. 1298-301.

ServiceMaster up. Me, by myself, I beat the entire ServiceMaster up, and I'm waiting—I'm waiting to catch Patty. I'm waiting—I'm lurking—I'm lurking to catch that n***a Patty. I'm lurking."). On another occasion, a chaser named "Sharif" signed a fire in Staten Island. After Smith threatened him, Sharif backed down and Smith signed the job. Tr. 248-49.

25.    Smith testified that Staten Island fires would be allocated through the rotation system as well. Tr. 1264. This contradicts Jackson's testimony, which the Court found to be more credible on this score. Further, Benjamin Vargas -- whose company was a member of the rotation system -- testified that he was never allocated a fire on Staten Island through the rotation system, which corroborates Jackson's testimony. Tr. 946-47.

26.    For a restoration company to be part of the Enterprise's rotation system, it had to pay Smith or one of his chasers. Tr. 253, 683-84. The companies that paid to be in the rotation system included ServPro Upper West Side ("ServPro"),[6] EFS, Flag, Upper Restoration ("Upper"), East Coast, Service Master and CPR. Tr. 270, 284-90, 1201-11, 1301; GX 649. Some of these payments were made via checks, but

---

[6]    As detailed more fully *infra*, ServPro is a national franchise, with franchise locations throughout New York and elsewhere. Here, however, unless otherwise indicated "ServPro" refers specifically to ServPro Upper West Side, owned by Benjamin Vargas.

many payments were made using cash and still other companies paid Smith by performing work on his family home. Tr. 284-90.[7]

27.    Companies that refused to make payments to participate would be removed from the rotation. Tr. 283, 291-92. Companies that refused to comply with the rules of the rotation system would be subject to threats and intimidation. Tr. 247-49, 283, 565. Restoration companies outside of the rotation system would be subjected to threats and intimidation by Enterprise members when they attempted to chase fires. Tr. 187, 191, 208-09, 252-54, 283. While other restoration companies still did chase outside of the rotation system, the Enterprise did not allow such outside companies to become a major presence. Tr. 253-54 (Jackson testifying that a chaser who came out only occasionally would not necessarily be threatened because "[i]t's only one fire"). As a result of the rules implemented by the Enterprise, and the intimidation tactics it used, the Enterprise signed the majority of fires for First Response. Tr. 252, 564.

E. **The Enterprise Enforces Its Rules Through Violence and Threats of Violence**

28.    Jackson, who the Court found in general to be a highly credible witness, testified at a high level that Smith and Enterprise members used threats and intimidation against restoration companies

---

[7]    Smith points out that Upper restoration company was in the rotation system by at least November 2021, but the financial summaries of payments by Upper show the company did not start making payments via check until April 2022. Smith Summation at 18. However, Jackson testified that Upper paid Smith in cash, which fully explains this supposed discrepancy.

that refused to participate in the rotation system. Tr. 187, 191, 209, 252-54, 283. When Smith directed his crew members to engage in conduct he did not want to be easily traced back to First Response, he told them to wear black. Tr. 315-17, 738, 1131-32; GX 378. In addition to the clashes with AES described *supra* Section I.C, the assault on Service Master described *supra* paragraph 24, and the assault on Peter Rafferty described *infra* paragraphs 62-64, the Government has presented evidence of at least five other specific assaults carried out by members of the Enterprise.

### a. Assault of Phil Navarra

29. Even before the creation of the rotation system, Smith and his co-conspirators began developing (indeed, cultivating) a reputation for violence. In March 2020, Jackson was at the scene of a fire with Phil Navarra, a public adjuster with New York Adjustments. Navarra refused to put First Response on a fire, after which Jackson and Navarra got into a verbal disagreement, which another member of First Response filmed. GX 301, 304; Tr. 209-15, 1248. Jackson relayed the disagreement to Smith. Smith then ordered an individual whom Smith knew named "Teo," a member of the Bloods, to assault Navarra.[8] The assault was recorded, and the video of the assault shows Teo repeatedly

---

[8] Smith testified that assaulting Navarra was Jackson's idea and that it was Jackson who ordered the assault be carried out. Tr. 1248-49. The Court finds Jackson's testimony on this score to be credible. Regardless, even Smith does not dispute that he was aware of, and acquiesced in, the assault before it occurred, and that he offered to share the video of the assault with other industry participants (presumably for its intimidating effect).

punching Navarra, who is seated in a car, in the head. Tr. 215-16, 692-93, GX 305. The reason for the assault, as recounted by Jackson at trial, was that "Phil was . . . trying to stop us from getting fires so . . . [Smith] was tired of it and [Smith] said I got something for him." Tr. 216. Smith acknowledged that he offered to show the video to industry participants, including in a meeting with EFS in June 2020 (discussed *infra*). Tr. 1318-19.

        b. Assault of Thomas Muratore

    30. On September 15, 2020, Smith directed McGee to assault Thomas Muratore, a public adjuster who worked for Friedman Adjustments. Tr. 296-97, 527; GX 316. The assault was carried out at the direction of Smith. Tr. 296-97, 527, 747, 1131, 1245, 1247. McGee directed Pereira to film the assault, although Pereira did not arrive at the scene in time to do so. Tr. 577-78. The assault was carried out to retaliate against Muratore's employer, Jeff Friedman, after Friedman kicked First Response off of a fire. Tr. 693-94, 747-48, 1245-47.[9] Smith chastised Pereira for failing to record the assault and later deducted money from Pereira's paycheck. Tr. 578.

    31. Muratore was 67 years old at the time he was assaulted. Tr. 841. As a result of the assault, Muratore was hospitalized for a night, lost a tooth, cut his lip, and suffered a brain bleed. Tr. 841. In his

---

       [9] Smith disputes that he ordered the assault, testifying that Walsh was the driving force behind the assault. However, Smith concedes that he agreed that the assault should be carried out and that the assault occurred in retaliation for First Response being kicked off a fire. Tr. 1245-47.

34 years as a public adjuster, Muratore had never before been assaulted on the job. Tr. 841.

        c. <u>Assault of Richard McCormick</u>

   32.  Richard McCormick is a public adjuster. Tr. 796. On November 13, 2020, McCormick signed a loss located at 505 East 93rd Street in Brooklyn. Tr. 569-70, 619; GX 313. Pereira approached McCormick and asked whether First Response could be retained as the restoration company. 797-98. McCormick said that he would not retain First Response because there was not enough damage to warrant the retention of a restoration company. Tr. 798. After Pereira told Smith that McCormick would not sign First Response, Smith told Pereira to get McCormick on the phone. Tr. 571. Smith insisted that ServPro would do the restoration work, in an apparent attempt to allocate the fire pursuant to the rotation system. Tr. 798. McCormick told Smith that the loss was too small to justify bringing in a fire restoration company. Tr. 571, 799.

   33.  After Smith spoke to McCormick, Smith called Pereira. Tr. 571. Smith was angry and told Pereira to wait at the scene of the fire for McGee, who was on his way to assault McCormick. Tr. 571. Smith himself admitted at trial that he then told one of his co-defendants to "slap the shit out of" McCormick. Tr. 1242. After McGee arrived in a dark sweatshirt, McGee punched McCormick in the face. Tr. 299; 572. McCormick fell down, striking his face on a pillar. Tr. 572, 800; GX 703, 704. Pereira recorded the assault from the inside of his car at Smith's direction. Tr. 571-72; GX 312, 314. Smith was displeased with

the quality of the video; as a result, Pereira got in trouble. Tr. 573. Smith used the McCormick assault video to intimidate other industry participants. Tr. 322-23, 573.

34. Smith testified that ServPro had already signed the fire that gave rise to this dispute, and that McCormick had in fact kicked ServPro off of the fire. Tr. 1239-41. This series of events is supported by what appears to be a signed retainer agreement dated November 12, 2020 -- the day before McCormick was assaulted -- between ServPro and the owner of this property. *See* DX 417; *see also* DX 200; Tr. 619-20. But even accepting Smith's testimony regarding this series of events (which is contradicted by both Pereira's and McCormick's testimony), that would not change the fundamental import of this assault, which was that McCormick was assaulted for denying a fire to a member of the rotation system.[10]

      d. <u>Assault of Jimmy Johnson</u>

35. Jimmy Johnson is a public adjuster who was assaulted at Smith's direction by Small. Tr. 310-12. Jackson and Smith both agree that the assault occurred, but offer conflicting reasons for it.

---

[10]    Smith testified that McCormick said he would work with First Response (or ServPro) only if Smith gave him an outsized percentage of the overall restoration work. Tr. 1241-42. To the extent it is material, the Court credits Pereira's and McCormick's description of these events, which were internally consistent and attributed McCormick's refusal exclusively to the size of the fire. However, even if the Court were to accept Smith's narrative, that would not excuse the assault.

36. According to Jackson, the assault concerned Johnson's refusal to comply with the rotation system. Jackson testified that, prior to Johnson's assault, Johnson spoke with Jackson. Tr. 310. Jackson told Johnson to put a restoration company, Flag, on a particular job. Tr. 311. Johnson told Jackson that he did not want to put Flag on the job. Tr. 311. Smith then got on the phone and also told Johnson to put Flag on the fire. In response, Johnson hung up on Smith. Tr. 311-12. Smith then instructed Small to have someone assault Johnson, but in the end Small committed the assault himself. Tr. 311-12. Smith later told Small that he should have found someone else to assault Johnson because Small was extremely recognizable (Small stands about seven feet tall and is perhaps over 300 pounds). Tr. 312, 502.

37. Smith testified that the reason for the assault on Johnson had nothing to do with the rotation system. Rather, Smith testified, he overheard Johnson use a racial slur, and, separately, Johnson had given a homeowner a check that should have been given to First Response, and as a result First Response would need to sue the homeowner to recover the funds they were owed. Tr. 1250-53.

38. Having considered the demeanor, motives, and other factors related to the credibility of these two witnesses, the Court finds Jackson to be the more credible, on this score (as elsewhere). Moreover, the Court notes that even if Johnson were assaulted over a business dispute not specifically related to the rotation system (i.e. improperly giving a homeowner money owed to First Response), that would still tend to show the Enterprise's willingness to use violence

to achieve its objectives and would have still served as an "object lesson" for other industry participants in the future.

e. Reiss Lane Assault

39.  First Response had a construction job at a property located at 37 Reiss Lane on Staten Island. Tr. 312-13. Multiple issues arose during the course of construction, including delays and safety issues, and as a result the homeowner threatened to kick First Response off of the job. Tr. 518-19, 1254, 1392, 1394-95. When Smith attempted to address these issues with the construction crew, he apparently got into a dispute with the individuals working there, who were refusing to listen to his instructions. Tr. 1254.

40.  On October 18, 2021, Smith directed Jackson to go to the property. Tr. 314. Lacewell and Dore were also at the property. Once Jackson arrived, Smith told Jackson that the construction workers were not respecting Smith and not listening to him. Tr. 320. Smith directed Jackson to take his First Response shirt off and put on his black clothing. Tr. 315, 320. Jackson and Lacewell both removed their First Response shirts and then returned to the construction site. Tr. 319; GX 706A. A van was parked in such a way to block the construction workers from leaving because Smith did not want the workers to be able to leave. Tr. 320-21. Smith pointed out to Jackson a particular construction worker, later identified by law enforcement as Juan Siguencia. Tr. 321. Jackson, in turn, smacked Siguencia with an open hand. Siguencia began to bleed and suffered a cut on his face. Tr. 321-22; Tr. 541-42.

41.   Smith then demanded ID cards from the workers and photographed the cards. Tr. 322. A photograph of Siguencia's ID card was found on Smith's phone, with a creation date of October 18, 2021. GX 375, 1215. Jackson testified the purpose of taking the photos of these individuals' IDs was so that Smith knew where they lived and could (presumably) threaten them. Tr. 322. Smith, by contrast, testified that the sole purpose of taking these photos was to confirm whether all of the workers were OSHA certified. Tr. 1257. Smith's version of events is at least partially corroborated by Walsh, who testified First Response had issues with work-place accidents in the past and so was focused on ensuring OSHA compliance. Tr. 1087. The Court, however, need not resolve this factual dispute because it has minimal relevance to the case as a whole. Indeed, the only relevance of this entire Reiss Lane incident is that it tends to show the willingness of Smith and members of the Enterprise to use violence to achieve business objectives even with respect to First Response.

F.  **The Enterprise Obtains Money and Business Contracts from Industry Participants Through Violence, Threats of Violence, and Economic Fear.**

42.   The Government has also presented evidence that five specific individuals or entities were extorted by Smith and his co-conspirators. The Court addresses each in turn below.

a. Benjamin Vargas and ServPro Upper West Side

43.   Benjamin Vargas is the owner of ServPro Upper West Side, a franchise of the national organization of ServPro. Vargas has been in the fire restoration industry for 13 years. Vargas's offices are in

Manhattan, and he solicits business in all New York City boroughs. The national organization of ServPro does business in Florida and New Jersey as well as New York. Tr. 876-77, 937-38; DX 213, at 48:00.

44.   In approximately 2020, Smith called Vargas and told Vargas to meet him outside a deli in Staten Island. Tr. 879. Vargas traveled to the meeting with two of his chasers. Tr. 879-80. Once he arrived, Vargas met Smith, who had brought approximately eight to nine people with him, including Jackson. Tr. 880-81. Smith proceeded to tell Vargas the "rules": Smith had all nighttime fires, and priority access to the initial daytime fires each month. Tr. 880-81. Smith further told Vargas that he would not negotiate. Tr. 880. Vargas understood Smith to mean that, if he did not follow Smith's rules, he would not be able to work. Tr. 880-81. Vargas was scared following this meeting. Tr. 881. He had never attended a meeting like this before, and no one had previously told him that he could not solicit fires at night. Tr. 881-82.

45.   Several months later, Smith directed Vargas to meet him at Peter Luger's Steakhouse. Tr. 882. During that meeting, Smith reiterated his rules and told Vargas that, if Vargas wanted to participate in the rotation system, he had to pay Smith $1,000 a week. Tr. 883. During the meeting, Smith told Vargas that if his rules were not followed, he would hurt families and children. Tr. 883-84. Smith offered up AES as an object lesson during this meeting, telling Vargas that AES was not around anymore because they did not follow Smith's rules. Tr. 884. Vargas was scared following the meeting. Tr. 884.

Vargas also testified that, in addition to physical fear, Vargas believed that if he did not accede to Smith's demand, it would negatively affect his business because he would be unable to chase fires. Tr. 969.

46.   Following this meeting, Vargas agreed to pay money to Smith, sometimes in cash. Tr. 286, 885-86.   Initially, he paid Smith weekly payments of $1,000. Tr. 883-84; GX 358, 1209. Vargas also paid Smith a commission on top of the weekly payments. Tr. 888; GX 358. Then, in late 2020 or early 2021, Smith demanded that Vargas increase weekly payments to $2,000. Tr. 890-91; GX 360, 361, 1209. Vargas agreed because he believed that he did not have a choice. Tr. 891. Vargas reasonably believed that if he tried to solicit fires without paying Smith, Smith would hurt him. Tr. 891-92. From November 13, 2020 to June 22, 2022, Vargas paid Smith through bank transfers 82 times, for a total of $141,000. GX 1209.

47.   The focus of the rotation system was Brooklyn, Queens and Staten Island. However, whenever a member of the Enterprise became aware that ServPro had signed a fire in Manhattan, it would be counted against ServPro's quota of fires for that month. Tr. 937-38.

48.   On or about January 14, 2021, there was a six-alarm fire[11] located in the vicinity of 244 Montrose Avenue, Brooklyn. GX 339, 351, 352; Tr. 904. Smith, Dore, Hasim, Jackson, and Pereira went to this

---

[11]   A six-alarm fire refers to a fire where six domiciles are affected. Tr. 581.

fire. Tr. 588, 906. Smith told Vargas that there were multiple fires and that each EMS company could sign one loss. Tr. 905. Mike Rafael Navarro, one of Vargas's chasers (whose children, as discussed *infra*, Smith had previously threatened to kill), signed two contracts with one owner. Tr. 589, 906-07, 933. Smith became mad. Tr. 589, 907. Smith and a group of individuals took Navarro around the corner. Tr. 907. Vargas tried to calm down Smith, and Smith told Vargas, in substance and in part, "do you really think you are going to stop me?" Tr. 908. Sharif, a chaser for Upper Restoration, proceeded to punch and kick Navarro to the ground. Tr. 301, 589-90, 908-09. Smith told Navarro, in substance and in part, "Why would you play games when you know your family is in jeopardy?" Tr. 910. When the police came, several people ran; Sharif had indicated that he was "packing," i.e., carrying a gun. Tr. 909. After they ran away, Smith stated, in substance and in part, that he was a Blood for life, and that he had a bunch of kids ready to make a name for themselves. Tr. 909. Vargas understood Smith to mean that Smith could call someone to hurt anyone who crossed Smith. Tr. 909. After Navarro was assaulted, and at Smith's direction, Vargas ripped up a contract Navarro had signed on behalf of ServPro, and the loss was subsequently assigned to a different company. Tr. 910.[12]

---

[12] Smith denied any involvement in this fight, testifying that he was simply an observer of a dispute between other restoration companies and did not make any of the statements attributed to him above. Tr. 1258-60. The Court credits Vargas' testimony that Smith made threatening statements to Navarro, particularly given that doing so is consistent with other evidence that the rules of the rotation system were enforced through threats and violence. The Court agrees there is no direct evidence that Smith ordered the assault; however, the assault

49.   In approximately March 2022 (after Walsh fired Smith and others from First Response), Smith told Vargas that he had to pay for two First Response chasers, Jackson and a different Jay. Tr. 900-01. Vargas obliged. Tr. 900; GX 1210 ($1,400 per week for Jackson, for a total of $15,400); GX 1211 ($1,000 per week for Zheng Jiang Zhong, for a total of $10,000). Smith represented to Vargas when he hired these two chasers that they would only be signing fires for ServPro, but Vargas was quickly disappointed, as it became apparent they continued to sign fires for other companies. Tr. 940. Vargas did not believe that he had the option to refuse, because if he did, Smith or his crew would hurt him. Tr. 900.

50.   In addition to the amounts that Vargas paid Smith, Jackson, and Jay (approximately $166,400), Vargas further estimates that he lost between $500,000 to $600,000 in business income per year during the course of the rotation system. Tr. 903.

b. Jordan Boryk and EFS

51.   Jordan Boryk is the owner of EFS, a restoration company. Tr. 188. In approximately June 2020, Smith convened a meeting between EFS and First Response. GX 1215 (entry for GX 310); S6, GX 311A-H. Boryk and other EFS workers, including the same Mike Navarro who was later assaulted as described above, attended on behalf of EFS. Tr. 187-188. Smith brought Jackson, Hasim, Jay, Perez, and Pereira to the meeting.

---

was plainly carried out to further the broader goals of the conspiracy (i.e. to enforce the rotation system).

Tr. 188. During the meeting, which was held in a parking lot, Smith paced around in front of EFS, taking out his cellphones from his pockets and removing his watch, as if he was trying to get ready to fight or intimidate someone. Tr. 190.

52.   Smith himself recorded that meeting, during which he made the following threats:

a. "When anybody is ready to put on a vest and get a gun, they come on out and play, man. Come on out and play, man, like, but Santos don't you ever call and talk like that again, n***a. Santos. I will pick you up and slam you on your fucking head if you ever call me and talk to me like that again, B." GX 311A, 00:30-00:48.

b. "Get your fucking guns and come out and play because I ain't going to be diplomatic." GX 311A, 2:28-2:31.

c. "Y'all wanna fight it out or shoot it out?" GX 311A, 03:19-03:21.

d. "Mike [Navarro], did we not get your address, Mike? And I told Mike in his face I'll kill that n****'s kid. Y'all, n****s play with me, I'll kill one of your kids. I'll kill one of your kids just to send a message, B. To send a message. Who the fuck y'all n****s think y'all playing with? I'm not a sucker. Y'all n****s think this fire chasing business is something. I'm a gang member. I been gang banging for years, n****. I'll kill one of you n****s to send a message. That's the messages I send, man." GX 311A, 03:59-04:20.

e. "Like I said, if a n***a wanna get busy, I am willing to get busy. Like, I'm willing to get busy. I'll willing to fight. Fuck that nobody n***a don't pick nobody -- I'm willing to fight, get it on, shoot it out, anything, myself, B." GX 311C.

f. "I got ego problems, and I—I don't pretend about it. I got ego problems. I'm willing to clash with anybody's ego to see who's bigger. I'm willing to do it. I'm willing to do it. I'm willing to take the risk. I did 16 years of prison time to show I'll take that risk." GX 311E.

53.   During this meeting, Smith explicitly referenced the assault of Phil Navarra, discussed *supra*:

a. "Man, we sat there, and we solicited that shit for three hours and got it. All right. New York did what they did, but now we see New York is playing ball cause when I catch them old n****s, them old n****s gonna get it, too. Them old n****s gonna get it, too. Nobody's exempt from none of this, man." GX 311D, 00:20-00:33.

b. "Like who was there, you was there when we got Navarra beat up right? Phil Navarra?. . . I'll send you the video. Like, it's still reflect on ya'll. It will still reflect on ya'll if ya'll think like with that same shit where they caught the fire and kicked us off. We're not gonna do it. Let's not have that— let's not have that again." GX 311H, 01:45-02:04.

54.   During this meeting, Smith acknowledged -- both directly and by implication -- that he had established rules for the industry that

EFS was required to comply with. Early in the conversation, Smith denied the allegation, apparently leveled by an EFS employee, that First Response prohibited EFS from getting *any* fires, thereby implicitly conceding that there were *some* restrictions on EFS obtaining fires. S*ee* GX. 311A. Smith repeatedly made clear that he was the one who made the rules. *See* GX 311B, at 1:30-34 ("For everyone standing here, whatever I say is gonna go. Whatever I say is gonna go."); GX 311B, at 1:45-51 ("None of them standing here makes policy. I make the policy, that's it."). And Smith explicitly referenced the rule that only First Response could chase fires at night. GX 311F ("Oh, but then listen, the nighttime belongs to us. Point blank. The nighttime belongs to us. Like we really shot it out for the nighttime. The overnight belongs to us."); GX 311G ("That is not a negotiation. That is not a talk. That is not a conversation. The night truly belongs to us . . . and we willing to make that understood. The night belongs to us.").

55.   EFS attendees looked shocked, scared, and nervous during the meeting. Tr. 192, 580, 1308. Furthermore, when testifying about this recording, Smith acknowledged that he used threats involving guns, his gang membership, and threats to kill children of industry participants. Tr. 1308-10, 1339; 1342; 1349-50. Smith acknowledged that he wanted EFS to understand that, if they upset Smith, there would be violent repercussions. Tr. 1309-11.

56.   In addition to the June 2020 meeting described above, Boryk was threatened by Smith on other occasions. Tr. 285. For example, Smith told Boryk, in substance and in part, "I'm not asking you,"

which Jackson understood to mean that Smith was demanding something from Boryk. Tr. 285. Jackson also stated that Boryk appeared scared during some of his interactions with Smith. Tr. 286. In addition, on one occasion, Smith screamed in front of Peralta, "go shoot Jordan [referring to Boryk]." Tr. 695-96.

57.    From October 2, 2020, to March 26, 2022, Boryk paid Smith on 82 occasions, for a total of $198,546.44. GX 1202. With some exceptions, these payments started as weekly payments of $1,000, which increased in or around January 8, 2021, to $2,000. Beginning on April 15, 2022 until June 25, 2022, EFS paid Anthony McGee weekly, for a total of $12,000. GX 1201.

### c. Willon Charles

58.    Willon Charles is a public adjuster for Maximum Adjustments. Tr. 302-03. On the evening of May 24, 2021, Smith, Jackson, Small, Lacewell, Dore and others met Charles at the site of a fire in Queens located at 123-16 145th Street, Jamaica. GX 353A, 353C; Tr. 865-66. Smith wanted to approach Charles about money that Charles owed Smith for other fires. Charles owed Smith this money because Smith expected adjusters whom Smith had put on fires to give Smith a portion of the contract fee that adjusters traditionally negotiated for themselves. Tr. 306-07, 864-66. Furthermore, Smith was upset at Charles about the Queens fire because Charles had charged the maximum 12.5 percent fee. Tr. 306.

59.    Peter Rafferty, an employee of Charles, arrived at the scene during this confrontation between Smith and Charles. Rafferty

recalled that there was a large group of workers at the fire, whom he understood, based on their uniforms, to be affiliated with First Response. Tr. 865. When Rafferty got to the fire, he saw Charles standing outside the property in a circle with a smaller group.

60.    As Rafferty approached the group, the conversation between Charles and Smith had become heated. Tr. 308. Charles told Rafferty to go home. Tr. 308. Smith then proceeded to place Rafferty in a headlock. Tr. 308, 867. As Smith put Rafferty in a headlock, Smith said, "Nah, he [Rafferty] got to go nowhere. He's gonna hear the bullshit you about to say." Tr. 308. Smith also told Charles, in substance and in part, "I'll punch your fucking head off right now." Tr. 308. Rafferty, who did not recall the specific things that were said, was fearful and in shock. Tr. 868

61.    While Rafferty was in a headlock, Charles told Smith that he was going to pay Smith and give Smith a percentage of the fire at which they were currently present. Tr. 308-09. On April 25, 2022, a business account for 22 Maximum LLC paid Solid Smith $15,000. Payments from insurance companies take between weeks to months to years, explaining this delay. Tr. 309, 670-71.

             d. Queens Village Fire

62.    Public adjuster Richard McCormick went to a fire in Queens Village in approximately April 2021. Tr. 808. McCormick had been called in by a restoration company called iFlood. Tr. 808-09. The homeowner for the loss agreed to move forward with iFlood, and McCormick was speaking to the homeowner to sign as the public adjuster. Tr. 809.

Shortly thereafter, Jackson, Walsh, Smith, and many other First Response workers arrived. Tr. 809-12. Jackson told iFlood that iFlood needed to rescind its contract. Tr. 810. As a result, iFlood lost the job. Tr. 810. Shortly after this, McCormick approached Walsh to ask him what had happened with iFlood. Tr. 811. During this conversation, Smith approached McCormick and was hostile and angry. Tr. 1125. Smith told McCormick that Walsh was not in charge, and Walsh agreed that he was not. Tr. 812, 1125. Smith also told McCormick that the loss was Smith's. Tr. 1125. McCormick left the fire because he was feeling angina in his chest. Tr. 812.

### e. The Mala Sangre Incident

63.  Pereira reported to a six-alarm fire that had multiple losses to sign. Tr. 581. Pereira did not sign any losses, and understood that a general contractor, who spoke Spanish, had control over assigning contracts for the restoration work. Tr. 581. Smith then arrived at the scene of the fire and spoke to the general contractor. Tr. 581. Smith, using intimidating and aggressive body language, asked the general contractor if the contractor knew who Smith was. Tr. 582. Then Smith proceeded to tell the contractor his gang name, Bad Blood, in Spanish -- mala sangre. Tr. 582. Pereira reported that the contractor appeared shaken, and that as a result the contractor assigned the contract for the loss to Smith. Tr. 581-82.

### G. **Insurance Fraud**

64.  The vast majority of work performed by First Response and other restoration companies is paid for by insurance companies. If

insurance companies do not pay for any restoration work, as a practical
matter that work will frequently go uncompensated, as home owners are
rarely in a position to pay. Restoration companies such as First
Response therefore have a strong financial incentive to ensure any
insurance claim is accepted. Tr. 331-32, 560, 677-78.

65.   Typically, homeowner insurance policies have coverage
exclusions pursuant to which an insurance claim for fire damage will
be denied if certain prohibited or illegal conditions are present on
the property. Tr. 331-32, 676-77, 722. For example, coverage might be
denied if a homeowner had an illegal stove in the attic or basement,
or if they had a second unit -- such as a rented-out furnished basement
-- in what was supposed to be a single-family home. Tr. 331, 676-77.
Such illegal conditions are frequently concealed from insurance
carriers by, for example, removing the offending stove. Tr. 678, 1066.
As a result of this practice, insurance carriers wind up paying money
to homeowners to which the homeowners are not entitled, which also
impacts the money received by the fire restoration companies serving
these homeowners. Tr. 678.

66.   When First Response, under Smith's leadership, saw illegal
conditions in a property, at times it used the fact of those conditions
as a tool to get Peralta retained. Tr. 677-78, 680; GX 108 (Peralta
to Jackson: "You need Mariano to come down and close it, huh?").

67.   When First Response, under Smith's leadership, saw an
illegal condition that could interfere with an insurance claim,
employees would remove or effectively cover-up that condition and

conceal it from the insurance carrier. Tr. 332-33, 677-78; GX 320, 321, 457, 458. First Response engaged in this fraudulent practice on multiple occasions. Tr. 333, 561; GX 457, 458. For example, photos of the property, with the stove removed, would be sent to the insurance companies, and deceptive claims would be filed. Tr. 561. Public adjusters who worked with First Response, such as Peralta, would communicate with insurance companies by email, fax, or private mail carrier. Tr. 666, 732-33.

68. In one instance, a Chinese homeowner rented a home to a Muslim family. The policy did not permit rentals. Jackson concealed the problem by, for example, adding a Chinese calendar and adding photographs of the Chinese family to make it look as if the Chinese homeowners, instead of the Muslim family, lived there. The claim was paid by the insurance carrier. Tr. 333.

69. Smith was aware of and, at least at times, involved in the covering up of illegal conditions. Tr. 332-33 (Jackson testifying he learned about covering up illegal conditions from Walsh and Smith); GX 320 (Smith texting Walsh stating "need the stove taken out of the basement"); GX 321 (similar); GX 457 (recorded conversation where Smith states: "They trying to say that we, that we tampered with, um, the conditions of a fire. That didn't happen every single fire, n***a. In a year, that was probably two fires. That's not a pattern. That is not a pattern."); GX 458 (recorded conversation where Smith states: "God forbid we blow trial to the wire fraud? Because I—I keep telling

everybody that is only thing I could truly see because n***as was moving stoves out.").

**H. <u>Obstruction of Official Proceeding</u>**

70.  By November 11, 2021, a grand jury investigation was pending in the Southern District of New York. Tr. 132. In approximately November 2021, Smith and his crew learned that there was a federal investigation into their activities. Tr. 339-40; GX 116 (November 12, 2021 call where Jackson tells Lacewell "they tryin' to indict n****s").

71.  On November 10, 2021, Gerry Curcio, the owner of Cipco, a "board-up" company (a kind of restoration company), contacted Jackson. Tr. 339. At First, Curcio used an intermediary to call Jackson ("Gerry needs to talk to you in person and not over the phone and shit."), but then Curcio spoke to Jackson directly and told Jackson that he was "paid a visit" but didn't "want to talk on the phone." Tr. 339-40; GX 111, 112, 113. Curcio, Smith, and Jackson met later that day, and Curcio told them that federal law enforcement had visited Curcio. Tr. 339-341. Curcio had told law enforcement that he was not being extorted. Tr. 689.

72.  Smith requested to be interviewed by Detective Nick Geroulakis and voluntarily met with him. GX 1000A-D. During the interview, which took place on November 11, 2021, Smith indicated that there had previously been violence in the industry, but claimed that he had stopped the violence because other companies' tactics of intimidation did not work on him and that he was able to deter other companies' violent tactics through Smith's own reputation for

violence, including that he was a member of the Bloods. GX 1000B-C. With regard to the ongoing state of the industry, Smith specifically stated "There's no fighting no more" and "I stopped every single problem. There's no fights. There's no arguments. If you get there first now, you get there first and you go do your thing." GX 1000B.

73.  Later in November, Smith hosted a dinner at Baci, a restaurant on Staten Island. Tr. 343. Several members of First Response, including Jackson, Jay, Hasim, and Dore attended, as did representatives of other companies in the industry, including Curcio from Cipco, Bobby Sands from Flag, and Vargas from ServPro. Tr. 343-44; 912-13. Attendance at the dinner was mandatory. Jackson also assisted Smith in organizing the dinner. Tr. 344. In front of these individuals, Smith toasted Curcio for "not lying," doing "some standup shit," and for "stepp[ing] up when the cops approached him [Curcio]" and "going back to tell him [Smith]." Tr. 344, 688-89, 912-13. No threats were exchanged during this dinner. Tr. 506 (Jackson testifying that he did not recall threats being exchanged at this meeting); Tr. 751 (Peralta testifying to same).

74.  Sometime after the Baci dinner, Smith held another mandatory meeting in a parking lot outside a Toys "R" Us. Tr. 345, 918, GX 517. The attendees were told to leave their phones in their cars. 917-18. Beyond this, there is conflicting testimony about what occurred at this meeting. In Vargas' telling, Smith said, in an angry tone, "the only reason all of these guys were there was just to stop him [Smith] from killing one" of the meeting participants and that Smith referenced

having guns in connection with this threat. Tr. 917-18. Vargas testified he was nervous because, by that point, Vargas had already begun speaking with the FBI. Tr. 917. Vargas's testimony is at least partially corroborated by Jackson, who recalled that members of other mitigation companies looked shocked and nervous during the meeting. Tr. 347.

75. Vargas's testimony is inconsistent, however, with that of several other individuals who attended this meeting. Smith denies making this threat. Tr. 1271. Peralta testified that he did not hear Smith threaten anyone during this meeting. Tr. 751.[13] Sands -- who according to Jackson was present at the meeting -- testified that he had never been threatened by Smith or felt intimidated at any of these monthly meetings. Tr. 346, 1412-14. Jackson did not recall this threat being made; the only statements Jackson recalled from this meeting were Smith saying he did not know whom he could trust, and that Smith was going to pat down people at the meeting to see if they were

---

[13] There is some ambiguity about whether Peralta is referring to the same meeting. In offering this testimony, Peralta did not refer to a meeting in a Toys "R" Us parking lot, but instead a meeting in May 2022, whereas Vargas and Jackson did not provide a specific date for the meeting, instead referring to it only by location. Several facts in the record support the inference that this was the same meeting, including (a) Peralta had testified earlier he had attended a meeting in a Toys "R" Us parking lot at some point, Tr. 689; (b) Peralta was a regular attendee at these monthly meetings Tr. 689, 742-43; (c) defendants were arrested in June 2022 and Vargas referred to this Toys R' Us meeting as the "last" meeting, Tr. 912; and (d) Smith testified the Toys "R" Us meeting occurred "a month before" the defendants arrest in June 2022, Tr. 1360. Accordingly, the Court concludes Peralta was referring to the same meeting.

cooperating with the government and wearing a wire. Tr. 346-47. Further, whereas Vargas said Smith brought "all of these guys" to restrain him, Jackson testified that he and Smith were the only members of First Response present at the meeting. Tr. 346, 918. Having reviewed the record as a whole, the Court finds the Government has failed to prove beyond a reasonable doubt that Smith made the threatening statements described by Vargas during the meeting at Toys "R" Us.

76.   Smith and Jackson also discussed the investigation with Walsh. Before learning that Walsh was speaking with federal investigators, Smith directed Walsh to meet Smith in Smith's car. Tr. 1133-34. During this encounter, Smith did not speak to Walsh; rather, they communicated by typing out messages on a cellphone, which they passed back and forth. Walsh felt nervous during this meeting. Tr. 1133-34. Smith had previously told Walsh about times that Smith had been violent, including an instance where Smith claimed that he had assaulted one of Smith's ex-bosses. Tr. 1134.[14]

77.   Smith eventually tricked Walsh into revealing that Walsh had spoken to law enforcement. Tr. 348-49. After learning this, Smith told Walsh that they "should stick together," which Walsh understood to mean that he should not speak with the FBI. Tr. 1095-96. However,

---

[14]   Smith testified that the fight with his ex-boss was actually a fight with his brother, who was his manager at Amazon at the time, and that the fight was the result of a purely interpersonal dispute. Tr. 1155-57. However, Walsh testified that he was unaware that the assault was against Smith's brother. Tr. 1142.

Smith did not threaten Walsh and did not tell Walsh to lie or exaggerate to the FBI. Tr. 1095-96.[15]

78.   On March 11, 2022, Jackson went to Walsh's home at Smith's direction. Tr. 349-50; GX 901. Their plan was to see if Walsh answered: if he did not, they thought there was a greater chance that Walsh was cooperating. Tr. 349-50; GX 901. Walsh was frightened by this incident, and temporarily moved his family out of their home. Tr. 1137-38.

79.   Jackson testified that he was told by Smith, while they were incarcerated together after being arrested in connection with the instant case, that if Walsh cooperated, members of the Bloods knew where Walsh lived and would go to his house, beat him up, or threaten him. Tr. 360. The record contains no indication that this threat was conveyed to Walsh, either before or after Jackson and Smith were arrested. The record similarly contains no indication that this plan was concocted before the arrest occurred.

80.   After Jackson and Smith were arrested, they were bunkmates at the Metropolitan Detention Center ("MDC"). Together they discussed their trial strategy. While at the MDC, Jackson and Smith prepared a timeline of fabricated events, which Smith instructed Jackson to study.

---

[15]   Walsh also recounted an incident where Smith grabbed Walsh's phone from Walsh's hand, and texted Walsh's lawyer that he should contact Smith's lawyer. Walsh testified this encounter made him feel nervous. Tr. 1135-36. As the Court noted on the record at trial, absent very unusual circumstances that are not present here, a request of one witness or suspect to have another witness's or suspect's lawyer talk with his lawyer is proper, and to suggest otherwise would chill a normal form of defense communication.

Jackson understood that he was instructed to study this fabricated timeline so that he could lie in court. Tr. 352-54; GX 461, 905. While drafting the timeline, Jackson would recount an event that actually occurred, and Smith would respond with an exaggerated and false version of the event for Jackson to write down. Tr. 355. Jackson understood the purpose of this false testimony was to minimize Smith's violence. Tr. 355.

81.   While at MDC, Smith told Jackson numerous lies that Smith intended to introduce at his trial. For example, for the Reiss Lane assault, Smith said he would argue that they took photographs of construction workers' IDs not for intimidation, but for OSHA purposes. Tr. 356. According to Jackson, this was not true: the photographs of ID cards were taken for intimidation. Tr. 356. With respect to the Muratore assault, Smith wanted to argue that Muratore was punched because Muratore had a gambling problem. Tr. 357. To that end, at the time of the assault, McGee told Muratore "Pay my fucking money," so that the assault seemed unrelated to First Response. Tr. 357. Jackson, however, did not believe that Muratore's assault had anything to do with a gambling problem. Instead, Jackson understood that Muratore was assaulted because he did not give First Response a fire. Tr. 296-97, 357. Regarding the McCormick assault, Smith intended to argue that Walsh, not Smith, sent a hit out for McCormick. Tr. 358. According to Jackson, this was not true, because Smith had ordered the assault on McCormick. Tr. 358. For the Jimmy Johnson assault, Smith wanted to argue that Johnson was assaulted because Johnson tried to show Smith

child pornography. To Jackson's knowledge, this was not true. Tr. 358-59. And with respect to Walsh, Smith told Jackson that if Walsh cooperated, Smith would attempt to put all the blame on Walsh and say that Walsh drove all the violence. Tr. 359-60. Jackson did not believe this was true, either. Tr. 360.

82.   Smith also attempted to reach out to witnesses he believed to be cooperating. For example, Smith speculated that Peralta was cooperating and attempted to call him. Tr. 363, 689-90; GX 462. Smith also told Peralta's associate, Quentin, that Smith was disturbed to hear that Peralta was cooperating. Tr. 690-91.

## II.   Conclusions of Law

Applying the forgoing factual findings, the Court makes the following conclusions of law:

### A. Venue

As a threshold matter, Smith challenges the propriety of venue in this district. Smith Summation, at 35. A criminal defendant has the right to be tried in the "district wherein the crime shall have been committed[.]" U.S. Const. amend. VI; *see* Fed. R. Crim. P. 18. Where an offense implicates more than one location, venue is proper "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). In general, "venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003).

"Venue is proper for conspiracy charges in any district in which an overt act in furtherance of the conspiracy was committed." *United States v. Lange*, 834 F.3d 58, 70 (2d Cir. 2016) (internal quotation marks omitted). To support venue, an overt act need not be criminal and "can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." *Id.* Telephonic or electronic communications to or from the venue in furtherance of the conspiracy can also support venue. *Id.* The Government need only prove venue is proper by a preponderance of the evidence. *Id.* at 69.

Although venue need only be established by a preponderance of the evidence, here the Government has proved overwhelmingly that venue is proper in this judicial district.  For example, ServPro, which as explained below was a victim of the alleged conspiracies, was based on the Upper West Side of Manhattan. Findings of Fact ("FoF") ¶ 43. Communications in furtherance of the conspiracy were sent to and from there, as were payments made from Vargas. At a bare minimum, it was readily foreseeable that these communications and payments would touch Manhattan, given that ServPro was based there. *See* FoF ¶ 46.  In addition, Vargas credibly testified that fires ServPro signed in Manhattan would be counted against ServPro's quota pursuant to the rotation system, demonstrating the extortionate conspiracy extended to this District. FoF ¶ 47. Finally, there is evidence that, at various times, First Response chased fires in Manhattan and the Bronx. FoF ¶ 5.

**B. <u>Extortionate Conspiracy</u>**

One of the two counts lodged against Smith is that at some time between 2019 and June 2022 he joined in a conspiracy to commit extortion in violation of the Hobbs act. *See* Indictment (Dkt. 2) ¶ 13. "In order to prove a conspiracy in violation of 18 U.S.C. § 1951 ('the Hobbs Act'), the Government must show that two or more persons entered into an agreement to commit the substantive offense as charged." *United States v. Zhou*, 428 F.3d 361, 370 (2d Cir. 2005); *see also United States v. Clemente*, 22 F.3d 477, 480 (2d Cir.1994) ("In order to establish a Hobbs Act conspiracy, the government does not have to prove any overt act."). The substantive offense of Hobbs Act extortion, in turn, has three elements: first, that the defendant wrongfully obtained the property of another; second, that the defendant obtained this property with the victim's consent but that this consent was induced by the wrongful use or threat of force, violence or fear (including fear of violence or economic loss); and third, that as a result of these actions, interstate commerce was delayed, obstructed or affected in any way or degree. *See Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 400-03 (2003); *Stirone v. United States*, 361 U.S. 212, 218 (1960); *United States v. Gotti*, 459 F.3d 296, 324 (2d Cir. 2006).

"[I]ntangible property can qualify as extortable property under the Hobbs Act regardless of whether its exercise, transfer, or sale would be legal." *Gotti*, 459 F.3d at 325. Thus, extortable property can include, for example, the right to operate a business or solicit future

business in a particular geographic area. *See, e.g., United States v. Tropiano*, 418 F.2d 1069, 1072-75 (2d Cir. 1969) (holding that "'the right to do business' in the Milford area" was "property" within the meaning of Hobbs act); *United States v. Cain*, 671 F.3d 271, 282 (2d Cir. 2012) (affirming *Tropiano* is still good law and upholding Hobbs Act conviction where defendant used violence in an attempt to "induce his competitors to cede their right to solicit business to" the defendant).

The <u>first element</u>, requiring the consensual transfer of property, is here plainly satisfied. The property in question took one of three forms. First, Smith, acting through the Enterprise received, or attempted to obtain, direct monetary payments from all of the victims. *See* FoF ¶¶ 26, 46, 57, 61. Second, Smith, acting through the Enterprise, took business contracts from certain victims, in the form of fires that had already been signed by a company but were then transferred to another. *See* FoF ¶¶ 20-25. Third, Smith, acting through the Enterprise, took, or attempted to obtain, the right to solicit business in particular areas and at particular times from certain victims. *See* FoF ¶¶ 18-19, 22-25; *see also Tropiano*, 418 F.2d at 1072-75.

The <u>third element</u>, requiring some effect on interstate commerce, is also satisfied. ServPro, for example, is a national franchise with locations in at least New York, New Jersey and Florida. FoF ¶ 43. Further, the insurance companies making the payments were frequently

located out-of-state or had operations that were national in scope. FoF ¶ 5.

It is the <u>second element</u>, requiring that the transfer of property have been induced by the wrongful use or threat of force, violence or fear, that Smith chiefly disputes. Of course, since the charge is conspiracy, the Government does not have to prove any actual instances of such extortion but only an agreement which Smith joined to commit such extortion. But in fact the Government has proved numerous instances in which Smith and his co-conspirators confirmed their agreement by actually carrying out such extortion. Specifically, of the six specific instances in which the Government alleges that Smith and his co-conspirators carried out such extortions, namely the alleged extortions AES (McKenzie), ServPro (Vargas), EFS (Boryk), Willon Charles, iFlood, and an unnamed contractor during the "mala sagure incident," the Court finds the Government has proven beyond a reasonable doubt that the first four extortions occurred in furtherance of an agreement-to-extort entered into by Smith and his co-conspirators. Specifically, the Court concludes as follows:

a. <u>AES</u>

The Government has proven beyond a reasonable doubt that Smith and his co-conspirators agreed to extort McKenzie and AES in at least two respects. First, Smith and other members of the Enterprise attempted to extort McKenzie and AES by demanding that AES pay $100,000 to continue chasing fires. FoF ¶¶ 15-19. While there is no evidence as to whether AES actually made this payment, the fact that it was

demanded, when combined with the other evidence in the record, supports the existence of a conspiracy to extort money from AES.

Second, Smith and his co-conspirators successfully extorted AES by forcing them out of the fire chasing business, and thereby obtaining the right to chase in the areas where they were previously chasing, and by obtaining the business contracts they otherwise would have obtained. *See* FoF ¶ 18-19; *see also Tropiano*, 418 F.2d at 1072-75 (concluding the right to conduct and solicit business in a particular area constituted extortable property). Accordingly, the Court concludes that Smith and other members of the Enterprise agreed to extort AES.

In his written summation, Smith goes to great lengths to claim that AES was the aggressor in this conflict and that he was simply responding to their violence. Smith Summation, at 4-10. But even assuming *arguendo* that Smith initially was simply responding to AES's own allegedly violent tactics, that fact is of minimal relevance to the question of whether AES was itself eventually extorted. For example, the record unequivocally demonstrates that First Response was willing not only to meet AES's alleged violence, but also to exceed it. Smith admitted during his testimony that he obtained the personal addresses of AES workers, told the AES workers of that fact, and threatened to kill their families. Tr. 1235-36; GX 311A. Several witnesses who were victims of First Response's violence and intimidation testified that they had never experienced violence from AES. Tr. 830-31, 945-46. Indeed, when Smith met with detective

Geroulakis, Smith made the following statement regarding AES that the Court finds telling: "I'm not what they are. Like, I'm a criminal trying to work and stay home. They was just regular fucking civilians trying to be criminals." GX 1000B.

It was virtually undisputed at trial that AES stopped chasing fires after these events occurred. Smith offers no plausible alternative explanation for AES's exit, and in his summation relegates discussion of this question to a single, highly speculative footnote. Smith Summation, at 10 n.6. The Court concludes beyond a reasonable doubt that AES exited the industry as a result of violence and threats of violence perpetrated by Smith and his co-conspirators. *See* FoF § I.C.

### b. Members of Rotation System

While AES was forced out of the industry, other companies were also extorted by being forced by threats to join the rotation system that Smith created and controlled to his benefit. As detailed more fully in the Court's findings of fact, *supra*, the Government has put forward multiple kinds of evidence demonstrating Servpro and EFS were also coerced into participating in the rotation system, to their economic detriment and to the advantage of Smith and his co-conspirators.

Indeed, the very structure of the rotation system, which was designed to favor First Response and the Enterprise over other participants, supports an inference of coercion. First Response received the first fires each month, received all of the fires in

Staten Island, and monopolized fires that occurred at night. *See* FoF ¶¶ 22-25. It is unclear why an industry participant would voluntarily agree to such a system, let alone pay to participate in it, when it is so heavily skewed in favor of its competitor. As a result, after AES was forced out of the industry First Response was signing the majority of fires. FoF ¶ 27. While Smith disputes that he monopolized night fires and Staten Island fires, the Court finds the Government's evidence on this score totally persuasive.

Smith argues that the purpose of the rotation system was to reduce conflicts between competitors and to ensure that all chasers got a minimum number of fires each month. Smith Summation, at 16-17.[16] But the fact these were among the stated purposes of the rotation system does not respond to the skewed nature of the system. Nor can it explain or justify the evidence of threats and violence used to enforce the system, as further discussed below. Offering up these benign explanations for the rotation system is akin to a mobster calling extortion payments "protection money."

Smith also argues that the payments he received were not made in connection with the rotation system but were instead payments for Smith's fire chasing services. Smith Summation, at 18-19. The Court finds this explanation to be totally implausible. *See* FoF ¶ 26. Smith admitted at trial that Smith was receiving payments from at least five

---

[16]   As noted at trial, the fact that this might constitute an antitrust violation is entirely irrelevant to the issues before the Court here.

companies at once -- ServPro, Service Master, East Coast, Upper and Flag -- while also being paid his $118,000 salary from First Response. Tr. 1293, 1301, 1303. The notion that these payments had nothing to do with the rotation system, and Smith was just such a good chaser that it was otherwise worth it for all these companies to pay him, cannot be credited. Smith may well have described these payments as a "salary" for chasing fires, but that label cannot be allowed to obscure the economic reality that they were also payments forced on these competitors by the Smith-skewed rotation system. Indeed, Peralta testified at trial that the way a restoration company would, under duress, become part of the rotation system was "hire Tiek or one of Tiek's guys as a chaser." Tr. 684.

When testifying at trial, Smith nonetheless insisted that any fires he or his crew signed pursuant to these bonus payments were outside of the rotation system, were not counted towards the rotation, and were distributed directly by Smith. Tr. 1301-04. But the notion that fires were being allocated wholly outside of the rotation system undercuts Smith's own account of the purposes of that system -- reducing competition amongst restoration companies and evenly allocating fires between them. And even if Smith's testimony on this score were credited, that would still support a finding that rotation system members were being extorted: the exclusive power to allocate fires outside of the rotation system that Smith claims he possessed would itself have been a means for Smith to monetize his control over the rotation system, because only by paying Smith could rotation system

members increase their total number of fires. Accordingly, whether one labels the payments as fees to participate in the rotation system, as Jackson credibly testified was the case, or as compensation for Smith's chasing services, the result is the same: Smith was extorting rotation system participants to pay him in exchange for fires.

Further, even if (contrary to fact) the Court were to conclude these payments were not themselves a direct result of extortion, the Court would still find that members of the rotation were deprived of the opportunity to chase fires at night and in Staten Island as a result of threats and intimidation. *See* FoF ¶¶ 22-25. As with AES, the coerced surrender of the right to chase fires itself constitutes an act of extortion.

The simple fact is that the Government has put forward substantial evidence that violence and intimidation by Smith and his co-conspirators were used to enforce the rotation system. Jackson, who was Smith's second in command and whom the Court found to be a highly credible witness, testified that threats and intimidation would be used against competitors who initially declined to join the rotation system, and that threats and intimidation were also used to enforce the rotation system rules for those who had joined. FoF ¶¶ 27-28. Indeed, the Government presented evidence from numerous witnesses of at least six specific acts of intimidation carried out by Smith and his co-conspirators against participants in the industry, in addition to the violence against AES described above. FoF ¶¶ 11-19, 24, 28-38, 58-60. These include the threats or acts of intimidation directed at

Navarra, Muratore, McCormack, Johnson, A.J. and Mark from Service Master, and Rafferty.[17]

Smith argues that the Government has not put forward any evidence of physical assaults against members of the rotation system. Smith Summation, at 19-20. Aside from totally being untrue -- for example, Smith previously assaulted two Service Master chasers who signed a fire in Staten Island (Smith's territory) and an employee of Vargas was assaulted by a rotation system member when he violated the rotation's rules, *see* FoF ¶¶ 24, 56-60 -- proof that members of the rotation were actually physically assaulted is unnecessary. The critical question is whether members of the rotation system were threatened or intimidated in furtherance of an extortionate conspiricy. As described more fully below, the Government has presented credible evidence that both ServPro and EFS were threatened by Smith. *See* FoF §§ I.F.a-b. Further, the imposition of the rotation system occurred right after First Response forced AES out of the industry through the use of violence, a fact that would no doubt have been on the mind of any industry participant approached by Smith.[18]

---

[17]    While the Government has also proven that an assault occurred at Reiss Lane, it is not clear the extent to which that assault was tied to the purposes of the conspiracy.

[18]    Indeed, when threatening both EFS and ServPro, Smith made specific reference to AES. GX 311A ("AES is not out here. Nobody -- if I'm not capitalizing, if I'm not capitalizing off it, nobody's capitalizing off it."); Tr. 884.

Further still, the evidence of specific assaults against public adjusters, even if not directly against rotation system members, is also highly relevant. Smith attempts to waive these assaults away because they did not involve specific acts of extortion. Smith Summation, at 11-12. But even assuming *arguendo* that these specific assaults were not extortionate, they nonetheless support the inference that the charged conspiracy exists. All of these assaults directly relate to the Enterprise's core purpose of dominating the fire restoration industry: McCormick and Johnson were assaulted because they refused to give fires to members of the rotation system, Muratore was assaulted because his employer kicked First Response off a fire, and Navarra was assaulted because he refused to work with First Response. *See* FoF §§ I.E.a-d. Not only does this demonstrate a willingness of the Enterprise to use violence, but the assaults also served, along with the recordings of them, to bolster Smith's and the Enterprise's reputation for violence amongst rotation system members and thereby assist in the Enterprise's extortion attempts. Indeed, the only plausible reason for Smith to have directed that multiple of these assaults be recorded is to use the recordings for intimidation. *See* FoF ¶¶ 29, 30, 33.

Finally, Smith argues that there is insufficient evidence to show that companies that remained outside of the rotation system were threatened or intimidated, which he argues is needed to show rotation system members were coerced into participating. Smith Summation, at 16-17. Aside from being a *non-sequitur*, since there could be any number

of reasons why Smith and his co-conspirators might choose not to threaten some competitors (such as that they were inconsequential), this argument is contrary to the evidence, for Jackson testified that threatening and intimidating companies that tried to remain outside of the rotation was a common practice of the conspirators. FoF ¶ 27. Further, assaults on public adjusters who refused to give fires to Smith and his co-conspirators support an inference that assaults would also have been carried out on other companies that attempted to take away fires from the Enterprise. *See* FoF §§ I.E.a-d. Vargas also testified that he believed that he would be unable to chase fires if he left the rotation, which supports an inference that other companies felt the same. FoF ¶¶ 44-46.

While Pereira testified that there were still some non-rotation companies that chased fires that he was not told to assault but instead to "walk away" from, Tr. 633-34, 649, this is not inconsistent with the testimony of Jackson. Jackson also acknowledged there were non-rotation companies chasing fires, but testified they would not be threatened so long as the number of fires they were signing was fairly small. Tr. 253-54. Moreover, Pereira was not an enforcer within the Enterprise and never carried out assaults, so the fact he was directed to walk away does not prove intimidation did not occur.[19]

---

[19]    For example, prior to both the Muratore and McCormick incidents, after Pereira reported back to Smith on the situation, Smith sent other members of the Enterprise to carry out the actual assaults. FoF §§ I.E.b-c.

To be sure, the record contains some evidence -- beyond Smith's self-serving testimony -- that not every member of the rotation was extorted. In particular, Robert Sands, the owner of Flag, testified that he voluntarily participated in and benefited from the rotation system. Tr. 1305, 1420, 1452. But the fact that one company felt it was beneficial to participate in the rotation cannot overcome the substantial credible evidence that other companies that would and did lose business after joining the rotation joined only after they were threatened by Smith and his co-conspirators. Similarly, while there is evidence that at least three companies eventually pulled out of the rotation system (iFlood, Service Master and ASAP), *see* Tr. 701, 1277; GX 649, there is no clear evidence in the record as to when they pulled out, why they pulled out, or whether there were any negative repercussions, and so this fact alone does not prove that any and all companies were free to exit as they pleased.

Nonetheless, the Court declines to reach the question of whether each and every member of the rotation was extorted into participating. The simple fact is that there was ample evidence that at least two major competitors, ServPro and EFS, were coerced into participating in the rotation by physical and other threats, pursuant to the conspiratorial agreement amongst Smith and his co-conspirators.

Specifically, with respect to ServPro, Smith initially met with its owner, Benjamin Vargas, and laid down the rules that ServPro was not allowed to chase at night or in Staten Island. Given the reputation for violence that Smith and his co-conspirators had already

established, even this alone constituted an attempt at extortion. FoF ¶ 44. Then, Smith met with Vargas and demanded he begin paying Smith $1,000 per week, plus commissions, to participate in the rotation system. During this meeting, Smith made reference to threats of violence and the elimination of AES from the industry by First Response. FoF ¶¶ 45-46. Vargas testified that he was so scared after this meeting that he agreed to join the rotation out of fear of both physical violence and of the economic consequences of not joining. FoF ¶¶ 45-46.

Smith later increased the payments he required to $2,000. FoF ¶¶ 45-46. During the course of making these payments, Vargas also witnessed Smith threaten one of his chasers, who was then assaulted by an individual from another restoration company for violating the rotation system's rules, thus reinforcing Vargas's fear that leaving the rotation or not making the payments to Smith would result in violence. FoF ¶ 48. In total, Vargas paid Smith $141,000. FoF ¶ 46.

In addition, Vargas testified he was forced by Smith to hire two First Response fire chasers after Walsh shut down the company, and that he paid them a total of $25,400. FoF ¶ 49. Moreover, Vargas estimated that he lost between $500,000 to $600,000 in business income per year during the course of the rotation system. FoF ¶ 50.

Smith argues that Vargas's testimony is not credible. *See* Smith Summation, at 21-24. While there were certain aspects of Vargas's testimony that were inconsistent, the Court finds this does not undermine the core of his testimony, especially when viewed in light

of the evidence outlined above. Among the points of Vargas's testimony that were clear, consistent, and credible was that participating in the rotation and paying Smith the weekly payments was not financially advantageous to Vargas, but just the opposite. When pressed on this point on cross, Vargas explained he was receiving only between one to four fires a month through the rotation, even though he was paying the equivalent of a full chaser's salary. Tr. 936; *see also* Gx 362 (text message from Smith to Vargas noting that Smith "got [Vargas] 2 losses last month"). By contrast, Vargas testified that his other chasers had a quota of five fires a month and that, prior to being forced into the rotation, they would bring him five to six fires a month, substantially more than he was receiving from similarly sized payments to Smith. Tr. 937, 940. When pressed about hiring the two First Response chasers directly, Vargas agreed he was initially optimistic because Smith promised that those two chasers would only sign fires for ServPro, but once Vargas actually hired them, the chasers continued to sign fires for other companies. Tr. 940. The fact that Vargas continued to participate in the rotation system for years even though it was not profitable and Vargas was losing substantial money as a result strongly supports the inference that his participation in the rotation was not voluntary.[20]

---

[20]    Smith argues that, to the extent the Government contends Vargas was in fear of purely economic harm (as opposed to physical harm), this constitutes an impermissible constructive variance from the Indictment. Smith Summation, at 23 n.19. The Court agrees with the Government, however, that fear of economic harm is fairly encompassed within the terms of the Indictment, and in any event Smith has not

With respect to EFS, a recording from June 2020 reflects Smith making numerous vicious and violent threats to EFS's owner, Jordan Boryk, and his employees. Smith threatened to kill their children, threatened to slam one of the EFS employees on his head, reminded them that Smith was a gang member, and reminded them that First Response "really shot it out for the nighttime" with AES. FoF ¶¶ 52-53. During the conversation, Smith acknowledged, both implicitly and explicitly, that he had established rules for the industry that restricted EFS's ability to chase fires, tying those rules to threats of violence. FoF ¶¶ 54-55. Further, Jackson recalled other instances where Smith threatened EFS, and Peralta testified to one instance where Smith screamed, "go shoot Jordan." FoF ¶ 56. At the very least, the June 2020 recording establishes unequivocally that Smith extorted EFS by imposing through threats of violence limitations on their ability to chase fires. The Court also finds that the Government has proven beyond a reasonable doubt that the payments EFS began making to Smith just a few months after this meeting were similarly the result of coercion pursuant to the conspiracy between Smith and his co-conspirators.

Smith claimed the June 2020 statements were made because First Response and EFS employees were fighting, which Smith wanted to stop,

---

shown he was prejudiced by this proof, given how closely intertwined the evidence of physical and economic harm are in this case. *See* Gov. Summation, at 5, n.7; Indictment (Dkt. 2) ¶ 13 (charging defendants with extortion by "obtaining money and property from and with the consent of another person, which consent would have been and was induced by the wrongful use of actual and threatened force, violence, and fear," without limiting "fear" to physical fear).

and because certain EFS employees had falsely told Boryk that First
Response was prohibiting EFS from chasing any fires. Tr. 1230-34;
Smith Summation, at 25-27. But even if this doubtful testimony is
credited, the very fact that First Response chasers made these
statements to EFS confirms the existence of *some* restrictions on EFS
chasing fires (as well as the existence of a conspiracy to implement
the same). And elsewhere during the call, Smith effectively confirmed
that he was the one who made the rules for the industry, and
specifically referenced the rule that night fires belonged to First
Response. Thus, the fact that Smith stated that EFS did not have "to
give up everything," GX 311A, in no way undermines the Court's finding
that First Response placed extortionate restrictions on the fires EFS
could chase.

The fact that Smith apparently funneled Walsh's construction
contracts to Boryk in exchange for payments, Smith Summation at 25-
26, does not undermine this conclusion. Jackson credibly testified,
and Smith does not deny, that *some* payments were made by EFS to remain
in the rotation system. Tr. 284-85; FoF ¶ 26. Even if some of the
payments made by EFS were for other reasons, that does not change the
fact that EFS made payments to participate in the rotation system
under threat of violence.

### c. Willon Charles

The Government argues that Willon Charles was extorted, whereas
Smith argues the evidence is insufficient to prove this is the case.
Jackson testified that Smith confronted Charles about money Charles

supposedly owed Smith, and because Charles was charging the home owner

excessive rates, that the confrontation became heated and in the midst

of it, an employee of Charles, Rafferty, entered the circle, and that

at this point Smith put Rafferty in a headlock and said "I'll punch

your fucking head off right now." FoF ¶¶ 58-60. Rafferty testified at

trial, and largely corroborated this series of events, although he did

not hear the statements made and described the assault slightly

differently than Jackson.[21] As a result of this intimidation, according

to Jackson, Charles agreed Smith could have the proceeds of the fire

he just signed to pay off the debt. FoF ¶ 61.[22] The Court finds that

the Government has proven that this constituted an instance of

extortion committed pursuant to the conspiracy.

      d. <u>Queens Village Fire</u>

The Government argues that Smith extorted iFlood in April 2021

when it forced iFlood to hand a fire over to First Response. *See* Gov.

Summation, at 18-19. However, the Court finds the Government has failed

---

[21] Smith argues that Rafferty's account of the assault differed materially from Jackson's because Rafferty said he was grabbed by the collar and had his head forced down for several seconds (rather than being put in a headlock). Smith Summation at 14-15. But this distinction (if it really is one) is without significance, because the key fact is that Smith engaged in unprompted violence against Rafferty in front of Charles (grabbing someone's neck and shoving their face to the ground is just as unacceptable and intimidating as putting them in a headlock).

[22] Smith argues that the fact the payment occurred approximately one year after the assault undermines an inference that it was made as a result of this threat. Smith Summation at 15. But the Government has put forward evidence that it is typical for it to take this amount of time for payments for fires to be made by insurance companies, and so this gap alone does not undermine the connection.

to prove beyond a reasonable doubt that iFlood was extorted on this occasion. The Government has put forward no evidence that iFlood, as opposed to McCormick, was intimidated or threatened during the day of this fire. By contrast, there is evidence that iFlood was a member of the rotation system, and the transfer of this fire from iFlood to First Response was consistent with that fact. FoF ¶ 62. In the absence of any evidence that iFlood specifically was coerced into joining the rotation system, the Court cannot conclude that I flood transferred this fire as a result of coercion.

The Government apparently does not also argue that McCormick, as opposed to iFlood, was extorted that day, but to the extent that is the Government's position, it would be unavailing. To be sure, the Government has adduced evidence that Smith was verbally aggressive towards McCormick that day, as well as evidence that just six months earlier Smith had had McCormick assaulted. *See* FoF ¶¶ 32-34, 62. These facts are relevant to the Court's overall conclusion there existed an extortion conspiracy. But unlike with respect to iFlood, there is no evidence that First Response actually obtained any money or property by denying McCormick this fire. McCormick was at the fire in his capacity as a public adjuster, and so First Response -- a restoration company -- did not obtain any business by forcing him to leave. It is conceivable that, after McCormick left, Smith was able to reassign the fire to another public adjuster, and thereby obtain some benefit. But absent any evidence to that effect in the record, the Court cannot conclude beyond a reasonable doubt that this constituted extortion.

*See Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393, 403-09 (2003) (holding defendant must have obtained some property from victim in order to be liable for Hobbs Act extortion). It is important to keep in mind, however, that Smith is not charged with substantive conspiracy but only with conspiracy to commit extortion.

        e. <u>Mala Sangre Incident</u>

Finally, the Government argues that the conspirators extorted an unnamed contractor using Smith's reputation for violence. Pereira was the sole witness to this incident. According to Pereira, Smith approached a contractor who apparently had just signed a fire and threatened the contractor by referencing Smith's gang name, mala sangre, which is Spanish for bad blood. By invoking this name, the contractor was apparently so frightened that he was willing to turn over the contract to Smith. *See* FoF ¶ 63.

The Court is unable to conclude beyond a reasonable doubt that this constituted an act of extortion, let alone that it was performed pursuant to the extortionate conspiracy. Pereira's testimony about this incident was extremely brief and lacked much in the way of detail. It is not clear when or where this occurred, how the contractor knew Smith's gang name, or why that name alone was sufficiently frightening to cause the contractor to hand over the contract. And even had this incident been proven, it would have had fairly minimal probative value in proving the overall existence of the charged conspiracy absent substantially more detail.

In sum, while the Government has not proven all the actual instances of extortion it claims occurred, it has proven many such, and, more importantly, has proven thereby that Smith and his co-conspirators in the Enterprise were engaged in the charged conspiracy to extort.

## C. **RICO Conspiracy**

"The essence of a RICO conspiracy is the existence of an *agreement* to violate RICO's substantive provisions." *United States v. White*, 7 F.4th 90, 98 (2d Cir. 2021) (internal quotation marks omitted). "RICO conspiracy requires proof: (a) of an agreement to join a racketeering scheme, (b) of the defendant's knowing engagement in the scheme with the intent that its overall goals be effectuated, and (c) that the scheme involved, or by agreement between any members of the conspiracy was intended to involve, two or more predicate acts of racketeering." *United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018). Specifically, Smith is here charged with entering into an agreement, at some time between 2019 and June 2022, with one or more co-conspirators to conduct the affairs of an association-in-fact enterprise through a pattern of racketeering activity. *See* Indictment (Dkt. 2) ¶¶ 1-12.

To establish such an agreement, the Government need not prove that the defendant and his co-conspirators actually conducted the affairs of an enterprise through two or more continuous and related predicate acts of racketeering. *See United States v. Arrington*, 941 F.3d 24, 36-37 (2d Cir. 2019). But proof of the actual existence of

such an enterprise, of the defendant's participation therein, and of the commission by the defendant and his co-conspirators of two or more continuous and related specified predicate crimes during the specified period is highly probative of the alleged conspiracy. *See White*, 7 F.4th at 99 ("[P]roof of the actual existence of a RICO enterprise –– though not necessary to convict on a conspiracy charge –– can be highly relevant to establishing an alleged RICO conspiracy."); *United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009) ("Just as the evidence used to establish the enterprise and pattern elements may in particular cases coalesce, so too may the evidence used to prove those elements and a conspiratorial agreement to engage in racketeering." (internal citation and quotation marks omitted)). And that is exactly what we have here.

As noted earlier, the enterprise here charged is an association-in-fact enterprise under 18 U.S.C. § 1961(4). Such an "enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct,' proved by 'evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" *United States v. Burden*, 600 F.3d 204, 214 (2d Cir. 2010) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). "The enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *White*, 7 F.4th at 99 (internal quotation marks omitted).

Here, the Enterprise established by the Government's evidence at trial clearly meets this definition. The Enterprise had a clear purpose of making money by dominating the fire restoration industry. *See* FoF §§ I.C-D. The Enterprise had a cohesive structure, with Smith as the leader and Jackson as the second-in-command. FoF ¶¶ 6-8. The members would conduct regular meetings at specific locations and communicated through regular channels. FoF ¶ 9. And the Enterprise itself had continuity of existence, lasting for approximately two years during the period specified in the Indictment. *ee* FoF ¶¶ 5-9.

Focusing on First Response, Smith notes that he took actions contrary to its interests. But this shows a complete misunderstanding of the charge and the Government's proof. To begin with, as already noted above, the Enterprise extended beyond the four corners of First Response as a legal entity. To be sure, Smith exercised substantial control over First Response, and First Response was certainly a portion of the Enterprise's overall organization structure. But the evidence Smith points to, that he acted against the interests of First Response (and for his self-interest) actually shows that the RICO enterprise here charged transcended that legal entity. For example, after the owner of First Response, Walsh, seemingly in reaction to his replacement by Smith as operational head of First Response, fired all of his employees, Smith simply arranged for all the First Response chasers to work for other restoration companies while still reporting to him and while still maintaining the rotation system. *See* FoF ¶ 8.

Given the above, the only real question is whether the Government has proven an agreement to conduct the affairs of the Enterprise through at least two continuous and related predicate acts of racketeering during the specified period. The Indictment specifies three kinds of predicate crimes: (1) extortion, under federal and state law; (2) mail and/or wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343; and (3) destruction or alteration of evidence in an official proceeding and witness tampering, in violation of Title 18, United States Code, Sections 1512(c)(2). *See* Indictment (Dkt. 2) ¶ 11.[23] As explained in more detail below, the Court concludes that the Government has proven that a pattern of extortionate acts and of mail and wire fraud activities were committed by the defendants in the course of their conduct of the Enterprise's affairs during the specified period, and that this was pursuant to the conspirator's agreement and plan, but the Court also concludes that

---

[23] The Indictment also charged predicates acts of destruction or alteration of documents to obstruct an official proceeding in violation of 18 U.S.C. § 1512(c)(1) and obstruction of justice in violation of 18 U.S.C. § 1503. At the close of trial, the Court granted in part the defendant's motion pursuant to Federal Rule of Criminal Procedure 29 with respect to predicate acts of violating 18 U.S.C. § 1512(c)(1), concluding the Government had put forward insufficient evidence to support any such predicate acts. *See* Dec. 12, 2023 Order (Dkt. 322). And in their written summation, the Government declined to proceed under 18 U.S.C. § 1503, "given the substantial overlap of the conduct underlying the predicates alleged under Sections 1512(c)(2) and 1503." Gov. Summation, at 4 n.3. Accordingly, the Court only analyzes the evidence of obstruction pursuant to 18 U.S.C. § 1512(c)(2).

there is insufficient evidence that the charged conspiracy encompassed an intent to obstruct justice during the specified period.

### a. Predicate Acts of Extortion.

The elements of Hobbs Act extortion have already been described above. The elements of extortion under New York Penal Law Section 155.40(2) are substantially similar to the elements of Hobbs Act extortion: to wit, that the defendant took, obtained, or withheld property by compelling or inducing the owner to deliver such property to the defendant or to a third person by intentionally instilling a fear in the owner that, if such property was not so delivered, the defendant or his accomplices would cause physical injury to that person, or damage to the property, in the future. *See* Criminal Jury Instructions 2d [NY] § 155.40(2).

For the reasons already set forth, *supra*, in Section II.B with respect to the extortion conspiracy count, the Court concludes that the Government has proven beyond a reasonable doubt that Smith and other members of the Enterprise agreed to, and in fact did, commit predicate acts of Hobbs Act extortion on numerous occasions during the specified period as part of a larger pattern of racketeering activity. The Court further concludes that the same conduct also constituted an agreement to violate New York Penal Law Section 155.40(2). Since there were more than two such predicate acts by Smith and his co-conspirators during the specified period this is sufficient to find Smith guilty of the RICO conspiracy. But, independently, he is also guilty because

of his agreement to commit acts of mail and wire fraud as part of the conduct of the Enterprise.

   b. <u>Predicate Act - Mail & Wire Fraud.</u>

The crimes of mail and wire fraud have three elements: first, that there existed a scheme to defraud or to obtain money or property by materially false and fraudulent pretenses, representations or promises; second, that the defendant knowingly and willfully participated in the scheme to defraud, with knowledge of its fraudulent nature and with a specific intent to defraud; and third, that in execution of that scheme, there was a use of the mails or a commercial interstate carrier (mail fraud) or of interstate wire communication (wire fraud). *See United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) ("The essential elements of [mail and wire fraud] are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme."). "Because the mail fraud and the wire fraud statutes use the same relevant language, [courts] analyze them the same way." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quoting *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023)). "[I]t is sufficient that a defendant's scheme was intended to deprive another of property rights, even if the defendant did not physically 'obtain' any money or property by taking it from the victim." *United States v. Males*, 459 F.3d 154, 158 (2d Cir. 2006).

The Government has proven beyond a reasonable doubt that members of the Enterprise conspired to, and in fact committed, mail and wire fraud by submitting, or assisting others to submit, false and fraudulent insurance claims on a continuing basis during the specified period. Those fraudulent claims, which were submitted through the interstate mails and wires, resulted in payments to insureds (and then to the Enterprise) of amounts that they were not owed pursuant to their insurance policies. Members of the Enterprise fraudulently participated in intentionally covering up or modifying conditions at properties to effectuate these fraudulent schemes, e.g., by removing illegal stoves. Finally, Smith was aware of, and agreed to, these fraudulent schemes. *See* FoF § I.G.

Smith argues that these acts of mail/wire fraud had no nexus to the charged conspiracy, because that conspiracy, in Smith's view, had at most the sole purpose of "dominat[ing] the fire restoration industry." Smith Summation, at 28 (quoting Gov. Summation, at 8). But the purpose of the RICO enterprise, as charged in the Indictment and as proven at trial, was not so limited. The first purpose of the enterprise listed in the Indictment was "[e]nriching the members and associates of the Enterprise through, among other things, extortion." Indictment (Dkt. 2) ¶ 9.a. So long as the insurance frauds fit within this broadly stated purpose, the fact the Indictment also charged that "[e]xerting control over the participants in the fire mitigation industry" was another purpose of the Enterprise, *Id.* ¶ 9.d, does not demonstrate the fraud was outside of the enterprise's scope. *See United*

*States v. Gershman*, 31 F.4th 80, 97-98 (2d Cir. 2022) (upholding RICO conviction where indictment alleged that the principal purpose of the enterprise was "to generate money for its members"); *United States v. Eppolito*, 543 F.3d 25, 41, 52-55 (2d Cir. 2008) (explaining that the fact the indictment alleged "purposes of the enterprise included the purchase and sale of confidential law enforcement information" "in no way suggested that the enterprise's purpose was limited to that activity" where indictment also alleged "[t]he principal purpose of the Enterprise was to generate money for its members").

Smith is also wrong that the insurance fraud was wholly unrelated to the purpose of dominating the fire restoration industry. The members of the Enterprise plainly did not want to dominate the fire restoration industry simply for its own sake, but rather to further their efforts to obtain money (especially for Smith). Dominating the fire restoration industry, including by increasing the number of fires signed by the Enterprise, was only profitable if insurance companies paid out insurance claims. FoF ¶¶ 64-65. Because the insurance frauds were a means to ensure those insurance claims were paid, these frauds directly facilitated the profits generated by the Enterprise through its dominance of the restoration industry and its extortion.[24]

---

[24]    Further still, Peralta testified that at times he and First Response used the promise that the illegal conditions would be covered up as a means of convincing home owners to hire First Response/Peralta. FoF ¶ 66.

Smith testified that his text messages demonstrating his awareness of these fraudulent practices were from early in his tenure at First Response, that he became uncomfortable with these practices over time, and that he directed his chasers to distance themselves from them. Tr. 1227-28. Absent independent support for the latter assertion, the Court does not credit it. And, in any case, there is no requirement that Smith actually led this portion of the conspiracy in order to be held liable for it. Rather, absent clear proof of withdrawal from the conspiracy (which is totally absent here), Smith may be held liable for any criminal acts reasonably encompassed within the agreed-to scope of the conspiracy. *See Salinas v. United States*, 522 U.S. 52, 62-63 (1997) ("A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other."); *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000) ("To be convicted as a conspirator [under RICO], one must be shown to have possessed knowledge of only the general contours of the conspiracy."). In short, Smith is independently guilty of the RICO conspiracy because of the conspirators' agreement to commit a pattern of mail and wire fraud, as clearly evidenced by their continuing engagement in that fraud.

c. Predicate Acts of Obstruction of Official Proceeding.

It is a crime to "corruptly . . . otherwise obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do

so." 18 U.S.C. § 1512(c)(2). This crime has two elements. First, the defendant obstructed, influenced, or impeded an official proceeding. Second, the defendant acted corruptly. To demonstrate a defendant acted corruptly, the Government must show "that a defendant acted with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means." *United States v. Ng Lap Seng*, 934 F.3d 110, 142 (2d Cir. 2019)

"'[A]n official proceeding need not be pending or about to be instituted at the time of the offense....' However, the Government must prove that such a proceeding was reasonably foreseeable to the defendant." *United States v. Martinez*, 862 F.3d 223, 237 (2d Cir. 2017), *cert. granted, judgment vacated on other grounds sub. nom.*, *Rodriguez v. United States*, 139 S. Ct. 2772 (2019). "[A] grand jury proceeding is foreseeable if the defendant was aware that he was the target of an investigation." *United States v. Brooks*, 828 F. App'x 9, 11 (2d Cir. 2020) (internal quotation marks omitted).

Further, "the government must show that there was a 'nexus' between the defendant's conduct and the pending, or foreseeable, official proceeding." *Martinez*, 862 F.3d at 237. The nexus requirement is satisfied where "discretionary actions of a third person [would be] required to obstruct the judicial proceeding if it was foreseeable to [the defendant] that the third party . . . would act on the [communication] in such a way as to obstruct the judicial proceeding." *United States v. Desposito*, 704 F.3d 221, 231–32 (2d Cir. 2013) (internal quotation marks omitted).

Here, the Court finds the Government has failed to prove an obstructive intent or conspiratorial agreement to obstruct justice prior to the defendant's arrest in connection with the instant case. Specifically, while there is evidence that Smith and Jackson conspired to obstruct justice after their arrest, the Court finds there is insufficient evidence that this post-arrest conduct related back to the pre-arrest conspiracy charged in the Indictment. Accordingly, the Court concludes the Government has failed to prove beyond a reasonable doubt that the RICO conspiracy charged in the Indictment encompassed an intent and agreement to obstruct justice, since the only relevant evidence of an obstructionist intent is associated with post-Indictment activities that more likely arose in response to the conspirators' arrest than as something already contemplated by the charged conspiracy.

Members of the Enterprise learned of the federal investigation on or around November 11, 2021, and a grand jury proceeding was reasonably foreseeable from that point on. FoF ¶ 70. Upon learning this information, during a dinner at a restaurant called Baci, Smith praised Curcio -- the owner of a board up company called Cipco -- for (supposedly) not lying to the FBI. FoF ¶¶ 71, 73. Nothing about this clearly evinces an obstructive intent. Nor is there sufficient evidence to conclude Smith made threatening statements during the meeting at Toys "R" Us, or that any other aspect of the discussion evinced an obstructive intent. *See* FoF ¶¶ 74-75.

While Smith repeatedly tried to determine whether Walsh and others had spoken to the FBI or were cooperating, simply trying to learn this information, without more, is insufficient to prove beyond a reasonable doubt an agreement to obstruct justice. *See* FoF ¶¶ 76-78. This is particularly true in light of Walsh's admission that, after Smith learned Walsh had spoken to the FBI, Smith did not threaten Walsh or instruct him to lie. The Government also points to evidence that, at various times, Smith and others sought to avoid speaking on the phone, as they were afraid their conversations would be intercepted. But again, not wanting the Government listening in on your conversations cannot by itself be equated with an intent to obstruct a grand jury proceeding or federal investigation.

The closest the Government comes to demonstrating an intent to obstruct prior to Smith's arrest is Smith's voluntary meeting with detective Geroulakis. *See* FoF ¶ 73. The Government argues that during this meeting Smith made materially false or misleading statements to law enforcement when Smith stated that he had stopped the violence in the restoration industry, when in fact violence was ongoing and Smith was contributing to it. Gov. Summation, at 20. The statements Smith made during this meeting were quite vague, and the Court is unable to conclude Smith made these vague statements with the specific intent to corruptly influence the federal investigation (let alone as part of a previously-formed conspiratorial agreement to do so). *See Ng Lap Seng*, 934 F.3d at 142 (noting that "corruptly" connotes a specific-

intent crime requiring the Government "prove more than the general intent necessary for most crimes").

The Government argues that, even if no one instance constitutes obstruction, when viewed as a whole this series of events evinces an obstructive intent on the part of Smith and his co-conspirators. But even if true, this begs the question of whether there was a pre-existing conspiratorial agreement entered into before the Indictment issued to conduct such obstruction as part of the affairs of the Enterprise. And in fact, these events really show only that the conspirators were becoming increasingly concerned about the prospect that they were the target of a federal investigation and sought to learn more. The Court will not infer from this understandable unease that the defendants had agreed to corruptly obstruct the grand jury's investigation.

To be sure, there is clear evidence that Smith and Jackson agreed to obstruct justice after they were arrested, that is, post-Indictment. Jackson testified that, while placed in a cell with Smith, the two discussed how they would coordinate their testimony at trial and lie in court in order to obtain an acquittal. *See* FoF ¶¶ 80-81. Smith also suggested to Jackson at this time that he had accomplices on the outside who would threaten or assault Walsh if Walsh were cooperating. FoF ¶ 79. But there is no evidence tying this agreement between Smith and Jackson to any ongoing conspiracy to obstruct justice that predated their arrest. Accordingly, the Court finds that the Government has failed to prove that obstruction of justice was an object of the RICO

conspiracy charged in the Indictment. Put another way, the Court concludes that Smith is guilty of participating in a RICO conspiracy to commit extortion and fraud, but not obstruction.

### III.   Verdict

For the reasons set forth above, the Court finds the defendant guilty of Count One and Count Two charged in the Indictment in the above-captioned case. A sentencing hearing will be held on April 12, 2024 at 3 PM. Each side may submit written materials bearing on any aspect of sentencing provided their materials are submitted by no later than April 5, 2024.

SO ORDERED.

New York, NY
February 14, 2024

JED S. RAKOFF, U.S.D.J.